Jeremy C. Lieb
Erik Grafe
Ian S. Dooley
Carole A. Holley
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: jlieb@earthjustice.org
E: egrafe@earthjustice.org
E: idooley@earthjustice.org
E: cholley@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Center for Biological Diversity, Defenders of Wildlife, Friends of the Earth, and Greenpeace, Inc.*

Kristen Monsell (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, St. #800
Oakland, CA 94612
T: 510.844.7100
E: kmonsell@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological Diversity*

Cecilia Segal (*pro hac vice application pending*)
Ann Alexander (*pro hac vice application forthcoming*)
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter St., 21st floor
San Francisco, CA 94104
T: 415.875.6100 / 415.875.6190
E: csegal@nrdc.org
E: aalexander@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

CENTER FOR BIOLOGICAL DIVERSITY, )
DEFENDERS OF WILDLIFE, FRIENDS OF THE )
EARTH, GREENPEACE, INC., and NATURAL )
RESOURCES DEFENSE COUNCIL, INC., )
                                                       )
       *Plaintiffs*, )
                                                      )   Case No. 3:23-cv-00061-SLG
        v. )
                                                        )
BUREAU OF LAND MANAGEMENT; UNITED )
STATES FISH AND WILDLIFE SERVICE; )
NATIONAL MARINE FISHERIES SERVICE )
UNITED STATES DEPARTMENT OF THE )
INTERIOR; UNITED STATES DEPARTMENT OF )
COMMERCE; DEB HAALAND, in her official )
capacity as Secretary of the Interior; TOMMY P. )
BEAUDREAU, in his official capacity as Deputy )
Secretary of the Interior; GINA M. RAIMONDO, in )
her official capacity as Secretary of Commerce; )
STEVEN COHN, in his official capacity as Alaska )
State Director of Bureau of Land Management; )
SARA BOARIO, in her official capacity as Regional )
Director of United States Fish and Wildlife Service; )
and JONATHAN KURLAND, in his official )
capacity as Regional Administrator of National )
Marine Fisheries Service, )
                                                   )
       *Defendants*. )

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT ...................................................................................................... 5

I.    Plaintiffs are likely to succeed on the merits........................................... 5

      A.    Plaintiffs have standing. ............................................................... 5

      B.    BLM violated NEPA by failing to consider reasonable alternatives. .......... 6

            1.    BLM's overly narrow alternatives analysis is inconsistent
                  with this Court's decision and BLM's statutory obligations. ............ 7

            2.    BLM's additional justification for limiting alternatives,
                  centering on the Project's purpose and need, is also flawed........... 12

      C.    BLM violated NEPA by failing to analyze downstream greenhouse
            gas emissions from future oil development caused by Willow.................. 13

II.   Plaintiffs are likely to suffer irreparable harm without an injunction. ................... 17

      A.    Gravel mining and road construction this winter will cause
            immediate and long-term irreparable harm to the environment and
            Plaintiffs' members. ................................................................... 18

            1.    The immediate effects of construction this winter will cause
                  irreparable harm. ............................................................... 18

            2.    Longer-term effects of construction this winter will also cause
                  irreparable harm. ............................................................... 19

      B.    The permanent road will skew a decision on remand toward
            development. ............................................................................ 21

III.  The balance of harms tips sharply in Plaintiffs' favor. ......................................... 22

IV.   A preliminary injunction advances the public interest......................................... 22

CONCLUSION ................................................................................................ 23

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS ........................................ 24

# INTRODUCTION

Plaintiffs move to enjoin implementation of Defendants' approval of ConocoPhillips Alaska Incorporated's (ConocoPhillips) Willow Master Development Plan ("Willow" or "Project") in the National Petroleum Reserve-Alaska (Reserve), including authorization of construction activities planned for this winter and spring, pending adjudication of the merits of Plaintiffs' challenge to that approval. Plaintiffs request a decision on this motion by August 3, 2023. Doc. 23.

In 2021, this Court vacated Defendants' first approval of the Project for violating the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA). Defendants have now approved the Project a second time, and have again acted unlawfully. Among other deficiencies, two stand out for their failure to rectify the problems this Court previously identified. First, the Bureau of Land Management's (BLM) final Supplemental Environmental Impact Statement (SEIS) continues to exclude reasonable alternatives based on the flawed conclusion that BLM must allow ConocoPhillips to develop all economically viable oil on its leases. Second, while BLM improved its assessment of the greenhouse gas emissions from Willow itself, it failed to assess the downstream emissions of future development the Project will facilitate.

Like the earlier iteration, the newly approved Project would have far-reaching impacts across the Reserve and beyond. The Project would have major impacts on wildlife, habitat, and ways of life for people in the region. It would cause millions of

metric tons of greenhouse gas emissions over its 30-year lifespan, exacerbating the climate crisis. Further, it would provide a hub for future exploration and development, leading to even greater surface impacts and climate degradation.

