Jeremy C. Lieb
Erik Grafe
Ian S. Dooley
Carole A. Holley
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: jlieb@earthjustice.org
E: egrafe@earthjustice.org
E: idooley@earthjustice.org
E: cholley@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Center for Biological Diversity, Defenders of Wildlife, Friends of the Earth, and Greenpeace, Inc.*

Kristen Monsell (*pro hac vice*)
CENTER FOR BIOLOGICAL
DIVERSITY
1212 Broadway, St. #800
Oakland, CA 94612
T: 510.844.7100
E: kmonsell@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological Diversity*

Cecilia Segal (*pro hac vice*)
NATURAL RESOURCES DEFENSE
COUNCIL
111 Sutter St., 21st floor
San Francisco, CA 94104
T: 415.875.6100
E: csegal@nrdc.org

Michelle Wu (*pro hac vice*)
NATURAL RESOURCES DEFENSE
COUNCIL
40 West 20th St., 11th Floor
New York, NY 10011
T: 646.889.1489
E: michellewu@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

CENTER FOR BIOLOGICAL DIVERSITY,
DEFENDERS OF WILDLIFE, FRIENDS OF THE
EARTH, GREENPEACE, INC., and NATURAL
RESOURCES DEFENSE COUNCIL, INC.,

     *Plaintiffs*,

       v.

BUREAU OF LAND MANAGEMENT; UNITED
STATES FISH AND WILDLIFE SERVICE;
NATIONAL MARINE FISHERIES SERVICE;
UNITED STATES DEPARTMENT OF THE
INTERIOR; UNITED STATES DEPARTMENT OF
COMMERCE; DEB HAALAND, in her official
capacity as Secretary of the Interior; TOMMY P.
BEAUDREAU, in his official capacity as Deputy
Secretary of the Interior; GINA M. RAIMONDO, in
her official capacity as Secretary of Commerce;
STEVEN COHN, in his official capacity as Alaska
State Director of Bureau of Land Management;
SARA BOARIO, in her official capacity as Regional
Director of United States Fish and Wildlife Service;
and JONATHAN KURLAND, in his official
capacity as Regional Administrator of National
Marine Fisheries Service,

     *Defendants*.

Case No. 3:23-cv-00061-SLG

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
**(5 U.S.C. §§ 701-706; 42 U.S.C. § 4321-4347; 42 U.S.C. § 6501-6508;**
**16 U.S.C. §§ 1531-1544)**

# INTRODUCTION

1. This action arises from the Bureau of Land Management's (BLM) second approval of ConocoPhillips Alaska Incorporated's (ConocoPhillips) Willow Master Development Plan ("Willow Project," "Willow," or "Project"), a massive oil and gas development project in the National Petroleum Reserve-Alaska (Reserve). This Court vacated an earlier approval of the Project for violating the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA). BLM has now prepared a final supplemental environmental impact statement (SEIS) and decided to approve the Project anew. Its decision to approve the Willow Project must again be set aside, because it violates NEPA and the National Petroleum Reserves Production Act (Reserves Act) in ways similar to BLM's initial flawed decision. Additionally, the ESA consultations underlying the approval are unlawful, because they fail to consider the impact of carbon emissions on threatened species.

2. BLM has failed to address two of the central flaws identified by the Court when it rejected BLM's first approval of ConocoPhillips' Willow Project. It has again analyzed an inadequate range of alternatives in the SEIS based on the mistaken conclusion that it must allow ConocoPhillips to fully develop its leases. BLM has failed to assess any alternatives that meaningfully reduce greenhouse gas emissions or prohibit infrastructure in the designated Special Areas within the Reserve. It has also again failed to assess the full climate consequences of approving the Willow Project, this time by failing to assess the downstream emissions from the reasonably foreseeable future oil

development that the Willow Project will facilitate. It also failed to assess oil spill risks of this reasonably foreseeable development. These failings violate NEPA.

3.     BLM's decision also violates the Reserves Act, because it fails to rationally explain how approving the Willow Project, which the final SEIS shows will have significantly adverse impacts, is consistent with BLM's obligation to protect surface resources in the Reserve from such impacts. BLM's decision further violates the Reserves Act because BLM arbitrarily constrained its ability to condition, restrict, or prohibit ConocoPhillips' activities to mitigate adverse effects on surface resources, based on the erroneous view that it must allow ConocoPhillips to fully develop all economically recoverable oil on its leases.

4.     In violation of the ESA, despite recognizing that the Willow Project will increase greenhouse gas emissions and that climate change is already destroying the sea-ice habitat that polar bears, Arctic ringed seals, and bearded seals need to survive, the U.S. Fish and Wildlife Service (FWS) and National Marine Fisheries Service (NMFS) failed to consider how the increased greenhouse gas emissions from Willow may affect the survival and recovery of these ice-dependent species or their critical habitat. BLM's reliance on these unlawful consultations to approve the Willow Project violates BLM's substantive ESA obligations to ensure its actions do not jeopardize ESA-protected species and or result in the destruction or adverse modification of their critical habitat.

5.     The Willow Project will have far-reaching impacts across the Reserve, the North Slope, and beyond.

6.     It could produce 576 million barrels of oil, resulting in approximately 239 million metric tons of indirect, and about 260 million metric tons of combined direct and indirect, greenhouse gas emissions over 30 years.  It would have an enormous footprint on an irreplaceable landscape, including three drill sites, 25.8 miles of gravel roads, a central processing facility, an operations center, an airstrip, and hundreds of miles of ice roads.

7.     The Project's enormous greenhouse gas emissions are inconsistent with the urgent need to transition away from fossil fuels to meet climate goals.  Developing a massive new Arctic oil formation is a threat to the global climate and an already dramatically warming Arctic region.

8.     The Project represents a significant expansion into previously undeveloped areas of the Reserve, including areas within the ecologically and culturally important Teshekpuk Lake and Colville River Special Areas.  The Project will disturb wildlife, destroy wetlands, and significantly restrict traditional cultural practices dependent on food resources like fish and caribou.  The Project will further imperil polar bears and seals that are already threatened by climate change and the expansion of oil and gas development in the Arctic.

9.     Willow is only the starting point for industry plans to transform the Western Arctic.  ConocoPhillips and other companies have identified billions of additional barrels of oil that could be developed by leveraging Willow's infrastructure. The full-scale development that ConocoPhillips foresees following Willow would have

*CBD et al. v. BLM et al.,*
Case No. 3:23-cv-00061-SLG                                                                    3

catastrophic impacts to a globally important ecosystem and people who live there, and it threatens the ability of the U.S. to meet its climate action commitments.

10.    Defendants' approval of the Willow Project is unlawful.  The Court should vacate BLM's final SEIS and Record of Decision (ROD) approving the Willow Project, the FWS's biological opinion, and the NMFS's letter of concurrence, and preclude any action under the ROD from moving forward.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1361, 2201-02.  Judicial review and vacatur is available under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-06, and the ESA, 16 U.S.C. § 1540(g).  Plaintiffs provided BLM with notice of Plaintiffs' intent to sue over the ESA violations alleged in this Complaint 60 days ago.  BLM has not remedied these violations of law.  Venue is appropriate under 28 U.S.C. § 1391(e).

## PLAINTIFFS

12.    Plaintiff Center for Biological Diversity (the Center) is a national, non-profit organization, with offices across the country and in La Paz, Mexico.  The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health.  The Center has more than 89,000 members.  The Center is actively involved in species and habitat protection issues throughout the United States, including protection of the Arctic and wildlife threatened

by oil and gas leasing, exploration, and development.  As part of these efforts, the Center works to protect Arctic wildlife that lives in and near the Reserve from the numerous harms inherent in oil and gas leasing, exploration, and development, including noise pollution, habitat destruction, oil spills, and greenhouse gas pollution that exacerbates the climate crisis.

13.     Plaintiff Defenders of Wildlife (Defenders) is a nonprofit organization founded in 1947 with more than 1.8 million members and supporters, including approximately 6,400 in Alaska.  Defenders maintains regional offices across the country, including one in Anchorage.  Its mission is to protect all native animals and plants in their natural communities, especially listed species and their designated critical habitats under the ESA.  Defenders works to protect and restore key species and their habitats throughout North America through education, advocacy, litigation, and other efforts. Defenders advocates for the sound management of our public lands and wildlife, including the Reserve.  Defenders prioritizes protecting imperiled species such as the polar bear and their habitats and works to reduce human-wildlife conflicts.  Defenders has actively worked to promote wildlife habitat conservation and public land management in Alaska, including in the Reserve.  Defenders serves on FWS's Polar Bear Recovery Advisory Work Group on Reducing Human-Polar Bear Conflicts.  Defenders also works to reduce any conflicts with or impacts to polar bears and other wildlife that may arise from current or proposed development activities in the Reserve and elsewhere in the Arctic.

