Jeremy C. Lieb
Erik Grafe
Ian S. Dooley
Carole A. Holley
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: jlieb@earthjustice.org
E: egrafe@earthjustice.org
E: idooley@earthjustice.org
E: cholley@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Center for Biological Diversity, Defenders of Wildlife, Friends of the Earth, and Greenpeace, Inc.*

Kristen Monsell (*pro hac vice*)
CENTER FOR BIOLOGICAL
DIVERSITY
1212 Broadway, St. #800
Oakland, CA 94612
T: 510.844.7100
E: kmonsell@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological Diversity*

Cecilia Segal (*pro hac vice*)
NATURAL RESOURCES DEFENSE
COUNCIL
111 Sutter St., 21st floor
San Francisco, CA 94104
T: 415.875.6100
E: csegal@nrdc.org

Michelle Wu (*pro hac vice*)
NATURAL RESOURCES DEFENSE
COUNCIL
40 West 20th St., 11th Floor
New York, NY 10011
T: 646.889.1489
E: michellewu@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY *et al.*,<br><br>   *Plaintiffs*,<br><br>   v.<br><br>BUREAU OF LAND MANAGEMENT *et al.*,<br><br>   *Defendants*,<br><br>CONOCOPHILLIPS ALASKA, INC. *et al.*,<br><br>   *Intervenor-Defendants*. | ) ) ) ) ) ) ) ) ) ) )  Case No. 3:23-cv-00061-SLG |

**PLAINTIFFS' PRINCIPAL BRIEF UNDER LOCAL RULE 16.3(c)(1)**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

I.      Willow threatens significant local and global environmental harm........................ 2

II.     The federal government's analyses of the Project remain flawed. ......................... 5

PLAINTIFFS' INTERESTS ....................................................................................... 7

STANDARD OF REVIEW ......................................................................................... 7

ARGUMENT .............................................................................................................. 8

I.      BLM violated NEPA. ......................................................................................... 8

        A.      BLM failed to consider a reasonable range of alternatives............................ 8

        B.      BLM failed to assess foreseeable downstream greenhouse gas
                emissions from future oil development induced by Willow. ...................... 15

II.     BLM violated the Reserves Act by failing to reasonably explain its decision
        not to adopt an alternative or mitigation measures to limit Willow's
        downstream emissions.................................................................................... 21

III.    The Willow ESA consultations are unlawful. ...................................................... 25

        A.      The consultations fail to consider the effects of Willow's carbon
                emissions. ................................................................................... 26

                1.      The agencies applied the wrong standard. ...................................... 28

                2.      The agencies ignored the best available science. .............................. 30

        B.      FWS's Biological Opinion fails to contain an incidental take
                statement for polar bears. ........................................................... 32

                1.      FWS's interpretation of harassment is arbitrary. ............................. 32

                2.      FWS's conclusion that Willow will not harass non-denning
                        bears is also arbitrary........................................................ 35

C.      BLM's reliance on the consultations violates its substantive ESA obligations. ............................................................. 38

IV.   Vacatur is the presumptive remedy and is merited here. ....................... 38

CONCLUSION ............................................................................. 41

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS ......................... 42

# TABLE OF AUTHORITIES

**CASES**

*Alaska Oil & Gas Ass'n v. Pritzker*,
    840 F.3d 671 (9th Cir. 2016) ...................................................... 29

*All. for the Wild Rockies v. USFS*,
    907 F.3d 1105 (9th Cir. 2018) ............................................. 38, 39

*Am. Fuel & Petrochem. Mfrs. v. EPA*,
    937 F.3d 559 (D.C. Cir. 2019) ................................................. 29

*Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*,
    515 U.S. 687 (1995) ................................................................... 34

*Barnes v. U.S. Dep't of Transp.*,
    655 F.3d 1124 (9th Cir. 2011) ............................................. 16, 20

*Cal. Cmtys. Against Toxics v. EPA*,
    688 F.3d 989 (9th Cir. 2012) ............................................... 39, 40

*California v. BLM*,
    277 F.Supp.3d 1106 (N.D. Cal. 2017) ...................................... 39

*Cantrell v. City of Long Beach*,
    241 F. 3d 674 (9th Cir. 2001) ..................................................... 7

*CBD v. Bernhardt*,
    982 F.3d 723 (9th Cir. 2020) ............................... 15, 19, 20, 38

*CBD v. BLM*,
    698 F.3d 1101 (9th Cir. 2012) ............................................. 27, 28

*CBD v. EPA*,
    861 F.3d 174 (D.C. Cir. 2017) ................................................. 29

*CBD v. NHTSA*,
    538 F.3d at 1219 ....................................................... 13, 14, 15

*CBD v. FWS*,
    409 F.Supp.3d 738 (D. Ariz. 2019) .......................................... 14

*City of Davis v. Coleman*,
 521 F.2d 661 (9th Cir. 1975) ........................................................ 16, 19, 20

*Conner v. Burford*,
 848 F.2d 1441 (9th Cir. 1988) ................................................................ 28

*Cook Inletkeeper v. Raimondo*,
 533 F.Supp.3d 739 (D. Alaska 2021) ................................................. 37, 40

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
 528 U.S. 167 (2000) ...................................................................................... 7

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*,
 109 F.Supp.2d 30 (D.D.C. 2000) ............................................................. 19

*Friends of Yosemite Valley v. Kempthorne*,
 520 F.3d 1024 (9th Cir. 2008) ............................................................... 8, 9

*Greater Yellowstone Coal. v. Servheen*,
 665 F.3d 1015 (9th Cir. 2011) ................................................................ 29

*Growth Energy v. EPA*,
 5 F.4th 1 (D.C. Cir. 2021) ................................................................. 28, 29

*Humane Soc'y v. Locke*,
 626 F.3d 1040 (9th Cir. 2010) ................................................................ 38

*Idaho Farm Bureau Fed'n v. Babbitt*,
 58 F.3d 1392 (9th Cir. 1995) .................................................................. 39

*Karuk Tribe v. USFS*,
 681 F.3d 1006 (9th Cir. 2012) ............................................... 25, 28, 29, 30

*Kenaitze Indian Tribe v. Alaska*,
 860 F.2d 312 (9th Cir. 1988) .................................................................. 34

*Klamath-Siskiyou Wildlands Ctr. v. NOAA*,
 109 F.Supp.3d 1238 (N.D. Cal. 2015) ................................................ 38, 40

*N. Alaska Env't Ctr. v. Kempthorne*,
 457 F.3d 969 (9th Cir. 2006) .................................................................. 10

*Nat'l Family Farm Coal. v. EPA*,
 960 F.3d 1120 (9th Cir. 2020) ............................................................ 38, 40

*Nat'l Parks Conservation Ass'n v. EPA*,
    788 F.3d 1134 (9th Cir. 2015) ............................................... 24

*NRDC v. DOE*,
    No. 04-cv-04448, 2007 WL 1302498 (N.D. Cal. May 2, 2007) ........................... 16, 19

*NRDC v. EPA*,
    38 F.4th 34 (9th Cir. 2022) ................................................... 40

*NRDC v. Kempthorne*,
    506 F.Supp.2d 322 (E.D. Cal. 2007) .......................................... 31

*NRDC v. Pritzker*,
    828 F.3d 1125 (9th Cir. 2016) ............................................. 23, 24

*NRDC v. USFS*,
    421 F.3d 797 (9th Cir. 2005) .................................................. 14

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) .................................................. 16

*Or. Nat. Desert Ass'n v. BLM*,
    625 F.3d 1092 (9th Cir. 2010) ................................................. 8

*Pollinator Stewardship Council v. EPA*,
    806 F.3d 520 (9th Cir. 2015) .............................................. 38, 40

*Rock Creek All. v. USFS*,
    703 F.Supp.2d 1152 (D. Mont. 2010) .......................................... 25

*Se. Alaska Conservation Council v. USFS*,
    468 F.Supp.3d 1148 (D. Alaska 2020) ......................................... 39

*Sierra Club v. Marsh*,
    816 F.2d 1376 (9th Cir. 1987) ................................................ 39

*Sovereign Iñupiat for a Living Arctic v. BLM*,
    555 F.Supp.3d 739 (D. Alaska 2021) .................................... 5, 9, 14, 32, 38

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ............................................... 41

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) .......................................................... 30

*W. Watersheds Project v. Abbey*,
  719 F.3d 1035 (9th Cir. 2013) ................................................................. 13

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) .............................................................. 8, 25

*Zuniga v. Barr*,
  946 F.3d 464 (9th Cir. 2019) ................................................................. 32

