Lia Comerford (*pro hac vice*)
OSB #141513
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd
Portland, OR 97219
 (503) 768-6823
comerfordl@lclark.edu

*Attorney for Amici Curiae*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BUREAU OF LAND MANAGEMENT, *et al.* <br><br> *Defendants*, <br><br> and <br><br> CONOCOPHILLIPS ALASKA, INC. et al., <br><br> *Intervenor-Defendants*. | No. 3:23-cv-00061-SLG |

## [PROPOSED] *AMICI CURIAE* BRIEF OF MEMBERS OF CONGRESS IN SUPPORT OF PLAINTIFFS' PRINCIPAL BRIEF

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

STATEMENT OF AMICI CURIAE ................................................................... 2

ARGUMENT ....................................................................................................... 3

I. Willow is inconsistent with U.S. policy and will harm the country's environment and species ....................................................................................................... 3

II. Willow is inconsistent with Congressional intent behind NEPA and the ESA that agencies fully consider the effects of their actions before making decisions ............. 8

    a. NEPA requires an analysis of downstream GHG emissions from future oil development catalyzed by Willow. ........................................................... 9

    b. The ESA requires consideration of impacts to ESA-listed species from GHG emissions. .................................................................................... 12

CONCLUSION ................................................................................................. 20

BRIEF OF *AMICI CURIAE*                                                                                     i
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 2 of 28

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alaska Oil & Gas Assoc. v. Pritzker*,
840 F.3d 671 (9th Cir. 2016) ........................................................................... 19

*Alaska Oil & Gas Ass'n v. Ross*,
722 Fed. Appx. 666 (9th Cir. 2018) ................................................................. 19

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
937 F.3d 559 (D.C. Cir. 2019) ......................................................................... 16

*Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*,
575 F.3d 999 (9th Cir. 2009) ........................................................................... 15

*Ctr. for Biological Diversity v. Rumsfeld*,
198 F. Supp. 2d 1139 (D. Ariz. 2002) .............................................................. 19

*City of Davis v. Coleman*,
521 F.2d 661 (9th Cir. 1975) ........................................................................... 11

*City of L.A. v. Nat'l Highway Traffic Safety Admin.*,
912 F.2d 478 (D.C. Cir. 1990) ...................................................................... 9, 10

*Greenpeace Action v. Franklin*,
14 F.3d 1324 (9th Cir. 1992) ........................................................................... 19

*Idaho Sporting Congress, Inc. v. Rittenhouse*,
305 F.3d 957 (9th Cir. 2002) ............................................................................. 9

*Juliana v. United States*,
947 F.3d 1159 (9th Cir. 2020) ........................................................................... 3

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) ......................................................................... 15

*San Juan Citizens All. v. U.S. Bureau of Land Mgmt.*,
326 F.Supp.3d 1227 (D.N.M. 2018) ................................................................. 11

*Sierra Club v. Bureau of Land Mgmt.*,
786 F.3d 1219 (9th Cir. 2015) ......................................................................... 16

BRIEF OF *AMICI CURIAE*                                                                ii
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 3 of 28

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
  723 F. Supp. 2d 1247 (E.D. Cal. 2010) .......................................................... 16

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
  555 F.Supp.3d 739 (D. Alaska 2021) ................................................................. 5

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ........................................................................................ 12

## Statutes

16 U.S.C. § 1533(a)(1)(E) ..................................................................................... 17

16 U.S.C. § 1536(a)(2) ................................................................................... 13, 17

42 U.S.C. § 4321 .................................................................................................. 12

42 U.S.C. § 4331(a) ......................................................................................... 9, 12

42 U.S.C. § 4332 .................................................................................................... 9

## Regulations

40 C.F.R. Parts 1500–1508 ................................................................................. 10

40 C.F.R. § 1500.1 ................................................................................................. 9

40 C.F.R. § 1500.3(a) .......................................................................................... 10

40 C.F.R. § 1508.1(g)(2) ................................................................................ 10, 11

50 C.F.R. § 402.02 (2018)............................................................................... 15, 16

50 C.F.R. § 402.02 (2019).................................................................................... 16

50 C.F.R. § 402.14 ......................................................................................... 13, 17

50 C.F.R. § 402.17(a)-(b) (2019) ......................................................................... 16

## Other Authorities

84 Fed. Reg.  45016 (Aug. 27, 2019).................................................................. 16

88 Fed. Reg. 1196 (Jan. 9, 2023) ............................................................. 10, 11, 12

BRIEF OF *AMICI CURIAE*                     iii
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 4 of 28

88 Fed. Reg. 40753 (June 22, 2023) ..................................................... 16

115 Cong. Rec. 19011 (July 10, 1969)............................................... 9, 20

119 Cong. Rec. 30162–63 (Sept 18, 1973) ........................................ 19

Exec. Order No. 13990, 86 Fed. Reg. 7037 (Jan. 20, 2021) ................ 6

Exec. Order No. 14008, 86 Fed. Reg. 7619 (Feb. 1, 2021)........... 3, 4, 6, 8, 12

Exec. Order No. 14057, 86 Fed. Reg. 70935 (Dec. 8, 2021) ............... 5

BRIEF OF *AMICI CURIAE*                                                                    iv
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 5 of 28

# INTRODUCTION

Climate change poses an existential threat to our planet and its biodiversity, and even our society itself. Recognizing these risks, Congress and the Biden Administration have prioritized reductions in carbon emissions and seeking environmental justice. Together, they have made great strides towards placing the United States on a path towards significantly curbing its greenhouse gas ("GHG") emissions and reducing climate change's disproportionate impacts on vulnerable communities. *Amici Curiae*, members of Congress dedicated to promoting climate justice, have supported and participated in these efforts.

