Max Sarinsky (N.Y. Bar No. 5387576)*
INSTITUTE FOR POLICY INTEGRITY
New York University School of Law
139 MacDougal Street, 3rd Floor
New York, NY 10012
(212) 992-8932
max.sarinsky@nyu.edu
*Pro Hac Vice Motion Pending

Attorney for *Amicus Curiae*, Institute for Policy Integrity

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, et al., <br><br> CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF LAND MANAGEMENT, et al., <br><br> Defendants, <br><br> and <br><br> CONOCOPHILLIPS ALASKA, INC., et al., <br><br> Intervenor-Defendants. | Case Nos. 3:23-cv-00058-SLG, <br> 3:23-cv-00061-SLG |

### *AMICUS CURIAE* BRIEF OF THE INSTITUTE FOR POLICY INTEGRITY AT NEW YORK UNIVERSITY SCHOOL OF LAW IN SUPPORT OF PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... ii

INTEREST OF *AMICUS CURIAE* ........................................................ 1

SUMMARY OF ARGUMENT ............................................................... 2

ARGUMENT ........................................................................................... 5

    I.    The Project Will Cause Substantial Climate Damages—Up To $18 Billion By BLM's Estimate, And Likely Far More ........................................................................... 5

        A.    The Project's climate costs are extensive even under BLM's own estimate. ............................................ 5

        B.    Monetized climate damages are very likely larger than what BLM estimated. ............................................ 8

    II.   By Displacing Other Energy Sources, The Project Is Likely To Reduce Revenues In Other Energy-Producing Regions ............................................................................................. 12

CONCLUSION ...................................................................................... 13

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**                                                                            **Page(s)**

*All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105 (9th Cir. 2018) .................................................................................................. 4

*Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023) ...................................................................................... 2

*Pollinator Stewardship Council v. Env't Prot. Agency*, 806 F.3d 520 (9th Cir. 2015) ............................................................................................ 3, 14

*Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs,* 486 F.3d 638 (9th Cir. 2007) .............................................................................. 3

**Administrative Record**

Bureau of Land Mgmt., *Willow Master Development Plan Final Supplemental Environmental Impact Statement* (2023) ............. passim

**Other Authorities**

Bureau of Ocean Energy Mgmt., *2023–2028 National Outer Continental Shelf Oil and Gas Leasing Proposed Program* (2022) ................... 10, 13

Env't Prot. Agency, Docket ID No. EPA-HQ-OAR-2021-0317, External Review Draft of Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances (2022) ................ 9

Inst. for Pol'y Integrity et al., Comment Letter on Willow Master Development Plan Draft Supplemental Environmental Impact Statement (DOI-BLM-AK-2018-0004-EIS) (Aug. 29, 2022) .................. 1

Interagency Working Grp. on the Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates (2021) ............................................. 9

Matthew J. Kotchen, *Which Social Cost of Carbon? A Theoretical Perspective*, 5 J. Ass'n Env't & Res. Economists 673 (2017) ............... 11

U.S. Energy Info. Admin., *Annual Energy Outlook 2022* (2022) ............ 10

*What More Gulf of Mexico Oil and Gas Leasing Means for Achieving U.S. Climate Targets: Hearing Before H. Nat. Res. Subcomm. On Energy & Mineral Res.*, 117th Cong. (2022) (statement of Max Sarinsky) ........................................................................................ 2

## INTEREST OF *AMICUS CURIAE*

The Institute for Policy Integrity at New York University School of Law (Policy Integrity) is a nonpartisan, not-for-profit think tank dedicated to improving the quality of government decisionmaking in the fields of administrative law, economics, and public policy, focusing primarily on environmental issues.[1]

An area of particular concern for Policy Integrity is the proper consideration of environmental and climate impacts in administrative decisionmaking. Policy Integrity has published reports, scholarly articles, and comment letters on assessing the climate and economic impacts of the federal oil and gas program—including several comment letters on the Willow Master Development Plan (Willow Project or Project). *See, e.g.*, Inst. for Pol'y Integrity et al., Comment Letter on Willow Master Development Plan Draft Supplemental Environmental Impact Statement (DOI-BLM-AK-2018-0004-EIS) (Aug. 29, 2022), https://policyintegrity.org/documents/Comment_Letter_on_Willow_Master_Development_Plan.pdf. One of its attorneys, Max Sarinsky, also

---

[1] No party's counsel authored this brief wholly or partly, and no person contributed money intended to fund its preparation or submission.

recently testified before Congress on the climate effects of the federal oil and gas program. *What More Gulf of Mexico Oil and Gas Leasing Means for Achieving U.S. Climate Targets: Hearing Before the H. Nat. Res. Subcomm. on Energy & Mineral Res.*, 117th Cong. (2022) (statement of Max Sarinsky), https://perma.cc/5R25-XAXB. And federal courts have relied on Policy Integrity's work on the climate and economic impacts of the federal oil and gas program, including in other cases involving the Bureau of Land Management (BLM). *E.g.*, *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1039–42 (10th Cir. 2023).