## BACKGROUND

The Reserve is an extraordinary and ecologically important landscape of lakes, rivers, wetlands, and sensitive coastal habitats. It is home to numerous species, including polar bears, caribou, moose, and millions of migratory birds. This landscape and wildlife are central to the traditional practices of local Alaska Native people. Ex. 3 at 13-23;[1] Ex. 21, ¶¶7-12; Ex. 1 at 246-47. Like other Arctic regions, the Reserve is also suffering the effects of the climate crisis more rapidly than the rest of the Earth. Ex. 10 at 43-44.

Because of the Reserve's unique wildlife and subsistence values, the National Petroleum Reserves Production Act (Reserves Act) requires the Secretary of the Interior (Secretary) to protect its surface resources any time the Secretary authorizes oil and gas activity there. 42 U.S.C. §§ 6504(a), 6506a(b). Specifically, it requires the Secretary to impose "conditions, restrictions, and prohibitions" on such activities that "the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects" to those resources. *Id.* § 6506a(b). Congress also designated certain areas, and authorized the Secretary to designate others, for "maximum protection" of "subsistence, recreational, fish and wildlife, or historical or scenic value[s]." *Id.* §

---

[1] This and other exhibits cited in support of likelihood of success on the merits are documents that should appear in the administrative record. *See* Declaration of Grafe.

6504(a). Under this authority, the Secretary has designated areas around Teshekpuk Lake and the Colville River, among others, as Special Areas meriting such protection. 42 Fed. Reg. 28,723 (June 3, 1977).

Industrial activity in the Reserve has largely been limited to the northeastern area closest to existing infrastructure on state lands. Ex. 1 at 6-7; Ex. 10 at 93. Willow would change that, expanding development activities into areas currently free of industrial infrastructure, including the Teshekpuk Lake and Colville River Special Areas. Ex. 10 at 93. The Project would include three drill sites, 25 miles of gravel road, a central processing facility, an operations center, an airstrip, and hundreds of miles of ice roads and pipelines. Ex. 12 at 12-13, 87; Ex. 10 at 36-39. The Project would also lock in decades of fossil fuel extraction in the Arctic. It would produce 576 million of barrels of oil, resulting in about 239 million metric tons of indirect greenhouse gas emissions over 30 years. Ex. 12 at 22. And it would serve as an infrastructure hub, facilitating additional exploration and development further into the Reserve and the extraction of potentially billions more barrels of oil. Ex. 1 at 28, 51, 121, 123, 130-31, 251; Ex. 18 at 2-3.

BLM approved the first iteration of the Project in October 2020. Ex. 6 at 3. Conservation and Alaska Native groups filed suit in this Court, promptly moving for a preliminary injunction to halt winter construction activities. *Sovereign Iñupiat for a Living Arctic v. BLM*, No. 3:20-cv-00290-SLG (Dec. 23, 2020) (*SILA*), Doc. 17; *Ctr. for Biological Diversity v. BLM*, No. 3:20-cv-00308-SLG (Dec. 24, 2020), Doc. 9. In

February 2021, the Court issued a temporary injunction pending the groups' motion for emergency relief in the Ninth Circuit, finding BLM's approval likely unlawful and winter construction likely to cause irreparable harm to vital subsistence practices. *SILA*, No. 3:20-cv-00290-SLG, 2021 WL 454280, at *2-3 (D. Alaska Feb. 6, 2021).

The Ninth Circuit affirmed, concluding "appellants will suffer irreparable harm in the absence of an injunction, and that at least one of its NEPA claims is likely to succeed if timely." *SILA*, Nos. 21-35085, 21-35095, 2021 WL 4228689, at *2 (9th Cir. Feb. 13, 2021). The parties subsequently agreed that construction would not commence while merits litigation proceeded. *SILA*, No. 3:20-cv-00290-SLG (Feb. 26, 2021), Doc. 63, ¶1. In August 2021, this Court vacated and remanded BLM's approval of the Project and a related biological opinion, finding, among other deficiencies, that (i) BLM violated NEPA by restricting the project alternatives it considered based on the mistaken view that ConocoPhillips had a right to extract all the oil and gas on its leases, and (ii) BLM failed to assess the Project's full climate consequences. *SILA*, 555 F. Supp. 3d 739, 767-78, 805 (D. Alaska 2021).

In February and March 2022, BLM began its revised environmental review. In July, BLM issued a draft SEIS. Public comments detailed serious deficiencies, including BLM's failure again to consider a reasonable range of alternatives and failure to fully examine impacts from reasonably foreseeable future actions facilitated by the Project. *See, e.g.*, Ex. 1 at 37-39, 41-42, 72-74, 82-84, 97-99, 130-31; Ex. 19 at 4-6; Ex. 17; Ex. 2 at 2-6; Ex. 10 at 99-105. In February 2023, BLM released a final SEIS that failed to

correct these problems.  On March 13, BLM signed a record of decision (ROD) approving the Project.  Ex. 12 at 37.

ConocoPhillips has already begun ice road construction but has agreed to stay any mining activity until April 3rd to allow the Court to adjudicate this motion.  Doc. 23, ¶¶2, 7.