14.    Plaintiff Friends of the Earth is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation with a headquarters in Washington, D.C., an office in Berkeley, California, and staff located across the U.S., including in Alaska.  Friends of the Earth is a membership organization consisting of nearly 294,000 members, including more than 650 members who live in Alaska, and more than 4.9 million activists nationwide.  Friends of the Earth is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide.  Friends of the Earth's mission is to protect our natural environment, including air, water, and land, and to create a more healthy and just world.  Friends of the Earth utilizes public education, advocacy, legislative processes, and litigation to achieve its organizational goals.  Friends of the Earth is concerned about the potential adverse impacts that fossil fuel exploration and development activities in Alaska's Arctic, including in the Reserve, have on the climate and people, fish, birds, and other species that depend on this region.  Therefore, on behalf of its members and activists, Friends of the Earth actively engages in advocacy to influence U.S. energy and environmental policies affecting Alaska's Arctic.

15.    Plaintiff Greenpeace, Inc. (Greenpeace), is a non-profit corporation organized under the laws of the State of California, with its principal place of business in Washington, D.C.  Its mission is to promote the protection and preservation of the environment.  Greenpeace is an independent campaigning organization that uses peaceful, creative action to expose global environmental problems and to force solutions that are essential for a green and peaceful future.  Greenpeace has over 780,000 active

supporters in the United States.  For more than a decade, Greenpeace has been a lead advocacy organization working to raise awareness of global warming and the protection of wildlife, and to press for serious cuts in greenhouse gas emissions through local, national, and global action.  In the United States, Greenpeace has run campaigns aimed at stopping global warming by phasing out fossil fuel use and promoting renewable energy systems.  As a part of these efforts, Greenpeace has actively worked to protect the Arctic from the harmful effects of oil and gas activities.

16.     Plaintiff Natural Resources Defense Council (NRDC) is an international, not-for-profit, tax-exempt membership organization with headquarters in New York. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends.  NRDC has hundreds of thousands of members and online activists across the U.S., including nearly 1,000 in Alaska.  NRDC works to solve the most pressing environmental issues we face today, including environmental injustice, air pollution, threats to wildlife and natural lands, and climate change.  NRDC's advocacy to protect regions, including Alaska, from the harms of oil and gas production dates back decades.

17.     Members of Plaintiff groups use and enjoy—and intend to continue to use and enjoy—the Reserve, including the Willow Project area and adjacent areas, for various purposes, including subsistence activities, recreation, wildlife viewing, education, research, photography, and/or aesthetic and spiritual enjoyment.  For example, one group's member uses the areas that would be affected by the Willow Project, including

the area of its planned gravel mine, for subsistence hunting of caribou, fishing, and gathering. Members of Plaintiff groups also use or otherwise enjoy migratory wildlife that depend on the ecological region in which the Willow Project is located, and that are threatened by the Project's development. For example, some groups' members travel to the Western Arctic to study, photograph, and enjoy polar bears, birds, and caribou that depend on areas that will be affected by the Willow Project. The Willow Project, as described and approved in BLM's final SEIS and ROD, will directly and irreparably injure these interests.

18. Plaintiffs submitted comments to BLM at multiple points in the Project's environmental review process, including on the July 2022 draft SEIS. Each of the Plaintiff groups monitors the use of public lands in the Reserve and compliance with the laws respecting these lands, educates its members and the public concerning the management of these lands, and advocates for policies and practices that protect the natural and cultural values and sustainable resources of these lands. It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law for the management of these public lands. The interests and organizational purposes of the Plaintiffs are directly and irreparably injured by Defendants' violations of law as described in this complaint.

19. The relief Plaintiffs seek in this lawsuit will redress their injuries by setting aside Defendants' approvals and requiring Defendants to comply with the law. This relief will give Plaintiffs, their members, other supporters, staff, and the general public

more comprehensive and complete information regarding the Willow Project's climate consequences and threats to valued resources. It will allow Plaintiffs, their members and supporters, and others concerned about Willow to advocate more effectively for denial of the Project or for changes to its design and operation that would help mitigate its adverse impacts. And it will give permitting authorities the chance to make better-informed decisions about whether and on what terms to approve the Project, unbiased by any bureaucratic momentum or irretrievable commitment of resources.

## DEFENDANTS

20.     Defendant BLM is the agency of the United States Department of the Interior entrusted with the conservation and management of resources within the Reserve and that issued the SEIS challenged in this action.

21.     Defendant FWS is the federal agency within the Department of the Interior responsible for administration of the ESA as it relates to terrestrial animals and some marine mammals, including polar bears.

22.     Defendant NMFS is a United States federal agency within the Department of Commerce responsible for administration of the ESA as it relates to some marine mammals, including bearded seals and ringed seals.

23.     Defendant United States Department of the Interior is an agency of the United States responsible for oversight of BLM and FWS.

24.     Defendant United States Department of Commerce is an agency of the United States responsible for oversight of NMFS.

25.     Defendant Deb Haaland is sued in her official capacity as Secretary of the United States Department of the Interior.  The Secretary holds the highest position within the Department of the Interior, has ultimate responsibility for overseeing the Department and its agencies and ensuring their compliance with all applicable federal laws, and has specific responsibilities related to the administration of the Reserve.

26.     Defendant Tommy P. Beaudreau is sued in his official capacity as Deputy Secretary of the United States Department of the Interior.  Defendant Beaudreau signed the ROD challenged herein.

27.     Defendant Gina M. Raimondo is sued in her official capacity as Secretary of Commerce.  The Secretary holds the highest position within the Department of Commerce, has ultimate responsibility for overseeing the Department and its agencies and ensuring their compliance with all applicable federal laws, and has specific responsibilities related to the administration of the ESA.

28.     Defendant Steven Cohn is sued in his official capacity as Alaska State Director of BLM.  Defendant Cohn signed the ROD challenged herein.

29.     Defendant Sara Boario is sued in her official capacity as Regional Director of FWS.

30.     Defendant Jonathan Kurland is sued in his official capacity as Regional Administrator of the NMFS.

## STATEMENT OF FACTS

### I.  The Reserve

31.    Originally set aside in 1923, the 23-million-acre Reserve is an extraordinary and ecologically important landscape of lakes, ponds, rivers, floodplains, other wetlands, upland areas, and sensitive coastal resources.  It is home to a diversity of species, including polar bears, brown bears, muskoxen, caribou, moose, and millions of migratory birds, among many other species.  This landscape and wildlife are central to the livelihoods and traditional practices of Iñupiat people living in the region.

32.    In 1976, Congress passed the Reserves Act, which transferred jurisdiction over the Reserve from the U.S. Navy to the Secretary of the Interior, in recognition of the area's significant ecological values and the need to protect them.  Pub. L. 94-258, Title I §§ 102-03, 90 Stat. 303-04 (codified at 42 U.S.C. §§ 6502-03).  The Reserves Act created a management structure for the Reserve separate from other public land laws, including the Mineral Leasing Act.  42 U.S.C. § 6502 (withdrawal from entry and disposition under public land laws).

33.    Because of the world-class wildlife and subsistence values of the Reserve, the Reserves Act charges the Secretary of the Interior with protecting the "environmental, fish and wildlife, and historical or scenic values" within the Reserve, *id.* § 6503(b), and requires that the Secretary take action to protect and conserve these other resources and uses in the Reserve any time oil and gas leasing, exploration, or development activities may occur.  *Id*. §§ 6504(a), 6506a(b).

34.     The Reserves Act requires the Secretary of the Interior to impose "conditions, restrictions, and prohibitions" on any activities undertaken pursuant to the Act "as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the Reserve.  *Id*. § 6506a(b).

35.     Surface values of the Reserve may be protected by limiting, restricting, or prohibiting the use of and access to lands within the Reserve, including within Special Areas.  *Id.*; 43 C.F.R. § 2361.1(e)(1).

36.     BLM may reject an oil development proposal if its environmental impacts are too significant, 43 C.F.R. §§ 3162.3-1(h)(2), 3137.73(b), and it may require a suspension of operations and production, 42 U.S.C. § 6506a(k)(2), including if "it is in the interest of conservation" or necessary to "mitigate[] reasonably foreseeable and significantly adverse effects on surface resources," 43 C.F.R. § 3135.2(a)(1), (3).

37.     The Reserves Act further requires the Secretary of the Interior to provide "maximum protection" to areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value."  42 U.S.C. § 6504(a).  "Special [A]reas" are "areas within the [R]eserve identified by the Secretary of the Interior as having significant subsistence, recreational, fish and wildlife, or historical or scenic value and, therefore, warranting maximum protection of such values to the extent consistent with the requirements of the Act for the exploration of the Reserve."  43 C.F.R. § 2361.0-5(f).

38.     Pursuant to this authority, in 1977, the Secretary designated regions around Teshekpuk Lake and the Colville River, among others, as Special Areas within the

Reserve. 42 Fed. Reg. 28,723, 28,723 (June 3, 1977).