## STATUTES

5 U.S.C. § 704 ................................................................................................ 7

5 U.S.C. § 706 ................................................................................................ 7

5 U.S.C. § 706(2)(A) .................................................................................. 7, 38

16 U.S.C. § 1532(5) ..................................................................................... 26

16 U.S.C. § 1532(19) ................................................................................... 33

16 U.S.C. § 1536(a)(2) ........................................................................... 25, 26

16 U.S.C. § 1536(b)(4) ........................................................................... 32, 33

42 U.S.C. § 6503(b) ..................................................................................... 10

42 U.S.C. § 6504(a) ....................................................................... 4, 9, 10, 21

42 U.S.C. § 6506a(a) .................................................................................... 10

42 U.S.C. § 6506a(b) ...................................................................... 4, 9, 10, 21

## REGULATIONS

40 C.F.R. § 1502.14 ....................................................................................... 8

40 C.F.R. § 1508.8(b) .................................................................................. 15

43 C.F.R. § 2361.1(a), (e)(1) ....................................................................... 10

43 C.F.R. § 3130.0-1 .................................................................................... 10

43 C.F.R. § 3135.2(a)(1), (3) ....................................................................... 10

43 C.F.R. § 3137.21(a)(4) ................................................................................ 11

43 C.F.R. § 3137.71(b)(1) ................................................................................ 11

43 C.F.R. § 3137.73(b) .................................................................................... 11

50 C.F.R. § 17.3 ......................................................................................... 32, 33

50 C.F.R. § 402.02 .......................................................................................... 33

50 C.F.R. § 402.14(a) ...................................................................................... 28

## FEDERAL REGISTER NOTICES

42 Fed. Reg. 28,723 (June 3, 1997) ................................................................... 4

78 Fed. Reg. 11,766 (Feb. 20, 2013) ................................................................. 35

87 Fed. Reg. 64,700 (Oct. 26, 2022) ................................................................. 30

## EXECUTIVE ORDERS

Exec. Order 13990, Sec. 1 ................................................................................ 25

Exec. Order 14008, Sec. 201 ............................................................................. 25

## LEGISLATIVE HISTORY

H.R. Rep. No. 94-942 (1976) .............................................................................. 4

## INTRODUCTION

The Willow Master Development Plan ("Willow" or "Project") is an enormous new oil drilling project with a correspondingly enormous climate footprint. It will cause the release of more than 239 million metric tons of greenhouse gas emissions over the course of its lifetime—the carbon equivalent of adding 1.8 million gas-powered cars to the road for thirty years.[1] The Bureau of Land Management (BLM) itself acknowledges that Willow's climate impact is significant; that climate change is already adversely affecting Alaska's National Petroleum Reserve-Alaska (Reserve); and that U.S. climate policy calls for the urgent reduction of greenhouse gas emissions. And the Project infrastructure will damage a biologically rich and culturally important area already suffering the effects of permafrost thaw and sea ice loss.

BLM nonetheless approved the Project in March 2023, without meeting its legal obligations to fully grapple with these impacts. BLM refused to consider, for example, any project alternatives that would meaningfully constrain Willow's oil production and resulting carbon emissions. It failed to explain its decision not to impose any conditions that would more fully mitigate the effects of Willow's downstream carbon emissions on the Reserve's surface resources. And it obscured Willow's full climate repercussions by omitting from its analysis the downstream emissions of other reasonably foreseeable future oil projects that Willow—as a hub for further development—would facilitate. BLM, the U.S. Fish and Wildlife Service (FWS), and the National Marine Fisheries

---

[1] *See* https://www.epa.gov/energy/greenhouse-gas-equivalencies-calculator.

Service (NMFS) also failed to consider the impacts Willow's greenhouse gas emissions will have on Arctic species threatened by climate change. These serious defects prevented decisionmakers and the public from understanding Willow's true carbon footprint and its consequences for the Reserve and beyond, and, even more significantly, resulted in a lack of action to address them.

The agencies' analyses were not written on a blank slate. In 2021, this Court held that the federal government's first approval of Willow violated both the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA). Though the agencies claim to have addressed the Court's decision on remand, they instead made similar and additional errors that continue to violate the law. Plaintiffs respectfully ask the Court to set aside once again the federal government's unlawful review and approval of the Project and remand for further analyses.

## BACKGROUND

### I. Willow threatens significant local and global environmental harm.

Willow aims to develop several oil and gas leases held by ConocoPhillips Alaska, Inc. (ConocoPhillips) within the Bear Tooth Unit in the northeastern portion of the Reserve. *See* BLM_3512_AR820723; BLM_3513_AR824893.[2] If built, it will include 199 wells placed across three drill sites, a central processing facility, an operations center, an airstrip, and a network of gravel roads, ice roads, and pipelines.

---

[2] For citations to the administrative record, the number following the relevant agency name refers to the document or folder number, where available.

BLM_3513_AR824892.  It will produce 576 million barrels of oil over its thirty-year

lifespan.  *See* BLM_3513_AR824901, 83.  Together, construction and operation of this

massive Project will accelerate climate change and cause lasting and devastating impacts

to a fragile ecosystem and many wildlife species and people who rely on it.

Fossil-fuel combustion is the primary driver of the climate crisis.  *See*

BLM_3512_AR820761; BLM_3458_AR705142.  And this crisis is already here.  *See*

BLM_3458_AR705141-42.  The effects are prevalent and wide ranging, and are

especially pronounced in Alaska's Arctic, which is warming at nearly four times the rate

as the rest of the planet.  BLM_3463_AR752844-51; BLM_3463_AR763742.  Indeed,

increased average temperatures, decreased sea ice and snow cover, and thawing

permafrost are well documented in the Arctic.  BLM_3512_AR820758-60.  These

conditions threaten caribou and numerous other species, particularly those dependent on

sea ice for survival, including the polar bear, Arctic ringed seal, and bearded seal.

BLM_3512_AR821744; BLM_3463_AR750175-81.

Willow's significant carbon footprint will exacerbate the climate crisis—

contributing to impacts felt both globally and in Alaska.  BLM_3451_AR704807-11; *see*

*also* BLM_3458_AR705141-44.  "[T]o avoid the worst impacts of climate change,"

scientists and policymakers agree that urgent and significant reductions in greenhouse gas

emissions are necessary.  BLM_3458_AR705141.  Yet Willow will result in more than

239 million metric tons of direct and indirect greenhouse gas emissions over its lifetime.

BLM_3513_AR824901.  Willow will also spur further development in the Reserve,

unlocking potentially *billions* more barrels of oil for consumption.

BLM_3484_AR773486; BLM_3458_AR705143.

Willow will cause substantial near-term harm to the Reserve and its resources, too. The Reserve is a nationally significant landscape and home to numerous species, including polar bears, caribou, and migratory birds. BLM_3451_AR704800-01. It is also central to the traditional practices of Alaska Native people. BLM_3512_AR821022-30; BLM_3512_AR824204. For these reasons, Congress charged the Secretary of the Interior with a dual mandate under the Naval Petroleum Reserves Production Act (Reserves Act): overseeing oil and gas exploration in the Reserve while also minimizing that development's harmful effects to the Reserve's ecological and subsistence values. *See* H.R. Rep. No. 94-942, at 20, 21 (1976) (Conf. Rep.) (vesting Secretary with responsibility to "carefully control[]" fossil fuel activity to "protect[] … the natural, fish and wildlife, scenic and historical values of the area"). Thus, the Secretary must impose "conditions, restrictions, and prohibitions" on oil and gas activity that she "deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects" on surface resources. 42 U.S.C. § 6506a(b). The Secretary must also ensure that designated special areas, such as the Teshekpuk Lake and Colville River Special Areas, receive "maximum protection" consistent with the Act's exploration requirements. *Id.* § 6504(a); 42 Fed. Reg. 28,723 (June 3, 1997).

Though oil and gas development in the Reserve has largely been limited to areas closest to existing infrastructure on state lands, Willow will change that—pushing such

development farther west and into the Teshekpuk Lake and Colville River Special Areas. *See* BLM_3451_AR704802-03; BLM_3512_AR820717, 45.  In doing so, it will damage sensitive habitats; disturb caribou, polar bears, and other wildlife; and impede local cultural and subsistence practices.  *See* BLM_3512_AR820885, 0970, 0997, 1001, 1068; BLM_3451_AR704964-5038, 5042-48.

## II. The federal government's analyses of the Project remain flawed.

BLM first approved Willow in October 2020.  BLM_3512_AR820722-23.  This Court struck down that approval.  *Sovereign Iñupiat for a Living Arctic v. BLM*, 555 F.Supp.3d 739, 805 (D. Alaska 2021) (*SILA*).  As relevant here, it held that (1) BLM violated NEPA by restricting the Project alternatives it considered based on the mistaken view that ConocoPhillips had a right to extract all the oil from its leases; (2) BLM violated NEPA by failing to assess the Project's full climate consequences; and (3) FWS violated the ESA by relying on unspecified mitigation measures in its Biological Opinion for the polar bear and by issuing an arbitrary and capricious incidental take statement for the bear.  *Id.* at 762-70, 799-804.

On remand, BLM released a draft Supplemental Environmental Impact Statement (SEIS) in July 2022.  BLM_3346_AR511580.  Public comments identified serious deficiencies in the agency's analysis, including BLM's failure to consider alternatives that would substantially reduce Willow's oil production, to impose measures to mitigate Willow's emissions, and to fully examine the climate impacts from reasonably foreseeable future development facilitated by the Project.  *See, e.g.*,

BLM_3394_AR533171-72; BLM_3451_AR704829-830, 877-882, 903;

BLM_3458_AR705142-43, 46-47, 56. The final SEIS, published in February 2023,

BLM_3348_AR511585, did not correct these defects. FWS and NMFS (collectively,

"the Services") concluded their reviews on January 13, and March 2, respectively.