The Bureau of Land Management's ("BLM") approval of ConocoPhillips Alaska Incorporated's ("ConocoPhillips") Willow Master Development Plan ("Willow" or "Project") in the National Petroleum Reserve-Alaska will undermine much of this critical work. BLM estimates that Willow will result in 239 million metric tons of indirect greenhouse gas ("GHG") emissions over 30 years. But Willow is far worse than it appears. The infrastructure built for Willow will facilitate additional fossil fuel development in the Arctic that will likely dwarf the amount of oil and gas produced from Willow alone. The GHG emissions from burning oil produced by Willow and foreseeable additional development in the surrounding area will almost certainly undo a meaningful portion of the important, hard-earned climate results Congress and the Administration have achieved.

Fortunately, five decades ago, Congress adopted two bedrock laws—the National Environmental Policy Act ("NEPA") and the Endangered Species Act ("ESA")—that require federal agencies to consider the impacts of their proposed actions to better protect our nation's environment and restore species facing extinction. However, the federal

BRIEF OF *AMICI CURIAE*                                                                 1
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 6 of 28

agencies tasked with assessing the impacts of Willow—BLM, for the NEPA analysis, and the U.S. Fish and Wildlife Service and the National Marine Fisheries Service ("FWS" and "NMFS"; together, "the Services"), for threatened and endangered species—interpreted their legal responsibilities under these statutes in a manner that allowed these agencies to blind themselves to Willow's most egregious climate impacts. As a consequence, BLM and the Services ignored harms to the climate, environmental justice communities, and imperiled species that should have led BLM to shelve Willow.

## STATEMENT OF *AMICI CURIAE*

*Amici* are Representatives Jared Huffman (CA), Raúl Grijalva (AZ), Becca Balint (VT), Nanette Diaz Barragán (CA), Katie Porter (CA), Don Beyer (VA), and Alexandria Ocasio-Cortez (NY) of the United States Congress. *Amici* file this brief in support of Plaintiffs' Principal Brief. *Amici*'s brief is necessary to provide the perspectives and present the interests of members of Congress that do not appear in the Parties' briefs. *Amici* are dedicated to ensuring that the federal government is doing all it can to combat climate change, the greatest threat to humans, the environment, and biodiversity. The Willow Project will exacerbate the climate crisis. As such, it is not just about Alaska; Willow will have far-reaching consequences for the entire nation. *Amici*'s brief raises important concerns about Willow's effects on the United States' ability to address climate change, as well as related efforts to promote environmental justice and protect national security. Moreover, as members of Congress, *Amici* have a strong interest in the proper interpretation of federal statutes, including NEPA and the ESA. *Amici* rely on federal agencies to properly implement the environmental laws Congress has enacted and ensure

that federal decisions adequately address climate change. BLM's and the Services' failure to comply with these statutes harms *Amici's* interests in solving the climate and biodiversity crises, and impairs their interest in faithful implementation of statutes the Legislative Branch designed to promote informed agency decision-making.[1]

## ARGUMENT

### I. Willow is inconsistent with U.S. policy and will harm the country's environment and species.

Climate change is the defining environmental issue of our era. Overwhelming evidence demonstrates that climate change is occurring at "an increasingly rapid pace" and that continuing fossil fuel combustion "will wreak havoc on the Earth's climate if unchecked." *Juliana v. United States*, 947 F.3d 1159, 1166 (9th Cir. 2020). As the Intergovernmental Panel on Climate Change ("IPCC") has warned, "[e]very bit of warming matters, every year matters, every choice matters." BLM AR639727 (2018 IPCC Special Report on Global Warming of 1.5°C).

Given this significant threat, Congress and the Administration have appropriately put fighting climate change at the forefront of their agendas. In one of the first actions of his presidency, President Biden asserted that fighting climate change is "more necessary and urgent than ever" and committed to deploying the "full capacity" of the government to combat the climate crisis. Exec. Order No. 14008, 86 Fed. Reg. 7619, 7619, 7622 (Feb. 1, 2021). The Administration set a target for the United States to achieve a 50 to 52 percent

---

[1] *Amici* state that no counsel for any parties authored the brief in whole or in part and that no party or party's counsel, and no person other than *Amici* or their counsel, contributed money intended to fund preparing or submitting the brief.