Policy Integrity's expertise in environmental and administrative law, especially the federal oil and gas program, provides a unique perspective on this case. Policy Integrity submits this brief to offer insights on the climate and economic impacts of the Willow Project.

## SUMMARY OF ARGUMENT

Plaintiffs[2] challenge BLM's approval of the Willow Project for violating the National Environmental Policy Act, the Naval Petroleum Reserves Production Act, the Endangered Species Act, and the Alaska

---

[2] The use of "Plaintiffs" in this brief generally refers to the plaintiffs in both of the above-captioned cases.

2

National Interest Lands Conservation Act. This brief does not directly address those claims, but instead provides reasons supporting vacatur if the Court grants summary judgment to Plaintiffs.

Of course, vacatur is "the normal remedy" for unlawful agency action. *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs,* 486 F.3d 638, 654 (9th Cir. 2007).[3] While remand without vacatur is permissible in "limited circumstances," this unusual remedy is appropriate only "when equity *demands*" it, considering such factors as the potential for "environmental harm" and whether "a different result may be reached" by the agency on remand. *Pollinator Stewardship Council v. Env't Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015) (emphasis added and internal quotation marks omitted). BLM cannot meet that high burden here.

**I.** First, the Willow Project will cause extensive environmental harm. According to BLM's projections, the Project will cause up to $18 billion in net climate damages. Moreover, as BLM indicates for reasons that other agencies have confirmed, that number itself is likely a

---

[3] *Rev'd on other grounds, Coeur Alaska, Inc. v. Se. Alaska Conservation Council,* 557 U.S. 261 (2009).

substantial underestimate. Therefore, if BLM meaningfully weighs the Project's climate costs on remand, it may reach a different result—particularly so if it accurately estimates those costs.

**II.** True, if development proceeds, the Project will result in regional economic benefits such as royalties, tax revenues, and employment. But, as BLM recognizes, the Project will also displace other energy production. Such displacement will negatively affect the royalties, revenues, and employment of other production areas—and so, BLM's estimates of regional benefits do not tell the fully story.

Given the Project's substantial climate damages, BLM's underestimation of those climate damages, and the partial displacement of benefits that would accrue to other production areas, BLM could reach a different result upon further analysis. This Court should thus not veer from "the presumpti[ve]" remedy "of vacatur" if it decides in favor of Plaintiffs' substantive claims. *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1122 (9th Cir. 2018).

# ARGUMENT

## I. The Project Will Cause Substantial Climate Damages—Up To $18 Billion By BLM's Estimate, And Likely Far More

According to BLM's estimates, the Project will cause up to $18 billion in net climate damages. AR820773 (SEIS at 52).[4] And for numerous reasons explained below, this number is likely an underestimate.

### A. The Project's climate costs are extensive even under BLM's own estimate.

BLM's estimation of the Project's climate costs involved three fundamental steps. First, BLM estimated the gross (or total) greenhouse gas emissions that would result from the Project. This estimate included direct emissions, namely "those resulting from the construction and operation of the infrastructure associated with the Project," and indirect emissions such as those resulting "from the transport, processing, and downstream combustion of the oil that would be produced by the Project." AR820761 (*id.* at 40). Through this analysis, BLM concluded that the

---

[4] AR citations refer to the Administrative Record in this case. SEIS citations refer to Bureau of Land Mgmt., *Willow Master Development Plan Final Supplemental Environmental Impact Statement* (2023).

5

Project would result, on gross, in more than 239 million metric tons of carbon dioxide equivalent. AR820777 (*id.* at 56).[5]

Second, BLM estimated the greenhouse gas emissions that would result from substitute energy sources that the Willow Project would displace, performing what is known as a "substitution analysis." Here, if the Project were not developed (i.e., the no-action alternative), "energy produced from the Project's oil would be replaced by other energy sources ranging from other oil sources to renewable sources." AR820762 (*id.* at 41). Additionally, "new production from the Project would reduce the global price per barrel of oil, and therefore, result in an increase in demand for oil." AR820769 (*id.* at 48). BLM then subtracted the greenhouse gas emissions associated with this no-action alternative from the gross greenhouse gas emissions from the Project to determine the Project's *net* greenhouse gas emissions. *Id.* All told, BLM estimated the

---

[5] This 239 million figure includes only indirect greenhouse gas emissions, as BLM does not appear to have reported direct greenhouse gas emissions from the modified Alternative E that it approved. Unmodified, Alternative E would have produced over 23 million metric tons of carbon dioxide equivalent in direct emissions. AR820770 (SEIS at 49 tbl.3.2.6). By adding 239 million and 23 million, we can estimate that the modified Alternative E would produce roughly 260 million metric tons of carbon dioxide equivalent in gross emissions.