## ARGUMENT

Plaintiffs request that this Court enjoin Defendants' authorization of the Project, including construction activities already occurring, pending adjudication of the merits. Plaintiffs meet all four factors for obtaining such relief: (1) they are likely to succeed on the merits; (2) they will suffer irreparable harm absent preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest.  *See Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## I.  Plaintiffs are likely to succeed on the merits.

### A.  Plaintiffs have standing.

Protecting the Reserve is central to Plaintiffs' missions.  Ex. 26, ¶¶3-4, 7-15, 17; Ex. 27, ¶¶4-11, 16; Ex. 28, ¶¶2-3, 8-11; Ex. 29, ¶¶7, 10-11;  Ex. 30, ¶¶2, 4, 21-25, 45. Plaintiffs have members who rely on the Reserve for recreation, aesthetic values, traditional cultural practices, and their professional livelihoods, and whose interests will be harmed by the Project.  Ex. 21, ¶¶3, 7, 12, 28, 45, 48, 53-56, 96; Ex. 22, ¶¶4, 10-34; Ex. 23, ¶¶2, 5, 8-28; Ex. 24, ¶¶3, 7-29; Ex. 25, ¶¶1, 7-18, 20.  An order setting aside the ROD and final SEIS, thereby halting implementation of the Project until Defendants

comply with the law, would redress those harms.  Plaintiffs thus have associational

standing.  *See Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th

Cir. 2000).

**B.    BLM violated NEPA by failing to consider reasonable alternatives.**

Instructed by this Court to reconsider alternatives it previously dismissed on the

mistaken "view that ConocoPhillips has the right to extract all possible oil and gas on its

leases," *SILA*, 555 F. Supp. 3d at 770, BLM took essentially the same approach on

remand and eliminated from consideration reasonable alternatives that would have

minimized the Project's adverse effects on climate and special areas within the Reserve.

This position is contrary to NEPA and BLM's obligation to protect surface resources

under the Reserves Act.  BLM's additional justification for excluding these alternatives—

that they would not meet the Project's purpose and need—is likewise flawed.

An agency must "[r]igorously explore and objectively evaluate all reasonable

alternatives [to a proposed action], and for alternatives which were eliminated from

detailed study, briefly discuss the reasons for their having been eliminated."  *Friends of

Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1032 (9th Cir. 2008) (quoting 40 C.F.R.

§ 1502.14(a)).  The alternatives must be meaningfully different from one another "to

allow for a real, informed choice."  *Id.* at 1039.  "The existence of a viable but

unexamined alternative renders an environmental impact statement inadequate."  *Id.* at

1038 (citation omitted).

1.    **BLM's overly narrow alternatives analysis is inconsistent with this Court's decision and BLM's statutory obligations.**

BLM's first review of the Project violated NEPA by arbitrarily limiting the range of alternatives considered based on a misguided interpretation of the agency's statutory authority.  BLM's second attempt fares no better.

This Court previously held that BLM acted unlawfully to the extent that it "developed its alternatives analysis based on the view that ConocoPhillips has the right to extract all possible oil and gas on its leases." *SILA*, 555 F. Supp. 3d at 770.  It concluded that such a view was inconsistent with BLM's responsibility under the Reserves Act "to mitigate adverse effects on surface resources." *Id.* at 769 (citing 42 U.S.C. § 6506a(b)). The Court also concluded that "[t]he leases do not grant the lessee the unfettered right to drill wherever it chooses or categorically preclude BLM from considering alternative development scenarios." *Id.* at 768 (citing lease documents).  The Court similarly held that BLM wrongly eliminated from consideration an alternative that would prohibit or limit infrastructure in special areas, finding that BLM failed to give such areas "maximum protection." *Id.* at 770.

On remand, BLM has *again* restricted the range of alternatives considered. Commenters requested that BLM consider an alternative that would prohibit infrastructure in the Teshekpuk Lake and Colville River Special Areas and eliminate construction of permanent roads.  Ex. 1 at 42; Ex. 2 at 4; Ex. 20 at 3-4.  Commenters, including the Environmental Protection Agency, likewise urged BLM to consider

alternatives that would substantially reduce production and resultant greenhouse gas emissions. Ex. 1 at 29, 42-47; Ex. 15 at 2, 4, 9-10. Yet, once more, BLM refused to do so.

The alternatives presented in the final SEIS are variants of the same project ConocoPhillips proposed, as in the prior EIS, Ex. 5 at 7-8, 22, 30-32, plus a new Alternative E that consolidates two well pads in the Teshekpuk Lake Special Area into one larger pad and defers approval of one pad to the south. Ex. 10 at 26-27, 31-33. Despite BLM acknowledging the important ecological and cultural values of the Teshekpuk Lake Special Area and the impacts the Project could cause, Ex. 10 at 5, 35, 70, 72; Ex. 12 at 18-20, and the statutory requirement for maximum protection of surface resources within special areas, Ex. 10 at 31, each alternative includes drill pads and other infrastructure within the Teshekpuk Lake Special Area and roads and pipelines crossing the Colville River Special Area. *Id.* at 25-27. And despite BLM acknowledging that the Project's greenhouse gas emissions will be significant—and citing evidence demonstrating those emissions are likely inconsistent with national emissions reduction targets, *id.* at 46-63—each action alternative would result in similar and substantial oil production and greenhouse gas emissions. *Id.* at 46-63, 116-18. The ROD adopts what BLM calls a "minor variation" of Alternative E: one that denies rather than defers the southern pad but would still place infrastructure in the Teshekpuk Lake and Colville River Special Areas and allow ConocoPhillips to access 92 percent as much oil as its own proposal. Ex. 12 at 12-14; *compare id.* at 22 (576 million barrels of oil for the approved

Project) *with* Ex. 10 at 117 (628.9 million barrels of oil for Proponent's Project).