39.     The Teshekpuk Lake Special Area protects essential caribou habitat, subsistence resources and uses, and world-class water- and shorebird nesting, staging, and molting habitat. The Teshekpuk Lake Special Area provides calving, insect relief, and wintering areas for the approximately 56,000 caribou of the Teshekpuk Caribou Herd.

40.     The Colville River Special Area lies along the Colville River and two of its larger tributaries, the Kogosukruk and Kikiakrorak rivers, and encompasses 2.44 million acres. The Special Area was designated to assure maximum protection of its subsistence, wildlife, recreational, and other identified values, such as the unique bluff and riparian habitats associated with the Colville River and its tributaries. It protects the largest and most productive river delta in Arctic Alaska, which supports populations of pink and chum salmon, burbot, broad whitefish, Arctic cisco, and other fish species, and provides habitat for peregrine falcons, gyrfalcons, golden eagles, and rough-legged hawks.

## II.     The climate crisis

41.     Temperatures across the globe are rising at an unprecedented rate, and the world is rapidly approaching a "point of no return" where the worst effects of climate change will wreak havoc across the Earth. *See Juliana v. United States*, 947 F.3d 1159, 1166 (9th Cir. 2020).

42.     Overwhelming evidence shows that the unprecedented increase in Earth's

temperatures is caused by fossil fuel combustion.

43. Without "some action, the destabilizing climate will bury cities, spawn life-threatening natural disasters, and jeopardize critical food and water supplies." *Id.*

44. Several scientific studies show there is a tipping point or threshold at which the most dangerous effects of climate change could occur abruptly and irreversibly.

45. There is international consensus that limiting the global increase in temperature to 1.5 degrees Celsius (°C) above pre-industrial levels would significantly reduce the risks and impacts from climate change.

46. Each ton of carbon dioxide ($CO_2$) released into the atmosphere contributes to global warming.

47. As recent scientific information demonstrates, any additional increase in greenhouse gas emissions from fossil fuel consumption increases the likelihood of failing to limit warming to 1.5°C.

48. The federal government plays an important role in addressing the climate crisis and in ensuring the U.S. does not exhaust its share of the global carbon budget.

49. The U.S. has recognized the urgent imperative to act to reduce greenhouse gas emissions. In Executive Order 14008, President Biden recognized that addressing the climate crisis is "more necessary and urgent than ever" and committed to deploying the "full capacity" of agencies "to implement a Government-wide approach" to combat the climate crisis. The U.S. has committed to reducing greenhouse gas emissions by 50–52 percent below 2005 levels by 2030, and to reach net-zero emissions by 2050. Analysis

shows that the potential carbon emissions from already leased fossil fuel resources on federal lands could exhaust the remaining U.S. carbon budget consistent with the 1.5°C target.

50.     Indeed, to meet the 1.5°C target, the U.S. must not only limit new development on undeveloped fossil fuel leases, it must phase out production in some existing fields and mines before their reserves are fully depleted.

51.     While avoiding reaching the 1.5°C target can halt the most catastrophic consequences of climate change, severe impacts from the climate crisis are occurring right now.

52.     The impacts caused by climate change "are serious and well recognized," and "have already inflicted significant harms" to many resources around the globe. *Massachusetts v. EPA*, 549 U.S. 497, 521 (2007).

53.     There is high confidence among scientists that climate change has already caused substantial damage and irreversible loss among terrestrial and freshwater and oceanic ecosystems.

54.     Climate change represents a significant threat to the future of biodiversity within the United States and around the world.  The best available science shows that climate change is disrupting species' distribution, breeding, physiology, vital rates, and genetics.  Climate change is already threatening numerous species with extinction by, for example, destroying the habitat they need to survive.

## III.    Climate change in the Reserve

55.    The effects of climate change are especially observable in Alaska's Arctic.

56.    During the latter half of the 20th century, the Arctic region experienced temperature increases two to three times the global rate of increase.

57.    Now, during the first two decades of the 21st century, the Arctic region is experiencing temperature increases four times that of the global rate of increase.

58.    The Arctic's average winter temperature has increased by six degrees Fahrenheit (°F) over the past 60 years, and the Arctic is expected to warm by an additional 10°F to 12°F this century.

59.    This rapid warming presents myriad disruptions to Arctic ecosystems, including in the Reserve.

60.    In the Arctic, climate change is causing, and will continue to cause, sea-level rise, sea-ice melt, river flow changes, and permafrost thaw.

61.    There is nowhere in the world where global warming is causing greater increases in mean air temperatures than the Arctic, or where the effects of climate change are more directly observable.

62.    The extent of spring snow cover has been decreasing over the Arctic region since 2005.  This, combined with shorter snow cover duration, is causing a reinforcing feedback effect: more land surface is left uncovered, which in turn absorbs more of the sun's energy, causing further depletion of existing snow cover.

63.    Sea-ice extent has dramatically decreased in the Arctic.  The region

experienced the lowest coverage of sea ice on record in 2017, and measurements show the sea-ice extent to be approximately half of what it was in 1979.

64.     There is a direct connection between greenhouse gas emissions and sea-ice loss, with each metric ton of anthropogenic $CO_2$ emissions corresponding to three square meters of September Arctic sea-ice loss between 1953-2015.

65.     Like the loss in snow cover, the loss in the sea-ice extent also creates a feedback effect on climate, causing an increased amount of the sun's energy to be absorbed by the ocean, and in turn increasing the rate of sea-ice melt.

66.     It is expected that the first sea-ice-free Arctic summer will happen before 2050.

67.     The increases in air temperatures over the Arctic are also having a pronounced effect on permafrost and the plants and systems that depend on this highly specialized ecosystem.

68.     Permafrost melt, like sea-ice loss, is directly connected to increases in greenhouse gas emissions.

69.     The Arctic's permafrost layer is expected to decrease significantly by the end of the century, releasing $CO_2$ and methane into the atmosphere and accelerating climate feedback effects.

70.     Permafrost on Alaska's Arctic coast has warmed substantially, causing profound changes in the active layer temperatures.

71.     Alaska is experiencing substantial increases in tundra greenness,

contributing to increasingly limited opportunities for tundra travel by local communities.

72.     As a result of climate change, the annual area burned by wildfire in Alaska is expected to double by 2050 and to triple by the end of the century.

73.     The expected increase in wildfires will in turn release commensurate amounts of $CO_2$ into the atmosphere, illustrating yet one more climate feedback system that is exacerbated in Alaska's Arctic.

74.     Climate change is expected to have negative effects on Reserve species, such as caribou.

75.     Climate change is already having negative effects on other Reserve species. The polar bear was the first species in the United States to be protected under the ESA primarily because of future climate change related impacts caused by greenhouse gases. The polar bear is listed as a threatened species under the ESA and the FWS has designated polar bear critical habitat in Alaska.

76.     The Southern Beaufort Sea polar bear population in the Reserve area has already declined significantly, and the remaining bears are under enormous stress because climate change is destroying their habitat, making it more difficult for them to find food, increasing their energy expenditure, and reducing reproductive success.  As the sea ice continues to melt, polar bears are increasingly using marginal habitats and will become increasingly vulnerable to interactions with humans and encounters with oil and gas development.

77.     If current greenhouse gas emissions trends continue, scientists estimate that

two-thirds of global polar bear populations will be lost by 2050, including the complete loss of both of Alaska's polar bear populations, while the remaining third will near extinction by the end of the century due to the disappearance of sea ice. Conversely, aggressive emissions reductions will allow substantially more sea ice to persist and increase the chances that polar bears will survive in Alaska and across their range.

78. Arctic ringed seals and bearded seals are also listed as threatened species under the ESA. Ringed and bearded seals breed, reproduce, raise their young, and molt on sea ice; they also use it as a platform for hunting. Unlike other seals, ringed seals dig caves in the snow accumulated on sea ice to rest and give birth. These snow caves provide vital life functions—they conceal pups from predators and protect them from the extreme cold while nursing. Without these snow caves, ringed seal pups freeze to death or are eaten by polar bears or other animals. A certain amount of sea ice and snow are necessary for ringed seals to build their caves. NMFS has designated ringed seal and bearded seal critical habitat in Alaska.

79. In Alaska, climate change is having adverse effects on subsistence and other resources important to rural communities, with serious human health consequences, and causing some communities to be relocated or abandoned.

## IV. The Willow Project

### A. Project approval in 2020

80. The Willow Project originated in May 2018, when ConocoPhillips sent a letter to BLM requesting approval of the Project.

81.     In August 2018, BLM published notice of its intent to prepare an environmental impact statement (EIS) for the Project.  83 Fed. Reg. 38,725 (Aug. 7, 2018).

82.     On August 30, 2019, BLM released a draft EIS for the Willow Project. 84 Fed. Reg. 45,801 (Aug. 30, 2019).

83.     The draft EIS considered a no action alternative and three action alternatives.  The action alternatives were not meaningfully different from one another.