BLM_3513_AR824906. The Services' analyses do not consider, let alone mitigate,

Willow's climate impacts. FWS also failed to issue an incidental take statement for the

polar bear.

BLM signed a Record of Decision (ROD) approving the Project on March 12.

BLM_3513_AR824916. Though the ROD adopts a modified Project alternative in an

effort to reduce Willow's environmental impacts, BLM_3513_AR824897-98, it neither

cures the inadequacies of the agencies' underlying reviews nor reconciles Willow's

climate impacts with the agencies' legal obligations.

Following that approval and the denial of Plaintiffs' motions for preliminary relief,

ConocoPhillips opened a new gravel mine and began building a permanent road from an

existing development in the Greater Mooses Tooth Unit towards Willow. *See*

ConocoPhillips' Opp'n to Mots. Inj. Pending Appeal, 9th Cir. No. 23-35227, Dkt. 20-1 at

7. Major new construction activities are now paused until next winter. Pls.' Mot. to

Voluntarily Dismiss Appeal, 9th Cir. No. 23-35227, Dkt. 30 at 1.

## PLAINTIFFS' INTERESTS

Plaintiffs are a coalition of member-based non-profit organizations committed to protecting the Reserve from the detrimental effects of fossil fuel development.  Ex. 7, ¶¶2, 4, 10-23; Ex. 8, ¶¶1-4, 9-15; Ex. 9, ¶¶2-9; Ex. 10, ¶¶2-3, 6-12; Ex. 11, ¶¶3, 8-11. Plaintiffs bring this suit on behalf of their members, including those who use the Project site and surrounding areas of the Reserve, and species dependent on it, for recreation, aesthetic value, cultural and subsistence practices, and professional pursuits, and who are harmed by Willow and the federal government's inadequate analyses and approval of it. Ex. 1, ¶¶3, 7, 12, 28, 39, 45-49, 51-56, 68, 74-82, 84-87, 90, 96-101; Ex. 2, ¶¶3-38; Ex. 3, ¶¶2, 5, 8-33; Ex. 4, ¶¶3-5, 13-63; Ex. 5, ¶¶3-12, 14-29; Ex. 6, ¶¶1, 3-20; Ex. 7, ¶¶7, 27-31, 33-44; *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-84 (2000).  An order setting aside the ROD and related review documents—thereby halting Project implementation until BLM and the Services fully disclose and, as appropriate, mitigate Willow's environmental impacts—would redress these harms.  *See Cantrell v. City of Long Beach*, 241 F. 3d 674, 682 (9th Cir. 2001).

## STANDARD OF REVIEW

Plaintiffs' claims are governed by the Administrative Procedure Act's standard of review.  *See* 5 U.S.C. §§ 704, 706.  Accordingly, the Court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).  "Critical to that inquiry is whether there is 'a rational connection between the facts found and the conclusions made ....'"

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011) (citation omitted).

## ARGUMENT

**I.      BLM violated NEPA.**

**A.      BLM failed to consider a reasonable range of alternatives.**

BLM's SEIS does not meet NEPA's alternatives requirements or adequately address this Court's previous decision.  It again severely limits the range of alternatives—excluding those that might have addressed Willow's massive climate impacts—based on a cramped interpretation of the agency's statutory authority.  The SEIS's additional justification for constraining the alternatives analysis—the agency's purpose and need statement—is likewise unlawful because the statement is fully consistent with excluded alternatives.

The alternatives analysis is the "heart" of an environmental impact statement (EIS).  *Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092, 1100 (9th Cir. 2010) (quoting 40 C.F.R. § 1502.14).[3]  The agency "must '[r]igorously explore and objectively evaluate all reasonable alternatives'" to a proposed action, and, "for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." *Id.* (quoting same).  Alternatives must be meaningfully different from one another "to allow for a real, informed choice." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008).  "The existence of a viable but

_____

[3] This brief cites the 1978 NEPA regulations.  *See* Doc. 48 at 12 n.6.

unexamined alternative renders an [EIS] inadequate." *Id.* at 1038 (citation omitted).

This Court struck down BLM's first alternatives analysis for Willow because the agency erroneously adopted the "view that ConocoPhillips has the right to extract all possible oil and gas on its leases." *SILA*, 555 F.Supp.3d at 770. The Court found this view inconsistent with BLM's responsibility under the Reserves Act "to mitigate adverse effects on … surface resources." *Id.* at 769 (citing 42 U.S.C. § 6506a(b)). It also found that the leases did not grant ConocoPhillips "the unfettered right to drill wherever it chooses or categorically preclude BLM from considering alternative development scenarios." *Id.* at 768. It similarly held that BLM wrongly eliminated an alternative that would prohibit or limit infrastructure in the Teshekpuk Lake Special Area, given its statutory obligation to give such areas "maximum protection." *Id.* at 769 (quoting 42 U.S.C. § 6504(a)).

BLM's second alternatives analysis adopts a nearly identical view: that ConocoPhillips has the right—indeed, the obligation—to extract all "economically viable quantities of recoverable oil" from its leases. *See* BLM_3512_AR821958-59. The SEIS suggests there is daylight between this and the previously unlawful "all possible oil" constraint. BLM_3512_AR821709, 40 (acknowledging ConocoPhillips is not entitled to "100% resource extraction"). But any purported distinction is belied by the record. While the final SEIS ultimately buries the discussion in an appendix, *see id.*, the draft SEIS explicitly ties the economic viability constraint to a newly added requirement that alternatives "[f]ully develop" the oil field. BLM_3510_AR814575-76. In other words,

to satisfy this "fully develop" requirement, alternatives must not "strand" economically viable quantities of oil. *Id.* BLM repeatedly conveyed this rationale to ConocoPhillips and other stakeholders, asserting that it would not carry forward alternatives that resulted in less than full field development. *See, e.g.*, BLM_3149_AR505821; BLM_2981_AR501639. BLM's old and new constraints are functionally indistinguishable; a lessee would only ever choose to extract "economically viable" oil, regardless of how much more extraction might be theoretically "possible."

Even if these rationales meaningfully differed, BLM's economic viability constraint continues to rest on a misapplication of the agency's Reserves Act authority. True, the Act and its implementing regulations direct BLM to conduct an "expeditious program" of "competitive leasing." 42 U.S.C. § 6506a(a); 43 C.F.R. § 3130.0-1 (similar). But nowhere do they mandate that BLM maximize oil recovery in the Reserve regardless of environmental impact. Nor do ConocoPhillips' leases. To the contrary, they each require BLM to protect the Reserve's surface resources—particularly in special areas—and authorize BLM to limit, reject, or suspend development projects to accomplish that aim. *See, e.g.*, 42 U.S.C. §§ 6503(b), 6504(a), 6506a(b); 43 C.F.R. §§ 2361.1(a), (e)(1), 3135.2(a)(1), (3); BLM_AR950260, §§4, 6 (leases providing that BLM may "specify rates of development and production in the public interest" and impose measures to "minimize adverse impacts" to ecological and cultural resources); *see also N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 976 (9th Cir. 2006) (BLM "can condition permits for drilling [in the Reserve] on implementation of

environmentally protective measures, and we assume it can deny a specific application altogether if a particularly sensitive area is sought to be developed and mitigation measures are not available.").[4]

BLM's erroneous interpretation played a significant role in narrowing the range of alternatives considered. BLM is correct that it explicitly referenced this Court's decision on remand and recanvassed potential project components. *See* BLM_3512_AR820722, 29; BLM_3512_AR821922, 26-27. Ultimately, however, BLM eliminated most of those alternative components from further evaluation, including some that touched on Plaintiffs' concerns around climate and harm to special areas. *See* BLM_3512_AR821957-60. Both Plaintiffs and the Environmental Protection Agency (EPA), for example, advocated for alternatives that would have meaningfully reduced Willow's total oil production and eliminated infrastructure in the Teshekpuk Lake Special Area. BLM_3451_AR704837-43; BLM_3458_AR705146, 56; BLM_3394_AR533169-72; BLM_2875_AR500188-89; BLM_2893_AR500323. BLM nonetheless declined to carry forward two such alternative components because they "would strand economically viable quantities of recoverable oil."

---

[4] The SEIS cites 43 C.F.R. § 3137.71(b)(1), which calls for a plan to "fully develop" an oil field, to support its position that it cannot consider alternatives that would "strand … a large quantity of oil." BLM_3512_AR821709; *see also* BLM_3510_AR814576. But this regulation simply requires *lessees* to meet certain development obligations for pooled (or "unitized") fields. It does not compel *BLM* to ensure full field development and has no bearing on the agency's duty to protect surface resources. In fact, the unitization regulations acknowledge BLM's authority "to set or modify the quantity, rate, and location of development and production," 43 C.F.R. § 3137.21(a)(4), and to reject development plans, *id.* § 3137.73(b).

BLM_3512_AR821958 (discussing components 43 and 44). Indeed, BLM

acknowledged that these options would address the Court's decision and produce less

oil—and thus, fewer greenhouse gas emissions—yet refused to give them full

consideration, staunchly adhering to a misguided view of its own authority instead. *See*

BLM_3512_AR821965; BLM_2951_AR501182-83, 86-87; *see also*

BLM_2948_AR501165 ("BLM will not accept a proposal that would strand an

economically viable amount of oil …."").