BRIEF OF *AMICI CURIAE*                                                                 3
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 8 of 28

reduction in net GHG pollution below 2005 levels by 2030, BLM AR820760, and emphasized the need to move away from fossil fuels and toward renewable and sustainable energy. 86 Fed. Reg. at 7620–21, 7624. The Administration also rejoined the Paris Agreement, the international agreement wherein countries committed, among other things, to address climate change, reduce their GHG emissions to "avoid catastrophic planetary warming."[2] Congress also acted decisively, developing a Climate Crisis Action Plan to aggressively pursue net-zero by or before 2050 and net-negative GHG emissions in the years after 2050.[3] To help accomplish these critical goals, Congress passed the Inflation Reduction Act, the most significant climate change legislation in U.S. history.

To avoid climate change's most catastrophic impacts, the United States must immediately transition away from fossil fuels. The IPCC recently concluded that all pathways to fulfilling the Paris Agreement's commitments "involve rapid and deep and in most cases immediate GHG emission reductions in all sectors."[4] To keep global warming to 1.5°C above pre-industrial levels—the goal set in the Paris Agreement to avoid the worst

---

[2] U.S. Department of State, Press Statement: The United States Officially Rejoins the Paris Agreement (Feb. 19, 2021), *available at* https://www.state.gov/the-united-states-officially-rejoins-the-paris-agreement/ (last visited July 17, 2023).

[3] House Select Committee on the Climate Crisis, Solving the Climate Crisis: The Congressional Action Plan for a Clean Energy Economy and a Healthy, Resilient, and Just America (2020) at 3, *available at* https://bonamici.house.gov/sites/evo-subsites/bonamici-evo.house.gov/files/documents/Climate_Crisis_Action_Plan.pdf (last visited July 17, 2023).

[4] Working Group III Contribution to the Sixth Assessment Report of the Intergovernmental Panel on Climate Change, Mitigation of Climate Change: Summary for Policymakers, at 24 (2022), *available at* https://www.ipcc.ch/report/ar6/wg3/downloads/report/IPCC_AR6_WGIII_SummaryForPolicymakers.pdf (last visited July 17, 2023).

BRIEF OF *AMICI CURIAE*                                                                                          4
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 9 of 28

climate change impacts—global $CO_2$ emissions must reach net-zero around 2050. BLM AR639742; *see also* Exec. Order No. 14057, 86 Fed. Reg. 70935, 70935 (Dec. 8, 2021) (adopting goal of reaching net-zero emissions economy-wide by 2050). To achieve net-zero GHG emissions by 2050, it is essential that no new oil and gas fields be approved beyond those committed as of 2021.[5]

Turning a blind eye to these warnings, BLM approved Willow, which will produce 576 million barrels of oil, resulting in an estimated 239 million metric tons of GHG emissions from the transportation, processing, and downstream combustion of Willow's oil over 30 years. BLM AR820761 (BLM Final Supplemental Impact Statement ("FSEIS"), explaining indirect emissions); BLM AR824901 (BLM Record of Decision, providing indirect emissions figures). While this figure is enormous standing alone, it does not include the downstream emissions from reasonably foreseeable future oil and gas development that Willow is likely to put in motion.[6] This is problematic because Willow is only the starting point for plans for such development in the area. *See* BLM AR821122 (in FSEIS, acknowledging that infrastructure needed for Willow "may result in additional development opportunities to the south and west of the Project area if [ConocoPhillips] or other North slope operators use Project infrastructure as a jumping-off point for new

---

[5] International Energy Agency, Net Zero by 2050: A Road-map for the Global Energy Sector (2021) at 13, 21, *available at* https://iea.blob.core.windows.net/assets/deebef5d-0c34-4539-9d0c-10b13d840027/NetZeroby2050-ARoadmapfortheGlobalEnergySector_CORR.pdf (lasted visited July 17, 2023).
[6] "Downstream" emissions commonly refer to those emissions resulting from the consumption of the oil. *See Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F.Supp.3d 739, 762 n. 104 (D. Alaska 2021).

BRIEF OF *AMICI CURIAE*      5
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 10 of 28

development [p]rojects"). ConocoPhillips described Willow as the "next great Alaska hub" and has stated that Willow's infrastructure could help it leverage up to 3 billion barrels of oil from areas near Willow,[7] more than five times the amount of oil Willow itself will produce. Thus, the downstream emissions from additional oil and gas development facilitated by Willow's infrastructure will greatly magnify Willow's climate harms.

*Amici* are thus gravely concerned that Willow will significantly hinder the United States' crucial efforts to fight climate change. The nation cannot reduce its GHG emissions while simultaneously authorizing major fossil fuel projects such as Willow. Willow will undercut Congress's and the Administration's efforts to significantly reduce GHG emissions and lock in new fossil fuel infrastructure at a time when the United States must do the exact opposite.

*Amici* also have serious concerns regarding Willow's impacts on environmental justice. The Administration has committed to advance and prioritize environmental justice since day one. *See* Exec. Order No. 13990, 86 Fed. Reg. 7037, 7037 (Jan. 20, 2021). Recognizing the link between climate change and environmental justice, the Administration pledged "the full capacity of its agencies to combat the climate crisis to implement a Government-wide approach that . . . delivers environmental justice." Exec. Order No. 14008, 86 Fed. Reg. at 7622.

Willow does not advance or prioritize environmental justice; it furthers environmental *injustice*. Climate change causes disproportionate harm to communities of

---

[7] *See* Edited Transcript from ConocoPhillips 2021 Market Update, ECF 24-20, at 2–3.