6

Willow Project would result in a net increase of around 130 million metric tons of carbon dioxide equivalent above what would be emitted under the no-action alternative. AR820771 (*id.* at 50).[6]

Third, BLM converted these net emissions figures into monetized climate-damage estimates using a tool known as the social cost of greenhouse gases (SC-GHG). The SC-GHG provides an "estimate[] of the monetary value of the net harm to society associated with adding" one metric ton of each greenhouse gas "to the atmosphere in a given year," and it includes such damages as "public health effects, changes in net agricultural productivity, [and] property damage from increased flood risk." AR820767 (*id.* at 46). BLM used a range of four different SC-GHG values developed in 2016 by a federal interagency working group. *Id.*

Based on this method, BLM projected that the net climate damages attributable to the Project would be $1.5 billion–$18 billion, depending on which of the four different SC-GHG values from the interagency

---

[6] BLM does not appear to have reported net greenhouse gas emissions for the modified Alternative E that it approved. This 130 million figure is for the unmodified Alternative E.

working group it used. AR820773 (*id.* at 52).⁷ But as described further below, even BLM's highest estimate is likely an undervaluation of the Project's true climate damages.

### B. Monetized climate damages are very likely larger than what BLM estimated.

BLM's projection is very likely an underestimate of the Project's true climate damages for at least three key reasons in addition to the fact that the Project is expected to induce greater oil and gas production in the future, thus generating more greenhouse gas emissions. CBD Opening Br. 15–20; SILA Opening Br. 22–24.

First, as BLM acknowledges, the SC-GHG values that it used "underestimate societal damages from [greenhouse gas] emissions due to limitations in the approaches used" and their failure to incorporate "new data and evidence." AR820769 (SEIS at 48).⁸ Last year, the U.S.

---

⁷ Once again, BLM does not appear to have reported SC-GHG figures for the modified Alternative E that it approved. These figures are for the unmodified Alternative E.

⁸ In 2021, the interagency working group published a technical support document adjusting its 2016 valuations for inflation and re-adopting them on an interim basis, while acknowledging that they are underestimates in light of recent evidence. Interagency Working Grp. on the Social Cost of Greenhouse Gases, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates (2021).

8

Environmental Protection Agency (EPA)—the federal agency most responsible for regulating greenhouse gas pollution—released draft updated values that incorporate new data on the costs of climate change; those new values are much higher than the 2016 values that BLM applied here. Env't Prot. Agency, Docket ID No. EPA-HQ-OAR-2021-0317, External Review Draft of Report on the Social Cost of Greenhouse Gases: Estimates Incorporating Recent Scientific Advances (2022), https://www.epa.gov/environmental-economics/scghg. In fact, EPA's *central* (or midpoint) SC-GHG value is considerably greater than the *highest* SC-GHG value that BLM used.

Second, in conducting its substitution analysis, BLM operated under the "assumption that current . . . consumption patterns [for different energy sources] will not change over the long term." AR822498 (SEIS App. E.2B at 25). Accordingly, BLM concluded that the Project would mostly displace other oil sources and minimally affect renewables. AR820766 (SEIS at 45 tbl.3.2.3). But this is a questionable assumption given the long-term trend toward renewable energy; indeed, BLM "acknowledge[d] that new laws and policies governing energy production, efficiency, and [greenhouse gas] emissions are likely to be enacted, . . .

9

[which] may have significant implications for energy markets and substitutes." AR822498 (SEIS App. E.2B at 25). This has in fact already happened: BLM's forecast of substitute production assumed current policy as of late 2021, AR822495 (*id.* at 22) (noting calibration to "the 2022 Annual Energy Outlook"[9]), before passage of the Inflation Reduction Act that is now rapidly shifting the energy market toward renewables. Accordingly, BLM's sister agency in the Department of the Interior, the Bureau of Ocean Energy Management (BOEM), has recognized that a substitution analysis accounting for long-term trends would find that oil production substitutes "less . . . [for] oil" and "more [for] renewable energy." Bureau of Ocean Energy Mgmt., *2023–2028 National Outer Continental Shelf Oil and Gas Leasing Proposed Program* 7 (2022). While the Willow Project will inevitably displace some oil, it is likely to displace a greater amount of renewables than projected by BLM. Displacing a larger portion of renewables means that the Project has higher net greenhouse gas emissions.

---

[9] The 2022 Annual Energy Outlook—a long-term energy market forecast—was published in Mar. 2022 and based on extant policies as of Nov. 2021. U.S. Energy Info. Admin., *Annual Energy Outlook 2022*, at 2 (2022), https://www.eia.gov/outlooks/aeo/pdf/AEO2022_Narrative.pdf.