The record reveals that BLM, as before, cabined its alternatives analysis by adopting a limited view of its authority. BLM chose the alternatives in the draft SEIS based on screening criteria that included a reference to this Court's decision, but also that included requirements that alternatives must allow ConocoPhillips to "access ... at least some" of the viable oil resources under "all" its leases and to "fully develop" the field, so as not to "strand an economically viable quantity of oil." Ex. 8 at 7; *see also id.* at 3-4. Though BLM deleted a reference to the latter criteria in the similar location in the final SEIS, Ex. 10 at 107a, elsewhere the final SEIS makes clear these criteria remained critical. In its response to comments, BLM maintained that ConocoPhillips must "fully develop" the oil under its leases, and therefore BLM must only consider alternatives that would accomplish "full field development." *Id*. at 98. BLM thus explained it eliminated from consideration alternatives that would meaningfully reduce oil production and emissions or prohibit infrastructure in special areas because such alternatives "would strand an economically viable quantity of recoverable oil." *Id.* at 109-10, 112. The importance of these factors to the alternatives choice is further evidenced by the actual alternatives considered.

BLM's position is unlawful for the same reason as its previous articulation that "ConocoPhillips has the right to extract all possible oil and gas on its leases": it cannot be squared with the agency's "statutory responsibility to mitigate adverse effects." *SILA*, 555 F. Supp. 3d at 769. There is no meaningful difference between "extracting all

possible oil" and not "strand[ing] an economically viable quantity of oil"; no lessee is obliged to or would develop oil that is uneconomic to produce. But even if there were, the current formulation is no more justified. The Reserves Act charges BLM with protecting the "environmental, fish and wildlife, and historical or scenic values" within the Reserve. 42 U.S.C. § 6503(b). Furthermore, BLM "shall include or provide for such conditions, restrictions, and prohibitions as [it] deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [Reserve]." 42 U.S.C. § 6506a(b). This broad grant of authority includes the power to limit or reject a development proposal if impacts are too significant and cannot be mitigated. *Id.*; 43 C.F.R. § 2361.1(e)(1) (BLM "may limit, restrict, or prohibit use of and access to lands within the Reserve"); 43 C.F.R. § 3162.3-1(h)(2) (BLM may "[r]eturn the application" for a permit to drill and indicate the "reasons for disapproval"); *id.* § 3135.2(a)(1), (3) (BLM may suspend production "in the interest of conservation of natural resources" or to mitigate "reasonably foreseeable and significantly adverse effects on surface resources"); *N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 976 (9th Cir. 2006) ("The government can condition permits for drilling on implementation of environmentally protective measures, and we assume it can deny a specific application altogether if a particularly sensitive area is sought to be developed and mitigation measures are not available."). BLM can no more decline to fulfill these protective responsibilities based on an assertion that doing so would strand some economically viable oil than it can because it would preclude development of all possible oil.

ConocoPhillips' lease rights do not undercut BLM's authority, *SILA*, 555 F. Supp. 3d at 768-69, or justify BLM's alternatives criteria. No lease provision states that BLM must allow access to the resources under the lease regardless of impacts or other circumstances, much less that it must do so by approving any particular project. *See* Ex. 7 at 6-8. The rights granted in a lease are explicitly subject to BLM's regulatory authority. *Id.* at 6. And the lease terms specifically allow BLM to condition and restrict development by "specify[ing] rates of development and production" and requiring measures to "minimize adverse impacts to the land, air, and water, to cultural, biological, visual, and other resources, and to other land uses or users." *Id.* at 7, ¶¶4, 6.

Similarly, BLM is incorrect that 43 C.F.R. § 3137.71(b)(1), which requires lessees to submit plans to "fully develop" a "unit," restricts BLM's authority. Ex. 8 at 4 (citing regulation to justify constraint on alternatives). The regulation is aimed at preventing lessees who have pooled (or "unitized") their leases overlying an oil field from holding leases without a plan for overall development of the field. *See* 43 C.F.R. §§ 3137.5, .10, .40. The regulation does not affect BLM's obligation to protect surface resources in the Reserve or to condition, restrict, or prohibit activities proposed in a plan as necessary to carry out that responsibility. In fact, the unitization regulations specifically acknowledge BLM's authority "to set or modify the quantity, rate, and location of development and production," *id.* § 3137.21(a)(4), and to reject development plans, *id.* § 3137.73(b).