84.     Alternative B had five well pads housing at least 50 wells each, a processing facility, an operations facility, and an airstrip, all connected by permanent gravel roads and seven bridges.  It included infield and pipelines carrying oil out of the region to existing North Slope infrastructure and fuel into the Project area.  Diesel would be trucked in.

85.     Alternative C was intended to reduce effects to caribou movement and decrease the number of stream crossings.  It omitted a portion of the infield permanent gravel road between one well pad (BT1) and the processing facility, contained six bridges instead of seven, and added a second airstrip compared to Alternative B.  Otherwise, it largely mirrored Alternative B, with the same well pad configuration and number of wells and the same pipeline infrastructure.

86.     Alternative D was intended to minimize the Project's footprint, reduce stream crossings, and reduce impacts to caribou movement.  It omitted the gravel road connecting Willow with existing infrastructure at the Greater Mooses Tooth (GMT)

development and at Alpine. It collocated one of the well pads with the processing facility and located some other infrastructure close together. It contained additional infrastructure, including chemical storage tanks and warehouse space, to compensate for not being connected to GMT and Alpine. The well pad locations and number of wells and pipeline alignment remained the same as Alternatives B and C.

87. The draft EIS also separately considered module delivery options that would accompany any action alternative, each of which included construction of an artificial island to transport large sealift modules during construction.

88. On March 26, 2020, BLM released a supplemental draft EIS to evaluate an additional module delivery option that would transport large modules via ice road from an existing dock.

89. On August 14, 2020, BLM announced its publication of the final EIS for the Willow Project. 85 Fed. Reg. 49,677 (Aug. 14, 2020). In the final EIS, BLM identified ConocoPhillips' proposal—Alternative B and Module Delivery Option 3 (the Colville River ice crossing)—as its preferred alternative.

90. On October 16, 2020, FWS issued a biological opinion addressing the Willow Project's effects on Steller's eiders, spectacled eiders, northern sea otters, and polar bears, and areas designated as critical habitat. The biological opinion concluded that the Willow Project was not likely to adversely affect Steller's eiders or northern sea otters, and that it was likely to adversely affect, but not jeopardize the continued existence of, spectacled eiders and polar bears. The biological opinion also concluded

that the Willow Project was not likely to adversely affect critical habitat for any listed species.

91.    On October 26, 2020, BLM signed a ROD approving the Willow Project. The ROD approved ConocoPhillips' proposed project—Alternative B and Module Delivery Option 3.

92.    The approved Project included five drill sites, a central processing facility, an operations center, up to 700 miles of ice roads during construction, 262 miles of resupply ice roads during operations, permanent gravel access roads, an airstrip, up to 385.5 miles of pipelines, and a gravel mine site in the Reserve.  BLM estimated the Project would produce 586 million barrels of oil, resulting in approximately 258 million metric tons of $CO_2$ equivalent emissions over its 30-year life.

**B.    Court decision vacating and remanding agency decisions**

93.    Conservation and Alaska Native groups filed legal challenges to BLM's decision in this Court and immediately moved for a preliminary injunction to stop Project construction from moving forward.  *Sovereign Iñupiat for a Living Arctic v. BLM*, Case No. 3:20-cv-00290-SLG, Doc. 17 (Dec. 23, 2020); *Ctr. for Biological Diversity v. BLM*, Case No. 3:20-cv-00308-SLG, Doc. 9 (Dec. 24, 2020).

94.    This Court denied the groups' motions for preliminary injunction on February 1, 2021.  It concluded that the groups' claims were barred by the Reserves Act's statute of limitations, which requires challenges to EISs "concerning oil and gas leasing"

to be brought within 60 days after notice of availability of the EIS. *Sovereign Iñupiat for a Living Arctic v. BLM*, 516 F. Supp. 3d 943, 955 (D. Alaska 2021). However, on February 6, 2021, this Court issued a temporary injunction, stopping construction of the Project pending the groups' motion for emergency relief in the Ninth Circuit Court of Appeals. *Sovereign Iñupiat for a Living Arctic v. BLM*, Case Nos. 3:20-cv-00290-SLG, 3:20-cv-00308-SLG, 2021 WL 454280 (D. Alaska, Feb. 6, 2021).

95. On February 13, 2021, the Ninth Circuit granted an injunction pending appeal, *Sovereign Iñupiat for a Living Arctic v. BLM*, Case Nos. 21-35085, 21-35095, 2021 WL 4228689 (9th Cir. Feb. 13, 2021). The parties subsequently agreed that construction would not commence while litigation on the merits proceeded in this Court. *Sovereign Iñupiat for a Living Arctic v. BLM*, Case No. 3:20-cv-00290-SLG, Doc. 63 (D. Alaska, Feb. 26, 2021).

96. On August 18, 2021, this Court vacated and remanded BLM's approval of the Willow Project and FWS's biological opinion. *Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F. Supp. 3d 739, 805 (D. Alaska 2021). The Court held that BLM violated NEPA by failing to adequately disclose and analyze the Project's downstream greenhouse gas emissions and by restricting the project alternatives it considered based on the mistaken view that ConocoPhillips had a right to extract all of the oil and gas on its leases. *Id.* at 767-78. The Court also held that FWS violated the ESA by relying on unspecified Marine Mammal Protection Act (MMPA) mitigation measures to support the no jeopardy and adverse modification determinations in its biological opinion for the

polar bear, and by issuing an arbitrary and capricious incidental take statement for the bear. *Id.* at 796-805.

97.    No party appealed the Court's decision.

**C.    BLM's consideration of the Willow Project on remand**

98.    Following the Court's decision, BLM conducted an informal scoping process in February and March 2022, in which numerous organizations and individuals, including the Plaintiffs in this case, submitted comments.

99.    Commenters urged BLM to comprehensively reevaluate the Project, noting, among many other things, that BLM must evaluate reasonable alternatives—consistent with BLM's broad authority and obligation to condition, restrict, and prohibit oil and gas activity as necessary to protect other resources—and conduct a robust analysis of the Project's environmental impacts, including its contribution to climate change, the impacts of additional oil projects facilitated by the proposal, and the Project's full cumulative impacts.

100.    BLM issued a draft SEIS for the Willow Project in July 2022.

101.    The draft SEIS considered a no action alternative, the three action alternatives from the previous EIS, and one new alternative.

102.    Like the previously considered alternatives, the new Alternative E is a variation on ConocoPhillips' proposed plan that would not meaningfully reduce the Project's impacts.  Alternative E would eliminate one of the two drill pads (BT4) in the

Teshekpuk Lake Special Area, but it relocates the remaining well pad in the Special Area to a new location between the original two well pads. It also expands drill pad sizes (for BT1 and BT2) by approximately 100 feet to accommodate up to 80 wells, and includes additional water source access pads and placement of 96 additional vertical support members below ordinary high water, as compared to Alternative B, to support pipelines at five water source lakes throughout operations. Because Alternative E retains gravel road connections between all drill sites, caribou migrating through the area in the fall are likely still to encounter road infrastructure, including the pinch point where the access road intersects with infield roads. Alternative E still extends project infrastructure across both Iqalliqpik (Judy) and Uvlutuuq (Fish) creeks, and into Ublutuoch (Tiŋmiaqsiuġvik) River channel and the Teshekpuk Lake Special Area. While the reduction in infrastructure in the Teshekpuk Lake Special Area under this alternative could reduce indirect effects to subsistence users, it will not result in a substantial reduction in direct impacts on Nuiqsut subsistence harvesters compared to the other action alternatives. There are multiple project components under Alternative E where the use of Reserve resources is the same or increased when compared to other action alternatives. As presented in the final SEIS, Alternative E defers, but does not deny, approval of one pad (BT5), but the assessment of impact assumes that pad would be approved in the future. Otherwise, Alternative E involves nearly the same infrastructure, such as processing and operations centers, roads, and pipelines, as the previously considered alternatives. And, despite the modifications, it would result in only a minor reduction of oil production and

greenhouse gas emissions compared to the previously considered action alternatives.

103.    The draft SEIS described specific screening criteria BLM used to consider possible alternatives, explaining that BLM excluded alternatives that the agency concluded were inconsistent with the following positions: (1) ConocoPhillips' lease rights dictate BLM must "allow access to at least some of the subsurface resource under all of [ConocoPhillips'] leases with a demonstrated development potential"; and (2) ConocoPhillips' development obligations under the Reserves Act implementing regulations mean that BLM must allow ConocoPhillips to "fully develop" the oil on its leases and that BLM "may not permit a development proposal that would strand an economically viable quantity of oil."

104.    The draft SEIS also included numerous other statements indicating that BLM continued to constrain its authority to condition, restrict, or prohibit oil and gas activities based on the view that ConocoPhillips has a right to develop all the oil on its leases.  For example, BLM asserted that it "must allow access to at least some of the subsurface resource under all of [ConocoPhillips'] leases with a demonstrated development potential," that it "may not permit a development proposal that would strand an economically viable quantity of oil," and that it is "obligated to approve development of leases in some form."