      As a result, the SEIS adds a single new action alternative to the analysis—

preferred Alternative E—that is hardly different from the other three. Although this

alternative eliminates one drill pad from the Teshekpuk Lake Special Area and defers

another to the south, it compensates by shifting a third pad farther north into the Special

Area to retain reservoir access and increasing the number of wells on certain pads.

BLM_3512_AR820732-33; BLM_3512_AR822091; BLM_3059_AR503906.

Accordingly, each action alternative—including Alternative E—would allow

ConocoPhillips to produce at least 97 percent as much oil as its own proposal

(Alternative B). *See* BLM_3512_AR822035; *see also* BLM_3162_AR505892

(ConocoPhillips admitting that total carbon emissions are "essentially the same" across

action alternatives). And though Alternative E would reduce some surface impacts, each

action alternative still places hundreds of oil wells and miles of ice roads, pipelines, and

gravel road and infrastructure within the Teshekpuk Lake and Colville River Special

Areas. BLM_3512_AR822001-02, 36, 44-45, 58-59, 76-77, 92-93. The "minor

variation" of Alternative E adopted by the ROD, which disapproves rather than defers the southern pad, would do much the same. *See* BLM_3513_AR824891, 893, 898-99, 901 (indicating presence of infrastructure within Special Areas and that alternative would produce 92 percent as much oil as ConocoPhillips' proposal).

That the ROD's adopted alternative approves three well pads instead of five does not satisfy BLM's obligation to consider reasonable alternatives. ConocoPhillips itself requested that BLM only authorize three drill sites. BLM_2949_AR501166. And while modified Alternative E results in less infrastructure near Teshekpuk Lake and slightly lower greenhouse gas emissions relative to the other alternatives, that is insufficient when other viable alternatives exist that would have gone much farther in reducing both. *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1053 (9th Cir. 2013) (BLM's failure to consider alternatives that would feasibly meet project goals "while better preserving" monument resources than existing alternative violated NEPA); BLM_2904_AR500421 (EPA recommending that BLM consider an alternative "that further reduces surface occupancy and impacts … beyond the reductions evaluated in Alternative E, even if that may involve less long-term production of oil and gas"); BLM_3142_AR505789 (estimating that an alternative eliminating all infrastructure from Teshekpuk Lake Special Area would still recover "71% of the resource").

*CBD v. NHTSA* is instructive. There, the agency analyzed an overly narrow set of alternatives based on the mistaken view that it lacked statutory authority to adopt a more environmentally protective option. 538 F.3d 1172, 1218-19 (9th Cir. 2008). The Ninth

Circuit rejected that approach, finding that the agency plainly possessed such authority and noting that Congress specifically mandated agency compliance with NEPA "to the fullest extent possible" out of "concern" that agencies would "narrowly constru[e] other statutory directives to create a conflict." *Id.* at 1213, 1219 (citation omitted). Similarly, in *CBD v. FWS*, the agency eliminated feasible and more environmentally protective alternatives from detailed study and instead considered five alternatives that "were largely the same" based on a constrained interpretation of its governing regulations. 409 F.Supp.3d 738, 764-66 & nn.14-15 (D. Ariz. 2019). The court held that this mistake "infected" the EIS and led to the agency "misinforming the public" and violating NEPA. *See id.* at 764.

So too here. Although multiple factors informed the range of alternatives considered, BLM's erroneous insistence that it could only evaluate alternatives that allowed ConocoPhillips to extract all "economically viable quantities of recoverable oil" infected the alternatives analysis and rendered it "inadequate" under NEPA. *SILA*, 555 F.Supp.3d at 769; *cf. NRDC v. USFS*, 421 F.3d 797, 807 (9th Cir. 2005) (harmless error doctrine applies "only when a mistake … *clearly* had *no bearing* on the procedure used or the substance of decision reached" (citation omitted)).

The SEIS's additional rationale for analyzing a limited range of alternatives—that a more meaningful reduction of Willow's oil production would not meet the statement of purpose and need—also falls short. The Project's purpose is "to construct the infrastructure necessary to allow the production and transportation to market of federal

oil and gas resources in the Willow reservoir … while providing maximum protection to significant surface resources within the [Reserve]."  BLM_3512_AR820723-24.  An alternative that substantially reduces Willow's carbon footprint and prohibits infrastructure within the Teshekpuk Lake Special Area, while also allowing ConocoPhillips to produce *some* oil from its leases, satisfies that purpose.  *See CBD v. NHTSA*, 538 F.3d at 1219 (where agency's statutory mandate included energy conservation, "consideration of more stringent fuel economy standards that would *conserve more energy* is clearly reasonably related" to "the project's purpose").

## B.    BLM failed to assess foreseeable downstream greenhouse gas emissions from future oil development induced by Willow.

The record shows Willow was designed to facilitate future development, that such development is reasonably foreseeable, that it could be huge—as much as three billion barrels—and that BLM had substantial information before it from which to meaningfully assess the potential downstream greenhouse gas emissions from this future development. Yet the agency failed to assess these indirect effects, violating NEPA.

NEPA requires BLM to assess the "indirect effects" of its action, which are those "caused by the action and … later in time or farther removed in distance, but are still reasonably foreseeable."  40 C.F.R. § 1508.8(b).  These include foreseeable downstream greenhouse gas emissions consequences.  *CBD v. Bernhardt*, 982 F.3d 723, 737-38 (9th Cir. 2020) (*Liberty*).  Indirect effects also include "growth inducing effects and other effects related to induced changes in the pattern of land use."  40 C.F.R. § 1508.8(b). Thus, NEPA requires BLM to assess the foreseeable downstream emissions from projects

induced by the construction of Willow.

Distinct from the direct and overall cumulative effects associated with a project, assessment of a project's specific growth-inducing indirect effects—even if not certain or necessarily likely—is particularly important because it discloses information about the full effects that will flow from the agency's decision. In *City of Davis v. Coleman*, for example, the court required assessment of effects of potential future development facilitated by a highway interchange even though the required rezoning had not occurred or even been proposed, and the "nature and extent" of future development were "uncertain." 521 F.2d 661, 667-69, 674-76 (9th Cir. 1975). Nevertheless, the county had begun to promote an industrial park for the area and the record and "common sense" indicated that, without the interchange, accessibility costs would substantially increase. *Id.* Similarly, in *NRDC v. DOE*, the court required assessment of how remediation of a former nuclear testing facility "could *potentially* induce" people to move to and reside in the area, even though there were no plans to convert the area to residential use. No. 04-cv-04448, 2007 WL 1302498 at *1, *16 (N.D. Cal. May 2, 2007); *see also Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1138-39 (9th Cir. 2011) (finding that agency should have assessed the effects of a new airport runway's "potential to create demand"); *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 867-70 (9th Cir. 2005) (finding a proposed dock expansion had a "'reasonably close causal relationship'" with increased tanker traffic and "attendant increased risk of oil spills," requiring analysis (citation omitted)). Thus, potential induced effects of a decision must be assessed.

The record here easily shows Willow could induce future development. BLM characterized the most definitive of future development projects identified in the SEIS, the "Greater" or "West Willow" discovery, as a reasonably foreseeable future action, BLM_3512_AR821123-24, that "*would occur* as part of any Willow alternative," BLM_3512_AR822689 (emphasis added). BLM understood Willow's infrastructure will accommodate future production of about 75 million barrels of oil from West Willow, starting in 2035. BLM_3512_AR821124; BLM_3512_AR822689.

And beyond West Willow, the SEIS acknowledges the Project "would likely facilitate future development," BLM_3512_AR824367, and will make development of other adjacent lands "easier and more economically viable," BLM_3512_AR821122. The SEIS states Willow could "result in additional development opportunities to the south and west of the Project area," that its "existence … makes exploration of these areas more attractive," and that it makes development of any future discoveries in these areas more likely. *Id.*[5] Indeed, BLM determined continued exploration of ConocoPhillips' nearby Harpoon prospect is likely to occur. BLM_3512_AR821121, 24.

Consistent with this, ConocoPhillips told its investors that it has already "identified up to 3 billion [barrels of oil equivalent] of nearby prospects and leads … that could leverage the Willow infrastructure." BLM_3484_AR773486; *see also*

---

[5] BLM's Integrated Activity Plan (IAP), analyzing Reserve-wide impacts, also describes "additional development near [] Willow" as "likely to occur," FWS_78_AR364554, and shows Willow in a high hydrocarbon potential area, where vast swaths of land have been leased for development, *see* FWS_78_AR364549-50 & map B-1.

BLM_3484_AR773442 (showing West Willow discovery and Soap, Juniper, and Harpoon prospects on company leases west of Willow). And the company has touted Willow as the "Next Great Alaska Hub" that "unlocks the west." *Id.*; *see also* BLM_3484_AR773440 (map showing company's history of leveraging initial infrastructure to expand development).

Recognizing this potential for substantial facilitated development, EPA urged BLM to conduct a "more robust analysis of [ConocoPhillips'] adjacent oil prospects and the reasonably foreseeable actions related to these prospects" that would function as "potential satellite locations that tie into the proposed Willow development." BLM_3458_AR705143.