BRIEF OF *AMICI CURIAE*                                                                 6
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 11 of 28

color, low-income communities, and tribal and indigenous communities across the country, including harms to their health, environment, and ways of life. [8] Oil extraction and industrialization in the Arctic, including from Willow, exacerbates climate change and thus worsens and compounds these adverse impacts, especially for native communities in Alaska. [9] Indeed, the Native Village of Nuiqsut and City of Nuiqsut, located near the Willow Project area, raised numerous concerns related to Willow's impacts on subsistence resources, human health, and air quality, as well as concerns regarding BLM's public consultation process. *See generally* BLM AR772921 (Native Village of Nuiqsut and City of Nuiqsut comment letter on preliminary FSEIS); BLM AR776976 (letter from Native Village and City of Nuiqsut officials, in their individual capacities, regarding FSEIS). Environmental justice demands a different approach than allowing Willow to further propound disproportionate impacts on environmental justice communities.

Finally, contrary to Willow's proponents' assertions, *see* Alaska Congressional Delegation Amicus Brief, ECF 55-1 at 12–13, the Project will adversely affect energy independence and national security. Climate change is a vast and growing threat to national security, and the Administration has made climate considerations central to foreign policy

---

[8] *See, e.g.*, BLM AR821068–69 (FSEIS section addressing environmental justice); U.S. Department of Health and Human Services, Climate Change & Health Equity, and Environmental Justice at HHS, *available at* https://www.hhs.gov/climate-change-health-equity-environmental-justice/index.html (last visited July 17, 2023).

[9] *See generally*, Department of Interior, Bureau of Indian Services, Office of Trust Services, Tribal Climate Resilience Program, Informational Report: The Unmet Infrastructure Needs of Tribal Communities and Alaska Native Villages in Process of Relocating to High Ground as a Result of Climate Change, Fiscal Year 2020, *available at* https://www.bia.gov/sites/default/files/dup/assets/bia/ots/tcrp/Informational_Report.pdf (last visited July 17, 2023).

BRIEF OF *AMICI CURIAE*                                                                 7
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 12 of 28

and national security. 86 Fed. Reg. at 7619.[10] The best way to enhance national security and to insulate the United States from volatile fossil fuels markets is to end dependence on fossil fuels, not perpetuate it. Nor is it accurate to portray domestic oil production as greener than foreign production, as some of Willow's proponents do. ECF 55-1, at 1–2. BLM concluded that foreign oil would replace just over half of Willow's would-be production under a no-action alternative, BLM AR820744, but it does not necessarily follow that this replacement oil would come from countries with substantially weaker environmental standards. More importantly, this debate obscures the stark reality that every drop of oil drilled contributes to the climate crisis.

In sum, significantly increasing fossil fuel production in the Arctic goes against Congress's and the Biden Administration's priorities. Willow should not move forward.

## II. Willow is inconsistent with Congressional intent behind NEPA and the ESA that agencies fully consider the effects of their actions before making decisions.

In addition to hindering U.S. efforts to fight climate change and promote climate justice, Willow is also inconsistent with federal agencies' obligations under NEPA and the ESA. BLM has ignored NEPA's bedrock principle of informed decision-making by failing to consider vast GHG emissions linked to its Willow decision. Moreover, the Services employed an outdated policy of the George W. Bush Administration to whitewash the impacts of massive GHG emissions on species in peril precisely due to the effects of

---

[10] *See also, e.g.*, Department of Defense Draft Climate Adaptation Plan: Report Submitted to National Climate Task Force and Federal Chief Sustainability Officer (Sept 1, 2021), *available at* https://www.sustainability.gov/pdfs/dod-2021-cap.pdf (last visited July 17, 2023).

BRIEF OF *AMICI CURIAE*                                                                 8
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 13 of 28

climate change.

### a. NEPA requires an analysis of downstream GHG emissions from future oil development catalyzed by Willow.

Congress passed NEPA, the "basic national charter for protection of the environment," 40 C.F.R. § 1500.1 (1978), in a moment of environmental crisis. By the late 1960s, poor and non-existent planning had led to devastating environmental consequences, as one Congressional subcommittee responsible for NEPA's drafting understood: "[o]ne of the major factors contributing to environmental abuse and deterioration is that actions— often actions having irreversible consequences—are undertaken without adequate consideration of, or knowledge about, their impact on the environment." 115 Cong. Rec. 19011 (July 10, 1969) (excerpt from Committee on Interior and Insular Affairs Report on S. 1075). In the face of this environmental degradation, Congress adopted NEPA to "restor[e] and maintain[] environmental quality" for present and future generations. 42 U.S.C. § 4331(a). Congress enshrined in NEPA the fundamental idea that agencies must fully consider the environmental and social impacts of their proposed projects prior to making final decisions. *See id.* at § 4332; *see also Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 963, 973 (9th Cir. 2002) (stating that NEPA requires agencies to take a "hard look" at the direct, indirect, and cumulative impacts of their actions).