10

Third, "in the context of international climate policy, . . . some degree of reciprocity is clearly at work." Matthew J. Kotchen, *Which Social Cost of Carbon? A Theoretical Perspective*, 5 J. Ass'n Env't & Res. Economists 673, 683–84 (2017). In other words, when the United States takes action to mitigate greenhouse gas emissions, other nations become more likely to follow suit. *Id.* But that also means approving this massive extraction project could trigger similar reciprocal action by foreign nations, resulting in even more greenhouse gas emissions.

\* \* \*

In sum, the high burden of establishing remand without vacatur is not met here for at least two reasons. First, and regardless of exactly how the analysis is conducted, the Willow Project will cause extensive climate damages—as BLM's own $18 billion estimate of net climate damages shows.[10] Second, and as the agency itself acknowledges, the Project's net climate damages are likely far higher than BLM estimated, further suggesting a different result is possible on remand.

---

[10] BLM also projected that the Project will cause up to nearly $39 billion in *gross* climate damages, i.e., not considering substitution effects. AR820773 (SEIS at 52). Again, this figure is for the unmodified Alternative E. And it too is likely an underestimate.

11

## II. By Displacing Other Energy Sources, The Project Is Likely To Reduce Revenues In Other Energy-Producing Regions

True, the Project will bring economic benefits such as revenues, royalties, and regional employment if development proceeds. *See* AR821019–21 (SEIS at 298–300). However, the Project will also exacerbate the severe effects of climate change on the local region. *See* AR820759–60 (*id.* at 38–39) (outlining climate trends and impacts on the North Slope, such as the thawing of the permafrost and increasing risk of wildfires and insect outbreaks in the region). Moreover, the economic projections that BLM provides paint a deceptively rosy picture of the Project's economic impacts because, as BLM's substitution analysis shows, the Project will also displace other energy production (both fossil fuels and renewables). *See supra* p. 6. This means that, while the Project will bring economic benefits (and climate costs) to the local region if development proceeds, those benefits will partially come at the expense of revenues and royalties that substitute production would have generated in other regions.

Yet the fact that the Willow Project would displace production in other energy-producing regions—though central to BLM's analysis of climate costs, *see supra* pp. 6–7—was absent from its assessment of

12

economic benefits. *See* AR821019–21 (SEIS at 298–300). Instead, BLM focused its economic analysis only on the local region. Here too, it went against the practice of its sister agency BOEM. When analyzing extraction projects at sea, BOEM has recognized that, in general, energy "substitutes . . . provide [net economic value] under" no-action alternatives; accordingly, BOEM has reduced its estimates of the economic benefits of offshore oil and gas leasing to reflect this partial substitution. Bureau of Ocean Energy Mgmt., *supra*, at 5-42.

That the Project could displace billions of dollars in revenues and royalties in other energy-producing regions (both domestic and foreign[11]) provides another reason that BLM could reach a different result and further indicates that remand without vacatur is unwarranted.

## CONCLUSION

As detailed above, the Willow Project will likely cause billions of dollars in climate damages. And while the Project will carry economic

---

[11] Although BLM estimated the Project would displace some foreign energy production, it also projected that close to 40% of the substitution effect would be felt domestically. AR820766 (SEIS at 45). And that percentage is likely an underestimate of the share of domestic forgone production, since renewables—which are usually domestically produced—likely make up a higher share of displaced production than BLM estimates. *See supra* pp. 9–10.

13

benefits, it will also partially displace production in other energy-producing regions. It is therefore hardly clear that equity *demands* remand without vacatur, not least because BLM could reasonably choose a different approach on remand with a stronger analysis using more accurate estimates of climate and economic effects. *See Pollinator Stewardship Council*, 806 F.3d at 532 (offering similar reasons as bases to reject remand without vacatur).

Accordingly, this Court should vacate BLM's approval of the Willow Project if it rules in favor of Plaintiffs' substantive claims.

| | |
|---|---|
| DATED: July 31, 2023 | Respectfully submitted, |
| | Max Sarinsky<br>INSTITUTE FOR POLICY INTEGRITY<br>*Counsel for* Amicus Curiae<br>*Institute for Policy Integrity* |
| | */s/ Max Sarinsky*<br>Max Sarinsky, *Pro Hac Vice*<br>motion pending |

## CERTIFICATE OF COMPLIANCE

This *amicus curiae* brief complies with the page/word limits of the United States District Court for the District of Alaska because this brief contains 2,601 words, excluding the parts of the brief exempted by Local Rule 7.4(a)(4), as counted by counsel's word processing system.

DATED: July 31, 2023      Respectfully submitted,

/s/ Max Sarinsky
Max Sarinsky

*Counsel for Amicus Curiae*
*Institute for Policy Integrity*