In short, as with its first EIS for Willow, BLM's flawed interpretation of its statutory duties under the Reserves Act led the agency to arbitrarily constrain its

alternatives analysis, rendering the analysis "inadequate." *SILA*, 555 F. Supp. 3d at 769;

*see also City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1313 (9th Cir. 1990)

(agency's "failure seriously to consider any alternative to the rigid application of its own

interpretation of the contract requirements raise[d] serious questions" about its analysis).

### 2. BLM's additional justification for limiting alternatives, centering on the Project's purpose and need, is also flawed.

BLM's other reason for rejecting alternatives that would meaningfully reduce

emissions or prohibit infrastructure in the Teshekpuk Lake Special Area—that they

would not meet the Project's purpose and need—is unsupported and provides an

independent basis for rejecting BLM's analysis.

The final SEIS states that the Project's purpose is "to construct the infrastructure

necessary to allow the production and transportation to market of federal oil and gas

resources in the Willow reservoir located in the Bear Tooth Unit, while providing

maximum protection to significant surface resources within the [Reserve], consistent with

BLM's statutory directives." Ex. 10 at 29-30. An alternative that reduces total oil

production and emissions or an alternative that prohibits infrastructure in the Teshekpuk

Lake Special Area is entirely consistent with this purpose. Such alternatives are also

consistent with BLM's description of the "decision to be made" as "whether to approve

the [Project]…in whole or in part, based on the analysis contained in this [SEIS]." *Id.* at

5.

BLM's steadfast reliance on an "unreasonably narrow" range of action alternatives

did not "allow for a real, informed choice," violating NEPA.  *Friends of Yosemite Valley*, 520 F.3d at 1039.

## C.  BLM violated NEPA by failing to analyze downstream greenhouse gas emissions from future oil development caused by Willow.

Itself a major source of carbon emissions, the Project will also catalyze future oil development, which would produce millions of additional metric tons of climate-altering carbon pollution.  NEPA required BLM to assess these "indirect effects."  *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737 (9th Cir. 2020); 40 C.F.R. § 1508.8(b) (indirect effects are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," such as "growth inducing effects and other effects related to induced changes in the pattern of land use").  BLM failed to do so, thereby, again, unlawfully obscuring the full climate impacts of its decision.

The record demonstrates that Willow will cause future development in the region. The Environmental Protection Agency urged BLM to "include more robust analysis of the project proponent's adjacent oil prospects and the reasonably foreseeable actions related to these prospects, as ConocoPhillips envisions future developments of these prospects will be potential satellite locations that tie into the proposed Willow development."  Ex. 15 at 6; *id.* at 5 (discussing "large-scale" emissions related to future West Willow development); *id.* at 6 (noting "ConocoPhillips stated that since the Willow discovery, it has discovered an additional 500 million barrels of oil equivalent [] to 1.1

[billion barrels of oil equivalent] since 2016").  ConocoPhillips told its investors that Willow will be the "next great Alaska hub" and that it has already "identified up to 3 billion [barrels of oil equivalent] of nearby prospects and leads with similar characteristics that could leverage the Willow infrastructure."  Ex. 18 at 2-3.

The final SEIS also concludes that Willow will make development of adjacent lands "easier and more economically viable."  Ex. 10 at 86; *see also id.* ("Construction of the Willow Project may result in additional development opportunities to the south and west of the Project area[.]").  Indeed, BLM made supporting reasonably foreseeable future development a core requirement of alternatives it would consider in the draft SEIS. Ex. 8 at 6.

The most definitive of these foreseeable future developments is named Greater or West Willow.  Ex. 10 at 88 (West Willow is a reasonably foreseeable future action); *id.* at 99 (reasonably foreseeable future actions "are defined as actions ... which are highly probable").  The final SEIS states that "the potential drill sites *are part of* the Willow [Master Development Plan]."  *Id.* at 124 (emphasis added).  It estimates that West Willow could produce 75 million barrels of oil, *id.* at 88, starting in 2035 and thus extending the life of the Project's infrastructure, *id.* at 124 (describing how West Willow would use the Project's operations and processing facilities once Project production peaks).

But despite acknowledging the Project's significant growth-inducing indirect effects, BLM does not disclose the downstream greenhouse gas emissions consequences

of that growth. For West Willow, it estimates only direct greenhouse gas emissions from construction and operation. *Id.* at 125, 90. BLM provides *no* analysis of greenhouse gas emissions from consumption of West Willow's oil or of the millions of additional barrels of other oil development the Project will catalyze.

The SEIS's single-sentence discussion of an analysis BLM conducted when approving an Integrated Activity Plan for the Reserve in 2020, *id.* at 90, does not provide the analysis NEPA requires here. That document's assessment of potential emissions from aggregate development across the entire Reserve does not shed light on how this Project, specifically, will induce future development and emissions. Indeed, BLM seems to recognize this by discussing West Willow, albeit only its direct emissions, as a separate line-item from the Integrated Activity Plan emissions in its tally of cumulative emissions. *Id.* The earlier analysis itself makes no mention of Willow-induced projects like West Willow, Ex. 4 at 30-33 (reasonably foreseeable future actions list); its projection of Willow is of a stand-alone smaller development. *Id.* at 31-32.