105.    Members of the public, including Plaintiffs, again submitted detailed comments on BLM's draft SEIS, which, among other things, pointed out that the draft SEIS failed to consider reasonable alternatives, failed to provide adequate process for

public involvement, failed to take a hard look at the direct, indirect, and cumulative impacts from the Project, including by failing to analyze downstream greenhouse gas emissions and oil spill risk from reasonably foreseeable future oil development, and that by arbitrarily constraining its authority, BLM was disregarding its obligation to protect the surface resources of the Reserve.

106. Commenters urged BLM to consider the no action alternative as a viable decision option, not only as a point of comparison, and to consider a range of reasonable alternatives that varied the development components that cause significant effects.

107. Commenters proposed reasonable alternatives that BLM should consider, including an alternative that would substantially reduce the Project's footprint and reduce total oil production; a seasonal, winter-only drilling alternative; an alternative eliminating infrastructure from within the Teshekpuk Lake Special Area and Colville River Special Area, among others, and an alternative that would delay authorization until a plan could be adopted to manage the Reserve consistent with the federal government's commitment to address the climate crisis. They also urged BLM to consult with FWS and NMFS on how greenhouse gas emissions from Willow would affect listed species and their habitat.

108. The Environmental Protection Agency (EPA), as a cooperating agency, urged BLM to consider alternatives that would reduce climate impacts and that would eliminate or reduce infrastructure in Special Areas.

### D. BLM's 2023 final SEIS

109. BLM published notice of availability of the final SEIS for the Willow Project on February 3, 2023. 88 Fed. Reg. 7,445 (Feb. 3, 2023).

#### 1. Failure to consider an adequate range of alternatives

110. The final SEIS considers the same four alternatives considered in the draft SEIS and identifies Alternative E, unchanged from the draft, as the preferred alternative.

111. The final SEIS deletes references that had appeared in the draft SEIS to the screening criteria BLM considered when deciding which alternatives to develop further and which to omit. It states that it adopted a new screening criteria that purports to address the *Sovereign Iñupiat for a Living Arctic* decision by directing consideration of alternatives that would reduce infrastructure and environmental impacts relative to ConocoPhillips' preferred project proposal.

112. The final SEIS nonetheless continues to assert that the agency must "allow access to at least some of the subsurface resource under all of [ConocoPhillips'] leases with a demonstrated development potential" and that BLM must allow ConocoPhillips to "fully develop" the oil on its leases. It continues to constrain its analysis to alternatives that would allow ConocoPhillips to develop all economically viable oil and gas on its leases.

113. Despite the fact the final SEIS acknowledges the urgency of the climate crisis and that Willow will result in significant greenhouse gas emissions, none of the alternatives meaningfully reduces the greenhouse gas emissions that would be caused by

*CBD et al. v. BLM et al.,*
Case No. 3:23-cv-00061-SLG
28

the Project.

114.    The final SEIS estimates Alternatives B, C, and D, would each produce an identical 628.9 million barrels of oil over 31 years, resulting in between 284 to 286 million metric tons of $CO_2$ equivalent emissions. Alternative E would reduce oil production by only approximately two percent, to 613.5 million barrels, resulting in approximately 278 million metric tons of $CO_2$ equivalent emissions.

115.    An alternative that would substantially reduce greenhouse gas emissions would reduce the Project's impact to the climate and surface resources in the Reserve. Such an alternative would be reasonable and consistent with the Project's purpose and need, and the terms of ConocoPhillips' leases.

116.    The final SEIS omits from consideration any alternative that would prohibit infrastructure in the Teshekpuk Lake Special Area on the basis that these alternatives "would strand an economically viable quantity of recoverable oil" or would not allow ConocoPhillips to "fully develop" the oil under its leases.

117.    An alternative that prohibited infrastructure in designated Special Areas would reduce impacts to these important and ecologically sensitive areas and is reasonable.  Such an alternative would be consistent with the Project's purpose and need, and the terms of ConocoPhillips' leases.

## 2.    Failure to assess the Project's full greenhouse gas emissions consequences

118.    The final SEIS describes the urgency of the climate crisis, and the severe

impacts of warming that are already occurring and projected to accelerate, especially in Arctic Alaska.

119.    It acknowledges that the Project will result in a significant amount of greenhouse gas emissions that will exacerbate climate change.

120.    BLM acknowledges that "[c]onstruction of the Willow Project may result in additional development opportunities to the south and west of the Project area if [ConocoPhillips] or other North Slope operators use Project infrastructure as a jumping-off point for new development [p]rojects."

121.    "Project infrastructure may provide additional opportunities for exploration or development in these areas by making exploration and development of leases to the south and west easier and more economically viable."

122.    BLM has identified a list of reasonably foreseeable future actions, including large oil development projects.

123.    This list includes a project, West Willow, which would directly link to the Willow Project's infrastructure and be dependent on and facilitated by the prior construction of the Willow Project.

124.    West Willow is an oil and gas discovery west of the Willow Project, consisting of two exploration wells that BLM has identified to have a resource potential of 75 million barrels of petroleum.  These wells are eight to 14 miles from the Willow Project's BT3 drill pad.

125.    The West Willow exploration wells, Greater Willow 1 and 2, are within the

Teshekpuk Lake Special Area.

126. Future development of West Willow would require additional oil and gas activity and infrastructure in the Teshekpuk Lake Special Area.

127. In addition to the potential West Willow project, other large-scale developments could flow from the construction of the Willow infrastructure.

128. ConocoPhillips has described Willow as the "next great Alaska hub" and stated that it has "identified up to 3 billion [barrels of oil equivalent] of nearby prospects and leads with similar characteristics that could leverage the Willow infrastructure."

129. EPA pointed out to BLM, "ConocoPhillips stated that since the Willow discovery, it has discovered an additional 500 million barrels of oil equivalent [ ] to 1.1 [billion barrels of oil equivalent] since 2016."

130. In addition to those projects, which would be connected to Willow and directly facilitated by the Willow Project, BLM has identified other specific reasonably foreseeable nearby projects, including the Pikka and Liberty projects, where high-quality information about likely oil production is publicly available.

131. Pikka is an oil and gas development east of the Colville River.

132. Construction for the Pikka development began in 2019. Drilling is expected to begin in the first half of 2023, with first oil expected in 2026.

133. Pikka will increase total North Slope oil production by 17 percent.

134. It is estimated Pikka will produce 80,000 barrels of petroleum per day and 768 million barrels over the life of the project.

135. Liberty is a proposed offshore oil and gas development project in the Beaufort Sea.

136. Development of Liberty would result in an increase in oil and gas production on the North Slope.

137. Liberty is estimated to contain approximately 120 million barrels of recoverable crude oil.

138. West Willow, Pikka, Liberty, and other large oil development projects will necessarily result in significant downstream greenhouse gas emissions. The final SEIS fails to quantify or analyze the downstream emissions from these reasonably foreseeable future actions, whether they are projects connected to or facilitated by the Willow Project or otherwise nearby. For the West Willow potential project, the final SEIS describes impacts associated with the emissions of greenhouse gas pollution flowing from the construction and operation of the development but ignores the downstream impact from consumption of the produced oil.

### 3. Failure to assess oil spill risk fully

139. The final SEIS also fails to include any analysis of oil spill risk from reasonably foreseeable future oil development.

140. The risk of spills of crude and refined oil, produced water and seawater, and other hazardous materials from these projects could be substantial.

141. BLM's method for assessing spill risk from oil production projects, which

the agency applied to quantify the probability of spills of different sizes and substances from drilling and oil production at the Willow Project, is based on the estimated barrels of oil to be produced by a given project.

142.    Because BLM has access to information about the likely oil production for reasonably foreseeable oil development projects, BLM could have applied the same method to estimate the probability of spills from reasonably foreseeable future oil development.

143.    Based on the barrels of oil to be produced under Alternative E, BLM estimates a spill rate of 1.61 medium-sized crude oil spills over the life of the Willow Project.  The final SEIS describes a medium-sized crude oil spill as ranging from 2,201 gallons to 36,036 gallons, with an average spill size of more than 9,800 gallons.  If BLM included in its analysis the estimated oil production from Pikka and West Willow, just two of the foreseeable developments BLM identified in the final SEIS, the anticipated frequency of medium-sized crude oil spills in the area during the time of these cumulative activities increases to almost four (3.83).

144.    Similarly, had BLM considered the cumulative potential for refined oil spills from production of Willow, West Willow, and Pikka, the number of medium-sized spills (average size 3,269 gallons) in the area would increase from less than one anticipated spill from production under Alternative E to more than two medium-sized spills.  For seawater or produced water spills, the number of medium-sized spills (average size 6,854 gallons) increases from a rate of 4.96 to an anticipated frequency of 11.77

spills.  And the anticipated frequency of medium-sized spills of other hazardous materials (average size 5,341 gallons), when considering production from West Willow and Pikka, increases from 1.98 to 4.71.