The SEIS not only recognizes this potential, but BLM also made supporting future development a core consideration in its alternatives analysis for the Project. BLM_3512_AR821927 ("The alternative should have the potential to support reasonably foreseeable future development"); BLM_3512_AR821941 (rejecting alternative component in part because it "would not support reasonably foreseeable future development"); BLM_3512_AR822006 (including Project component specifically that would accommodate future development).

Thus, just as with the interchange in *City of Davis*, Willow is intended to facilitate future development, and its infrastructure will reduce accessibility costs for such development, making development more economically feasible. And, just as in *City of Davis*, ConocoPhillips promoted this future development, calling Willow the hub that

will unlock the region for more oil extraction. BLM_3484_AR773442; *see also Friends of the Earth, Inc*. v. *U.S. Army Corps of Eng'rs*, 109 F.Supp.2d 30, 41 (D.D.C. 2000) (considering how proponents "trumpeted" future development). In fact, future development is even more foreseeable here than in *City of Davis* and *NRDC v. DOE* because BLM has concluded West Willow, at least, *would* occur, BLM_3512_AR822689, and the area where additional development dependent on Willow would occur is already zoned and held under lease for future oil development. FWS_78_AR364549-50.

Yet BLM never disclosed the downstream greenhouse gas emissions consequences of Willow's significant growth-inducing effects. For West Willow, the SEIS estimates only direct emissions from construction and operation. BLM_3512_AR822690. It provides no analysis of greenhouse gas emissions from consumption of West Willow's oil or of the billions of additional barrels of other oil development the Project could catalyze. BLM_3512_AR821126 (discussing West Willow's drilling emissions only). In other words, BLM failed to "either give[] a quantitative estimate of the downstream emissions … or explain[] more specifically why it could not have done so." *Liberty*, 982 F.3d at 740 (citation omitted); *see also City of Davis*, 521 F.2d at 675-76 (finding agency had available information to "produce an informed estimate of the environmental consequences" of future development).

The SEIS's reference to the emissions analysis BLM conducted when approving the IAP in 2020, BLM_3512_AR821126 (referencing IAP emissions analysis ("BLM

2020b")), does not suffice.  The IAP's assessment of potential emissions from development across the entire Reserve serves a different purpose—understanding the aggregate effect of adopting the Reserve-wide plan.  It was not meant to, nor does it, analyze the specific potential downstream emissions that could flow from the agency's decision approving *this Project*.[6]  Thus, it does not meet NEPA's requirement to assess the indirect effects catalyzed by this agency decision.  *See Barnes*, 655 F.3d at 1136 ("The agencies cannot point to any documents in the record that actually discuss[] the impact of [the project] on [] demand ....").

Finally, BLM has sufficient information to assess the emissions consequences of these potential induced projects, including the timing, location, and oil production estimates of foreseeable future development.  BLM_3512_AR821123-24; BLM_3512_AR822689-90; BLM_3458_AR705142-43; BLM_3484_AR773440-42; BLM_3484_AR773486.  Given the available information, BLM was not authorized to "ignore this foreseeable effect entirely."  *Liberty*, 982 F.3d at 740; *see also City of Davis*, 521 F.2d at 675-76 (once "substantial questions have been raised about [a project's] environmental consequences," the agency "should not be allowed to proceed ... in ignorance of what those consequences will be").

---

[6] In fact, it appears the IAP assessment specifically excludes West Willow from its downstream emissions analysis.  *See* FWS_78_AR364553 (excluding Willow and other existing and planned development from oil production estimates); FWS_78_AR363937 (similar); FWS_78_AR364805 (describing West Willow drill sites as "not subject to this IAP"); BLM_3512_AR822689 (West Willow is part of Willow).

## II. BLM violated the Reserves Act by failing to reasonably explain its decision not to adopt an alternative or mitigation measures to limit Willow's downstream emissions.

As stated above, the Reserves Act required BLM to impose measures to limit Willow's "reasonably foreseeable and significantly adverse" effects to the surface resources of the Reserve, 42 U.S.C. § 6506a(b), and to afford "maximum protection" to designated areas from such impacts, *id.* § 6504(a). Despite acknowledging its statutory obligations, the Project's massive greenhouse gas emissions, and climate harms to the Reserve's surface resources, however, BLM fell short of its responsibilities under the Reserves Act in two ways. First, BLM did not reasonably explain its failure to adopt an alternative that would meaningfully reduce downstream emissions. Second, alternatives aside, BLM decided not to impose any measures to mitigate those downstream emissions, again without reasoned explanation.

BLM concedes that the Project will generate massive greenhouse gas emissions that will exacerbate climate harm to the surface resources of the Reserve. Climate change impacts, it admits, are amplified in the Arctic and the North Slope, which are warming significantly faster than the global rate. *See* BLM_3512_AR820758-59; *supra* p. 3. The Project's greenhouse gas emissions and their contribution to climate change, it agrees, are significant. *See* BLM_3512_AR820776; *see also* BLM_3513_AR824901. And climate change, it acknowledges, will have adverse effects on the Reserve's surface resources. *See, e.g.*, BLM_3512_AR821744 (noting that the "overall net impacts of climate change" on caribou in Arctic Alaska "are likely to be negative");

BLM_3512_AR820759 (explaining that further warming will lead to thawing permafrost, reduced snow cover and sea ice, and increased risk of wildfires and insect outbreaks in the Arctic and the North Slope). BLM therefore recognized in the ROD that, "given the significant effects of climate change on the Arctic and the North Slope," it is "especially important" to reduce Willow's emissions and consequent climate impacts. BLM_3513_AR824900. In line with these findings, cooperating agencies and the public (including Plaintiffs) repeatedly urged BLM to exercise its authority and responsibility to reduce and mitigate Willow's climate effects. *Supra* pp. 5-6, 11.

Nevertheless, BLM refused to consider any alternative in the final SEIS that would meaningfully reduce carbon emissions—such as by reducing total oil production or delaying production, *see* BLM_3451_AR704838, 42-43—based on an arbitrary constraint requiring alternatives to allow ConocoPhillips to recover "economically viable quantities of recoverable oil." *Supra* pp. 11-12. That faulty analysis set BLM on a path to failure. Though BLM ultimately chose to modify the SEIS's preferred alternative in a way that slightly reduced downstream emissions, BLM_3513_AR824901, it could not rationally justify why that choice struck the appropriate balance between allowing development and reducing climate impacts—thereby protecting surface resources— compared, for example, to an alternative that would have reduced emissions by more than a modest five percent, *supra* pp. 12-13. BLM merely declared that its chosen alternative satisfies its statutory obligations. BLM_3513_AR824900. But an agency may not offer "mere lip service or verbal commendation of a standard but then fail[] to abide the

standard in its reasoning and decision." *NRDC v. Pritzker*, 828 F.3d 1125, 1135 (9th Cir. 2016).

Independent of—and in addition to—its selection of a preferred alternative, BLM disregarded its responsibility under the Reserves Act to impose measures to mitigate the Project's climate impacts and limit harms to surface resources. In fact, BLM did not impose a single measure to mitigate the Project's downstream emissions, by far the largest driver of the Project's climate impacts. BLM only imposed measures to mitigate the Project's *direct* emissions—*i.e.*, emissions resulting from the construction and operation of Project infrastructure. BLM_3512_AR820761 (defining direct emissions); 62-64 (listing lease stipulations and required operating procedures intended to reduce climate change impacts "associated with the construction, drilling and operation of oil and gas facilities"); 64-65 (listing design features intended to reduce climate change impacts "from development activity and operations"); BLM_3513_AR824926, 30-46 (listing adopted measures). But these direct emissions are small compared to the Project's *indirect*, or downstream, emissions—*i.e.*, emissions from the transport, processing, and combustion of oil it produces—which are over ten times greater. *See* BLM_3513_AR820770, Tbl. 3.2.6 (quantifying direct and indirect emissions from Alternative E); *see also* BLM_3513_824901 (quantifying indirect emissions from Alternative E as modified and approved). BLM never reasonably explained why it chose to impose some measures to address direct emissions, but none to address downstream emissions—or how that decision squares with the agency's statutory obligations and

admission that it is "especially important" to reduce Willow's climate impacts. BLM_3513_AR824900; *see Pritzker*, 828 F.3d at 1139 (courts do not defer to agency decisions that are "inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute" (citation omitted)); *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1143 (9th Cir. 2015) (agency determination "unsupported by any explained reasoning" is arbitrary and capricious).