In the face of the climate crisis, a full analysis of climate change impacts must be an integral part of NEPA's environmental review. Congress designed NEPA to handle crises such as climate change. *See City of L.A. v. Nat'l Highway Traffic Saftey Admin.*, 912 F.2d 478, 491 (D.C. Cir. 1990) (Wald, C.J., dissenting) (stating that NEPA "was designed

BRIEF OF *AMICI CURIAE*                                                                 9
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 14 of 28

explicitly to take account of impending as well as present crises in this country and in the world as a whole."). The Council on Environmental Quality ("CEQ") recently recognized this, asserting in interim guidance that "[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview." 88 Fed. Reg. 1196, 1197 (Jan. 9, 2023); *see also id.* at 1198 ("Consistent with NEPA, climate change analysis is a critical component of environmental reviews and integral to Federal agencies managing and addressing climate change.").[11]

BLM's reliance on a distorted interpretation of NEPA in its FSEIS blinded the agency to the significant downstream GHG emissions from future oil and gas development likely to occur as a result of Willow. BLM acknowledged that Willow is likely to lead to future development in the Reserve, and it included a list of reasonably foreseeable future actions in the FSEIS. *See supra* pp. 5–6; BLM AR821123–25. Yet BLM did not analyze the downstream GHG emissions from these future projects as part of its consideration of Willow's indirect effects. Plaintiffs' Principal Brief, ECF 115, at 19–20.

Such emissions constitute reasonably foreseeably indirect effects under NEPA. *See* 40 C.F.R. § 1508.1(g)(2) (explaining that "indirect effects" are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable"). CEQ recently affirmed that

---

[11] CEQ is charged with promulgating regulations to implement NEPA. CEQ's regulations, at 40 C.F.R. Parts 1500–1508, are binding on all federal agencies, 40 C.F.R. § 1500.3(a). BLM initially followed CEQ's 2016 GHG Guidance when developing the draft SEIS but followed the 2023 Interim CEQ Guidance after that Guidance was completed in January 2023. BLM AR820767–68.

BRIEF OF *AMICI CURIAE*                                                                  10
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG

Indirect effects generally include reasonably foreseeable emissions related to a proposed action that are upstream or downstream of the activity resulting from the proposed action. For example, where the proposed action involves fossil fuel extraction, direct emissions typically include GHGs emitted during the process of exploring for and extracting the fossil fuel. The reasonably foreseeable indirect effects of such an action likely would include effects associated with the processing, refining, transporting, and end-use of the fossil fuel being extracted, including combustion of the resource to produce energy.

88 Fed. Reg. at 1204. Courts have rightfully echoed these assertions, finding that agencies must consider downstream GHG emissions under NEPA. *See, e.g., San Juan Citizens All. v. U.S. Bureau of Land Mgmt.*, 326 F.Supp.3d 1227, 1242–43 (D.N.M. 2018) (collecting cases requiring analysis of downstream GHG emissions under NEPA). This analysis must account for emissions from reasonably foreseeable future fossil fuel activities, including future oil and gas development. This is not a new requirement; it is well-settled that an agency must evaluate a project's growth-inducing effects under NEPA. *See* 40 C.F.R. § 1508.1(g)(2) (explaining that indirect effects "may include growth inducing effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems"); *see also City of Davis v. Coleman*, 521 F.2d 661, 676–77 (9th Cir. 1975) (describing consideration of growth-inducing indirect effects in NEPA analysis as "indispensable" and noting that failure to consider growth-inducing effects was "precisely the kind of situation Congress had in mind when it enacted NEPA"). Thus, BLM's failure to consider the emissions from the combustion of fossil fuels generated by reasonably foreseeable future oil and gas development facilitated by Willow is a violation of NEPA's requirement that agencies consider the indirect effects of their proposed projects on the environment. It is also

BRIEF OF *AMICI CURIAE*                                                                                11
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 16 of 28

antithetical to NEPA's purposes to "prevent or eliminate damage to the environment and biosphere," 42 U.S.C. § 4321, and "restor[e] and maintain[] environmental quality." 42 U.S.C. § 4331(a). Agencies cannot meet Congress's goal of protecting our planet's environment and biosphere for future generations if they fail to take a hard look at actions that worsen the climate crisis.

BLM's NEPA analysis for Willow also ignored the fact that Willow's environmental impacts are inconsistent with national policies on climate change. The 2023 Interim CEQ Guidance affirms that NEPA reviews should account for national policies on climate change and GHG reduction goals. 88 Fed. Reg. at 1197, 1201, 1203. The United States has committed to curbing GHG emissions and has committed the "Federal Government [to] drive assessment, disclosure, and mitigation of climate pollution and climate-related risks." 86 Fed. Reg. at 7622. BLM cannot fulfill these commitments or NEPA's purposes while ignoring the significant downstream GHG emissions from future oil and gas development. BLM's decision is not only at odds with NEPA's "look before you leap" directive, but it also unlawfully obscures much of the climate harm stemming from a decision that will substantially undermine *Amici's* and the Administration's progress in the fight against climate change.

b. **The ESA requires consideration of impacts to ESA-listed species from GHG emissions.**

Congress designed ESA section 7 to "institutionaliz[e] . . . caution" among federal agencies and place the protection and recovery of listed species above competing federal goals. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978). Section 7 requires federal

BRIEF OF *AMICI CURIAE* 12
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 17 of 28

agencies to consult with the Services to ensure, based on the "best scientific and commercial data available," that their proposed actions are not likely to jeopardize listed species or adversely modify designated critical habitat. 16 U.S.C. § 1536(a)(2). Section 7 consultation is mandatory whenever a proposed agency action "may affect" listed species or critical habitat. 50 C.F.R. § 402.14(a).