BLM's failure to address emissions from the future development Willow will cause violates NEPA. It is well-settled that an agency must evaluate a project's growth-inducing effects. *See Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 866-67 (9th Cir. 2005); *City of Davis v. Coleman*, 521 F.2d 661, 675-77 (9th Cir. 1975); *NRDC v. Dep't of Energy*, No. C-04-04448 SC, 2007 WL 1302498, at *1, *16 (N.D. Cal. May 2, 2007). Such indirect effects need not be certain to trigger analysis; it suffices that the action "could *potentially* induce" the effects. *See NRDC*, 2007 WL 1302498, at *16

(citing *Ocean Advocates*, 402 F.3d at 864).

Willow easily meets this "[c]ommon sense," *City of Davis*, 521 F.2d at 675, standard. BLM and ConocoPhillips have identified that a core purpose of the Project is to facilitate future development of oil deposits on adjacent lands. Under the caselaw, that connection requires analysis. For example, in *City of Davis*, the court held NEPA required consideration of industrial development facilitated by a highway interchange even though such development required myriad future actions, including rezoning of land from agricultural to industrial use—something the county had not even yet proposed. *Id.* at 667-69. Likewise, in *Ocean Advocates*, the Ninth Circuit found a "reasonably close causal relationship" between a dock expansion and risk of crude oil spills due to increased tanker traffic, although the expansion did not enlarge refinery capacity at the dock and "market forces" independent of the expansion would contribute to increased traffic. 402 F.3d at 867-68 (citation omitted). And in *NRDC*, the court held the remediation of a former nuclear testing facility created "the substantial probability" of harm to homeowners where the property owner would first have to decide to convert its property to residential use—which it had "no plans" to do—and then people would have to choose to move in. 2007 WL 1302498, at *16. Building an industrial complex consisting of oil well pads, a processing facility, an operation center, a network of roads, and miles of pipelines directly adjacent to currently undeveloped but identified oil resources already under lease is a much more proximate cause of their development and consumption than the activities in these cases.

In failing to assess the indirect effects of future projects' downstream greenhouse gas emissions, BLM has unlawfully obscured that its decision to approve Willow could result in emissions many times greater (from burning three billion barrels of oil) than disclosed (from burning 576 million barrels of oil). *See City of Davis*, 521 F.2d at 675-76 (once "substantial questions have been raised about the environmental consequences" of a project, the agency "should not be allowed to proceed ... in ignorance of what those consequences will be").

## II.     Plaintiffs are likely to suffer irreparable harm without an injunction.

"Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987).

This winter, ConocoPhillips seeks to develop a new gravel mine and begin constructing a permanent road from GMT-2 to Willow. Doc. 23, ¶2. The new gravel source is in the Tiŋmiaqsiuġvik area, approximately four to five miles southeast of GMT-1 and within the Ublutuoch (Tiŋmiaqsiuġvik) River 0.5-mile setback. Ex. 10 at 113. Ice road construction is already underway. Doc. 23, ¶2.

### A. Gravel mining and road construction this winter will cause immediate and long-term irreparable harm to the environment and Plaintiffs' members.

#### 1. The immediate effects of construction this winter will cause irreparable harm.

Noise from construction this year will have a direct effect on wildlife and people in the Project area. Mining for gravel requires blasting, which produces the loudest sound levels projected for the Project. Ex. 10 at 76. The sound from blasting would not dissipate to ambient levels for more than 100 miles. *Id.* at 64-65. The mining noise would be loud enough to be intrusive to conversation in Nuiqsut. *Id.* at 64; *see also* Ex. 21, ¶53. And it would disturb and displace caribou from around the mine site. Ex. 10 at 76.

The construction of ice and gravel roads is further likely to affect caribou. *Id.* at 83. Roads, along with associated ground traffic and human activity, deflect and delay caribou movement. *Id.* Caribou are least likely to cross a road when traffic exceeds 15 vehicles per hour, as they would do during construction for Willow. *Id.* at 75-76, 77a. The gravel mining, road construction, and traffic will all take place within high-density caribou winter habitat. Ex. 4 at 25. Negative effects on caribou energy budgets caused by wintertime disturbances could result in increased mortality or a reduction in calf productivity. Ex. 3 at 26.

This disturbance and displacement of caribou and the presence of industrial activity will affect hunters and other subsistence users in the area as well. Near-term

construction activities will occur within a high-use subsistence area, at a time when such use is at its "highest." Ex. 10 at 82, 95. Even a temporary disruption of these communities' harvest patterns would have negative effects on them. Ex. 3 at 28. Dr. Rosemary Ahtuangaruak, a member of Plaintiff Friends of the Earth and Mayor of Nuiqsut, Ex. 21, ¶¶3-4, has experienced these types of impacts firsthand. She has "seen ice roads devastate the tundra" and alter the behaviors of fish and caribou. *Id.* ¶¶46, 49, 51. She has experienced mining blasts that shook "houses, bodies, and minds," cracking windows and agitating elders. *Id.* ¶53. And she and her family, who have traditionally hunted in the area of the mine, *id.* ¶54, have been forced to travel further to maintain their subsistence practices due to the effects of oil infrastructure, traffic, and overflights on caribou migration patterns. *Id.* ¶¶13-18, 23, 99-100. Willow's winter construction activities would produce the same effects and cause Dr. Ahtuangaruak, and the resources she relies on, immediate and irreparable harm. *Id.* ¶¶48, 53-54; *see also SILA*, 2021 WL 454280, at *3 (finding member who "lives, hunts, and harvests in the area" would suffer irreparable harm from Willow mining activities), *aff'd,* 2021 WL 4228689, at *2.