145.    Spills from crude and refined oil, seawater or produced water, and other hazardous materials could cause significant impacts to the tundra, nearby fresh and marine waters, the Teshekpuk Caribou Herd and bird habitat, other resources within the Reserve, subsistence availability, and human health.

146.    BLM's spill risk analysis in the final SEIS did not account for the increased risk of spills and impacts from reasonably foreseeable future development.

### 4.    Failure to mitigate significant impacts

147.    BLM acknowledged that Willow would result in significant greenhouse gas emissions that would worsen climate change that is already harming the Reserve.  It also determined that Willow may significantly restrict subsistence uses for the community of Nuiqsut "due to a reduction in the availability of resources caused by alteration of their distribution and limitations on subsistence user access to the area."

148.    Despite BLM's obligation to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the Reserve, the final SEIS acknowledges significant impacts from the Willow Project, as reflected in Alternative E, to a range of resources in the Reserve, including soils and permafrost; the visual landscape; water resources; wetlands; fish; birds, including special status and endangered

species; caribou; and marine mammals, including polar bears, bearded seals, and ringed seals; among others.

149. Despite BLM's acknowledgment of the important values protected by the Teshekpuk Lake Special Area and the Colville River Special Area, and BLM's obligation to provide "maximum protection" to these values, each alternative discussed in the final SEIS includes well pads, roads, and other infrastructure in the Teshekpuk Lake Special Area and a road and pipelines through the Colville River Special Area. BLM acknowledges that this infrastructure and the activities it will facilitate will have adverse effects on the surface resources of the Teshekpuk Lake Special Area, the Colville River Special Area, and other areas in the Reserve.

### E. ESA consultation

150. Oil and gas activity under the Willow Project will cause a myriad of direct impacts to polar bears, ringed seals, bearded seals, and other ESA-listed species, in the form of noise disturbance, physical obstructions, human-bear interactions, oil spills, and seismic vehicles that could crush polar bears in their dens, among other impacts. Additionally, the estimated 239 indirect, and 260 combined direct and indirect, million metric tons of greenhouse gas emissions that will result from the Willow Project are appreciable and significant and will result in indirect impacts to these species, and potentially others.

151. Because the Willow Project will affect ESA-listed species and their

federally designated critical habitat, the ESA required BLM to consult with the FWS and NMFS before approving the Project.

152. On December 16, 2022, BLM sent a request for ESA consultation on the Willow Project to NMFS. That request did not attempt to assess whether ESA-listed species may be affected by the greenhouse gas emissions under the Willow Project. BLM concluded that the Willow Project is not likely to adversely affect any listed species nor adversely modify any designated critical habitat under NMFS's jurisdiction.

153. On March 2, 2023, NMFS issued a letter of concurrence, concluding that the Willow Project may affect, but is not likely to adversely affect, the bowhead whale, blue whale, fin whale, North Pacific right whale, Western North Pacific gray whale distinct population segment (DPS), Western North Pacific humpback whale DPS, Mexico humpback whale DPS, sperm whale, Arctic ringed seal subspecies, Beringia bearded seal DPS, or the Western Steller sea lion DPS. NMFS also concluded that the Willow Project would not destroy or adversely modify critical habitat for the North Pacific right whale, Western North Pacific or Mexico humpback whale DPSs, Arctic subspecies ringed seal, Beringia bearded seal DPS, or Steller sea lion.

154. The NMFS letter of concurrence considered how the Willow Project will affect these species and their habitats through vessel traffic delivering construction materials from Dutch Harbor to Oliktok Dock, screeding (which uses a barge manipulated by two tugboats to redistribute seabed materials to provide a flat and even surface on which the barges can be grounded), pipeline crossing of the Colville River,

and oil spill prevention and response measures.

155. NMFS defined the action area as the area within which project-related noise occurs above a certain level. The action area includes the area within 1.5 miles of both sides of project-related vessels and the installation site for pipelines in the Colville River. NMFS did not consider whether there would be any effects resulting from greenhouse gas emissions caused by the Willow Project, and it did not analyze whether such emissions will affect ESA-listed species or destroy or adversely modify federally designated critical habitat.

156. On August 19, 2022, BLM sent a request for ESA consultation on the Willow Project to FWS. That request did not attempt to assess whether ESA-listed species may be affected by the greenhouse gas emissions under the Willow Project. BLM concluded that the Willow Project is not likely to adversely affect Alaska-breeding Steller's eiders or the southwest Alaska sea otter DPS nor adversely modify their designated critical habitat. It further concluded that the Willow Project is likely to adversely affect polar bears and spectacled eiders but is not likely to threaten the continued existence of these species or adversely modify their critical habitat.

157. On January 13, 2023, FWS issued a biological opinion on the Willow Project. FWS concurred with BLM that the Willow Project is not likely to adversely affect Alaska-breeding Steller's eiders or the southwest Alaska sea otter DPS or their critical habitat. FWS concluded that the Willow Project is likely to adversely affect but not jeopardize the polar bear and spectacled eider. FWS concluded that the Willow

Project is not likely to destroy or adversely modify polar bear critical habitat or spectacled eider critical habitat.

158. The FWS biological opinion considered how the Willow Project will affect these species and their habitats through habitat loss from roads, pads, and gravel excavation and fill; noise pollution from construction and operation of the Project; obstructions to the movement of polar bears; human-polar bear interactions; bird collisions with project infrastructure and vessels; and spills of oil and other products. Despite recognizing that many of these activities would disturb denning and non-denning bears and scientific evidence demonstrating that these activities could injure polar bears, FWS concluded that the Willow Project would not harass or otherwise incidentally take polar bears within the meaning of the ESA. In reaching this determination, FWS ignored or contradicted the best available science and adopted a new interpretation of the meaning of "harassment" under the ESA to conclude Willow will not take polar bears because oil and gas activities "would be conducted with the intent of developing and producing oil and gas and without any intent to annoy, disturb, or harass polar bears."

159. FWS defined the action area in two parts. It defined the terrestrial action area as the area within one mile of Willow Project activities. It defined the offshore action area as the area within 1.5 miles of offshore Project components, including vessel traffic and construction, screeding, and offloading activities at Oliktok Dock. FWS did not consider available information regarding the stress the species is already facing from climate change and other oil and gas projects in the Reserve. FWS did not consider

whether there would be any effects resulting from greenhouse gas emissions caused by the Willow Project, and it did not analyze whether such emissions will affect ESA-listed species or destroy or adversely modify federally designated critical habitat.

160.    Scientists can now predict specific impacts from the incremental increases in greenhouse gas emissions directly attributable to federal agency actions, and can also assess the consequences of those emissions for ESA-listed species' conservation and recovery.  One study estimated, for example, that each metric ton of $CO_2$ emissions results in a sustained loss of three-square meters of September Arctic sea-ice area based on the robust linear relationship between monthly mean September sea-ice area and cumulative $CO_2$ emissions.

161.    Despite this science and the requirements of the ESA, BLM has never at any stage in the fossil fuel leasing or production approval process consulted with the FWS or NMFS on the impacts of the emissions caused by burning fossil fuels extracted from the Willow Project, despite admitting that those emissions will occur.

**F.    BLM's 2023 ROD approving the Project**

162.    On March 13, 2023, BLM published a ROD approving the Willow Project.

163.    BLM approved a version of the Project that it analyzed in the final SEIS as Alternative E, approving three well pads and their associated infrastructure.  The approved Project deviates from Alternative E, as analyzed in the final SEIS, by disapproving a fourth well (BT5) rather than deferring it for a later decision.  As

approved, the Willow Project would have an enormous footprint on an irreplaceable landscape. The alternative approved by BLM includes the Willow processing facility, Willow operations center, 199 wells dispersed between three drill sites (BT1, BT2, and BT3), with drill site BT2 located north of Fish Creek in the Teshekpuk Lake Special Area. The approved Project also includes blasting a gravel mine in the Tiŋmiaqsiuġvik River drainage to provide gravel to construct more than 25 miles of gravel roads, the construction of hundreds of miles of pipelines, a more than mile-long airstrip, hundreds of miles of ice roads, and a 98-megawatt power plant. The Project includes excavation of 115 acres, and a total footprint of nearly 500 acres, resulting in a dust shadow of more than 2,700 acres.

164. Although the approved Project contains fewer drill pads than other alternatives considered in the final SEIS, two of the pads would be larger and accommodate more wells. In addition, to eliminate one of the two well pads in Teshekpuk Lake Special Area (BT4), the remaining pad (BT2) has been moved further into the Special Area, including requiring a stream crossing, to be able to access the oil that would otherwise have been accessed by BT4.

165. The approved Project would have significant consequences for the climate. As approved, the Project could produce approximately 576 million barrels of oil, resulting in indirect emissions of 239 million metric tons, and combined direct and indirect emissions of about 260 metric tons, of greenhouse gases over 30 years.

166. The approved alternative would also provide a hub for future exploration

and development in other nearby areas in the Western Arctic and could lead to production of billions of additional barrels of oil.