Indeed, BLM arbitrarily rejected three measures aimed at reducing Willow's downstream emissions and offered no explanation for refusing to explore any others. First, BLM flatly rejected EPA's suggestion to reduce impacts by changing the Project's operating term from 30 years to no more than 20—a measure plainly within BLM's authority to adopt. BLM_3513_AR824972; BLM_3458_AR705141. Second, BLM rejected EPA's suggestion to periodically review its NEPA analysis in the event ConocoPhillips recovers higher amounts of oil than anticipated, because it would "provide no additional reduction of known Project effects." BLM_3513_AR824964. But that is unsupported. If BLM *were* to revisit its analysis after learning that the amount of oil was greater than it initially assumed—a "well-recognized phenomenon," BLM_3458_AR705155—it could well conclude that further steps to reduce emissions were merited. Third, BLM rejected a measure to mitigate the Project's emissions through land reforestation, but its rationale there falls short, too. *See* BLM_3513_AR824973; BLM_3491_AR776241-42 (listing EPA recommendations for reforestation mitigation). BLM cited complexity, the need for government-wide cooperation, and its inability to

enforce the measure, *see* BLM_3513_824973, but did not explain *why* it cannot enforce the measure, address EPA's recommendations to improve the measure, or reconcile its position with executive orders directing all agencies to combat the climate crisis using a "[g]overnment-wide," "coordinated approach," Exec. Order 14008, Sec. 201; *see also* Exec. Order 13990, Sec. 1 (similar); BLM_3513_AR824898 (referencing these orders). And after arbitrarily rejecting these three measures, BLM never explained its decision not to explore any *other* mitigation measures that would limit climate harms to surface resources. *See Rock Creek All. v. USFS*, 703 F.Supp.2d 1152, 1170 (D. Mont. 2010) (agency decision not to impose mitigation measure was arbitrary where the benefits were "evident from the record," agency did not explain why the measure was "unreasonable or impracticable," and the record was "bereft of analysis or explanation concerning this problematic but capacious gap").

## III.     The Willow ESA consultations are unlawful.

Section 7(a)(2) of the ESA is the "heart" of the statute. *Kraayenbrink*, 632 F.3d at 495. It requires federal agencies to ensure their actions are "not likely to jeopardize the continued existence of any [listed] species" or "result in the destruction or adverse modification" of those species' critical habitat. 16 U.S.C. § 1536(a)(2). This substantive obligation is effectuated by the Act's procedural requirements: a federal agency must consult with the Services "before engaging in any discretionary action that may affect a listed species or critical habitat." *Karuk Tribe v. USFS*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc). Agencies must use the "best scientific … data available" throughout the

consultation process.  *See* 16 U.S.C. § 1536(a)(2).  The consultations here violate the

ESA and deprive threatened Arctic species of important protections.

>    **A.    The consultations fail to consider the effects of Willow's carbon emissions.**

In evaluating Willow's impacts, BLM and the Services arbitrarily refused to

examine the Project's most significant threats to polar bears, ringed seals, and bearded

seals: carbon emissions.  That violated the ESA.

The continuing decline of Arctic sea ice is an existential threat to each of these

species.  Indeed, sea ice loss from climate change—driven by human-caused carbon

emissions—is the reason they received ESA protections in the first place.

FWS_76_AR032461-63 (polar bear); NMFS_AR0006473 (ringed seal);

NMFS_AR0006465-66 (bearded seal).  And much of these species' sea ice home in

Alaska is designated as critical habitat, meaning protecting these areas is "essential to the

conservation of the species."  16 U.S.C. § 1532(5); *see also* FWS_76_AR032472-73

(polar bear); NMFS_AR000147, 171 (ringed and bearded seal).

While BLM assessed some of Willow's impacts on listed species in its biological

assessments sent to the Services, BLM did not consider in those assessments the impact

of the massive greenhouse gas emissions flowing from Willow on any listed species.  *See*

FWS_57_AR030540-30819; NMFS_AR000003-142.  Instead, just weeks before it

approved the Project, BLM sought to justify this failure in a "Memorandum to File."

FWS_75_AR032342-47.  Though admitting that Willow will contribute to climate

change and that climate change, in turn, decreases the sea ice that polar bears and ice seals depend upon, BLM concluded that it lacked the scientific "precision" necessary to evaluate "precise effects to individual animals" in specific areas. FWS_75_AR032345-46. As a result, BLM determined it need not have consulted about such impacts and, therefore, without explicitly saying it, that Willow's greenhouse gas emissions will have no effect on polar bears or bearded and ringed seals.

The Services agreed. *See* NMFS_AR000495; FWS_75_AR032341. Without any justification or legal support, NMFS simply stated: "Without commenting on the conclusions that BLM has drawn, we agree that the scope of the ESA Section 7 consultation with respect to [greenhouse gas] emissions is appropriate." NMFS_AR000495.[7] And a mere 48 hours after receiving BLM's memorandum, FWS stated: "the level of reliability and granularity provided by existing models is still insufficient to identify project-specific effects to listed species or designated critical habitat" from project-specific greenhouse gas emissions. FWS_75_AR032341.

The ESA does not require the "precision" the agencies claimed was required and does not permit them to ignore this substantial impact from Willow.

---

[7] NMFS's failure to explain its reasons for agreeing with BLM's conclusion is facially unlawful. *See CBD v. BLM*, 698 F.3d 1101, 1124 (9th Cir. 2012) (finding that FWS arbitrarily "provide[d] no indication at all that [it] applied its expertise" on the potential impact of groundwater withdrawals by "remaining silent" on the issue).

### 1. The agencies applied the wrong standard.

The agencies unlawfully rewrote the relevant legal standards to require a level of "precision" that is absent from the statute and its implementing regulations. At the first step of consultation, BLM must "determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a); *Karuk Tribe*, 681 F.3d at 1027. When an action crosses the "may affect" threshold, consultation with the Services is required. *Karuk Tribe*, 681 F.3d at 1027. The only exception is when the action will have "no effect" on listed species or critical habitat. *Id.*

The threshold for a "may affect" determination is exceedingly low. "'*Any possible effect*, whether beneficial, benign, adverse or of an *undetermined* character'" is sufficient. *Id.* (citation omitted) (second emphasis added). Under this standard, impacts "that have any chance of affecting listed species or critical habitat—even if it is later determined that [they] are 'not likely' to do so—require at least some consultation …." *Id.*; *see also Conner v. Burford*, 848 F.2d 1441, 1453 (9th Cir. 1988) (the ESA requires analysis of "all the possible ramifications of the agency action" (citation omitted)). The "may affect" standard also applies in analyzing whether an issue is "a 'relevant factor'" that should be "analyzed in [a] Biological Opinion." *CBD v. BLM*, 698 F.3d at 1121-22 (citation omitted).

Consistent with these basic principles, agencies are regularly required to consider far-ranging impacts, including when the precise impacts on species and their habitats may be unknown. *See, e.g.*, *Growth Energy v. EPA*, 5 F.4th 1, 30-32 (D.C. Cir. 2021) (agency

must assess how crop production to meet national renewable fuel standards affects Gulf of Mexico dead zone); *CBD v. EPA*, 861 F.3d 174, 180, 188 (D.C. Cir. 2017) (agency must consider impacts of pesticide use in areas that provided habitat for over 1,300 endangered species).

By insisting on "precision" or "granularity" in the ability to predict effects from emissions here, the agencies ignored the ESA's low bar for consultation on Willow's climate effects. Demanding such precision is inconsistent with the requirement to consult on effects of an "undetermined character." *See Karuk Tribe*, 681 F.3d at 1027 (describing "may affect" standard).

Not being able to determine "precise" effects with "granularity" is not the same as concluding that an impact has "no effect" on listed species. *See Am. Fuel & Petrochem. Mfrs. v. EPA*, 937 F.3d 559, 597-98 (D.C. Cir. 2019) (reaching similar conclusion); *see also Growth Energy*, 5 F.4th at 32 ("To the extent EPA questions the causal connection between the [agency action] and specific land use changes, this alone does not excuse the failure to engage in formal consultation."). Similarly, given the ESA's "best available science requirement," the agencies cannot dismiss their obligation to consider Willow's carbon emissions because "highly specified data" are lacking. *See Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 683 (9th Cir. 2016); *Greater Yellowstone Coal. v. Servheen*, 665 F.3d 1015, 1028-30 (9th Cir. 2011) (uncertainty does not justify dismissing potential effects when "considerable data" points to potential impacts).

Nor can FWS rely on its historic refusal to consult on the impacts of carbon

emissions due to a purported lack of precision,[8] and particularly not for a project that will cause such a substantial amount of carbon emissions. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 173 (1978) (noting that Section 7(a)(2) "admits of no exception").[9]

Though the agencies may be able to articulate a reasonable, science-based rationale for limiting consultation on carbon emissions in some circumstances, they have not done so here. The agencies' insistence on precision and particularity as a basis for declining to consult on the effects of Willow's emissions is inconsistent with the low bar Congress intended for consultation and is unlawful.

### 2. The agencies ignored the best available science.

The agencies' decisions not to consult on this impact violated the ESA in another way: they ignored the best available science demonstrating the impacts that Willow's emissions may have on the polar bear, the ringed and bearded seal, and their critical

---

[8] FWS referenced its position, held since it listed the polar bear in 2008, that the impacts of a project's carbon emissions do not require consultation. *See* FWS_75_AR032341. That can only refer to an M-Opinion authored by the Solicitor of the Interior, which likewise insists on a level of precision that is fundamentally inconsistent with the ESA's low bar for consultation. *See* FWS_75_AR032371-77. Moreover, the M-Opinion, based on 2008 information, *id.*, cannot be used as a permanent shield to ignore current science about the climate impacts of agency actions. *See infra* pp. 30-31.