As noted above, people across the country are rightfully concerned about Willow because of its implications for climate change. Incredibly, however, both BLM and the Services explicitly refused to consider the climate impacts of Willow's massive carbon emissions on listed species, including species listed specifically because climate change threatens their sea ice habitat. *See, e.g.*, FWS AR032478–79, AR032482–83, AR0032485–87 (FWS Biological Opinion, discussing climate change impacts on spectacled eiders and polar bears); NMFS AR000165–66 (NMFS Letter of Concurrence, explaining that the Arctic ringed seal was listed on the ESA "primarily due to expected impacts on the population within the foreseeable future due to climate-driven declines in sea ice and snow cover"). To justify its action that contravenes common sense, BLM remarkably gave itself permission to acknowledge—but ultimately ignore—the effects on listed species and their critical habitat stemming from the huge carbon emissions resulting from burning oil and gas connected with Willow. *See* FWS AR032344–47 (BLM Memo concluding that scope of ESA section 7 consultation should not include Willow's GHG emissions). The Services agreed with this analysis. *See* FWS AR032341–43 (FWS email agreeing with BLM's ESA section 7 scope memo); NMFS AR000495–97 (same, for

BRIEF OF *AMICI CURIAE*                                                                 13
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 18 of 28

NMFS). These decisions fly in the face of the ESA's precautionary approach to managing threatened and endangered species that Congress specifically emphasized in constructing the mandatory duties applicable to federal agencies under section 7.

The baffling idea that agencies can simply blind themselves to the impacts of massive carbon emissions on climate-vulnerable endangered species stems from a 2008 Bush Administration memorandum authored by then-Solicitor of the Department of the Interior David Bernhardt. *See* FWS AR032371–77. Taking a page from uncertainty arguments honed by entities such as tobacco companies, this Memo essentially crafted a "precision exception" to ESA section 7 requirements that require federal agencies to consider the impacts of their actions that "may affect" listed species. *Id.* Reasoning that science (at least in 2008) could not link the effects of given GHG emissions to specific impacts in precise locations, the Memo concluded that the climate change effects of GHG emissions linked to a proposed federal action need not be the subject of ESA section 7 consultation. *See* FWS AR032377; *see also* FWS AR032375 (noting that climate change research had not yet developed tools specifically intended for evaluating or quantifying end-point impacts attributable to GHG emissions from a single source, so the impacts of emissions did not amount to "indirect effects" requiring ESA consultation).

The facts of this case starkly illustrate the consequences of this climate change carve-out to section 7. BLM does not deny that carbon emissions linked to Willow are likely to exacerbate the impacts of climate change on the ecosystem affected by the project, acknowledging that these emissions may produce "a marginal season decrease in sea ice extent somewhere in the Arctic." FWS AR032345. Nonetheless, citing a "lack of a linear

BRIEF OF *AMICI CURIAE*                                                                 14
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 19 of 28

relationship between sea ice loss and impacts to polar bears and associated listed species and/or their habitat," FWS AR032346, BLM decided that carbon emissions linked to Willow do not meet the section 7 regulations' definitions of effects that must be considered in section 7 consultation. To meet this threshold, according to BLM, "more specificity would be necessary" regarding the details of links between sea ice loss and impacts on polar bears, and the agency would need "similar additional, granular information" on effects on ice-dependent seals. FWS AR032346. Lacking such information, BLM—with a nod from the Services—simply ignored impacts on listed species stemming from Willow's likely climate change-worsening impacts.

BLM and the Services' actions are inconsistent with both the ESA's clear requirements and Congress's intent in creating a powerful hedge against extinction. First, ignoring emissions-related climate effects on listed species misinterprets the "may effects" threshold for ESA section 7 consultation. The "*may affect*" test is a "relatively low threshold," and "'[a]*ny possible effect*, whether beneficial, benign, adverse or of undetermined character' triggers the requirement." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (en banc) (quoting *Cal. ex rel. Lockyer v. U.S. Dep't of Agric.*, 575 F.3d 999, 1018 (9th Cir. 2009)). The definition of "indirect effects" employed in the Bernhardt memo and by regulations in effect for over three decades until amended by the Trump Administration in 2019 included "those that are caused by the proposed action and are later in time, but still are reasonably certain to occur," 50 C.F.R. §

BRIEF OF *AMICI CURIAE*                                                      15
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 20 of 28

402.02 (2018) (superseded in 2019), [12] and "attenuated consequences of the agency action." *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1224 (9th Cir. 2015) (quotation omitted). Even where a project's effects may have only a small or uncertain impact on listed species, that can be sufficient to trigger ESA consultation. *See Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 598 (D.C. Cir. 2019) (in finding that EPA violated the ESA by failing to make an effects determination, stating "EPA concluded that it is impossible to know whether the 2018 Rule will affect listed species or critical habitat. That is not the same as determining that the 2018 Rule 'will not' affect them."); *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*, 723 F. Supp. 2d 1247, 1273–74 (E.D. Cal. 2010) (finding NMFS's jeopardy analysis inadequate, noting "the court cannot conclude that global warming's potential impacts are so slight that NMFS could ignore them without discussion."). In sum, neither the ESA nor cases interpreting the statute allow for federal agencies to ignore effects on listed species simply because the agencies believe they cannot describe such effects with sufficient precision.