### 2. Longer-term effects of construction this winter will also cause irreparable harm.

Once built, Project infrastructure will cause harm lasting far into the future. For example, gravel and ice roads and the mine site "would result in the removal or disturbance of habitat for resources such as fish …, waterfowl, and caribou." Ex. 10 at 81. The road would cause changes in surrounding soil, causing changes to the tundra,

and "would increase mechanisms for invasive species." *Id.* at 68.

For caribou, roads permanently affect movement and key behavioral patterns. It is unlikely that caribou would habituate to this disturbance. As BLM acknowledged, "except perhaps for a small proportion of the most tolerant females, maternal caribou do not habituate to road traffic during the calving period." *Id.* at 75; *see also id.* at 79 (noting that long-term changes in caribou distribution or migration may extend beyond the life of the Project). "[L]arge deflections of caribou away from the area west of Nuiqsut would have substantial impacts to subsistence users." *Id.* at 85.

Again, Dr. Rosemary Ahtuangaruak, whose family engages in traditional subsistence hunting, fishing, and gathering, Ex. 21, ¶¶7-12, has witnessed firsthand how oil infrastructure alters caribou behavior and migration patterns. *Id.* ¶¶13-15, 44, 51-52. For example, she recalls how, during a hunt, a caribou fled from a helicopter flying overhead and drowned in a water-filled gravel pit near the Alpine oilfield. *Id.* ¶14. Failed hunts threaten not only the food security of Dr. Ahtuangaruak and her family, but their physical and mental health as well. *Id.* ¶¶13-15, 17-19, 83, 92. Dr. Ahtuangaruak fears that Willow, including the ice roads and gravel mine to be built this winter, would exacerbate these impacts, with deep and lasting consequences for her traditional way of life. *Id.* ¶¶42-44, 48-49, 54, 84, 86, 96-100, 108. Mine blasting, permanent road construction, and related industrial activity will also adversely affect Plaintiffs' members who plan to travel to the region for professional, recreational, and aesthetic reasons. For example, Daniel Ritzman intends to travel down the Colville River this summer, ending

his trip in Nuiqsut. Ex. 22, ¶27. The presence of a mine and road would harm his enjoyment of the landscape and could diminish his ability to view raptors, caribou, and other wildlife. *Id.* ¶¶11, 18, 20-21, 27-31. Other members intend to visit the Project area for research and recreation and would similarly be harmed by Willow's irrevocable impacts to the area, its unindustrialized quality, and the diverse and valuable species that rely on it. Ex. 23, ¶¶15-28, 32-33; Ex. 24, ¶¶17, 20, 23-25; Ex. 25, ¶¶7-9, 12-13, 17-18.

The long-term impacts of ConocoPhillips' immediate construction activities would irreparably harm Plaintiffs' members' ability to "view, experience, and utilize" the Project area in its "undisturbed state." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also SILA,* 2021 WL 454280, at *3 (once blasting begins, the landscape will be "irreparably altered").

### B. The permanent road will skew a decision on remand toward development.

The irreparable harm to Plaintiffs identified above is compounded by the fact that absent an injunction, on-the-ground activities threaten to set in motion a "bureaucratic steam roller," *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 995 (8th Cir. 2011), that "commit[s]" BLM "to a particular outcome" and "may foreclose or diminish the prospect for an open-minded examination of alternatives down the road," *W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1239 (D. Idaho Sept. 21, 2018), were the Court to remand the Willow approval to the agency at the conclusion of this case.

**III.    The balance of harms tips sharply in Plaintiffs' favor.**

When, as here, environmental injury is "sufficiently likely," the balance of harms "will usually favor the issuance of an injunction to protect the environment." *Amoco Prod. Co.*, 480 U.S. at 545.  Irreparable harm to the environment and to Plaintiffs is likely.

Any claims of economic loss by Defendants and ConocoPhillips do not shift the balance.  *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) ("[L]oss of anticipated revenues … does not outweigh the potential irreparable damage to the environment."), *abrogated on other grounds by Monsanto v. Geertson Seed Farms*, 561 U.S. 139 (2010).  That is particularly true where the purported economic harm is temporary.  *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765-66 (9th Cir. 2014); *Indigenous Env't Network v. United States Dep't of State*, 369 F. Supp. 3d 1045, 1051-52 (D. Mont. 2018) (environmental harms to plaintiffs outweighed economic harms to developer from loss of construction season).