167. To the west of the Willow Project lies West Willow, which BLM has estimated could hold an additional 75 million barrels of oil. In an appendix to the ROD approving Willow, BLM stated ConocoPhillips could provide a mitigation measure in which it would relinquish leases within the northern and southern areas of the Bear Tooth Unit. Relinquishment of these leases would not affect development of West Willow.

168. The Project allows ConocoPhillips to access 92 percent as much oil as ConocoPhillips' preferred alternative.

169. The ROD acknowledges BLM's obligation to ensure maximum protection of surface values in designated Special Areas, such as the Teshekpuk Lake and Colville River Specials Areas. The selected alternative includes Project infrastructure in both the Teshekpuk Lake and Colville River Special Areas. The ROD does not explain how lessening the Project infrastructure in the Teshekpuk Lake Special Area assures maximum protection of the special area. The ROD also does not explain how the continued Project infrastructure in the Colville River Special Area, under the selected alternative, assures maximum protection.

170. The ROD acknowledges BLM's obligations under the Reserves Act to provide for "such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of" the Reserve. The ROD lists components of the

Project that have been reduced in size or frequency under the final decision compared to other considered alternatives. The ROD does not otherwise explain how the decision addresses the significantly adverse effects of Alternative E as described in the final SEIS. The ROD also includes Mitigation Measure 27 as an adopted mitigation measure. Mitigation Measure 27 is described as compensatory mitigation with a stated objective to "[p]ermanently protect the most important habitat areas for the maternal and migrating caribou of the Teshekpuk Caribou Herd, including Teshekpuk Lake, a buffer around the lake, and the migration corridors to the east and northwest." BLM states that it will develop compensatory mitigation to provide long-term protections for the Teshekpuk Caribou Herd to offset impacts from the Willow Project on the herd. BLM does not state when the future mitigation measure will be implemented or provide any details of what the measure might entail.

## CLAIMS FOR RELIEF

### I.     First claim for relief (NEPA)

171.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs.

172.    NEPA requires that federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

173.    An agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts

concerning alternative uses of available resources." *Id.* § 4332(2)(E); 40 C.F.R. § 1502.14.

174. The range of alternatives must include reasonable alternatives to the proposed action that will avoid or minimize adverse effects of these actions upon the quality of the human environment. 40 C.F.R. § 1500.2(e).

175. An agency must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14.

176. The final SEIS fails to consider a reasonable range of action alternatives.

177. The final SEIS fails to consider appropriate, environmentally protective alternatives, including any alternative that would meaningfully reduce the climate impacts of the Willow Project by reducing total downstream greenhouse gas emissions, or any alternative that would prohibit infrastructure in the Teshekpuk Lake Special Area and the Colville River Special Area. Plaintiffs and others specifically suggested alternatives that would accomplish these goals during the public comment process.

178. Although BLM asserts that it has considered alternatives that would reduce infrastructure and environmental impacts relative to ConocoPhillips' preferred project proposal in response to the S*overeign Iñupiat for a Living Arctic* decision, it continues to constrain its analysis to alternatives that would allow ConocoPhillips to develop all economically viable oil and gas on its leases.

179. BLM asserts elsewhere in the final SEIS that it may only consider

alternatives that would allow ConocoPhillips to "fully develop" the oil under its leases and that it cannot consider any alternative that "would strand an economically viable quantity of recoverable oil." This is contrary to BLM's obligations and authority under the Reserves Act to condition, restrict, or prohibit activity as it determines necessary to protect surface resources, and it is an unlawful basis on which to justify failure to consider reasonable project alternatives that would reduce environmental impacts.

180.    Defendants' decision to permit the Willow Project without considering reasonable alternatives that would reduce adverse impacts and without describing the comparative environmental impacts of those alternatives was arbitrary, capricious, and not in accordance with law in violation of NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. §§ 1500.2, 1502.14, and the APA, 5 U.S.C. §§ 702, 706.

## II.    Second claim for relief (NEPA)

181.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs.

182.    NEPA requires that federal agencies take a hard look at the environmental consequences of a proposed action, including by disclosing and analyzing the significance of all direct, indirect, and cumulative environmental impacts of each alternative. 40 C.F.R. §§ 1502.14, 1502.16, 1508.7, 1508.8. The agency's analysis must consider and incorporate accurate scientific analysis, expert agency comments, and public

comments.  *Id.* § 1500.1(b).

183.    An agency analysis of an action's indirect effects must include an assessment of effects caused by the action that may be later in time or farther removed in distance from the action, including growth-inducing effects and other effects related to induced changes in the pattern of land use.  *Id.* § 1508.8.

184.    An agency's analysis of cumulative environmental impacts must consider the impacts of the Project together with past, present, and reasonably foreseeable future actions.  40 C.F.R. § 1508.7.  This analysis requires quantified or detailed information.

185.    When reasonably foreseeable future actions will result in fossil fuel production, NEPA requires the agency to disclose and analyze the downstream environmental effects associated with consumption of the produced oil, including by quantifying the resulting greenhouse gas emissions and describing both indirect and cumulative impacts.

186.    The final SEIS fails to disclose or analyze the indirect and cumulative environmental effects of the downstream greenhouse gas emissions of oil production that the Willow Project will facilitate or that the final SEIS identifies as reasonably foreseeable.

187.    When reasonably foreseeable future actions will create risk of oil spills, an agency must disclose and analyze that oil spill risk.

188.    The final SEIS fails to disclose or analyze oil spill risk from reasonably foreseeable future actions.

189. The final SEIS fails to disclose or analyze the environmental effects of reasonably foreseeable oil production from additional nearby discoveries and prospects.

190. Defendants' failure to accurately disclose and adequately analyze indirect and cumulative impacts from the Willow Project is arbitrary, capricious, and not in accordance with law, in violation of NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. §§ 1508.7, 1508.8, and the APA, 5 U.S.C. §§ 702, 706.

## III. Third claim for relief (Reserves Act)

191. Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs.

192. The APA bars an agency from arbitrary and capricious decisionmaking, including reliance on factors Congress did not intend it to consider, failure to consider an important aspect of the problem, failure to analyze compliance with governing legal requirements, failure to explain conclusions rationally, and failure to respond to properly raised public comments that bear on the agency's consideration of relevant factors or adoption of a proposed decision.  5 U.S.C. § 706(2)(A).

193. The Reserves Act charges the Secretary of the Interior with protecting the "environmental, fish and wildlife, and historical or scenic values" within the Reserve. 42 U.S.C. § 6503(b).  For all activities undertaken pursuant to the Act, the Secretary "shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and

significantly adverse effects on the surface resources of the [Reserve]." *Id.* § 6506a(b).

The Secretary also must provide "maximum protection" to areas containing "significant

subsistence, recreational, fish and wildlife, or historical or scenic value." *Id.* § 6504(a).

194. The final SEIS demonstrates that the Willow Project as approved will have

significantly adverse effects on the surface resources of the Reserve. The ROD

acknowledges that the Willow Project will have significant adverse effects on the

Reserve and subsistence uses there.

195. BLM's assertions in the final SEIS that it must allow ConocoPhillips to

"fully develop" the oil under its leases and that it cannot consider any project that "would

strand an economically viable quantity of recoverable oil" are inconsistent with the

agency's obligation under the Reserves Act to condition, restrict, or prohibit activity as it

determines necessary to protect surface resources and its clear authority to take a broad

range of actions to do so.

196. By arbitrarily limiting its own authority, BLM has unlawfully constrained

its ability to condition, restrict, or prohibit ConocoPhillips' activities in order to mitigate

adverse effects on other resources and offer maximum protection to special areas.

197. Defendants' decision to approve the Willow Project without considering

the full range of ways BLM could condition, restrict, or prohibit ConocoPhillips'

proposed project to ensure compliance with 42 U.S.C. §§ 6504(a) and 6506(a)(b) is

arbitrary, capricious, and otherwise not in accordance with law in violation of the

Reserves Act and the APA, 5 U.S.C. §§ 702, 706.

198. Defendants' approval of the Willow Project despite acknowledging significant adverse impacts is arbitrary, capricious, and otherwise not in accordance with law in violation of the Reserves Act, 42 U.S.C. § 6506a(b), and the APA, 5 U.S.C. §§ 702, 706, without further explanation, given their obligation to prevent such impacts.

## IV.    Fourth claim for relief (ESA)—Unlawful NMFS letter of concurrence

199. Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs.

200. If listed marine species may be present in a project's action area, the action agency must prepare a "biological assessment" or engage in "informal consultation" to determine whether the listed species is likely to be adversely affected by the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12, 402.13.

201. The "action area" includes all areas that would be "affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02. The indirect effects of an action can be far removed from the location a project occurs and can encompass the entirety of a threatened or endangered species' range.

202. If an agency determines that a proposed action "may affect" any listed species or critical habitat, the agency must engage in formal consultation with the expert wildlife agencies unless the biological assessment or informal consultation concludes that the action is not likely to adversely affect any listed species or critical habitat and the

expert wildlife agencies concur in writing with that finding.  *Id*. § 402.14(a), (b).