[9] Equally unhelpful is FWS's citation to the conclusions in its emperor penguin listing decision that it was "unable to draw a causal link between the effects of specific [greenhouse gas] emissions and take of the emperor penguin." FWS_75_AR032341 (quoting 87 Fed. Reg. 64,700, 64,704 (Oct. 26, 2022)). "Whether [such emissions] effectuate a 'taking' under Section 9 of the ESA is a distinct inquiry from whether they 'may affect' a species or its critical habitat under Section 7." *Karuk Tribe*, 681 F.3d at 1028. Moreover, that FWS believes there is insufficient evidence to link carbon emissions to take of penguins in Antarctica does not undercut the current science demonstrating how such emissions could affect polar bears in the Arctic. *See infra* pp. 30-31.

habitat.  *See NRDC v. Kempthorne*, 506 F.Supp.2d 322, 362-67 (E.D. Cal. 2007) (holding biological opinion unlawful for failing to consider recent scientific information).

The current science substantially develops information about sea ice trends in all polar bear subpopulation regions, BLM_3377_AR522799-813, and other information estimating the extent and timing of projected Arctic sea ice loss, BLM_3463_AR752368, 642, 646; BLM_3462_AR725580; BLM_3420_AR644960-645078.  The science also shows that significant emissions reductions will allow substantially more sea ice to persist and increase the chances that polar bears will survive in Alaska and across their range.  BLM_3462_AR725265-70; BLM_3462_AR736462-66; BLM_3462_AR725322-28; *see also* BLM_3377_AR523567 (FWS stating that "[i]t cannot be overstated that the single most important action for the recovery of polar bears is to significantly reduce the present levels of global [carbon] emissions, which are the primary cause of warming in the Arctic.").

Perhaps most important, current models estimate the specific impacts in the Arctic from incremental greenhouse gas emissions.  For example, one study determined that each metric ton of emissions results in a sustained loss of approximately three square meters of September Arctic sea ice.  BLM_3462_AR736154-58.  Other recent research establishes that the number of ice-free days polar bears face each year determines their reproductive and survival potential, BLM_3462_AR725322-28, and demonstrates that drawing a direct link between increases in greenhouse gas emissions and increased ice-free days (and thus impacts to polar bears) is possible.  *See* BLM_3462_AR725306-14.

Only by engaging with the specific science on how carbon emissions affect Arctic sea ice, polar bears, and ice seals can BLM and the Services make a reasonable determination about whether the emissions from this massive oil project may affect these species and their critical habitat.  Here they failed to do so.

## B.    FWS's Biological Opinion fails to contain an incidental take statement for polar bears.

FWS's Biological Opinion is also unlawful for concluding that Willow will not cause any incidental take of polar bears.  FWS_76_AR032540.  FWS reached this determination by (1) employing a new, unlawful interpretation of "harassment"; and (2) arbitrarily determining that none of the disturbances to non-denning bears would significantly disrupt polar bear behavior.  *See* FWS_76_AR032541 (citing 50 C.F.R. § 17.3).  As a result, the Biological Opinion fails to contain an incidental take statement for this take, violating the ESA.  16 U.S.C. § 1536(b)(4); *SILA*, 555 F.Supp.3d at 802.

### 1.    FWS's interpretation of harassment is arbitrary.

In concluding that Willow will not "harass" polar bears within the meaning of the ESA, FWS adopted a novel interpretation that eviscerates the entire concept of incidental take by harassment.  Its interpretation—that there is no incidental take where the activity is not undertaken with the *intent* to harass the species—is contrary to the ESA's plain language, legislative history, implementing regulations, and FWS's past practices.  *See Zuniga v. Barr*, 946 F.3d 464, 470 (9th Cir. 2019) (per curiam) (a court "need not accept an agency's interpretation of its own regulations if that interpretation is inconsistent with the statute under which the regulations were promulgated" (citation omitted)).  The only

reading of "harass" that is consistent with the ESA and its implementing regulations is that the actor intends to engage in the activity leading to the harassment, rather than with the intent to harass a protected species.

The ESA defines "take" broadly as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). While the ESA does not define "harass," FWS's ESA regulations define it as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns." 50 C.F.R. § 17.3. The ESA authorizes FWS to permit take "*incidental* to [an] agency action" if FWS determines such take will not jeopardize the species and issues a "statement that … specifies the impact of *such incidental taking* on the species [and] … measures … necessary or appropriate to minimize such impact," among other requirements. 16 U.S.C. § 1536(b)(4) (emphases added). FWS regulations define "incidental take" as "takings that result from, *but are not the purpose of*, carrying out an otherwise lawful activity." 50 C.F.R. § 402.02 (emphasis added). Thus, the ESA and its implementing regulations make clear that "incidental take" includes all forms of take— whether via harassing, harming, killing, or some other form—that occur *without* purpose or intent to take the species. And the ESA makes clear that an incidental take statement must specify and minimize all such take. 16 U.S.C. § 1536(b)(4).

Here, FWS pointed to the "intentional or negligent act or omission" language of the "harass" definition to conclude that because (except for hazing) ConocoPhillips will

conduct activities "with the intent of developing and producing oil and gas and without any intent to annoy, disturb, or harass polar bears," it will not "harass" any polar bears. FWS_76_AR032541. But by interpreting "harass" to require intent to take, FWS "tak[es] a blue pencil to [the ESA]" to carve out an exception where none exists to the requirement that FWS include this type of take in an incidental take statement. *Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 316 n.7 (9th Cir. 1988).

The legislative history confirms FWS's reading is unreasonable. In enacting the ESA in 1973, Congress "underscored the breadth of the 'take' definition by noting that it included 'harassment, *whether intentional or not.*'" *Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Or.*, 515 U.S. 687, 704-05 (1995) (quoting legislative history). Congress explained that the definition "would allow, for example, [FWS] to regulate or prohibit the activities of birdwatchers where the effect of those activities might disturb the birds and make it difficult for them to hatch or raise their young." *Id.* (quoting same). Congress reaffirmed these principles in the ESA's 1982 amendments "that gave [FWS] authority to grant permits for 'incidental' takings," intending that they apply to activities where take "is incidental to, and not the purpose of, the activity." *Id.* at 707 (quoting legislative history).

Indeed, FWS has for years interpreted incidental take restrictions to apply when the actor intends to engage in the activity, but not necessarily to take a protected species. For example, in reissuing the ESA Section 4(d) rule for polar bears, FWS stated that the ESA's "take restrictions … apply regardless of whether the action causing take is

purposefully directed at the animal or not (i.e., the take is incidental)." 78 Fed. Reg. 11,766, 11,770 (Feb. 20, 2013). FWS pointed to examples of activities that could cause take of polar bears, including "incidental take caused by noise, lights, [and] visual disturbance," *id.* at 11,785—precisely the types of activities at issue here.

### 2. FWS's conclusion that Willow will not harass non-denning bears is also arbitrary.

In addition to relying on a new and unlawful intent standard, FWS arbitrarily concluded that Willow will not incidentally take even one non-denning polar bear over the three decades of Project operations.

Willow will involve substantial activity in polar bear habitat, risking significant disruptions and take. As one example, BLM anticipates over three million ground transportation trips, BLM_3512_AR820708, including up to 150 vehicle trips per hour during the first ten years of operation, FWS_76_AR032516. The Project also involves gravel mining and blasting, pile driving, new roads, and hundreds of boat trips. FWS_76_AR032512-13, 16.

Such activities can significantly disrupt polar bears' normal behaviors. The Biological Opinion repeatedly acknowledges that polar bears "can be sensitive to noise disturbance" and that Willow could disturb the bears via "disruption of normal activities, displacement from foraging and resting areas, and interruption of movement patterns." FWS_76_AR032513; *see also* BLM_3377_AR515923 (study finding that, except for male adults, snowmachine noise caused significant avoidance responses in polar bears).

Polar bears have high energy demands and already suffer from nutritional stress,

declining reproductive and survival rates, and poor body condition.

BLM_3377_AR523622; BLM_3377_AR517712-30; BLM_3377_AR517731-72. More energetic stress, including from disturbance, only exacerbates these harms and can lead to injury. *See, e.g.*, BLM_3377_AR522216 (increased travel by polar bears can increase energetic costs and "result in lower survival and recruitment"); BLM_3377_AR523624 (increased travel distances can "negatively affect denning success").

Yet FWS determined that *none* of the disturbances from Willow over the next three decades would significantly disrupt the normal behavioral patterns of any polar bear. This conclusion rests on several arbitrary rationales contradicted by the record, any one of which justifies reversal. *See* FWS_76_AR032516-17.

The first and third of FWS's rationales relied on the fact that polar bears occur in "low density" in the Project area, especially "inland" where bears are "less likely to occur." FWS_76_AR032516. But this acknowledges that bears do occur in the Project area, including inland, and a lower density does not preclude Willow from harassing individual bears. *See, also, e.g.*, *id.* (FWS noting that "[c]onstruction and operation of facilities would produce localized disturbance").

FWS also based its conclusion on the fact that non-denning bears "can move away from disturbance if necessary." FWS_76_AR032516. But such movements can themselves constitute harassment, particularly for females. Studies have shown, for example, that "[w]hen energetically stressed, female polar bears may forego reproduction," BLM_3377_AR522160, and that "females with small cubs … have higher

energetic demands due to lactation" and increased movements require them "to expend

additional energy," BLM_3377_AR523622; *see* BLM_3377_AR521546-56.