Further, Congress structured the ESA to deal with uncertainty, and the agencies

---

[12] Seeking to narrow the definition of "effects of the action," the Trump Administration amended the section 7 regulations in 2019 to eliminate "indirect" effects as an explicit component of this term. 84 Fed. Reg. 45016 (Aug. 27, 2019); *see also* 50 C.F.R. § 402.02 (2019). Clearly targeting climate impacts, the Trump Administration also added a new regulatory section imposing additional constraints on delineating "activities that are reasonably certain to occur" and "consequences caused by the proposed action." 50 C.F.R. §§ 402.17(a)–(b) (2019). The Biden Administration has proposed to eliminate these newly added provisions. *See* 88 Fed. Reg. 40753, 40763, 40757 (June 22, 2023). However, in this case BLM acknowledges that emissions from oil and gas linked to Willow will contribute to climate change, giving BLM and the Services an obligation to consider the project's climate impacts on listed species.

BRIEF OF *AMICI CURIAE*                                                    16
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 21 of 28

charged with implementing the statute have numerous ways to deal with incomplete information in working to conserve listed species. For example, anticipating that factors unknown in 1973 could imperil biodiversity, Congress included a catch-all criterion among the factors the Services must consider in making ESA listing decisions. *See* 16 U.S.C. § 1533(a)(1)(E) (including as ESA-listing criterion, "other natural or manmade factors affecting [the] species continued existence"). Lawmakers also allowed the Services to act without definitive scientific information, directing them to use the best science available to make important decisions under the law. *See* 16 U.S.C. § 1536(a)(2) (requiring agencies to use "the best scientific and commercial data available" in ESA consultations). For their part, the Services have also developed means of managing impacts to listed species that involve some degree of uncertainty rather than simply choosing to ignore such effects. For example, even though the Services in some cases may not be able to quantify the individual members of a protected species likely to be incidentally killed or injured by a federal action, they still authorize incidental take by creating surrogate measures to approximate likely incidental take to the greatest extent possible. *See* 50 C.F.R. § 402.14(i)(1)(i). Yet inexplicably, action agencies and the Services continue to entirely dismiss the climate impacts stemming from federally linked GHG emissions merely because the specific contours of the impacts cannot be predicted with some arbitrary degree of precision.

Moreover, 15 years of scientific advances in climate science since the Bernhardt Memo was written in 2008 show it is high time to discard the "uncertainty excuse" to justify ignoring climate impacts of carbon emissions linked to federal agency actions. Over the past two decades, the Arctic has warmed at likely more than double the global rate.

BRIEF OF *AMICI CURIAE*                                                                 17
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 22 of 28

BLM AR820758. This warming has significantly affected Arctic sea ice. As BLM summarized,

> Since the early 1980s, average annual sea ice extent has decreased by 3.5% to 4.1% per decade and the annual minimum sea ice extent, which occurs in September, has decreased at a rate of 11% to 16% per decade (USGCRP 2018). The 15 lowest September sea ice extents in the satellite record (since 1979) have all occurred in the last 15 years (Moon, Druckenmiller et al. 2021).

*Id.* Researchers estimate that for each metric ton of anthropogenic carbon dioxide emitted, a sustained loss of $3 \pm 0.3$ m$^2$ of September Arctic sea-ice follows. *Id.* (citing Dirk Notz & Julienne Stroeve, *Observed Arctic Sea Ice Loss Directly Follows Anthropogenic CO$_2$ Emissions,* 354 SCIENCE 747, 748 (2016)). Scientists project the Arctic to have ice-free summers by the 2040s.[13] Ultimately, there is simply no real scientific dispute that increased GHG emissions are leading to a warming climate that is amplified in the Arctic and causing a drastic loss in sea ice. *See* BLM AR820757–60 (FSEIS discussion regarding impacts of GHG emissions on the climate and the ensuing effects in the Arctic, including effects to sea ice, and, citing multiple studies and reports since 2008).

Of course, a degree of scientific uncertainty surrounds the exact relationship between a specific amount of carbon emissions and the extent of sea ice loss in specific locations in the Arctic. However, uncertainty in predicting future impacts on listed species is a routine aspect of implementing the ESA. As numerous courts have emphasized, in the face of uncertainty over the precise impacts of an agency action's impacts on listed species,

---

[13] U.S. Global Change Research Program, Climate Science Special Report: Fourth National Climate Assessment, Vol. II, App. 5 at 1497, *available at* https://nca2018.globalchange.gov/downloads/NCA4_2018_FullReport.pdf.