**IV.    A preliminary injunction advances the public interest.**

Ensuring federal agencies' faithful compliance with federal laws "comports with the public interest." *All. for the Wild Rockies*, 632 F.3d at 1138.  Plaintiffs have demonstrated a likelihood of success on the merits of their claims that BLM violated NEPA when it approved the Project.  Halting construction given those legal infirmities— and the irreparable harm construction poses to the Reserve and those who rely on it—

plainly serves the public interest. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007).

## CONCLUSION

Plaintiffs request that this Court enter a preliminary injunction effective until this Court issues a final decision on Plaintiffs' claims.

Respectfully submitted this 16th day of March, 2023.

*s/ Erik Grafe*

Erik Grafe (Alaska Bar No. 0804010)
Jeremy C. Lieb (Alaska Bar No. 1810088)
Ian S. Dooley (Alaska Bar No. 2006059)
Carole A. Holley (Alaska Bar No. 0611076)
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE

*Attorneys for Plaintiffs Center for Biological Diversity, Defenders of Wildlife, Friends of the Earth, and Greenpeace, Inc.*

*s/ Kristen Monsell*

Kristen Monsell (California Bar No. 304793)
(*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY

*Attorneys for Plaintiff Center for Biological Diversity*

*s/ Cecilia Segal*

Cecilia Segal (California Bar No. 310935)
(*pro hac vice application pending*)
Ann Alexander (California Bar No. 321751)
(*pro hac vice application forthcoming*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Plaintiff Natural Resources Defense Council*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITS**

I certify that this document contains 5,700 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(2).

Respectfully submitted this 16th day of March, 2023.

_s/ Erik Grafe_
Erik Grafe

# TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Alaska Soles Great Old Broads for Wilderness *et al.*, Comments on Willow Master Development Plan Draft Supplemental Environmental Impact Statement (Aug. 29, 2022) |
| 2 | Alaska Wilderness League *et al.*, Comments on Willow Master Development Plan Supplemental Environmental Impact Statement (Feb. 2, 2022) (excerpt) |
| 3 | Bureau of Land Management (BLM), National Petroleum Reserve-Alaska, Final Integrated Activity Plan/ Environmental Impact Statement (Nov. 2012) (excerpts) |
| 4 | BLM, National Petroleum Reserve in Alaska, Final Integrated Activity Plan and Environmental Impact Statement (June 2020) (excerpts) |
| 5 | BLM, Willow Master Development Plan, Final Environmental Impact Statement (Aug. 2020) (excerpts) |
| 6 | BLM, Willow Master Development Plan, Record of Decision (Oct. 26, 2020) (excerpts) |
| 7 | BLM, Executed leases for the Willow Project area, as provided by BLM in *Center for Biological Diversity et al. v. BLM et al.,* Case No. 3:20-cv-00308-SLG, Docs. 118, 118-2, 118-3, and 118-4 (July 16, 2021) |
| 8 | BLM, Willow Master Development Plan, Draft Supplemental Environmental Impact Statement (June 2022) (excerpts) |
| 9 | BLM, Willow Master Development Plan, Draft Supplemental Environmental Impact Statement Public Meetings, Presentation (Aug. 2022) (excerpts) |
| 10 | BLM, Willow Master Development Plan, Final Supplemental Environmental Impact Statement (Jan. 2023) (excerpts) |
| 11 | BLM, Willow Development, Bear Tooth Unit Lease Map (Mar. 13, 2023) |

| 12 | BLM, Willow Master Development Plan, Record of Decision (Mar. 13, 2023) |
| 13 | BLM, Decision, Amended Right-of-Way Grant FF097428 Issued (Mar. 13, 2023) |
| 14 | BLM, Decision, Mineral Material Sale Contract Royalty Rate Adjustment and Amended Stipulations for Mineral Material Disposal, Willow Gravel Mine (Mar. 13, 2023) |
| 15 | R. Chu, Environmental Protection Agency, Letter to S. Rice, BLM (Aug. 29, 2022) |
| 16 | Omitted |
| 17 | Earthjustice, Comments on Willow Master Development Plan Draft Supplemental Environmental Impact Statement – BLM's Decision-Making Authority (Aug. 29, 2022) |
| 18 | Refinitiv StreetEvents, ConocoPhillips 2021 Market Update, Edited Transcript (June 30, 2021) (excerpt) |
| 19 | Earthjustice *et al.*, Comments on Assessment of Greenhouse Gas Emissions Significance in the Willow Master Development Plan Draft Supplemental Environmental Impact Statement (Aug. 29, 2022) |
| 20 | Alaska Wilderness League *et al.*, Comments on Willow Master Development Plan Draft Environmental Impact Statement (Oct. 29, 2019) (excerpt) |
| 21 | Declaration of Rosemary Ahtuangaruak |
| 22 | Declaration of Daniel Ritzman |
| 23 | Declaration of Jeffrey Scott Fair |
| 24 | Declaration of Richard G. Steiner |
| 25 | Declaration of Jenna Jonas |

26         Declaration of Brendan Cummings

27         Declaration of Hallie Templeton

28         Declaration of Timothy Donaghy

29         Declaration of Gina Trujillo

30         Declaration of Nicole Whittington-Evans