203.    The "may affect" standard broadly includes "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character."  51 Fed. Reg. 19,926, 19,949 (June 3, 1986).

204.    Emissions from the Willow Project would contribute to climate change, which would affect climate-threatened species, including Arctic ringed seals and bearded seals and their designated critical habitat.  Yet BLM's biological assessment to NMFS and NMFS's Willow letter of concurrence fail to analyze any possible impact of the Willow Project's greenhouse gas emissions.  The letter of concurrence fails to consider whether take of ringed seals, bearded seals, or other species would result from the impacts of the Willow Project's greenhouse gas emissions.  The letter of concurrence fails to consider whether adverse modification or destruction of critical habitat of ringed seals, bearded seals, or other species would occur due to the impacts of greenhouse gas emissions from the Willow Project.

205.    NMFS's letter of concurrence is a final agency action within the meaning of the APA.

206.    NMFS's analyses and conclusions, and its reliance on the BLM biological assessment, are not based on the best scientific and commercial data available.  NMFS ignored relevant factors and failed to analyze and develop projections based on information and methodology that were available, in violation of the ESA and the APA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.13 & 14; 5 U.S.C. §§ 702, 706.

207. NMFS's letter of concurrence means it did not engage in formal consultation, and as a result, NMFS failed to determine whether the action, in combination with the environmental baseline and cumulative effects, will jeopardize these ESA-listed species or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.12, 402.14. Additionally, NMFS failed to prepare an incidental take statement that would have required that impacts to these threatened species be minimized through reasonable and prudent measures, terms and conditions, and monitoring and reporting requirements. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7), (i).

208. NMFS's letter of concurrence, concluding that the Willow Project is not likely to adversely affect these threatened species or their critical habitat, is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA or its procedures. 5 U.S.C. §§ 702, 706.

## V. Fifth claim for relief (ESA)—Unlawful FWS biological opinion

209. Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs.

210. In completing a biological opinion and making its jeopardy determination pursuant to section 7(a)(2) of the ESA, FWS, in its capacity as the expert consulting agency, must consider whether the aggregate effects of the factors considered in the environmental baseline, effects of the action, and cumulative effects, when viewed

against the status of the species, are likely to jeopardize the continued existence of the species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14(g).

211. A biological opinion that concludes that the agency action is not likely to jeopardize the continued existence of a listed species but is reasonably likely to result in incidental take must include an incidental take statement. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7).

212. FWS's Willow biological opinion is a final agency action within the meaning of the APA.

213. Greenhouse gas emissions from the Willow Project would contribute to climate change, which would affect climate-threatened species, including polar bears and their designated critical habitat.

214. The FWS Willow biological opinion fails to consider whether adverse modification or destruction of polar bear critical habitat due to loss of sea ice would result from the greenhouse gas emissions from the Willow Project. The FWS Willow biological opinion fails to consider whether adverse modification or destruction of polar bear critical habitat due to reduced prey availability of ice seals—themselves declining due to climate change—would result from the Willow Project. The FWS Willow biological opinion fails to consider whether take to any listed species might result from the greenhouse gas emissions caused by the Willow Project.

215. FWS's Willow biological opinion is not based on the best scientific and

commercial data available. FWS, for example, failed to properly analyze the environmental baseline for polar bears by ignoring available information regarding the stress the species is already facing from climate change and other oil and gas projects in the Reserve. 50 C.F.R. § 402.02. FWS ignored relevant factors and failed to develop and analyze projections based on information and methodology that were available, in violation of the ESA and the APA. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14; 5 U.S.C. §§ 702, 706.

216. FWS's Willow biological opinion fails to contain an incidental take statement for take reasonably certain to occur from the Willow Project. FWS's conclusion that the Willow Project is not likely to take polar bears within the meaning of the ESA is contrary to the agency's own findings and the best available science. FWS's new interpretation of the meaning of "harassment" is arbitrary and undermines the conservation purposes of the ESA.

217. FWS's Willow biological opinion is arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA or its procedures, in violation of the APA. 5 U.S.C. §§ 702, 706.

218. In ignoring the climate effects of the Willow Project on the polar bear or its critical habitat, FWS may be relying on the U.S. Department of the Interior, Office of the Solicitor, Guidance on the Applicability of the Endangered Species Act's Consultation Requirements to Proposed Actions Involving the Emissions of Greenhouse Gases (Oct. 3, 2008) (Bernhardt Legal Opinion). In view of the best available science regarding the

threats that climate change poses to the polar bear, and the extent to which federal agency actions such as the Willow Project contribute to such threats, FWS's reliance on the Bernhardt Legal Opinion to avoid consideration of these impacts in its section 7 consultation violates the ESA and is arbitrary, capricious, and not in accordance with law in contravention of the APA.  5 U.S.C. §§ 702, 706.

## VI.    Sixth Claim for Relief (ESA)—Unlawful Reliance on NMFS concurrence

219.    Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs.

220.    BLM has a duty as the action agency authorizing and managing the Willow Project to ensure that its actions are not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of designated critical habitat.  16 U.S.C. § 1536(a)(2).  BLM cannot meet its ESA section 7 obligations for the Willow Project by relying on a letter of concurrence that is legally flawed.  *Id.*

221.    The NMFS Willow letter of concurrence is unlawful for the reasons described in this complaint, and thus BLM's reliance on that concurrence in authorizing and approving the Willow Project is arbitrary, capricious, and in violation of the ESA.  16 U.S.C. § 1536(a)(2).

222.    Because the NMFS Willow letter of concurrence is unlawful, BLM is in ongoing violation of its independent and substantive duty to ensure that its authorization and management of the Willow Project is not likely to jeopardize the continued existence

of the ringed seal or bearded seal, or result in the destruction or adverse modification of their designated critical habitat, in violation of section 7 of the ESA. 16 U.S.C. § 1536(a)(2).

## VII. Seventh Claim for Relief (ESA)—Unlawful Reliance on FWS biological opinion

223. Plaintiffs incorporate by reference each of the allegations in the preceding paragraphs.

224. BLM has a duty as the action agency authorizing and managing the Willow Project to ensure that its actions are not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. § 1536(a)(2). BLM cannot meet its ESA section 7 obligations for the Willow Project by relying on a biological opinion that is legally flawed. *Id.*

225. The FWS Willow biological opinion is unlawful for the reasons described in this complaint, and thus BLM's reliance on that opinion in authorizing and managing the Willow Project is arbitrary, capricious, and in violation of the ESA. 16 U.S.C. § 1536(a)(2).

226. Because the FWS Willow biological opinion is unlawful, BLM is in ongoing violation of its independent and substantive duty to ensure that its authorization and management of the Willow Project is not likely to jeopardize the continued existence of the polar bear or Steller's eider, or result in the destruction or adverse modification of their designated critical habitat, in violation of section 7 of the ESA. 16 U.S.C.

§ 1536(a)(2).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

1. Enter declaratory judgment that the decision to approve ConocoPhillips' Willow Project, the NEPA review of the Project, the biological opinion for the Willow Project, and the letter of concurrence for the Willow Project, were arbitrary, capricious, and/or not in accordance with the law;

2. Enter declaratory judgment that BLM is in violation of the ESA and its implementing regulations by failing to ensure that the Willow Project will neither jeopardize the continued existence of ESA-listed species nor destroy or adversely modify designated critical habitat;

3. Vacate the ROD approving the Willow Project;

4. Vacate the final SEIS for the Willow Project;

5. Vacate the biological opinion for the Willow Project;

6. Vacate the letter of concurrence for the Willow Project;

7. Enter appropriate injunctive relief to ensure that Defendants comply with NEPA, the Reserves Act, and the ESA and to prevent irreparable harm to Plaintiffs and to the environment until such compliance occurs;

8. Award Plaintiffs the costs of this action, including reasonable attorney's fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and the ESA, 16

U.S.C. § 1540(g)(4); and

9.    Grant such other relief as this Court deems just and proper.

 Respectfully submitted this 20th day of June, 2023.

*s/ Eric P. Jorgensen*

Eric P. Jorgensen (Alaska Bar No. 8904010)
Erik Grafe (Alaska Bar No. 0804010)
Jeremy C. Lieb (Alaska Bar No. 1810088)
Ian S. Dooley (Alaska Bar No. 2006059)
Carole A. Holley (Alaska Bar No. 0611076)
EARTHJUSTICE

*Attorneys for Plaintiffs Center for Biological Diversity, Defenders of Wildlife, Friends of the Earth, and Greenpeace, Inc.*

*s/ Kristen Monsell*

Kristen Monsell (California Bar No. 304793) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY

*Attorneys for Plaintiff Center for Biological Diversity*

*s/ Cecilia Segal*

Cecilia Segal (California Bar No. 310935) (*pro hac vice*)
Michelle Wu (New York Bar No. 5633664) (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Plaintiff Natural Resources Defense Council*