FWS also pointed to the fact there is already "on-going existing levels of human

activities and disturbance" in some polar bear habitat. FWS_76_AR032516-17. But this

contradicts, without explanation, the available evidence showing that the more

disturbances a bear experiences, the more negative impacts that bear will suffer. *See*

BLM_3377_AR523622 (noting the harms to polar bears "from increased movements").

Finally, FWS assumed that various Project design features would minimize the

impacts of any disturbance. FWS_76_AR032517. This includes disturbance from all

vehicle traffic, including during the intensive construction period. *See*

FWS_76_AR032516 ("[d]isturbance from vehicle use would occur throughout the life of

the Project but would also be greatest during the Construction Phase"). But of the design

features FWS relies on, only one even applies to vehicle traffic: ROP M-1/Design Feature

66. *See* FWS_76_AR032423, 25 (describing Design Features 46, 60, 66, and 81);

FWS_76_AR032411, 20 (ROP A-8 and M-1 requirements). This measure simply states

that "[c]hasing wildlife with ground vehicles is prohibited" and that "[p]articular

attention will be given to avoid disturbing caribou." FWS_76_AR032420, 512. It does

not require anything that will prevent incidental harassment to polar bears from vehicle

traffic. *Cf. Cook Inletkeeper v. Raimondo*, 533 F.Supp.3d 739, 754-55 (D. Alaska 2021)

(rejecting agency's conclusion that no take would occur, which relied on a mitigation

measure that would not reduce take from the specific impact at issue).

C. **BLM's reliance on the consultations violates its substantive ESA obligations.**

For all the above-stated reasons, the Willow ESA consultations are unlawful.

BLM relied on them in authorizing Willow. *See, e.g.*, BLM_3513_AR824906. Because

BLM "cannot meet" its substantive Section 7(a)(2) duties "by relying on a legally

flawed" ESA consultation, BLM's reliance on the ESA consultations was also unlawful.

*Liberty*, 982 F.3d at 751; *see also SILA*, 555 F.Supp.3d at 804.

IV. **Vacatur is the presumptive remedy and is merited here.**

When a court finds an agency's decision unlawful under the Administrative

Procedure Act, vacatur is the standard remedy. 5 U.S.C. § 706(2)(A) (courts "*shall* … set

aside" unlawful agency action (emphasis added)); *All. for the Wild Rockies v. USFS*, 907

F.3d 1105, 1121 (9th Cir. 2018) (vacatur "normally accompanies a remand").

Conversely, remand without vacatur is appropriate only in "rare," *Humane Soc'y v.*

*Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010), or "limited circumstances," *Pollinator*

*Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (citation omitted).

To evaluate whether such rare circumstances exist, courts consider whether

vacatur risks environmental harm. *See Pollinator*, 806 F.3d at 532. Courts also "weigh

the seriousness of the agency's errors against the 'disruptive consequences of an interim

change that may itself be changed.'" *Nat'l Family Farm Coal. v. EPA*, 960 F.3d 1120,

1144 (9th Cir. 2020) (citation omitted). In ESA cases, "courts will tip the scales in favor

of the endangered species under the 'institutionalized caution' mandate." *Klamath-*

*Siskiyou Wildlands Ctr. v. NOAA*, 109 F.Supp.3d 1238, 1242 (N.D. Cal. 2015) (quoting

*Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987)).  These factors warrant

vacatur here and Defendants cannot carry their burden of proving otherwise.  *See All. for*

*the Wild Rockies*, 907 F.3d at 1122 (burden is on defendants to "overcome" the

presumption of vacatur).

First, vacatur would not cause any environmental harm.  This is not a situation in

which the agencies promulgated standards to protect natural resources or endangered

species, such that vacatur of those standards would cause more environmental harm than

leaving them in place.  *Cf. Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989 (9th Cir.

2012) (per curiam) (declining to vacate air quality plan in part to avoid pollution from

interim use of diesel generators); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392,

1405-06 (9th Cir. 1995) (declining to vacate ESA listing decision to prevent the

"potential extinction" of a species).  Rather, vacatur would simply restore the parties to

the status quo ante.  *See California v. BLM*, 277 F.Supp.3d 1106 (N.D. Cal. 2017)

(vacatur warranted where it would "merely put the … parties back in the position" they

were previously in).

Second, BLM's and the Services' errors are serious.  For example, BLM's failure

to consider a reasonable range of alternatives "undermine[d] the 'two fundamental

objectives' of NEPA": taking a hard look at the Project's environmental impacts and

enabling the public to comment on those impacts.  *Se. Alaska Conservation Council v.*

*USFS*, 468 F.Supp.3d 1148, 1152 (D. Alaska 2020) (citation omitted).  Similarly, the

agencies' failures to consult on Willow's carbon emissions and FWS's failure to include

an incidental take statement for polar bears reflect "substantive errors under the ESA" that, unlike "mere technical or procedural formalities," are not "readily cure[d]." *Klamath-Siskiyou*, 109 F.Supp.3d at 1244-45. The agencies' other legal errors, detailed above, are equally serious. Given these "fundamental flaws," vacatur is appropriate because it is "unlikely that the same [decision] would be adopted on remand" or because, at least, "a different result may be reached." *Pollinator*, 806 F.3d at 532. And even if there were uncertainty on this point, it does not "tip the scale." *NRDC v. EPA*, 38 F.4th 34, 52 (9th Cir. 2022).

Finally, ConocoPhillips' and other stakeholders' anticipated assertions of economic harm are not sufficiently disruptive. Potential harm to ConocoPhillips from Project delay and related harms other parties may raise, such as near-term job losses, are the kind of economic impacts that are generally insufficient, standing alone, to justify remand without vacatur. *See, e.g.*, *Cal. Cmtys. Against Toxics*, 688 F.3d at 992-93 (remanding without vacatur where both disastrous economic impacts *and* environmental impacts weighed against vacatur); *Cook Inletkeeper*, 541 F.Supp.3d at 993-94 (same). Moreover, as of March, ConocoPhillips had not yet made a final investment decision on Willow—*i.e.*, a decision "whether to commit to full project construction." Doc. 54-10, ¶19. Regardless, such economic harms, even if significant, do not by themselves present the "rare" or "limited" circumstances in which remand without vacatur might be appropriate. *See, e.g.*, *Nat'l Family Farm Coal.*, 960 F.3d at 1145 (holding seriousness of agency's error "compel[led]" vacatur, despite resulting economic

harm to innocent third-party stakeholders); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1051, 1053 (D.C. Cir. 2021) (affirming vacatur given the "seriousness of the NEPA violation," even though shutting down pipeline operations would economically harm company and other entities).

## CONCLUSION

For the foregoing reasons, the Court should declare the agencies' actions unlawful, and vacate and remand the ROD and accompanying SEIS and ESA consultation documents.

Respectfully submitted this 26th day of July, 2023.

*s/ Eric P. Jorgensen*
Eric P. Jorgensen (Alaska Bar No. 8904010)
Erik Grafe (Alaska Bar No. 0804010)
Jeremy C. Lieb (Alaska Bar No. 1810088)
Ian S. Dooley (Alaska Bar No. 2006059)
Carole A. Holley (Alaska Bar No. 0611076)
EARTHJUSTICE

*Attorneys for Plaintiffs Center for Biological Diversity, Defenders of Wildlife, Friends of the Earth, and Greenpeace, Inc.*

*s/ Kristen Monsell*
Kristen Monsell (California Bar No. 304793) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY

*Attorneys for Plaintiff Center for Biological Diversity*

*s/ Cecilia Segal*
Cecilia Segal (California Bar No. 310935) (*pro hac vice*)
Michelle Wu (New York Bar No. 5633664) (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL

*Attorneys for Plaintiff Natural Resources Defense Council*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 9,973 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 26th day of July, 2023.

_s/ Eric P. Jorgensen_
Eric P. Jorgensen

**CERTIFICATE OF SERVICE**

I hereby certify that on July 26, 2023, a copy of foregoing PLAINTIFFS'

PRINCIPAL BRIEF UNDER LOCAL RULE 16.3(c)(1),with attachments, was served

electronically through the CM/ECF system on the following counsel of record:  Paul A.

Turcke, Rickey Doyle Turner, Jr., Ryan P. Steen, Whitney A. Brown, Jason T Morgan,

Stacey M. Bosshardt, Eric B. Fjelstad, Melinda Meade Meyers, Tyson C. Kade, Charlene

Koski, Jonathan David Simon, Charles A. Cacciola, Brooks W. Chandler, Mary Hunter

Gramling, and Jonathan W. Katchen.

I further certify that Tarek Farag, tarekfaragusa@hotmail.com, was served by

electronic mail.

> *s/ Eric P. Jorgensen*
> Eric P. Jorgensen

## TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Declaration of Rosemary Ahtuangaruak |
| 2 | Declaration of Daniel Ritzman |
| 3 | Declaration of Jeffrey Scott Fair |
| 4 | Declaration of Steven Amstrup |
| 5 | Declaration of Richard G. Steiner |
| 6 | Declaration of Jenna Jonas |
| 7 | Declaration of Nicole Whittington-Evans |
| 8 | Declaration of Brendan Cummings |
| 9 | Declaration of Hallie Templeton |
| 10 | Declaration of Timothy Donaghy |
| 11 | Declaration of Gina Trujillo |