BRIEF OF *AMICI CURIAE*                                                                                    18
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 23 of 28

federal agencies have an obligation to make their best assessment in light of the best scientific information available. *See, e.g.*, *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1337 (9th Cir. 1992) (describing standard for evaluating whether agency complied with its ESA consultation duties as considering whether, despite uncertainty, an agency's decision was based on the best available science and grounded in a consideration of relevant factors); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1156 (D. Ariz. 2002) (finding FWS BiOp legally inadequate where FWS no jeopardy determination was based on future plans, stating that the ESA's best available science standard "requires far less than conclusive proof"). Indeed, NMFS itself successfully argued in the Ninth Circuit that it could make long-term projections about the loss of sea ice due to climate change in listing as threatened two of the very species at issue in this case. *See Alaska Oil & Gas Assoc. v. Pritzker*, 840 F.3d 671, 681–84 (9th Cir. 2016) (affirming district court decision finding NMFS's listing of bearded seals not arbitrary or capricious); *Alaska Oil & Gas Ass'n v. Ross*, 722 Fed. Appx. 666, 668–69 (9th Cir. 2018) (based on Ninth Circuit's *Pritzker* decision, reaching similar decision for challenge to ringed seal listing). It therefore makes no sense for NMFS to now agree with BLM's assertion that it can simply ignore the climate impacts of massive GHG emissions linked to Willow.

BLM's and the Services' efforts in this case to exclude GHG emissions from their ESA consultations are inconsistent with what Congress envisioned when it described the ESA as a flexible tool capable of "adapt[ing] [itself] to the needs of the animals themselves and to deal with problems which did not exist until a few years ago." 119 Cong. Rec. 30162–63 (Sept 18, 1973). The agencies' failure to assess the impacts to species from

BRIEF OF *AMICI CURIAE*                                                                 19
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 24 of 28

Willow's GHG emissions, coupled with their disregard for the best available science on climate attribution, renders the actions of the FWS (in preparing an unlawful Biological Opinion), NMFS (in preparing an unlawful Letter of Concurrence), and BLM (in relying on unlawful ESA-consultation documents) in violation of the ESA.

## CONCLUSION

Roughly fifty years ago, Congress and the American public began to recognize that outsized focus on economic growth had spurred myopic planning that contributed to a significant decline in our nation's environment and species. At that time, in passing NEPA, Congress stated "[t]oday [1969] it is clear that we cannot continue on this course. Our natural resources—our air, water, and land—are not unlimited. We no longer have the margins for error that we once enjoyed." 115 Cong. Rec. at 19010. If the margins for error were slim in 1969, they are vanishingly so now in the face of the climate crisis.

Willow is a project leftover from a bygone era that sacrificed the planet's climate, environment, and species at the altar of fossil fuel extraction. Willow—and the massive additional oil and gas production in the Arctic that BLM acknowledges it will facilitate— calls into question the Biden Administration's professed priorities of reducing U.S. GHG emissions and centering climate justice. BLM and the Services were able to go forward with Willow only by constructing legally flawed means of blinding themselves to its true climate consequences. But it is impossible to escape the reality of Willow: it will result in massive carbon emissions in a climate-limited world, imperiling environmental justice communities and species protected because of climatic changes to their vanishing habitat. These emissions will have grave ramifications for the entire country. The law, science, and

BRIEF OF *AMICI CURIAE*                                                                    20
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 25 of 28

the priorities of Congress and the current Administration dictate an outcome directly opposite to that BLM selected—there is no room for Willow in this warming world.

Respectfully submitted this 28th day of July, 2023.

<u>s/ Lia Comerford</u>
Lia Comerford (*pro hac vice*)
OSB #141513
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd
Portland, OR 97219
 (503) 768-6823 (Comerford)
comerfordl@lclark.edu

*Attorney for Amici Curiae*

BRIEF OF *AMICI CURIAE*                                                                 21
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 26 of 28

# CERTIFICATE OF SERVICE

I certify that on this 28th day of July 2023, I filed the above [Proposed] *Amici Curiae* Brief of Members of Congress in Support of Plaintiffs' Principal Brief with the Court's CM/ECF system, which provided notice of this filing by email to all counsel of record.

<u>*s/ Lia Comerford*</u>
Lia Comerford (*pro hac vice*)
OSB #141513
Earthrise Law Center
Lewis & Clark Law School
10101 S. Terwilliger Blvd
Portland, OR 97219
(503) 768-6823
comerfordl@lclark.edu

*Attorney for Amici Curiae*

BRIEF OF *AMICI CURIAE*
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 27 of 28

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 5,633 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limit of Local Civil Rule 7.4.(a)(2).

Respectfully submitted this 28th day of July, 2023.

s/ *Lia Comerford*
Lia Comerford (*pro hac vice*)
OSB #141513
Earthrise Law Center at
Lewis & Clark Law School
10101 S. Terwilliger Blvd
Portland, OR 97219
(503) 768-6823 (Comerford)
comerfordl@lclark.edu

*Attorney for Amici Curiae*

BRIEF OF *AMICI CURIAE*
*Center for Biological Diversity, et. al. v. BLM, et al*, Case No. 3:23-cv-00061-SLG
Case 3:23-cv-00061-SLG   Document 117-1   Filed 07/28/23   Page 28 of 28