Ryan P. Steen (Bar No. 0912084)
ryan.steen@stoel.com
Jason T. Morgan (Bar No. 1602010)
jason.morgan@stoel.com
Luke A. Sanders (*admitted pro hac vice*)
luke.sanders@stoel.com
Tiffany Wang (*admitted pro hac vice*)
tiffany.wang@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500

Whitney A. Brown (Bar No. 1906063)
whitney.brown@stoel.com
STOEL RIVES LLP
510 L Street, Suite 500
Anchorage, AK 99501
Telephone: 907.277.1900
Facsimile: 907.277.1920

Attorneys for Intervenor-Defendant
ConocoPhillips Alaska, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF LAND MANAGEMENT, et al., <br><br> Defendants, <br><br> and <br><br> CONOCOPHILLIPS ALASKA, INC., et al., <br><br> Intervenor-Defendants. | Case No.: 3:23-cv-00058-SLG |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF LAND MANAGEMENT, et al., <br><br> Defendants, <br><br> and <br><br> CONOCOPHILLIPS ALASKA, INC., et al., <br><br> Intervenor-Defendants. | Case No. 3:23-cv-00061-SLG |

**CONOCOPHILLIPS ALASKA, INC.'S BRIEF IN OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTIONS (L.R. 16.3)**

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

I. INTRODUCTION ....................................................................................... 1

II. BACKGROUND ........................................................................................ 4

    A.    Petroleum Reserve Planning. ........................................................ 4

    B.    The Willow Project and This Court's Remand. ........................... 5

    C.    Status of Construction. ................................................................. 8

III. ARGUMENT ............................................................................................ 9

    A.    BLM's Approval of Willow Complies with NEPA. ..................... 9

        1.    BLM's Alternatives Analysis Satisfies NEPA. ................. 9

        2.    BLM Lawfully Evaluated Growth Inducing Impacts. ................... 15

            a.    The FSEIS Squarely Addresses Growth Inducing Impacts, Including West Willow. ........................................ 15

            b.    SILA Already Litigated and Lost Its "West Willow" Arguments. .......................................................... 18

            c.    CBD's Argument Is Erroneous. ........................ 20

    B.    BLM's Decision Complies with the NPRPA. ............................. 24

    C.    The Agencies' Determinations Regarding GHG Emissions Comply with the ESA. ................................................................. 26

        1.    Plaintiffs' Arguments Conflict with Longstanding Agency Practice. ............................................................. 27

        2.    Plaintiffs Lack Standing to Assert Their ESA GHG Claims. ......... 32

        3.    Plaintiffs' Section 7 GHG Claims Have No Merit. ....................... 40

    D.    FWS's "Take" Analyses and Conclusions Comply with the ESA. ........... 46

        1.    FWS Lawfully Interpreted Its Own Regulatory Definition. .......... 47

        2.    Plaintiffs' Challenges to FWS's "Take" Conclusions Have No Merit. .............................................. 52

    E.    Vacatur Is Unwarranted. ............................................................ 56

IV. CONCLUSION ........................................................................................ 60

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900  Fax 206.386.7500

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* – Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-i-

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Allen v. Wright,*
  468 U.S. 737 (1984) ................................................................. 33

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) .................................................. 57

*Am. Elec. Power Co. v. Connecticut,*
  564 U.S. 410 (2011) ................................................................. 43

*Amazon.com, Inc. v. Comm'r of Internal Revenue,*
  934 F.3d 976 (9th Cir. 2019) .................................................... 49

*American Fuel & Petrochemical Manufacturers v. EPA,*
  937 F.3d 559 (D.C. Cir. 2019) .................................................. 44

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.,*
  273 F.3d 1229 (9th Cir. 2001) .................................................. 28

*Audubon Soc'y of Portland v. Haaland,*
  40 F.4th 967 (9th Cir. 2022) .................................................... 19

*Audubon Soc'y of Portland v. U.S. Army Corps of Eng'rs,*
  No. 3:15-cv-665-SI, 2016 WL 4577009 (D. Or. Aug. 31, 2016) .............................. 58

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
  462 U.S. 87 (1983) ................................................................... 53

*Barnes v. U.S. Dep't of Transp.,*
  655 F.3d 1124 (9th Cir. 2011) .................................................. 21

*Bennett v. Spear,*
  520 U.S. 154 (1997) ................................................................. 50

*Cal. Cmtys. Against Toxics v. U.S. EPA,*
  688 F.3d 989 (9th Cir. 2012) ......................................... 57, 58, 60

*Cascadia Wildlands v. Bureau of Indian Affs.,*
  801 F.3d 1105 (9th Cir. 2015) ...................................... 16, 18, 19

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al. – Case No. 3:23-cv-00058-SLG*
*Center for Biological Diversity, et al. v. BLM, et al. – Case No. 3:23-cv-00061-SLG*

-ii-

*CBD v. Bernhardt,*
982 F.3d 723 (9th Cir. 2020) .................................................................. 17

*CBD v. National Highway Traffic Safety Administration,*
538 F.3d 1172, 1217 (9th Cir. 2008) ...................................................... 11

*CBD v. United States Fish and Wildlife Service,*
409 F. Supp. 3d 738 (D. Ariz. 2019) ................................................. 11, 12

*Chilkat Indian Vill. of Klukwan v. BLM,*
399 F. Supp. 3d 888 (D. Alaska 2019) .................................................... 21

*City of Davis v. Coleman,*
521 F.2d 661 (9th Cir. 1975) .................................................................. 21

*Clark v. Bear Stearns & Co.,*
966 F.2d 1318 (9th Cir. 1992) ................................................................ 18

*ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n,*
No. 3:22-cv-00121-SLG, 2023 WL 2403720 (D. Alaska Mar. 8, 2023) ..... 1, 2, 15, 24

*Cook Inletkeeper v. Raimondo,*
541 F. Supp. 3d 987 (D. Alaska 2021) .................................................... 57

*Ctr. for Biological Diversity v. U.S. Forest Serv.,*
No. 2:17-cv-372, 2021 WL 855938 (S.D. Ohio Mar. 8, 2021) .................. 57

*DaimlerChrysler Corp. v. Cuno,*
547 U.S. 332 (2006) ............................................................................... 33

*Defs. of Wildlife v. Flowers,*
414 F.3d 1066 (9th Cir. 2005) ................................................................ 42

*Fla. Audubon Soc'y v. Bentsen,*
94 F.3d 658 (D.C. Cir. 1996) ............................................................ 36, 39

*Fox Television Stations, Inc. v. FCC,*
280 F.3d 1027 (D.C. Cir. 2002) .............................................................. 57

*Franks v. Salazar,*
816 F. Supp. 2d 49 (D.D.C. 2011) .......................................................... 42

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* – Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-iii-
Case 3:23-cv-00061-SLG   Document 153   Filed 08/30/23   Page 4 of 71

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

*Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy,*
 383 F.3d 1082 (9th Cir. 2004) ....................................................................... 41

*Growth Energy v. EPA,*
 5 F.4th 1 (D.C. Cir. 2021) ............................................................................. 44

*Idaho Farm Bureau Fed'n v. Babbitt,*
 58 F.3d 1392 (9th Cir. 1995) ................................................................... 57, 59

*'Ilio'ulaokalani Coal. v. Rumsfeld,*
 464 F.3d 1083 (9th Cir. 2006) ....................................................................... 20

*Inst. for Fisheries Res. v. Burwell,*
 No. 16-cv-01574-VC, 2016 WL 4529517 (N.D. Cal. Aug. 30, 2016) ....................... 43

*Janjua v. Neufeld,*
 933 F.3d 1061 (9th Cir. 2019) ....................................................................... 18

*Juliana v. United States,*
 947 F.3d 1159 (9th Cir. 2020) ................................................................... 33, 40

*Kisor v. Wilkie,*
 139 S. Ct. 2400 (2019) ........................................................................... passim

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.,*
 109 F. Supp. 3d 1238 (N.D. Cal. 2015) .......................................................... 58

*Kungys v. United States,*
 485 U.S. 759 (1988) .................................................................................... 51

*Lands Council v. McNair,*
 629 F.3d 1070 (9th Cir. 2010) ....................................................................... 41

*League of Wilderness Defs.-Blue Mountains v. U.S. Forest Serv.,*
 549 F.3d 1211 (9th Cir. 2008) ....................................................................... 24

*Lujan v. Defs. of Wildlife,*
 504 U.S. 555 (1992) .................................................................................... 33

*Nat'l Fam. Farm Coal. v. U.S. E.P.A.,*
 966 F.3d 893 (9th Cir. 2020) ......................................................................... 57

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* – Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-iv-

Case 3:23-cv-00061-SLG   Document 153   Filed 08/30/23   Page 5 of 71

**STOEL RIVES LLP**
600 University Street, Suite 3600, Seattle, WA 98101
*Main 206.624.0900    Fax 206.386.7500*

*Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*,
    983 F.3d 498 (D.C. Cir. 2020) ....................................................................... 50

*Nat'l Parks Conservation Ass'n v. Semonite*,
    422 F. Supp. 3d 92 (D.D.C. 2019) ................................................................. 58

*Nat'l Wildlife Fed'n v. Espy*,
    45 F.3d 1337 (9th Cir. 1995) .......................................................................... 56

*Navajo Nation v. Dep't of the Interior*,
    876 F.3d 1144 (9th Cir. 2017) ........................................................................ 39

*Northern Alaska Environmental Center v. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) .............................................................. 10, 11, 22

*NRDC v. Dep't of Energy*,
    No. 04-cv-04448, 2007 WL 1302498 (N.D. Cal. May 2, 2007) ................... 21

*NRDC v. EPA*,
    542 F.3d 1235 (9th Cir. 2008) ........................................................................ 33

*NRDC v. Pritzker*,
    828 F.3d 1125 (9th Cir. 2016) ........................................................................ 26

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
    117 F.3d 1520 (9th Cir. 1997) ........................................................................ 20

*Ocean Advocs. v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) .......................................................................... 21

*Pac. Rivers Council v. U.S. Forest Serv.*,
    942 F. Supp. 2d 1014 (E.D. Cal. 2013) .................................................... 56, 57

*Ramirez v. City of Buena Park*,
    560 F.3d 1012 (9th Cir. 2009) ........................................................................ 60

*Robi v. Five Platters, Inc.*,
    838 F.2d 318 (9th Cir. 1988) .......................................................................... 18

*Rock Creek All. v. U.S. Forest Serv.*,
    703 F. Supp. 2d 1152 (D. Mont. 2010) ................................................ 14, 16, 26

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* – Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

*Sec'y of Lab. v. Seward Ship's Drydock, Inc.*,
  937 F.3d 1301 (9th Cir. 2019) ..................................................... 49

*Sierra Forest Legacy v. Sherman*,
  951 F. Supp. 2d 1100 (E.D. Cal. 2013) ................................. 57

*Sierra Forest Legacy v. U.S. Forest Serv.*,
  598 F. Supp. 2d 1058 (N.D. Cal. 2009)................................. 43

*Sovereign Iñupiat for a Living Arctic v. BLM*,
  555 F. Supp. 3d 739 (D. Alaska 2021) ............................ passim

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)........................................................ 39

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*,
  143 F.3d 515 (9th Cir. 1998) ........................................... 42

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978)........................................................ 20

*W. Watersheds Project v. Abbey*,
  719 F.3d 1035 (9th Cir. 2013) ........................................ 22

*Walker v. BOKF, Nat'l Ass'n*,
  30 F.4th 994 (10th Cir. 2022) ......................................... 50

*Wash. Env't Council v. Bellon*,
  732 F.3d 1131 (9th Cir. 2013) ................................... passim

*West Virginia v. EPA*,
  142 S. Ct. 2587 (2022).............................................. 40, 43

*Westlands Water Dist. v. U.S. Dep't of Interior*,
  376 F.3d 853 (9th Cir. 2004) ........................................... 22

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
  5 F.4th 997 (9th Cir. 2021) ........................... 33, 34, 40, 41

*Wildearth Guardians v. Salazar*,
  880 F. Supp. 2d 77 (D.D.C. 2012) .................................. 34

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* – Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-vi-

Case 3:23-cv-00061-SLG   Document 153   Filed 08/30/23   Page 7 of 71

*WildEarth Guardians v. U.S. Forest Serv.*,
    70 F.4th 1212 (9th Cir. 2023) ........................................................ 36, 38, 39

*WildEarth Guardians v. Zinke*,
    368 F. Supp. 3d 41 (D.D.C. 2019) ............................................................ 57

**Statutes**

5 U.S.C. § 704 ............................................................................................... 43

16 U.S.C. § 1362(18)(A)(i), (C) ................................................................... 55

16 U.S.C. § 1362(18)(A)(ii) .......................................................................... 55

16 U.S.C. § 1362(18)(D) ............................................................................... 55

16 U.S.C. § 1536(b) ....................................................................................... 50

16 U.S.C. § 1540(g)(2) .................................................................................. 42

28 U.S.C. § 2401(a) ....................................................................................... 51

42 U.S.C. § 6504(a) ................................................................................. 15, 24

42 U.S.C. § 6506a(b) ............................................................................... 24, 25

Pub. L. No. 96-514, 94 Stat. 2964 (1980) .................................................... 24

**Rules and Regulations**

40 C.F.R. § 1501.11(b) .................................................................................. 22

40 C.F.R. § 1508.1(g)(3) ............................................................................... 16

40 C.F.R. § 1508.7 ......................................................................................... 16

43 C.F.R. § 3137.71(b)(1) ....................................................................... 13, 14

50 C.F.R. § 17.3 ................................................................................. 47, 48, 51

50 C.F.R. § 402.02 ............................................................................. 26, 27, 43

50 C.F.R. § 402.14(a) ............................................................................... 42, 45

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* – Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

**STOEL RIVES LLP**
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

50 C.F.R. § 402.14(g) ................................................................................ 45

50 C.F.R. § 402.14(g)(7) ........................................................................... 44

50 C.F.R. § 402.17(b)(1) ........................................................................... 46

40 Fed. Reg. 28,712 (July 8, 1975) ........................................................... 49

40 Fed. Reg. 44,412 (Sept. 26, 1975) ....................................................... 49

42 Fed. Reg. 28,723 (June 3, 1977) ........................................................... 15

46 Fed. Reg. 29,490 (June 2, 1981) ...................................................... 49, 51

51 Fed. Reg. 19,926 (June 3, 1986) ........................................................... 42

73 Fed. Reg. 28,212 (May 15, 2008) ......................................................... 28

80 Fed. Reg. 64,510 (Oct. 23, 2015) ......................................................... 31

87 Fed. Reg. 64,700 (Oct. 26, 2022) ......................................................... 31

## Other Authorities

GHG Emitting Activities (Oct. 3, 2008)
   https://www.regulations.gov/document/EPA-HQ-OAR-2009-0472-
   11543 ...................................................................................................... 29

Laurel Graefe, *Oil Shock of 1978–79*, Fed. Reserve History
   www.federalreservehistory.org/essays/oil-shock-of-1978-79 .................... 24

NAEC, The Arctic Programs (2017), https://northern.org/northern-center-
   programs/ ................................................................................................. 32

Sovereign Iñupiat for a Living Arctic, https://www.silainuat.org/lastestnews ................. 32

**STOEL RIVES LLP**
600 University Street, Suite 3600, Seattle, WA 98101
*Main 206.624.0900    Fax 206.386.7500*

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* – Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

## LIST OF USEFUL ABBREVIATIONS

| Abbreviation | Definition |
| --- | --- |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| BTU | Bear Tooth Unit |
| $CO_2e$ | Carbon Dioxide Equivalent |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FSEIS | Supplemental Environmental Impact Statement |
| FWS | U.S. Fish and Wildlife Service |
| GHG | Greenhouse Gas |
| IAP | Integrated Activity Plan |
| MDP | Master Development Plan |
| MT | Metric Tons |
| NPRPA | Naval Petroleum Reserves Production Act |
| NPR-A or Petroleum Reserve | National Petroleum Reserve in Alaska |
| RFFA | Reasonably Foreseeable Future Action |
| ROD | Record of Decision |
| TLSA | Teshekpuk Lake Special Area |
| USGS | United States Geological Survey |

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900  Fax 206.386.7500

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* – Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-ix-

# I. INTRODUCTION

When Congress amended the Naval Petroleum Reserves Production Act ("NPRPA") in 1980, it sought to "expeditiously advance private oil and gas development on the NPR-A."[1] Since then, only two projects located on Petroleum Reserve leases (Greater Mooses Tooth 1 and 2) have achieved first oil, and those account for a small percentage of the dwindling throughput of the Trans-Alaska Pipeline System ("TAPS"). The Willow project is expected to more than triple Petroleum Reserve production, helping realize the NPRPA's purpose and providing a critical boost to TAPS. The project also realizes the intent of plans developed by the Obama administration, and affirmed by the Biden administration, to sensibly develop the Petroleum Reserve while also protecting the region's unique character.

In short, the Willow project has been a long time coming. It is therefore unsurprising that the project has received such enthusiastic public support from every corner of the State of Alaska, and particularly from the local Alaska Native organizations and communities that will benefit immensely from Willow.

Indeed, Willow's public benefits are staggering. It will generate $7.6 billion in federal revenues, $2.6 billion of which will be made available to North Slope communities via the NPR-A Mitigation Grant Program. It will provide $2.3 billion for

---

[1] *ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, No. 3:22-cv-00121-SLG, 2023 WL 2403720, at *13 (D. Alaska Mar. 8, 2023). "NPR-A" refers to the National Petroleum Reserve in Alaska, also referred to herein as the "Petroleum Reserve."

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* – Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

the State of Alaska in production, property, and income taxes. It will produce another

$1.2 billion for the North Slope Borough through *ad valorem* taxes—funding schools,

emergency response, health clinics, water facilities, roads, waste facilities, and power

facilities in all eight Borough villages. Constructing Willow will require approximately

nine million man-hours supporting over 2,500 construction jobs and approximately 300

long-term jobs. These jobs will be essential to local communities that have some of the

highest unemployment rates in the Nation. And all of these benefits will come from the

production of 600 million barrels of American oil that would otherwise be produced

overseas—"increas[ing] domestic oil supply" just as Congress intended.[2]

    This feat will be accomplished with a minimal footprint—a mere *three* drill

sites—and adherence to the most stringent environmental protections in the world. The

project has been rigorously reviewed over thousands of pages of environmental analyses

informed by over a hundred public meetings and tens of thousands of public comments. It

has been reduced and modified in response to local input, including the elimination of

drill sites and the addition of subsistence access features such as road pullouts, tundra

access ramps, and boat ramps. The project is subject to 261 mitigation measures and best

practices to minimize impacts. And it permanently preserves over 800 acres of pristine

North Slope wetlands.

---

[2] *Id.* at *8.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-2-

Nevertheless, Plaintiffs and their *amici* are not—and will never be—content with Willow.[3] Plaintiffs believe that all oil and gas should be kept in the ground, and therefore that Willow cannot be constructed. In their view, the introduction of *any* oil to the marketplace is itself a harm that must be mitigated (if it is not first prevented). But Plaintiffs' policy preferences run headfirst into congressional policy as expressed in the NPRPA.

In 2021, this Court ordered the Bureau of Land Management ("BLM") and the U.S. Fish and Wildlife Service ("FWS") to address discrete errors in the original evaluation of the Willow project. BLM and FWS fully addressed those errors. Willow now has an even smaller footprint, more benefits for Alaska Natives, and less environmental impact. It is an understatement to say that all impacts of Willow have been exhaustively analyzed. Yet Plaintiffs have sued again, repeating some old claims and fashioning new ones that could have been, but were not, raised in prior litigation. As set forth in this brief, and in the briefs by Federal Defendants, Kuukpik Corporation, the North Slope Borough, the State of Alaska, and Arctic Slope Regional Corporation, Plaintiffs' claims are meritless and should be denied.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

---

[3] Plaintiffs "don't see any acceptable version of the project" and hope "that Willow dies a death by a thousand cuts." SILA Dkt. 48 at 10. Congressional *amici* from California, New York, and Arizona proclaim that "[t]he only acceptable Willow project is no Willow project." SILA Dkt. 122 at 4.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-3-

## II. BACKGROUND

**A.  Petroleum Reserve Planning.**

In 2013, BLM issued an Integrated Activity Plan ("IAP") that closed approximately 11 million acres (48%) of the Petroleum Reserve to leasing and made about 2.5 million acres (11%) available for leasing but subject to "No Surface Occupancy" stipulations that do not allow for surface construction (with some exceptions not relevant here).[4] The closed portions "include areas critical to sensitive bird populations and the Teshekpuk Lake and Western Arctic Caribou Herds."[5] The 2013 IAP made the remaining 9.3 million acres (41%) of the Petroleum Reserve available for leasing and new oil and gas infrastructure, subject to terms and conditions designed to protect the surface resources of the Petroleum Reserve.[6] The infrastructure contemplated by the IAP included projects much larger than Willow.[7]

Many environmental groups, including some of the Plaintiffs here, praised the IAP. The Northern Alaska Environmental Center said the IAP "provides effective and reliable conservation measures to protect fish, wildlife and their habitats to ensure balanced management of the NPR-A, consistent with federal law."[8] Similarly, 12,600 members of the Alaska Wilderness League wrote to BLM that this was "the most

---

[4] BLM_3096_AR505211.
[5] BLM_3377_AR516640.
[6] BLM_3096_AR505211.
[7] *See* BLM_3514_AR847878 (considering up to eight central processing facilities).
[8] BLM_3514_AR848813.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-4-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA  98101
Main 206.624.0900   Fax 206.386.7500

responsible and balanced management plan for the Reserve."[9] Earthjustice said the IAP was "a positive step toward balanced management" that "allows for future oil and gas development."[10]

In 2022, the Biden administration issued a new IAP affirming the 2013 land allocations, finding that they "strike[] a balance" among development, the "importance of surface resources," and the need to mitigate impacts on subsistence uses.[11] The 2022 IAP includes dozens of lease stipulations and other measures designed to reduce and minimize the impact to surface resources.[12]

## B.   The Willow Project and This Court's Remand.

A full history of the Willow Master Development Plan ("MDP") is in BLM's administrative record[13] and is also described in Appendix D.1 to the final supplemental environmental impact statement ("FSEIS").[14] The Willow MDP addresses development in the Bear Tooth Unit ("BTU"), which consists of land leased to ConocoPhillips in the Petroleum Reserve.[15] All of these leases are within the area open to development under the 2022 IAP.[16]

---

[9] BLM_3514_AR848578.

[10] BLM_3514_AR848584-585.

[11] BLM_3377_AR516637, AR516652.

[12] BLM_3513_AR824926.

[13] *See* BLM_3096_AR505211-248.

[14] *See generally* BLM_3512_AR821922.

[15] BLM_3096_AR505211.

[16] *Id.*

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-5-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

As recounted in Federal Defendants' brief, this Court previously identified discrete errors with the original Willow project approval. On remand, BLM, in cooperation with State, federal, municipal, and Tribal cooperating agencies, screened 19 revised drilling pad configurations and other project components to address this Court's ruling on alternatives.[17] Based on that evaluation, BLM developed a new alternative (Alternative E), which included many changes to ConocoPhillips' proposed Alternative B, as summarized in the image below.[18]



The light green polygons in the above image represent the maximum underground drilling reach from the small surface pads.

---

[17] BLM_3512_AR821953-955.
[18] BLM_3102_AR505283.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-6-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

BLM explained that Alternative E "was developed . . . to reduce surface impacts, in response to the District Court's remand."[19] As indicated in the figure above, Alternative E reduces the footprint in the Teshekpuk Lake Special Area ("TLSA") by 40%, reduces the total project footprint by 55 acres, and eliminates seven miles of roads and one drill pad (BT4). Figure D.4.10 in FSEIS Appendix D.1[20] shows the subsurface reach (gray polygons) of the small surface drill sites (orange dots) for the alternatives, overlaid with an outline of the total lease unit (double red line) and the underlying oil pool (dotted line):



STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

---

[19] BLM_3512_AR822091.
[20] BLM_3512_AR822032.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-7-

As illustrated above, the polygons do not cover the entire pool; thus, the alternatives BLM presented in the 2020 EIS (Alternatives B, C, and D) allowed ConocoPhillips access to most, but not all, of the oil and gas within the reservoir. The drilling pad locations reflect a balance between access to the oil pool and protection for surface resources of the TLSA, while respecting the IAP's many constraints and setbacks.[21] Compared to Alternatives B, C, and D in the 2020 EIS, Alternative E further reduces ConocoPhillips' access to the reservoir by eliminating the northernmost drill site (BT4) and adjusting the locations of two drill pads (BT2 and BT5) northward.[22]

On March 13, 2023, BLM released its record of decision ("ROD") approving Alternative E but denying approval of the BT5 drill site (the southernmost site) to minimize any potential for impacts to caribou and subsistence hunting.[23] Four days later, ConocoPhillips relinquished all or portions of 13 leases comprising 68,085.50 acres, most of which was within the BTU and would have been accessible from BT4 and BT5.[24]

## C.    Status of Construction.

The same day BLM issued the ROD, ConocoPhillips started ice road and pad construction and, following the Court's denial of Plaintiffs' preliminary injunction

---

[21] These constraints are graphically represented in Figure D.3.2 of Appendix D.1 (BLM_3512_AR821950).

[22] BLM_3513_AR824898-899 (Table 1).

[23] BLM_3513_AR824890, AR824897-901. Traditional oil and gas developments use far more drill sites than Willow. See BLM_3099_AR505255.

[24] CBD Dkt. 54-010, Ex. 9, Bross Decl. ¶ 17, Ex. B.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-8-

Case 3:23-cv-00061-SLG   Document 153   Filed 08/30/23   Page 18 of 71


As illustrated above, the polygons do not cover the entire pool; thus, the alternatives BLM presented in the 2020 EIS (Alternatives B, C, and D) allowed ConocoPhillips access to most, but not all, of the oil and gas within the reservoir. The drilling pad locations reflect a balance between access to the oil pool and protection for surface resources of the TLSA, while respecting the IAP's many constraints and setbacks.[21] Compared to Alternatives B, C, and D in the 2020 EIS, Alternative E further reduces ConocoPhillips' access to the reservoir by eliminating the northernmost drill site (BT4) and adjusting the locations of two drill pads (BT2 and BT5) northward.[22]

On March 13, 2023, BLM released its record of decision ("ROD") approving Alternative E but denying approval of the BT5 drill site (the southernmost site) to minimize any potential for impacts to caribou and subsistence hunting.[23] Four days later, ConocoPhillips relinquished all or portions of 13 leases comprising 68,085.50 acres, most of which was within the BTU and would have been accessible from BT4 and BT5.[24]

## C.    Status of Construction.

The same day BLM issued the ROD, ConocoPhillips started ice road and pad construction and, following the Court's denial of Plaintiffs' preliminary injunction

---

[21] These constraints are graphically represented in Figure D.3.2 of Appendix D.1 (BLM_3512_AR821950).

[22] BLM_3513_AR824898-899 (Table 1).

[23] BLM_3513_AR824890, AR824897-901. Traditional oil and gas developments use far more drill sites than Willow. See BLM_3099_AR505255.

[24] CBD Dkt. 54-010, Ex. 9, Bross Decl. ¶ 17, Ex. B.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-8-

Case 3:23-cv-00061-SLG   Document 153   Filed 08/30/23   Page 18 of 71

motions, was able to complete the Winter 2023 construction activities on May 3, 2023.[25] This included opening a new gravel mine, extracting gravel, extending the gravel road from an existing pad westward toward Willow, and beginning construction of a subsistence boat ramp.[26] Offsite fabrication of Willow materials, such as modules, pipes, and culverts, is ongoing, as is pre-construction summer work in the Kuparuk River Unit.[27] Major construction activities planned for this winter's season are scheduled to begin December 21, depending on weather.[28]

### III.  ARGUMENT[29]

**A.     BLM's Approval of Willow Complies with NEPA.**

**1.     BLM's Alternatives Analysis Satisfies NEPA.**

This Court directed BLM to revisit its alternatives analysis "to the extent" that BLM previously (1) failed to consider the NPRPA's "maximum protection" to the TLSA and (2) assumed that "ConocoPhillips has the right to extract all possible oil and gas on its leases."[30] BLM directly addressed those two issues on remand, undertaking a new alternatives-development process that considered the agency's obligations under the

---

[25] Declaration of Connor Dunn ("Dunn Decl.") ¶ 3.

[26] *Id.*

[27] *Id.* ¶¶ 4, 5.

[28] *Id.* ¶ 7.

[29] ConocoPhillips adopts by reference Federal Defendants' standard of review. *See* CBD Dkt. 149 at 25-26. Consistent with Federal Defendants' brief, citations to docket documents refer to the ECF-stamped page numbers.

[30] *Sovereign Iñupiat for a Living Arctic v. BLM ("SILA")*, 555 F. Supp. 3d 739, 770 (D. Alaska 2021).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-9-
Case 3:23-cv-00061-SLG   Document 153   Filed 08/30/23   Page 19 of 71

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

NPRPA to "allow the production and transportation to market of federal oil and gas resources . . . while providing maximum protection to significant surface resources within the [Petroleum Reserve]."[31] Federal Defendants' brief describes how this process satisfied this Court's prior order.[32] Below, ConocoPhillips emphasizes a few additional points.

*First*, BLM's approach aligns with *Northern Alaska Environmental Center v. Kempthorne*.[33] There, the Ninth Circuit rejected a similar alternatives challenge to BLM's EIS for an earlier version of the IAP for the Petroleum Reserve.[34] The plaintiffs argued that BLM's range of alternatives was inadequate because it did not include their preferred "Audubon Alternative," which offered more protection for wildlife than the five alternatives considered.[35] The court rejected that argument because BLM sufficiently explained why the "Audubon Alternative as a whole was inconsistent with the [IAP] project and statutory mandates" and the agency had agreed to "incorporate several recommendations" into the final alternative it selected.[36]

Similarly, here, BLM evaluated 28 new alternative components, documented why certain alternatives did not meet the revised screening criteria, and incorporated multiple

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

---

[31] BLM_3512_AR820723-724.
[32] ConocoPhillips adopts Federal Defendants' alternatives arguments.
[33] 457 F.3d 969 (9th Cir. 2006).
[34] *Id.* at 978-79.
[35] *Id.* at 978.
[36] *Id.* at 978-79.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-10-

elements from the rejected alternatives into a new alternative.[37] BLM even incorporated many of Plaintiffs' recommendations (fewer well sites, less access to oil, fewer greenhouse gas emissions, 40% less infrastructure in the TLSA, less impact on subsistence resources, and fewer gravel roads) into the new Alternative E.[38] Plaintiffs are upset that BLM did not select their proffered alternatives (vague as they were), but BLM explained why it did not.[39] In any event, *Kempthorne* explains, "NEPA does not require BLM to explicitly consider every possible alternative to a proposed action."[40]

*Second*, the cases CBD cites are inapposite. In *CBD v. National Highway Traffic Safety Administration*, the agency considered essentially no range of alternatives.[41] Here, by contrast, BLM considered a wide range of MDP alternatives with significant differences in the number of drill sites, size of gravel footprint, number of wells, and miles of gravel and ice roads.[42] Even further afield is *CBD v. United States Fish and Wildlife Service*.[43] There, unlike here, the court found that the Forest Service applied the wrong regulations altogether—a mistake that "infected the FEIS and led to the Forest

---

[37] BLM_3512_AR821953-960.

[38] BLM_3512_AR822091-093; Dkt. 115 ("CBD Br.") at 21-22; Dkt. 105 ("SILA Br.") at 22-23.

[39] BLM_3512_AR821957-960, AR821965-966.

[40] 457 F.3d at 978.

[41] 538 F.3d 1172, 1217-19 (9th Cir. 2008) (agency setting average fuel economy standards offered ranges that varied only by tenths of a mile per gallon).

[42] *See* Federal Defendants' Br. at 31 (describing wide ranges); *see also* BLM_3512_AR820730-733; *id.* at AR822115-120.

[43] 409 F. Supp. 3d 738, 763-66 (D. Ariz. 2019), *aff'd*, 33 F.4th 1202 (9th Cir. 2022).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-11-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

Service misinforming the public and failing to consider reasonable alternatives[.]"[44] BLM made no such mistake here and developed its alternatives according to its obligations under the NPRPA.

*Third*, Plaintiffs selectively quote the record to argue that BLM's current approach is "nearly identical" to its previous assumption that ConocoPhillips had "the right to extract all possible oil and gas."[45] They pluck the words "fully develop" and "economically viable quantities of oil" out of context to claim this is just the "all possible oil" constraint in another guise.[46] But Plaintiffs rely heavily on a statement in the *draft* SEIS and they ignore both BLM's responses to Plaintiffs' comments and the language of the FSEIS.[47] The full record makes clear that Plaintiffs' argument fails.

To start with, the alternative BLM selected—like all the other alternatives considered in the FSEIS—would not allow ConocoPhillips to recover "all possible oil." As shown in the figures above, none of the drill pad configurations considered allows access to the entire reservoir (or all possible oil).

On remand, moreover, BLM clearly stated that it was not allowing access to all possible oil.[48] BLM explained:

> In accordance with the District Court's decision, the [FSEIS] does not assume that ConocoPhillips has the right to extract all possible oil and gas from its leases. BLM does not require

---

[44] *Id.* at 764.

[45] CBD Br. at 18-19; SILA Br. at 22-23.

[46] CBD Br. at 18-19; SILA Br. at 20-21.

[47] *See* CBD Br. at 18; SILA Br. at 21; *see* BLM_3512_AR821709, AR821737-740.

[48] *See supra* § II.B.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-12-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

> 100% resource extraction and may condition Project approval
> to protect surface resources even if doing so reduces the
> amount of oil and gas that can be profitably produced.[49]

Consistent with that position, BLM proposed Alternative E, which further reduces

impacts and eliminates access to approximately 15.4 million more barrels of recoverable

oil.[50]

Plaintiffs cannot contort "fully develop" into the same thing as "all recoverable

oil." BLM regulations *required* ConocoPhillips to present BLM with a master plan to

"fully develop the oil and gas field."[51] That is what ConocoPhillips did with its proposed

Willow MDP (Alternative B). BLM explained:

> The purpose of a master development plan is *to evaluate the
> full development of an oil prospect* to disclose all impacts
> related to the proposed project and *prevent segmentation* of
> the National Environmental Policy Act analysis.[52]

In fact, Plaintiffs agreed, urging that "BLM should be clear about the true scope of

Willow and should not allow Conoco to piecemeal its proposal."[53]

BLM further explains that the term "fully develop" means "that the lessee may not

strand such a large quantity of oil and gas that, standing alone, is economic to develop

(i.e., that would warrant construction of an additional drill pad)."[54] This makes sense. A

---

[49] BLM_3512_AR821709.

[50] BLM_3512_AR820777.

[51] 43 C.F.R. § 3137.71(b)(1).

[52] BLM_3512_AR821737 (emphasis added).

[53] BLM_3330_AR509715.

[54] BLM_3512_AR821709.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-13-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

"master development plan" for an oil and gas field should include all of development that is planned. Again, BLM explained:

> [T]o the extent that an alternative concept strands an economically viable quantity of oil, the BLM would expect to receive a future permit application to develop it. Such an alternative concept therefore does not disclose and analyze the impacts of full field development and is a false comparison to other action alternatives.[55]

BLM explains that "Alternative E evaluates the full development of the Willow reservoir," while leaving behind more recoverable oil.[56] Thus, "full development" is not the same as "all possible oil," and Plaintiffs' argument to the contrary is baseless.

To be sure, BLM concluded that some of Plaintiffs' proposals to eliminate all infrastructure in the TLSA were not viable alternatives for a master development plan because they would strand so much recoverable oil that ConocoPhillips would certainly later apply to build another drill site.[57] That does not remotely show that BLM still thought ConocoPhillips had the right to develop *all* possible oil. It is instead consistent with BLM's statement of purpose and need, and is faithful to the NPRPA's primary

---

[55] BLM_3512_AR821710 (citing 43 C.F.R. § 3137.71(b)(1)).

[56] BLM_3512_AR821087.

[57] *See* BLM_3512_AR821710; BLM_3512_AR821958. Plaintiffs confuse BLM's mitigation authority to reduce the scope of a project with its NEPA obligation to evaluate the full scope of effects. The FSEIS explains that BLM reserved its authority to select "variations on Alternative E that would be more environmentally protective," BLM_3512_AR820701, and exercised that authority in the ROD to eliminate BT5.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-14-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

purpose—*i.e.*, to "expeditiously advance private oil and gas development on the NPR-A."[58]

*Finally*, Plaintiffs' desire for "[a]n alternative that substantially reduces Willow's carbon footprint and prohibits infrastructure within the [TLSA]" ultimately just conflicts with the NPRPA, under which "infrastructure is allowed, and indeed anticipated, within the TLSA" and which does not prohibit "exploration or other activities" in special areas.[59] And even if reduction of carbon footprint were a relevant factor under the NPRPA, Alternative E does so by 21,750,000 metric tons ("MT") of indirect carbon dioxide equivalent ("$CO_2e$") emissions.[60] In sum, BLM fully responded to this Court's prior remand order and the agency's alternatives analysis satisfies NEPA.

### 2. BLM Lawfully Evaluated Growth Inducing Impacts.

Plaintiffs argue that the FSEIS failed to consider "growth inducing" impacts. They focus on a potential future development ("Greater Willow" or "West Willow") and argue that BLM did not analyze its potential downstream greenhouse gas ("GHG") emissions. Plaintiffs' arguments ignore the record and are legally and factually flawed.

#### a. The FSEIS Squarely Addresses Growth Inducing Impacts, Including West Willow.

The FSEIS addresses growth inducing impacts in a new section aptly titled "Growth Inducing Impacts" (Section 3.20.3), which updates and expands the cumulative

---

[58] 42 U.S.C. § 6504(a); *ConocoPhillips Alaska, Inc.*, 2023 WL 2403720, at *13.

[59] CBD Br. at 24; *see also* SILA Br. at 24; *SILA*, 555 F. Supp. 3d at 769; 42 Fed. Reg. 28,723 (June 3, 1977) (see Addendum).

[60] BLM_3512_AR820777.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-15-

effects analysis from the prior EIS.[61] That section expressly identifies "West Willow" as a Reasonably Foreseeable Future Action ("RFFA") and discusses the potential for Willow to facilitate the growth of future projects, including "West Willow."[62] West Willow is a "technical oil and gas discovery into which two exploration wells have been drilled," and for which "[d]evelopment is not currently planned."[63]

The FSEIS analyzes the cumulative effects of Willow's downstream emissions in the context of *all* such emissions from future development in the Petroleum Reserve and across the North Slope, concluding that "the cumulative annual average of gross GHG emissions from the Project, the Coastal Plain, NPR-A, and other North Slope emissions would be approximately 95.60 [million] MT (i.e., about 1.46% of the 2019 U.S. GHG inventory and 2.9% to 3.0% of U.S. net GHG emissions target for 2030)."[64] This level of analysis is reasonable and consistent with controlling precedent: "The Ninth Circuit has held that an agency may group together several projects in its cumulative impacts analysis, including RFFAs."[65]

---

[61] BLM_3512_AR821122; *see also* BLM_3512_AR821126.

[62] BLM_3512_AR821122.

[63] BLM_3301_AR509540. West Willow is not part of Willow as CBD suggests. *Id.*; *see also SILA*, 555 F. Supp. 3d at 781 n.249 (deferring to BLM's determination that Greater Willow is an RFFA); BLM_3512_AR820696 (describing Willow project).

[64] BLM_3512_AR821126.

[65] *SILA*, 555 F. Supp. 3d at 782; *see Cascadia Wildlands v. Bureau of Indian Affs.*, 801 F.3d 1105, 1112 (9th Cir. 2015) ("Thus, 40 C.F.R. § 1508.7 does not explicitly require individual discussion of the impacts of reasonably foreseeable projects, and, absent such a requirement, it is not for the court to tell the agency how specifically to present such evidence in an EA."). 40 C.F.R. § 1508.7 has been recodified at 40 C.F.R. § 1508.1(g)(3).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-16-

Contrary to Plaintiffs' suggestions, BLM's analysis included indirect emissions from future growth in the Petroleum Reserve. Drawing on technical models from the 2020 IAP, BLM included in the FSEIS the projected indirect (or "downstream") emissions from future development scenarios in the Petroleum Reserve.[66] BLM's low- and medium-growth forecasts contemplated that satellite projects (like West Willow) would "connect to existing or planned infrastructure in the Willow development," with the high-growth forecast adding new central processing facilities.[67] Moreover, the FSEIS conservatively uses the future downstream emissions from the high-growth scenario, thereby fully capturing the potential growth induced by Willow (and much more).[68]

BLM performed this analysis along with the expanded analysis of GHG emissions to address this Court's remand order and the Ninth Circuit's decision in *CBD v. Bernhardt*.[69] The expanded analysis included detailed numerical estimates of Willow's direct and indirect GHG emissions,[70] the impact of foreign emissions,[71] the social cost of GHG emissions,[72] cumulative impacts to climate change based on cumulative and annual

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

---

[66] FWS_78_AR364011.

[67] FWS_78_AR363937-938.

[68] BLM_3512_AR821126; FWS_78_AR364011.

[69] 982 F.3d 723, 737 (9th Cir. 2020).

[70] BLM_3512_AR820760-762; AR820770-771.

[71] BLM_3512_AR820770-772.

[72] BLM_3512_AR820772-774.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-17-

CO$_2$e calculations,[73] and an appendix including the models and calculations themselves.[74] BLM therefore fully addressed growth inducing impacts and GHG emissions.

> **b.** **SILA Already Litigated and Lost Its "West Willow" Arguments.**

Two years ago, SILA argued that "the EIS does not provide detailed information on Greater Willow" and that the analysis "should have been included in the cumulative impacts section."[75] The Court rejected that argument, concluding that Greater Willow is an RFFA, the analysis was "sufficient for the decision maker and the public to understand the potential scope and impacts of Greater Willow," and "'[i]t is not for this court to tell [BLM] what specific evidence to include, nor how specifically to present it.'"[76]

SILA reprises its arguments, claiming that the even more robust discussion of Greater Willow in the cumulative effects section (where SILA asked that it be placed) is not sufficient.[77] But SILA does not get a do-over on an issue "actually adjudicated in previous litigation."[78]

Regardless, SILA's arguments are meritless. SILA argues that BLM was required to specifically "calculate" future emissions from the potential "Greater Willow."[79] That

---

[73] BLM_3512_AR821126.

[74] BLM_3512_AR822432-473.

[75] *SILA*, 555 F. Supp. 3d at 781.

[76] *Id.* (*quoting Cascadia Wildlands*, 801 F.3d at 1112) (alteration in *SILA*).

[77] SILA Br. at 30-31.

[78] *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019) (*quoting Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1320 (9th Cir. 1992)); *see also Robi v. Five Platters, Inc.*, 838 F.2d 318, 326 (9th Cir. 1988) (summary judgment can have preclusive effect as a final judgment).

[79] SILA Br. at 31.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900 Fax 206.386.7500

just ignores the reasonable approach BLM took—*i.e.*, grouping RFFAs together using a larger development scenario for the Petroleum Reserve and aggregating those impacts in the cumulative impacts section. Plaintiffs provide no authority requiring BLM to specifically quantify downstream GHG emissions for each RFFA individually, and Ninth Circuit authority is to the contrary.[80]

Additionally, SILA complains that the FSEIS's cumulative effects analysis omits 8,500 MT of emissions from the construction and operation of Greater Willow.[81] This is flyspecking to an extreme.[82] The FSEIS provides an estimate of the annual cumulative emissions based on aggressive (and unlikely) future development scenarios that include 370,000 MT of annual direct emissions and 6,200,000 MT of annual indirect emissions from future projects in the Petroleum Reserve, plus 380,000 MT of direct emissions and 62,000,000 MT of indirect annual emissions for the Coastal Plain in the Arctic National Wildlife Refuge (where leasing activity is currently suspended).[83] There is no reasonable prospect that BLM underestimated the cumulative GHG emissions. The 8,500 MT of annual emissions for potential West Willow operations is well within the scope of the 370,000 MT estimated by BLM for the aggregate of future direct annual emissions in the Petroleum Reserve.

---

[80] *Cascadia Wildlands*, 801 F.3d at 1112.

[81] SILA Br. at 32.

[82] *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 984 (9th Cir. 2022) ("[W]e do not 'fly-speck' [the agency's] analysis and 'hold it insufficient on the basis of inconsequential, technical deficiencies.'").

[83] BLM_3512_AR821126 (measurements in million metric tons ("MMT")).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-19-

SILA's argument is the worst kind of flyspecking because they did not raise this concern in public comments. Those who "wish to participate" in the administrative process regarding "the environmental impact of a proposed action" must "structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions."[84] "'[T]he failure to raise a specific factual contention regarding the substantive content of an EIS during the NEPA public comment process'" results in waiver.[85] SILA never told BLM that it should separately address the 8,500 MT of hypothetical direct emissions from the potential future construction and from operation of West Willow (a project that has never been proposed) in its cumulative effects analysis. SILA's argument is thus both meritless and waived.

### c. CBD's Argument Is Erroneous.

CBD likewise asserts that the FSEIS fails to address the growth inducing effects of Willow (again principally West Willow). But CBD then relies exclusively *on the FSEIS itself*, citing and quoting its section on "Growth Inducing Impacts" as proof that Willow will have growth inducing impacts.[86] Obviously, then, the FSEIS addressed the potential growth inducing effects of Willow.[87]

---

[84] *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council ("NRDC")*, 435 U.S. 519, 553 (1978).

[85] *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006) (*quoting Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1535 (9th Cir. 1997)).

[86] CBD Br. at 26.

[87] To the extent CBD argues that this analysis should have appeared in the "indirect" rather than "cumulative" effects section of the FSEIS, such an argument is baseless. "'[T]he scope and nature of the direct, indirect, and cumulative impacts analysis is a

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-20-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

Equally perplexingly, CBD discusses four cases that address induced growth, but overlooks that all four cases involved an agency's failure to prepare an EIS altogether.[88] The question in those cases was whether potential growth inducing impacts (ignored in the environmental assessment) could trigger an EIS.[89] Here, BLM prepared an EIS and addressed growth inducing impacts.[90]

CBD next argues that "BLM never disclosed the downstream greenhouse gas emissions consequences of Willow's significant growth-inducing effects."[91] As discussed above, that is not true. BLM provides the high-end estimates for growth and development in the Petroleum Reserve and quantifies the high-end potential future downstream emissions in the cumulative effects analysis.[92] These scenarios include "satellite

_____

matter committed to the sound discretion of the agency.'" *Chilkat Indian Vill. of Klukwan v. BLM*, 399 F. Supp. 3d 888, 919-20 (D. Alaska 2019) (citation omitted), *aff'd*, 825 F. App'x 425 (9th Cir. 2020).

[88] CBD Br. at 25 (citing *City of Davis v. Coleman*, 521 F.2d 661, 667-69, 674-76 (9th Cir. 1975); *NRDC v. Dep't of Energy*, No. 04-cv-04448, 2007 WL 1302498, at *11, *20 (N.D. Cal. May 2, 2007); *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1138-39 (9th Cir. 2011); *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 867-70 (9th Cir. 2005)).

[89] *See City of Davis*, 521 F.2d at 673.

[90] BLM_3512_AR821122.

[91] CBD Br. at 28. CBD points to a statement that ConocoPhillips has "3 billion" barrels of "prospects and leads" to suggest imminent future growth. This is both misleading (*see* BLM_3301_AR509540-541) and misses the point. The USGS determined that the Petroleum Reserve may have "8.7 billion barrels of recoverable oil" (BLM_3377_AR516558), and, accordingly, the IAP high-growth scenario predicts development up to 500,000 barrels per day (FWS_78_AR363938). This growth, and its downstream emissions, are captured in the Willow cumulative effects analysis.

[92] BLM_3512_AR821126 (citing 2020 NPR-A IAP EIS, FWS_78_AR364559-563, AR364738).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-21-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

developments using . . . Willow," which is precisely what West Willow (if ever built) would be.[93] These numbers also include downstream effects and market effects.[94]

Without acknowledging those estimates, CBD argues that BLM's emissions analysis does "not suffice" because it was derived from BLM's analysis in the 2020 IAP EIS.[95] But BLM was not required to reinvent the wheel and both the Ninth Circuit and the NEPA regulations confirm BLM's approach is reasonable.[96] BLM disclosed the downstream impacts associated with future growth and explained how those estimates were calculated.[97] That complies with NEPA.[98]

CBD then argues that West Willow was not included in any of the 2020 IAP EIS's projections, insisting that those projections exclude "Willow and other existing and planned development from oil production estimates."[99] CBD is confused. West Willow is not part of Willow. Nor is it "existing" or "planned." It is a potential future

---

[93] FWS_78_AR364561. The FSEIS incorporates the high-growth scenario for Alternative A from the 2020 IAP EIS. *Compare* BLM_3512_AR821126 *with* FWS_78_AR364011. Even the low-growth scenario in the IAP EIS contemplates future development that connects to the "Willow development." FWS_78_AR363937. The emissions for the high-growth scenario contemplate that and much more. FWS_78_AR363938. The downstream effects were modeled in Appendix G of the 2020 IAP EIS. FWS_78_AR364738-744.

[94] FWS_78_AR364738.

[95] CBD Br. at 28-29.

[96] *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1048-49 (9th Cir. 2013); *Kempthorne*, 457 F.3d at 974; 40 C.F.R. § 1501.11(b).

[97] BLM_3512_AR821126 (citing FWS_78_AR364559-563, AR364738); FWS_78_AR364011, AR364738-744.

[98] *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004) ("Preparing an EIS 'necessarily calls for judgment, and that judgment is the agency's.'" (citation omitted)).

[99] CBD Br. at 29 n.6 (citing FWS_78_AR364553).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-22-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

development[100] and is accordingly addressed in the IAP EIS as part of the reasonable future growth scenario, which, in turn, was added to the Willow cumulative effects analysis (as described above).[101]

Finally, in a surprise about-face, CBD cites Appendix H.6 of the IAP EIS, which analyzes cumulative *air quality* impacts, to argue that "it appears the IAP assessment specifically excludes West Willow from its *downstream emissions*."[102] But downstream emissions are addressed in Appendix G, and were modelled based on the low- and high-development scenarios, both of which, as explained above, contemplated the growth of satellite projects like West Willow.[103] By contrast, Appendix H models local air quality impacts.[104] CBD knows this, and already told the Court that Appendix H was "unrelated to the EIS's greenhouse gas analysis."[105]

Ultimately, neither CBD nor SILA argue that the cumulative analysis in the FSEIS—estimating some 95.60 million MT annually based on aggressive potential future development scenarios—*underestimates* the impacts of Willow. Instead, they engage in

---

[100] BLM_3503_AR811698; BLM_3301_AR509540.

[101] FWS_78_AR364014 (GHG impacts analysis "include[s] emissions from future projected production in the NPR-A and emissions that are released outside of the North Slope via downstream emissions.").

[102] CBD Br. at 29 n.6 (citing FWS_78_AR364805) (emphasis added).

[103] FWS_78_AR364750-751.

[104] FWS_78_AR364752.

[105] CBD Dkt. 78 at 3.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-23-

flyspecking and obfuscation. The FSEIS provides information "sufficient for the decision maker and the public to understand the potential scope and impacts of [the project]."[106]

**B.    BLM's Decision Complies with the NPRPA.**

CBD argues that BLM violated the NPRPA by not reducing oil production to mitigate potential climate impacts to the Petroleum Reserve.[107] This argument misunderstands the statute and its context.

Congress enacted the NPRPA to "expeditiously advance private oil and gas development on the NPR-A."[108] And it amended the law (during the 1979 energy crisis) "to increase domestic oil supply as expeditiously as possible."[109] But Congress balanced oil production with protection of "surface resources" in the NPR-A, giving BLM discretion to "mitigate . . . adverse effects" as it "deems necessary."[110] BLM did so here, mandating numerous mitigation measures and additional protections from the

---

[106] *SILA*, 555 F. Supp. 3d at 781; *see also League of Wilderness Defs.-Blue Mountains v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008).

[107] CBD Br. at 30-34.

[108] *ConocoPhillips Alaska*, 2023 WL 2403720, at *13.

[109] *Id.* at *8; Pub. L. No. 96-514, 94 Stat. 2964 (1980) (codified at  42 U.S.C. § 6506a) (see Addendum); *see* Laurel Graefe, *Oil Shock of 1978–79*, Fed. Reserve History www.federalreservehistory.org/essays/oil-shock-of-1978-79 (last visited Aug. 29, 2023) (see Addendum).

[110] 42. U.S.C. § 6506a(b); *see also id.* § 6504(a) (directing federal oil exploration be conducted to "assure the maximum protection of such surface values," but only "to the extent consistent with the requirements of this Act"). The NPRPA says nothing about downstream emissions.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-24-

Case 3:23-cv-00061-SLG    Document 153    Filed 08/30/23    Page 34 of 71

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

unchallenged 2013 and 2022 IAP RODs.[111] Plaintiffs do not dispute the adequacy of this mitigation to protect surface resources.

Instead, CBD turns the NPRPA upside down, arguing that BLM was *required* to reduce production to mitigate future climate change impacts to "surface resources." There is no plausible way to graft a "keep it in the ground" policy onto the Naval ***Petroleum Reserves Production*** Act, no matter how many times Plaintiffs call this statute the "Reserves Act." The whole purpose of the NPRPA is to *increase* the production of oil—not to ameliorate the long-term consequences of global climate change by imposing conditions to *restrict* the production of oil. The statutory reference to "surface resources" plainly refers to on-the-ground development activities, and mitigation measures for those activities were imposed here.[112]

Besides, other than raising generic concerns about increased GHG emissions, CBD cannot identify any actual harm to "surface resources" in the Petroleum Reserve that are causally linked to Willow emissions.[113] For these reasons, and those discussed by

---

[111] BLM_3513_AR824926, AR824946-956; *see also* BLM_3377_AR516637, AR516652 (IAP protections "strike[] a balance" between development and the "importance of surface resources").

[112] 42 U.S.C. § 6506a(b).

[113] As set forth *infra* § III.C.1, numerous federal agencies have stated that it is not scientifically possible at this time to establish such a connection.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

Federal Defendants and the other Intervenors, whose arguments ConocoPhillips adopts by reference, Plaintiffs' NPRPA arguments are without merit.[114]

## C. The Agencies' Determinations Regarding GHG Emissions Comply with the ESA.

Plaintiffs assert new ESA-based GHG emission claims that they could have raised, but did not, in the prior litigation. Specifically, Plaintiffs argue that Federal Defendants should have consulted on how GHG emissions from Willow will impact global climate change and sea ice levels, and, in turn, cause effects to polar bears and ice seals.[115] But Plaintiffs identify no example where the agencies have ever engaged in such a consultation. That is unsurprising because, as outlined below, the U.S. Environmental Protection Agency ("EPA"), the U.S. Geological Survey ("USGS"), FWS, and the Secretary of Interior (among others) have all concluded that there is no way to connect emissions from a specific GHG source or sources with specific impacts to animals at specific locations. Without a way to connect the dots, the possible impacts associated with GHG emissions do not meet the regulatory definition for "effects of the action," which must be "caused by the proposed action" and "reasonably certain to occur."[116]

Plaintiffs also give no reason why Willow should be the first project in ESA history to require consultation on indirect GHG emissions. There is no such reason. The

---

[114] The cases CBD cites are unrelated to the NPRPA or GHG downstream effects. *See NRDC v. Pritzker*, 828 F.3d 1125, 1135 (9th Cir. 2016); *Rock Creek All. v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1170 (D. Mont. 2010).

[115] CBD Br. at 35-41; SILA Br. at 34-39.

[116] 50 C.F.R. § 402.02.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-26-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

FSEIS projects Willow's total direct and indirect emissions at an average of 4.32 million MT per year.[117] For context, in 2019 alone, GHG emissions for the United States were 6,558.3 million MT and global emissions were 59,100 million MT.[118]

Federal Defendants' brief demonstrates that BLM appropriately limited the scope of its consultation to only the "effects of the action" that are "caused by the proposed action" and "reasonably certain to occur."[119] Without repeating those arguments, ConocoPhillips addresses three points. *First*, the scope of the Willow consultation is consistent with a long and unbroken chain of agency guidance and actions, and supported by Ninth Circuit case law. *Second*, Plaintiffs fail to establish standing to pursue their claims. *Third*, even if Plaintiffs had standing, their arguments are premised on a misreading of the ESA and its regulations.

### 1. Plaintiffs' Arguments Conflict with Longstanding Agency Practice.

CBD concedes in a footnote that the scope of the ESA consultation for Willow is consistent with guidance from the Solicitor of the Interior, but it suggests—incorrectly—that this guidance is isolated.[120] In reality, that guidance is one of many agency decisions reaching the same conclusion.

---

[117] BLM_3512_AR820777. Federal Defendants' briefs put this number at 9.268 million MT per year, but that is actually the *gross* emissions that do not account for market substitution. Net figures are provided at BLM_3513_AR820771, AR822452-454.

[118] BLM_3512_AR820761, AR821127.

[119] 50 C.F.R. § 402.02.

[120] CBD Br. at 39 n.8.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

In 2008, FWS listed the polar bear as a "threatened species" because "polar bear habitat—principally sea ice—is declining throughout the species' range" and "this decline is expected to continue for the foreseeable future[.]"[121] FWS explained that most of the observed increase in globally averaged temperatures is "very likely due to the observed increase in anthropogenic GHG concentrations" and that the Arctic is likely to be "ice-free" in the summer sometime in the 21st century.[122]

In the listing rule, FWS addressed the "Regulatory Implications for Consultations under Section 7 of the Act" for projects that emit GHGs (like a power plant) and for "oil and gas development activities conducted on Alaska's North Slope."[123] FWS explained that Section 7 is limited to effects that are "reasonably certain to occur" and would not occur "but for" the action under consultation.[124] Relying on *Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife Service*,[125] FWS explained that in order to attribute effects to an action, it "must 'connect the dots' between its evaluation of effects of the action and its assessment of take" and that "[t]he best scientific information available to us today . . . has not established a causal connection between specific sources and locations of emissions to specific impacts posed to polar bears or their habitat."[126]

---

[121] 73 Fed. Reg. 28,212, 28,302 (May 15, 2008) (see Addendum).

[122] *Id.* at 28,230, 28,245.

[123] *Id.* at 28,299-300.

[124] *Id.* at 28,299.

[125] *Id.* (citing *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229 (9th Cir. 2001)).

[126] *Id.*

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-28-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

FWS thus concluded that future ESA consultations on GHG sources would not satisfy even the low bar for actions that "may affect" polar bears.[127]

And with respect to North Slope activities, FWS explained that consultation may be required for localized operational and construction impacts but not for any downstream GHG impacts: "there is no traceable nexus between the ultimate consumption of the petroleum product and any particular effect to a polar bear or its habitat" and, therefore, "the emissions effects resulting from the consumption of petroleum derived from North Slope or Chukchi Sea oil fields *would not constitute an 'indirect effect' of any federal agency action to approve the development of that field.*"[128]

EPA reached the same conclusion by modelling the emissions from a hypothetical power plant that would emit over 14 million MT of $CO_2$ per year for 50 years.[129] EPA showed that *after 50 years* of operation, there could be an approximate 0.01 percent change in global $CO_2$ concentrations, which could potentially correspond to a change in global temperature between 0.00022 and 0.00035 degrees Celsius. EPA explained that these changes, if they occurred, "would be too small to physically measure or detect in

---

[127] *Id.* at 28,300.

[128] *Id.* (emphasis added).

[129] *See* Letter from Robert J. Meyers, Principal Deputy Assistant Administrator, Office of Air and Radiation re: Endangered Species Act and GHG Emitting Activities (Oct. 3, 2008) https://www.regulations.gov/document/EPA-HQ-OAR-2009-0472-11543 (last visited Aug. 30, 2023). This letter is discussed in detail at FWS_75_AR032375. A full copy of the letter is provided in the Addendum to this brief at A-15 to A-23.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-29-

the habitat" of listed species.[130] Accordingly, "EPA has determined that the risk of harm to any listed species including . . . polar bears, or to the habitat of such species based on the anticipated emissions of the model facility as described above, or any facility with lower emissions, is too uncertain and remote to trigger ESA section 7(a)(2) obligations."[131] USGS also performed an analysis that reached this conclusion.[132]

In this context, the Department of Interior reached the same conclusion, concurring with the positions of FWS, EPA, and USGS.[133] Based on a careful review of the statute, regulations, and guidance, the Department (with signed concurrence of the Secretary), concluded that "any observed climate change effect on a member of a particular species or its critical habitat cannot be attributed to the emissions of any particular source" and cannot be "reasonably certain to occur."[134]

In the years following, federal agencies have uniformly followed this approach.[135] As cited in Federal Defendants' brief,[136] EPA relied on its own prior analysis, the Bernhardt memorandum, and the polar bear listing decision to conclude that Section

---

[130] *Id.* at A-22.

[131] *Id.*

[132] *See Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1143 (9th Cir. 2013) (discussing USGS analysis and conclusions).

[133] Memorandum from David Longley Bernhardt, Solicitor, U.S. Department of Interior, re Guidance on the Applicability of the Endangered Species Act's Consultation Requirements to Proposed Actions Involving the Emission of Greenhouse Gasses (Oct. 3, 2008). FWS_75_AR032371-377.

[134] FWS_75_AR032376.

[135] BLM_3363_AR512743 ("the memo is still in effect").

[136] Federal Defendants' Br. at 51-52.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-30-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

7(a)(2) does not require an evaluation of GHG emissions associated with vehicle fuel standards (2012) or the Clean Power Plan (2015), explaining that "'any potential for a specific impact on listed species in their habitats associated with these very small changes in average global temperature and ocean pH is too remote to trigger the threshold for ESA section 7(a)(2).'"[137] Likewise, in 2022, FWS confirmed that "based on the best scientific data available we are unable to draw a causal link between the effects of specific GHG emissions and take of the emperor penguin[.]"[138]

The Ninth Circuit has recognized these limits in the standing context. In *Bellon*, the court evaluated a Clean Air Act challenge by environmental groups alleging that Washington State failed to regulate GHG emissions from five refineries with 5 million MT per year of collective emissions.[139] The plaintiffs asserted injury based on aesthetic and recreational harms from melting glaciers and other effects of climate change. The court held they lacked standing because the alleged injuries were not "fairly traceable" to Washington's failure to regulate GHG emissions from the refineries, explaining:

> [T]here is a natural disjunction between Plaintiffs' localized injuries and the greenhouse effect. Greenhouse gases, once emitted from a specific source, quickly mix and disperse in the global atmosphere and have a long atmospheric lifetime. . . . [T]here is limited scientific capability in assessing, detecting, or measuring the relationship between a certain GHG emission source and localized climate impacts in a given region. As the U.S. Geological Survey observed, "[i]t is currently beyond the scope of existing science to identify a specific source of $CO_2$

---

[137] 80 Fed. Reg. 64,510, 64,641 (Oct. 23, 2015) (citation omitted) (see Addendum).
[138] 87 Fed. Reg. 64,700, 64,704 (Oct. 26, 2022) (see Addendum).
[139] 732 F.3d at 1138.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-31-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

emissions and designate it as the cause of specific climate impacts at an exact location." Ltr. From Director, U.S. Geological Survey to Director, U.S. Fish & Wildlife Service, *The Challenges of Linking Carbon Emissions, Atmospheric Greenhouse Gas Concentrations, Global Warming, and Consequential Impacts* (May 14, 2008).[140]

The court found there was no way to connect the causal chain, especially because the refineries' annual emissions (5 million MT per year) were a tiny fraction of global emissions. The court explained that any related impacts are "scientifically indiscernible, given the emission levels, the dispersal of GHGs world-wide, and the absence of any meaningful nexus between Washington refinery emissions and global GHG concentrations now or as projected in the future."[141]

### 2. Plaintiffs Lack Standing to Assert Their ESA GHG Claims.[142]

For Article III standing, a plaintiff must satisfy three "irreducible constitutional minimum" requirements: (1) he or she suffered an injury-in-fact that is concrete, particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged

---

[140] *Id.* at 1143.

[141] *Id.* at 1143-44 (internal quotation marks and citation omitted).

[142] The State of Alaska argues that Plaintiffs lack standing on their ESA "take" claims because no Plaintiff demonstrates a legitimate recreational interest in viewing polar bears in the Petroleum Reserve. ConocoPhillips agrees with and incorporates that argument, and writes separately to address standing related to the ESA GHG claims. In addition, the lead plaintiff, SILA, does not appear to have standing in its own right because it is not a separate legal entity but instead a "program" of plaintiff Northern Alaska Environmental Center ("NAEC"). *See* NAEC, The Arctic Programs (2017), https://northern.org/northern-center-programs/ (NAEC website listing SILA as a "program" that is "housed" by NAEC); Sovereign Iñupiat for a Living Arctic, https://www.silainuat.org/lastestnews (last visited Aug. 29, 2023) (SILA's website soliciting donations to NAEC: "Send a check to Northern Alaska Environmental Center, 830 College Rd, Fairbanks, AK 99701 and put SILA in the memo line.").

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-32-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

conduct; and (3) the injury is likely to be redressed by a favorable court decision.[143] "[T]he 'fairly traceable' and 'redressability' components for standing overlap and are 'two facets of a single causation requirement.'"[144] However, they are distinct in that traceability "examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and requested judicial relief."[145] "Redress need not be guaranteed, but it must be more than 'merely speculative.'"[146] A plaintiff bears the burden to prove standing at summary judgment,[147] and must demonstrate standing for *each claim* asserted.[148]

Standing is substantially more difficult to prove when the plaintiff's injury "arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*[.]"[149] "In that case, the plaintiffs must 'adduce facts showing that [the choices of independent actors not before the courts] have been or will be made in such manner as to produce causation and permit redressability of injury.'"[150] Moreover, "a plaintiff [asserting a procedural harm] raising only a generally available grievance about

---

[143] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also NRDC v. EPA*, 542 F.3d 1235, 1244 (9th Cir. 2008).

[144] *Bellon*, 732 F.3d at 1146 (*quoting Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)).

[145] *Id.*

[146] *Juliana v. United States*, 947 F.3d 1159, 1170 (9th Cir. 2020) (citation omitted).

[147] *Lujan*, 504 U.S. at 561.

[148] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

[149] *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1013 (9th Cir. 2021) (citation omitted), *cert. denied*, 142 S. Ct. 713 (2021).

[150] *Id.* (citation omitted; alteration in original).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-33-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main 206.624.0900   Fax 206.386.7500*

government . . . and seeking relief that no more directly and tangibly benefits him than it does the public at large[,] does not state an Article III case or controversy."[151]

Plaintiffs' briefs each contain a single, conclusory paragraph addressing standing.[152] Plaintiffs' standing declarations make generic (and equivocal) assertions that Willow will contribute to climate change, climate change is harming polar bears, and Willow will therefore harm Plaintiffs' members' recreational or aesthetic interests in viewing polar bears in the future.[153] This is precisely the alleged causal chain that *Bellon* found too attenuated to support standing.[154] Plaintiffs provide no evidence to connect Willow emissions to specific impacts at specific locations in the Arctic, let alone to animals inhabiting those locations.[155] Plaintiffs thus cannot demonstrate causation or redressability.

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

---

[151] *Id*. at 1014 (citation omitted; alteration in original).

[152] SILA Br. at 16; CBD Br. at 16.

[153] *See, e.g.*, *SILA* Dkt. 105-3 ¶ 40 (Ritzman) ("If polar bears are impacted by Willow, including by Willow's greenhouse gas emissions further exacerbating climate change and sea ice loss, it will harm my opportunities to experience the bears across the Arctic."); CBD Dkt. 115-4 ¶ 59 (Amstrup) ("I am injured by the greenhouse gas emissions that result from the extraction and production of fossil fuels on public lands, and in particular, I am injured by the approval of the Willow Project which will result in substantial global emissions of greenhouse gases[.]").

[154] *Bellon*, 732 F.3d at 1143.

[155] *Wildearth Guardians v. Salazar*, 880 F. Supp. 2d 77, 84 (D.D.C. 2012) ("The fundamental problem with this theory of standing lies in the disconnect between Plaintiffs' recreational, aesthetic, and economic interests, which are uniformly local, and the diffuse and unpredictable effects of GHG emissions."), *aff'd sub nom. WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

Plaintiffs' burden is particularly difficult to meet here, given that most of the Willow emissions estimates in the FSEIS are indirect, and any allegation of injury must rely on an attenuated downstream causal chain. The FSEIS estimates Willow emissions in three categories. The first category is the ***direct*** emissions from constructing and operating Willow. For Alternative E, the direct emissions are 773 thousand MT of $CO_2e$ per year (or 23.19 million MT over 30 years).[156] The second category is ***indirect*** emissions, which are an estimate of future emissions that occur when third parties use fuel made from Willow oil (*e.g.*, by flying planes and driving vehicles). These estimates are based on many assumptions about future third-party behavior and future market forces, such as market substitution and no future government policies or voluntary programs to offset those future emissions.[157] For Alternative E, the FSEIS estimates those indirect emissions at 1.54 million MT per year (or 46.2 million MT over 30 years).[158] The third category is the ***indirect foreign*** emissions, which are estimates based on assumptions of how Willow will impact the global price of oil for the next 30 years and how those changes will, in turn, affect consumer choices and demand.[159] For Alternative E, the FSEIS estimates those indirect foreign emissions at 2.01 million MT per year (or

---

[156] BLM_3512_AR820770.
[157] BLM_3512_AR822452, AR822495-498.
[158] BLM_3512_AR820770.
[159] BLM_3512_AR820769-770, AR820777-778.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-35-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main 206.624.0900    Fax 206.386.7500*

60.273 million MT over 30 years).[160] Thus, the total direct and indirect emissions estimated in the FSEIS is 4.32 million MT per year.[161]

*Bellon* involved sources with 5 *million* MT per year of *direct* emissions. Willow direct emissions are estimated at 773 *thousand* MT per year. Even the total Willow estimated emissions (4.32 million MT per year) are still below just the direct emissions in *Bellon*. Indirect emissions are far more attenuated than direct emissions because they are remote in time and location and the product of future independent consumer choices, market forces, and policy decisions or regulation (or lack thereof).[162] Plaintiffs fail to "adduce facts showing that those choices have been or will be made."[163]

Plaintiffs may try to distinguish *Bellon*, to no avail. For instance, they cite a 2016 paper by Notz and Streove ("Notz") for the proposition that there is a generally observed linear relationship between increased GHG and decreased summer sea ice, which roughly correlates to a rate of 3 square meters of sea ice for every 1 MT of GHG. Any such

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900  Fax 206.386.7500

---

[160] BLM_3512_AR820770, AR820777.

[161] BLM_3512_AR820777.

[162] *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 670 (D.C. Cir. 1996) ("The Supreme Court itself has noted the improbability of establishing the necessary likelihood of some result when that result depends on predicting the acts of even a single 'interest group' who is unrepresented in the instant litigation, especially when that group . . . is actually composed of dozens of individual actors, each of whom must react to other market or regulatory inputs.") (citation omitted).

[163] *WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1217 (9th Cir. 2023) (citations omitted).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-36-

correlation does not fill the evidentiary gap.[164] That is because the paper does not

demonstrate a new "scientific capability in assessing, detecting, or measuring the

relationship *between a certain GHG emission source and localized climate impacts in a*

*given region*."[165]

Indeed, the limits of the Notz equation are demonstrated with simple arithmetic. If

each ton of direct emissions from Willow resulted in the direct loss of 3 square meters of

sea ice (as claimed by Notz), the sum per year is only 2.3 square kilometers of summer

sea ice.[166] If the more speculative indirect emissions are included (4.32 million tons per

year), the total is still only 12.9 square kilometers per year.[167] The Arctic ice sheet at its

maximal area in 2022 was 12.898 *million* square kilometers (larger than the entire United

States) and the minimal summer area (September average) in 2022 was 3.474 *million*

square kilometers.[168] Annual variations in minimal sea ice extent can exceed a million

---

[164] *See* Declaration of Dr. Anne Smith ("Smith Decl.") ¶ 9 ("There is no aspect of the Notz relationship that provides a basis for making location-specific estimates of sea-ice, and the paper does not provide any information to project how any sea-ice losses might translate into polar bear or ice seal population impacts."); *id.* ¶¶ 30-32. ConocoPhillips submits the Smith Declaration for the purpose of addressing standing. *See Bellon*, 732 F.3d at 1143-44 (relying on intervenor-defendant standing declaration). Because Plaintiffs appear to rely only on the administrative record for the merits of their ESA claims, ConocoPhillips does the same.

[165] *Id.* at 1143 (emphasis added). "[T]he Notz relationship is scientifically uninformative about impacts at more disaggregated scale, whether project it be project-specific or location-specific." Smith Decl. ¶ 30; *id.* ¶¶ 16, 31, 32.

[166] 773,000 (MT GHG) x 3 (square meters) = 2,319,000 (square meters) / 1,000,000 (square meters per square kilometer) = 2.3 square kilometers.

[167] 4,320,000 (MT GHG) x 3 (square meters) = 12,960,000 (square meters) / 1,000,000 (square meters per square kilometer) = 12.96 square kilometers. *Id.* ¶ 10.

[168] Smith Decl. ¶ 11.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-37-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

square kilometers. For example, in 2022, there were 1.1 million more square kilometers of summer sea ice extent than a decade earlier in 2012.[169] Sea ice changes *less than 1,000 square kilometers cannot be reliably measured*, and a change of 2.3 square kilometers (or 12.9 square kilometers if indirect emissions are included) of sea ice is thus not even perceptible or scientifically measurable in the context of a sea ice sheet that is regularly fluctuating in size by orders of magnitude more.[170] Notz provides no mechanism to show where on the expansive Arctic ice sheet this (imperceptible) change will occur, how that change in that location will impact polar bears in a perceptible way, or how that change (many years from now) will perceptibly impact Plaintiffs' recreational or aesthetic interests in polar bears.[171]

Plaintiffs also cannot avoid dismissal by arguing they have asserted a "procedural" injury. *Bellon* rejected this argument because those plaintiffs failed to show the "'meaningful contribution' to global GHG levels" necessary to establish a causal nexus.[172] The Ninth Circuit also recently confirmed that "the causation and redressability requirements are 'relaxed' for procedural claims *only* in the sense that a plaintiff 'need not establish the likelihood that the agency would render a different decision after going through the proper procedural steps.'"[173] A plaintiff still must show "a likelihood that the

---

[169] *Id.*

[170] *Id.* ¶¶ 10 & n.1, 12; *id.* ¶ 27 ("[T]he environmental impact of the additional Willow project-related emissions is, in any practical sense of the term, nil.").

[171] *Id.* ¶¶ 9, 16, 32.

[172] *Bellon*, 732 F.3d at 1144-46 (citation omitted).

[173] *WildEarth Guardians*, 70 F.4th at 1216 (emphasis added; citation omitted).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-38-

challenged action, if ultimately taken, would threaten a plaintiff's interests" and the procedural injury standard has no bearing when, as here, the alleged injury is caused by "third parties not before the court."[174] In other words, the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing."[175] Thus, "a procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest."[176]

Here, Plaintiffs' alleged climate change injuries result from potential third-party actions—future downstream emissions, future policies, and the actions of countless actors and market forces—which may or may not come to pass. Thus, the "procedural" standing test does not apply.[177] Moreover, Plaintiffs cannot show that any procedural breach of the ESA with respect to Willow will cause future global climate change, let alone cause the "essential injury" to Plaintiffs' recreational or professional interest in ESA-listed species.[178]

For similar reasons, Plaintiffs fail to demonstrate redressability. Whether Plaintiffs suffer global climate change impacts in the future that affect their interests in Arctic

---

[174] *Id.* at 1217 (*quoting Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1161 (9th Cir. 2017)).

[175] *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

[176] *Fla. Audubon Soc'y*, 94 F.3d at 664-65.

[177] *WildEarth Guardians*, 70 F.4th at 1216.

[178] *Fla. Audubon Soc'y*, 94 F.3d at 664-65; Smith Decl. ¶ 27.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-39-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

species is a function of many factors, including total global GHG emissions (past, present, and future) and global policy choices.[179] As the Ninth Circuit explained, while "[t]here is much to recommend the adoption of a comprehensive scheme to decrease fossil fuel emissions and combat climate change," "any effective plan would necessarily require a host of complex policy decisions entrusted . . . to the wisdom and discretion of the executive and legislative branches."[180]

At bottom, Plaintiffs have asserted, at most, a "generally available grievance" related to the future of sea ice and Arctic species that "does not state an Article III case or controversy."[181] Plaintiffs fail to establish Article III standing.

### 3. Plaintiffs' Section 7 GHG Claims Have No Merit.

Plaintiffs' arguments have no substantive merit anyway. BLM's decision on the GHG issue is reasonable and consistent with agency guidance and the settled practice of every relevant agency in every ESA consultation nationwide for the last 15 years. There is no basis to make Willow the first project in history that is subject to a different standard.

BLM fully evaluated potential climate change impacts in the Willow consultation. It evaluated "the possibility of establishing causal links between Willow-specific GHG

---

[179] Smith Decl. ¶ 9 ("The Notz relationship indicates that any projection of future Arctic sea-ice area depends on the future global emission path the world will follow and is not accelerated in any meaningful way by Willow's emissions."); *id.* ¶¶ 17, 33.

[180] *Juliana*, 947 F.3d at 1171-72 (climate injuries not redressable). Additionally, "[t]here is little reason to think Congress assigned" to FWS the duty to develop and implement a plan to address GHG emissions. *West Virginia v. EPA*, 142 S. Ct. 2587, 2612 (2022).

[181] *Mayorkas*, 5 F.4th at 1014.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

emissions" and addressed the "potential" for those impacts to occur.[182] It also evaluated Plaintiffs' information (including Notz) and concluded that the information "does not connect the impacts from GHG emissions for a specific, individual activity, such as Willow, to a specific area for analysis which could affect the health of a discrete listed species, such as polar bears or ice seals."[183] BLM also concluded that these speculative impacts are not "effects of the action" (because they are not "reasonably certain to occur").[184] FWS and NMFS agreed with BLM's conclusions.[185] The ESA does not require consultation on remote and speculative impacts.[186] These reasoned scientific determinations are entitled to deference.[187] Plaintiffs' arguments to the contrary are wrong for many reasons.

     *First*, Plaintiffs misconstrue the ESA and its regulations. They lean heavily on the "may affect" and "no effect" case law, claiming the "may affect" threshold was exceeded. But the decision as to whether a project "may affect" is vested solely with

---

[182] BLM_3505_AR811703-704.

[183] BLM_3505_AR811704; *see also* FWS_75_AR032341-377.

[184] *Id.*

[185] BLM_3382_AR525073-074; BLM_3383_AR525081.

[186] *See Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1092 (9th Cir. 2004) (Navy not required to consult on remote possibility of missile explosion).

[187] *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) ("[W]e generally must be 'at [our] most deferential' when reviewing scientific judgments and technical analyses within the agency's expertise.") (second alteration in original; citation omitted).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-41-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

BLM, not FWS or NMFS.[188] The "may affect" test applies to the *agency action*, and here BLM concluded that the action "may affect" polar bears and ice seals and produced a biological assessment.[189] BLM appropriately defined the scope of the biological assessment to exclude the incremental impact of GHG emissions associated with Willow because such an uncertain impact does not meet the definition for "effects of the action."[190]

Plaintiffs' "may effect" arguments are not only factually wrong, but also self-defeating. To the extent Plaintiffs argue that FWS or NMFS made an improper "no effect" determination, that claim is against the wrong party because only the action agency makes that determination.[191] To the extent that Plaintiffs want to challenge a supposed "no effect" determination by BLM, they have not alleged such a claim against BLM in their complaints and have not satisfied the 60-day notice requirements for such a claim.[192] Likewise, to the extent Plaintiffs argue that FWS or NMFS erroneously agreed with a supposed "no effect" determination by BLM, that is also barred. A consulting

[188] 50 C.F.R. § 402.14(a); *Defs. of Wildlife v. Flowers*, 414 F.3d 1066, 1069-70 (9th Cir. 2005) ("The Federal agency makes the final decision on whether consultation is required, and it likewise bears the risk of an erroneous decision.") (citation omitted); 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) (same) (see Addendum).

[189] 50 C.F.R. § 402.14(a) ("may affect" determination applies to the "action," not specific potential effects).

[190] BLM_3505_AR811704.

[191] *Flowers*, 414 F.3d at 1069-70.

[192] *Franks v. Salazar*, 816 F. Supp. 2d 49, 58 n.5 (D.D.C. 2011) ("[P]laintiffs cannot use their summary judgment briefing to press [ESA] claims not raised in their amended complaint."); *see also Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998); 16 U.S.C. § 1540(g)(2).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-42-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

agency's agreement (or disagreement) with a "no effect" determination is "not final agency action[]" and "therefore not subject to judicial review under the APA."[193]

 *Second*, Plaintiffs' reading of the ESA to require consideration of all potential effects of GHG emissions would turn the consultation process into a useless morass. The "effects of the action" establish the geographic limits on consultation (called the "action area") and also the species to be evaluated.[194] Because GHGs "once emitted from a given source, become well mixed in the global atmosphere,"[195] Plaintiffs' argument necessarily requires the "action area" for any action with direct or indirect GHG emissions (which is almost all actions) to be the entire Earth, in which case, for each consultation, the "may effect" test would have to be applied to all 1,300 or so listed species throughout the world. That is obviously impractical (and of little or no value).[196]

---

[193] *Sierra Forest Legacy v. U.S. Forest Serv.*, 598 F. Supp. 2d 1058, 1069 (N.D. Cal. 2009); *Inst. for Fisheries Res. v. Burwell*, No. 16-cv-01574-VC, 2016 WL 4529517, at *2 (N.D. Cal. Aug. 30, 2016) (dismissing challenge to FWS agreement with no-effect determination because the "Service's letter was not 'final agency action' within the meaning of 5 U.S.C. § 704"); *see* Endangered Species Act Consultation Handbook (March 1998) at 3-12 ("Although not required, an action agency may request written concurrence from the Services that the proposed action will have no effect on listed species or critical habitat. This concurrence is useful for the administrative record.") (see Addendum).

[194] 50 C.F.R. §§ 402.02 ("Action area means all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action."), 402.14(c)(1)(ii), (iii) (action area sets scope of consultation and species evaluated).

[195] FWS_75_AR032375; *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 422 (2011) ("Greenhouse gases once emitted become well mixed in the atmosphere[.]") (internal quotation marks and citation omitted).

[196] *See supra* note 180 (citing *West Virginia*, 142 S. Ct. 2587).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-43-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900 Fax 206.386.7500

*Third*, Plaintiffs' cherry-picking of words in BLM's memorandum ("specific" and "granular") ignores that BLM expressly applied the "reasonably certain to occur" standard.[197] The "granular" and "specific" details BLM said were missing were the elements necessary to show a *causal* connection. These elements include "[w]here in the Arctic the reduction in sea ice extent would occur," "[t]he type of sea ice affected, such as first-year or multi-year ice," "[w]hether that sea ice is utilized by polar bears," "[t]he reason(s) why polar bears utilize a particular area of sea ice," and "whether sea ice of sufficient extent and thickness would persist in that area to support continued use by polar bears and their prey."[198] Without information to answer these questions, BLM would only be speculating about effects.

*Fourth*, Plaintiffs' citations to *American Fuel & Petrochemical Manufacturers v. EPA*[199] and *Growth Energy v. EPA*[200] are inapposite. In *American Fuel*, EPA simply failed to make an effects determination and, therefore, "did not comply with its obligations under the ESA."[201] In *Growth Energy*, EPA made a "no effect" determination that was arbitrary and capricious because it was contrary to EPA's own report.[202] Here, by contrast, BLM made a "may affect" determination and produced a biological

---

[197] BLM_3505_AR811704; 50 C.F.R. § 402.14(g)(7).
[198] BLM_3505_AR811705.
[199] 937 F.3d 559 (D.C. Cir. 2019).
[200] 5 F.4th 1 (D.C. Cir. 2021).
[201] 937 F.3d at 598.
[202] 5 F.4th at 31.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-44-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

assessment that appropriately limited the "effects of the action" to those that are "reasonably certain to occur," and the Services agreed.[203]

*Fifth*, Plaintiffs' "best available science" arguments actually undermine their claims. For example, although CBD claims that "models estimate the specific impacts in the Arctic from incremental greenhouse gas emissions,"[204] they just refer to the Notz paper, which is in the administrative record, and which BLM evaluated and concluded "does not connect the impacts from GHG emissions for a specific, individual activity, such as Willow, to a specific area for analysis which could affect the health of a discrete listed species, such as polar bears or ice seals."[205]

As another example, CBD relies on a litigation declaration by CBD member Steven Amstrup filed in a different case challenging an EPA rule known as "SAFE II."[206] There, Amstrup says the SAFE II rule will produce 7.8 *billion* MT of $CO_2$, and opines that "polar bears in Alaska face an additional ice-free day . . . for each 9.0 billion metric tons of $CO_2$ emitted from fossil fuel combustion and industrial processes."[207] Tellingly, Amstrup does not do the same math for Willow's emissions. That is perhaps because if 9.0 billion MT of $CO_2$ supposedly equals *one* additional ice-free day, then 6.25 million tons creates an ice-free minute, and, by that calculation, the combined 30 years of Willow

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

---

[203] BLM_3505_AR811704; BLM_3360_AR512119; BLM_3382_AR525073-074; BLM_3383_AR525081; *see also* 50 C.F.R. § 402.14(a), (g).

[204] CBD Br. at 40.

[205] BLM_3505_AR811704; *see also* FWS_75_AR032341-377.

[206] CBD Br. at 40.

[207] BLM_3462_AR725315.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-45-

emissions—assuming all the speculative indirect and foreign emissions actually occur (129.7 million MT)—would mean there *could* be 20 minutes more ice-free time *in 2055*.[208] This "consequence is so remote in time from the action under consultation that it is not reasonably certain to occur[.]"[209] Besides, whether or when there will be ice-free days in the Arctic is a function of past, present, and future global emissions, combined with other global forces, not the result of a single project.[210]

In sum, the agencies fully and fairly complied with their obligation to consider the "effects of the action." Plaintiffs' claims should be dismissed.

## D.    FWS's "Take" Analyses and Conclusions Comply with the ESA.

This Court previously ruled that FWS: (1) improperly relied on uncertain and unspecified mitigation measures to reach its no-jeopardy conclusion; (2) failed to sufficiently explain its zero non-lethal take conclusion for polar bears; and (3) impermissibly authorized hazing take automatically upon issuance of future MMPA authorizations.[211] FWS addressed all these issues on remand.

---

[208] 9,000,000,000 MT divided by 24 hours and divided by 60 minutes = 6.25 million MT.
[209] 50 C.F.R. § 402.17(b)(1).
[210] SILA says the FSEIS "acknowledged that Willow's climate impacts would be significant." SILA Br. at 36-37. This is misleading. SILA cites a discussion of the "Climate Test," which was "developed by NRDC" lawyers to "test" a project's "potential impact on U.S. climate commitments and goals" to determine whether an EIS is required. BLM_3512_AR820771, AR822466-68. NRDC's test results in a "significance" finding for *any* oil project. BLM_3512_AR822466. The FSEIS acknowledges the NRDC test but does not find that potential Willow GHG emissions are a significant impact. *See id.*
[211] *SILA*, 555 F. Supp. 3d at 800-03.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-46-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

Plaintiffs do not challenge FWS's responses to issues (1) and (3), nor do they challenge FWS's reaffirmed "no-jeopardy" determination, which rests on FWS's conclusion that the agency does "not anticipate population level responses within the SBS [Southern Beaufort Sea] stock, much less the species which numbers approximately 26,000 individuals."[212] Plaintiffs, however, remain dissatisfied with FWS's zero non-lethal take determination. Their renewed challenge on that issue should be denied.

### 1.    FWS Lawfully Interpreted Its Own Regulatory Definition.

Plaintiffs first attack FWS's interpretation of its regulatory definition for "harass." FWS defines "harass" as "an *intentional or negligent* act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."[213] Plaintiffs contend that FWS's interpretation of "harass," as stated in the 2023 Biological Opinion ("BiOp"), conflicts with this regulatory definition.[214] They are wrong.

---

[212] FWS_76_AR032537. Section 7 determinations for the polar bear are based on the listed *species*, not populations within the species (unless they are designated a "distinct population segment"; no polar bear populations are so designated). The species has remained at a robust 26,000 since it was listed in 2008. Contrary to SILA's claim that the SBS population is "rapidly declining" (SILA Br. at 11), that population, which ranges "over an expansive area, extending from Icy Cape and Point Hope in the Chukchi Sea eastward to Cape Bathurst, Northwest Territories, Canada," has "remained relatively stable [at approximately 900 bears] since the decline that occurred in the mid-2000s." FWS_78_AR364218, AR036769.

[213] 50 C.F.R. § 17.3 (emphasis added).

[214] CBD Br. at 41; SILA Br. at 39-40.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-47-

Initially, Plaintiffs' arguments rest on a misunderstanding of ESA "take" by "harassment" and "harm." FWS's definitions of those terms establish four categories of acts or omissions that constitute such take:

1.  Intentionally killing or injuring listed species. This is "harm."[215]

2.  Intentionally causing the likelihood of injury to listed species by annoyance. This is "harass[ment]."

3.  Negligently causing the likelihood of injury to listed species by annoyance. This is also "harass[ment]."

4.  Significantly modifying or degrading habitat to the extent that listed species are actually killed or injured, regardless of intent or negligence. This is "harm."

Plaintiffs' argument would add a new category of take by harassment not contemplated by the regulations—namely, unintentional, non-negligent acts that create a likelihood of injury (but do not actually injure). As explained below, the regulation's plain language and history show that FWS never intended to extend "take" to such acts.

*Kisor v. Wilkie* establishes the framework governing challenges to an agency's interpretation of its own regulation.[216] A court must first determine whether a regulation is "genuinely ambiguous," by "carefully consider[ing] the text, structure, history, and

---

[215] *See* 50 C.F.R. § 17.3 ("harm" must "actually kill[] or injure[] wildlife").
[216] 139 S. Ct. 2400 (2019) (plurality).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-48-

purpose" of the regulation.[217] If the regulation is not ambiguous, "[t]he regulation then just means what it means—and the court must give it effect[.]"[218] If a regulation is genuinely ambiguous, a court will uphold the agency's interpretation if it is reasonable and "the character and context of the agency interpretation entitles it to controlling weight."[219]

The "harass" definition is unambiguous. Its plain language applies to conduct that *intentionally or negligently* creates the likelihood of injury. That is exactly what FWS concluded in the BiOp.

The Court's analysis could end there, but the regulatory history forecloses any suggestion that the regulation is ambiguous or that FWS misinterpreted it.[220] That regulatory history, which is recounted in Federal Defendants' brief, shows that, in 1975, FWS considered and expressly rejected the idea—urged by Plaintiffs—that "harass[ment]" should apply "to any action, regardless of intent or negligence."[221] The

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

---

[217] *Id.* at 2415 (internal quotation marks and citation omitted).

[218] *Id.*

[219] *Id.* at 2416.

[220] *See id.* at 2415 (courts consider text and history before concluding that a regulation is ambiguous); *Sec'y of Lab. v. Seward Ship's Drydock, Inc.*, 937 F.3d 1301, 1309 (9th Cir. 2019) (ambiguity in the regulation "is dispelled by the purpose of the [regulation] and its regulatory history," including statements in Federal Register); *Amazon.com, Inc. v. Comm'r of Internal Revenue*, 934 F.3d 976, 993 (9th Cir. 2019) (relying on "drafting history of the regulations and other indicators of [the agency's] contemporaneous intent").

[221] *See* 40 Fed. Reg. 44,412, 44,413 (Sept. 26, 1975); 40 Fed. Reg. 28,712, 28,714 (July 8, 1975); 46 Fed. Reg. 29,490, 29,491 (June 2, 1981) (see Addendum for all).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-49-

regulatory history confirms the regulation's plain text: to count as "harass[ment]," conduct must intentionally or negligently create the likelihood of injury.

Even if the definition of "harass" were ambiguous, FWS's interpretation would be reasonable. FWS's interpretation gives meaning to both "intentional" and "negligent," is rationally explained in the BiOp, and is consistent with the regulatory history.[222] Additionally, "the character and context" of FWS's interpretation "entitles it to controlling weight" because the interpretation, which relies on a Solicitor memorandum published in the Federal Register in 1981, is presented in a formal biological opinion—the statutorily required culmination of a Section 7 consultation.[223] The BiOp plainly "emanate[s] from" an agency "using [a] vehicle[] understood to make authoritative policy[.]"[224] It is therefore an "authoritative" or "official" position and not an "ad hoc statement not reflecting the agency's views."[225] The fulsome explanation in the BiOp

---

[222] Plaintiffs do not challenge either FWS's conclusion that ConocoPhillips would not intentionally harass wildlife or that the BiOp's mitigation measures create a standard of care that will be adhered to. *See* FWS_76_AR032541.

[223] *Kisor*, 139 S. Ct. at 2416; 16 U.S.C. § 1536(b); *Bennett v. Spear*, 520 U.S. 154, 156 (1997) (a biological opinion "constitutes final agency action . . . [and] marks the consummation of the agency's decisionmaking process").

[224] *Kisor*, 139 S. Ct. at 2416; *see id.* (official staff memorandum published in Federal Register constitutes agency's official position); *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 983 F.3d 498, 511 (D.C. Cir. 2020) (same for agency order published in Federal Register); *Walker v. BOKF, Nat'l Ass'n*, 30 F.4th 994, 1012 (10th Cir. 2022) (interpretive letter drafted by senior agency official constitutes agency's official position).

[225] *Kisor*, 139 S. Ct. at 2416-17; *cf. id.* (examples of ad hoc statements include speech of a mid-level employee or informal memorandum recounting a telephone conversation between employees).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-50-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

reflects FWS's "'fair and considered judgment'"[226] and, as FWS intended, "give[s] proper effect to all elements of the definition of 'harass.'"[227]

Plaintiffs' arguments ignore *Kisor* and the regulatory history, and give no meaning to the words "intentional or negligent" in the regulatory definition.[228] Plaintiffs claim that FWS's interpretation reads "incidental take" out of the ESA, but that is plainly wrong since both "harass[ment]" and "harm" can occur incidentally. A negligent act that incidentally causes the likelihood of injury to a listed animal is not done for the purpose of harassing the animal. And "harm," which FWS applies to acts of "significant habitat modification or degradation," can occur incidental to activities that do not have the purpose of harming an animal.[229] FWS's interpretation does not alter the meaning or purpose of "incidental take."

---

[226] *Id*. at 2417 (citation omitted).

[227] FWS_76_AR032542.

[228] *See Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality) ("[N]o provision should be construed to be entirely redundant.").

[229] 50 C.F.R. § 17.3. To the extent the legislative history CBD relies on is even relevant (CBD Br. at 43), it simply stands for the proposition that "harass[ment]" can be "intentional or not," as explained by FWS in its 1981 final rule. 46 Fed. Reg. at 29,491 (quoting same legislative history). And, obviously, a "negligent" act is not intentional. Moreover, CBD's legislative history argument appears to take issue with the regulation itself on the basis of alleged statutory inconsistency. But CBD has not pled a facial challenge to the regulation and, in any event, the six-year statute of limitations for such a claim has run. *See* 28 U.S.C. § 2401(a).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-51-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

In sum, FWS's regulation "means what it means."[230] Plaintiffs may disagree with FWS's approach, but they have not facially challenged the regulation, and FWS's interpretation in the BiOp is consistent with that regulation.

### 2. Plaintiffs' Challenges to FWS's "Take" Conclusions Have No Merit.

After evaluating all potential polar bear disturbance events, FWS concluded that no disturbance would cause either actual injury (harm) or the likelihood of injury (harassment). Plaintiffs' challenges to this separate basis for FWS's conclusion that non-lethal polar bear take will not occur lack merit.

The fatal flaw in Plaintiffs' arguments is that they fail to identify *any evidence* that potential polar bear disturbance will result in the likelihood of injury or that any such disturbance will be "biologically significant." Instead, Plaintiffs challenge FWS's conclusions based on its candid assessment of "whether activities associated with the Project could potentially disturb polar bears."[231] They think FWS should have concluded that potential incidents of disturbance would amount to "take." But these arguments conflict with what FWS actually concluded—*i.e.*, that any disturbances "would not be biologically significant" and "would be limited to minor and short-term behavioral changes, that do not result in a likelihood of injury."[232] Although Plaintiffs wanted a

---

[230] *Kisor*, 139 S. Ct. at 2415.
[231] FWS_76_AR032512.
[232] FWS_76_AR032516, AR032529.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-52-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

different conclusion, FWS's determinations are reasonable, explained in the record, and entitled to the highest degree of deference.[233]

For instance, CBD's arguments assume that because some Willow activity *could* happen where bears may be, and because such activity "can" have negative effects on bears, then "take" *must* occur.[234] But CBD cites no evidence that such effects will be "biologically significant" or create a "likelihood of injury." Additionally, CBD's insinuation that FWS relied on a single mitigation measure to conclude that vehicle traffic would not cause a "likelihood of injury" is false.[235] FWS explained that most traffic associated with the project will "take place well inland from the coast where polar bears are less likely to occur."[236] It further explained that because the discrete area where vehicles are more likely to be near bears (Oliktok) "is currently heavily used by existing Industry operators, [it] do[e]s not expect the increased noise and activity associated with the Proposed Action would result in measurable project-specific disturbance to bears transiting these areas."[237] FWS also noted that vehicle traffic is "tightly regulated in industry developments, including speed limits on in-field thoroughfares."[238]

---

[233] *See Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination . . . a reviewing court must generally be at its most deferential.").

[234] *See* CBD Br. at 44-45 (repeatedly using "can").

[235] *Id.* at 46.

[236] FWS_76_AR032516; *see* FWS_76_AR032509-510 ("The majority of the Action Area is farther inland than polar bears typically occur."); *see also* FWS_76_AR032510 (Figure 7.2); BLM_3360_AR512218.

[237] FWS_76_AR032516.

[238] FWS_76_AR032520.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-53-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
*Main 206.624.0900    Fax 206.386.7500*

SILA's arguments fare no better. SILA points to FWS's statement that "project related disturbances potentially include disruption of normal activities, displacement from foraging and resting areas, and interruption of movement patterns,"[239] and argues that "[s]uch impacts would logically create a likelihood of injury to polar bears."[240] But that is SILA's non-expert opinion, based on FWS's identification of "potential" impacts. Applying its expertise, FWS concluded that any such potential disruption "would be limited to short-term changes in behavior that would not be biologically significant," not create a likelihood of injury, and therefore not constitute ESA "take."[241]

SILA also faults FWS's evaluation of potential disturbance of denning adult bears, complaining that the agency "largely limited" its analysis to effects on cubs.[242] But SILA does not dispute either that FWS's focus on potential cub effects was rational or that FWS evaluated potential effects on denning adult bears.[243] FWS first examined the location of Willow project activities in relation to areas used by polar bears, finding that "small numbers of dens have been documented within or just beyond the discrete boundary of the Action Area within the last 100 years" and that "almost all were concentrated in coastal areas [away from the core Willow project], near Oliktok Dock,

**STOEL RIVES LLP**
600 University Street, Suite 3600, Seattle, WA 98101
*Main 206.624.0900    Fax 206.386.7500*

---

[239] FWS_76_AR032513.
[240] SILA Br. at 44.
[241] FWS_76_AR032516.
[242] SILA Br. at 43.
[243] *See* FWS_76_AR032517-520.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-54-

and nearby barrier islands . . . ."[244] Moreover, FWS explained, the "proposed activities at Oliktok dock (barging, lightering, and screeding) would be limited to open-water periods" and, therefore, "impacts to denning polar bears associated with activities at Oliktok Dock would be discountable due to lack of temporal overlap with the denning period."[245]

FWS also quantitatively evaluated the potential for "take" by modelling potential den disturbance events.[246] For any such events, FWS determined that the harm to the cub would constitute MMPA Level A harassment because it would cause a "potential to injure," or actually injure, the cub, resulting in either "harm" or "harassment" under the ESA.[247] FWS also determined that, for any such events, the adult female would experience MMPA Level B harassment, which creates a "potential to disturb" but not a "potential to injure," and therefore does not constitute ESA "take," which requires either actual injury (harm) or the likelihood of injury (harass).[248] SILA itself refers to such

---

[244] FWS_76_AR032518 ("The majority of the Action Area is farther inland than where most polar bear dens occur, with the exception of the coastal area near Oliktok Dock . . . . [I]n northern Alaska, west of the Kavik River, 95% of all historical confirmed and probable dens occurred within 4.5 km (2.8 mi) of the Beaufort Sea coast.").

[245] FWS_76_AR032517.

[246] *See* FWS_76_AR032542; AR032575-582.

[247] 16 U.S.C. § 1362(18)(A)(i), (C) ("Level A harassment" is "any act of pursuit, torment, or annoyance which . . . has the potential to injure a marine mammal or marine mammal stock in the wild.").

[248] FWS_76_AR032580; 16 U.S.C. § 1362(18)(A)(ii), (D) ("Level B harassment" is "any act of pursuit, torment, or annoyance which . . . has the potential to disturb a marine mammal . . . .").

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-55-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

potential interactions with denning adults as "non-injurious."[249] In any event, FWS's

model predicted *zero* den disturbance events, which "supports [FWS's] conclusion that

no incidental ESA take of denning bears is anticipated to result from the Proposed

Action."[250]

In sum, FWS's assessment of potential "take" on remand is well-supported by the

record. Plaintiffs' claims should be rejected.

## E.    Vacatur Is Unwarranted.

Plaintiffs request, in cursory fashion, that the Court vacate the challenged agency

decisions if it finds error. In that event, ConocoPhillips respectfully requests

supplemental briefing and argument on remedy because the appropriate remedy will

necessarily hinge on the type of legal error found by the Court, if any, which is presently

unknown. Additionally, although ConocoPhillips addresses the consequences of vacatur

below and in the Dunn Declaration, those consequences will be clearer and more

informed after this Court's decision. Given the enormous import of the Willow project to

the United States, ConocoPhillips, Alaska Native communities, and the State of Alaska,

any remedy should be addressed in a fully informed manner.

Vacatur is "a species of equitable relief," and "courts are not mechanically

obligated to vacate agency decisions that they find invalid."[251] "Whether agency action

---

[249] SILA Br. at 43 n.162.

[250] FWS_76_AR032542.

[251] *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014, 1017 (E.D. Cal. 2013); *see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995)

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-56-

Case 3:23-cv-00061-SLG    Document 153    Filed 08/30/23    Page 66 of 71

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900    Fax 206.386.7500

should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'"[252] The Ninth Circuit has made clear that when considering whether vacatur is appropriate, courts should consider economic and other practical concerns.[253] Indeed, courts often decline to vacate when "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand."[254]

---

("Although the district court has power to do so, it is not required to set aside every unlawful agency action.").

[252] *Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (*quoting Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

[253] *Id.* at 994; *see Cook Inletkeeper v. Raimondo*, 541 F. Supp. 3d 987, 993 (D. Alaska 2021) (rejecting plaintiffs' contention that "the primary consequences to be considered when assessing the disruptive impact of vacatur are environmental harms"); *Pac. Rivers*, 942 F. Supp. 2d at 1018 (rejecting plaintiffs' attempt to limit analysis of vacatur to potential environmental harm, concluding "courts should consider economic and other practical concerns"); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1106 (E.D. Cal. 2013) (The "determination of when to remand without vacatur should not be limited to situations where it is necessary to avoid environmental harm, but should instead be based on a broader examination of the equities.").

[254] *Allied-Signal*, 988 F.2d at 151; *see Nat'l Fam. Farm Coal. v. U.S. E.P.A.*, 966 F.3d 893, 929 (9th Cir. 2020) (remanding without vacatur where agency would "likely be able to offer better reasoning and adopt the same rule on remand" (internal quotation marks and citation omitted)); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures."); *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1049 (D.C. Cir. 2002) (declining to vacate because the "probability that the [agency] will be able to justify retaining the [rule] is sufficiently high"); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 85 (D.D.C. 2019) (declining to vacate "in light of the serious possibility that BLM may be able to substantiate the conclusions drawn" on remand); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 2:17-cv-372, 2021 WL 855938, at *3 (S.D. Ohio Mar. 8, 2021) (concluding that "a serious possibility that the [agency] will be able to substantiate its decision on remand . . . weighs against complete vacatur" (brackets in original; internal quotation marks and citation omitted)).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-57-
Case 3:23-cv-00061-SLG   Document 153   Filed 08/30/23   Page 67 of 71

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

Courts also decline to vacate when doing so would have disruptive consequences.[255] Here, the disruptive consequences of vacatur would be enormous. The Willow project is well underway. In the four months since this Court denied Plaintiffs' preliminary injunction motions, ConocoPhillips has opened a new gravel mine, built two miles of gravel road from an extant pad west toward Willow, and begun construction of a boat ramp for local resident access to subsistence resources.[256] Numerous contractors are presently fabricating equipment for the project, such as Willow Operations Center modules and pipe and culverts for road crossings.[257] And major construction work is planned for the next two seasons (and beyond).[258] That work will sustain or create approximately 1,800 jobs in the next year alone, many of which benefit Alaska Native people and businesses.[259] Nanuq, Inc., alone, anticipates having approximately 550 employees working on Willow construction this next season.[260] Through July 2023,

---

[255] *See Cal. Cmtys.*, 688 F.3d at 992; *Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92 (D.D.C. 2019) (declining to vacate when agency failed to issue an EIS); *Audubon Soc'y of Portland v. U.S. Army Corps of Eng'rs*, No. 3:15-cv-665-SI, 2016 WL 4577009, at *13 (D. Or. Aug. 31, 2016) (declining to vacate when NEPA alternatives analysis found unlawful); *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015) ("[C]ourts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error" (internal quotation marks and citation omitted)).

[256] Dunn Decl. ¶ 3.

[257] *Id.* ¶¶ 4, 5.

[258] *Id.* ¶¶ 9, 10.

[259] *Id.* ¶ 8.

[260] *Id.*

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG

-58-

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

ConocoPhillips has invested nearly $1 billion in the project.[261] By the end of this winter's construction season, ConocoPhillips will have invested a total of approximately $1.8 billion in Willow.[262]

As explained in the Dunn Declaration, vacatur of any of the agency decisions would make it "highly unlikely" that Willow will ever be constructed.[263] That would mean all of the jobs provided by Willow, including this year, would be lost and ConocoPhillips' multi-billion-dollar investment in Alaska would not be made. In the long term, that would mean "no Willow-based production to (a) extend the life of the Trans-Alaska Pipeline System; (b) contribute to the NPR-A Impact Mitigation Grant Program; (c) contribute production tax revenue to the State of Alaska; (d) contribute *ad valorem* tax revenue to the North Slope Borough; (e) create jobs and boost the economy on the North Slope, throughout Alaska, and in the rest of the United States; and (f) bolster energy security from domestic American production to offset foreign imports during the anticipated transition to a lower carbon energy economy."[264]

---

[261] *Id.* ¶ 11.

[262] *Id.*; *see Idaho Farm Bureau*, 58 F.3d at 1405-06 ("significant expenditure of . . . resources" counsels against vacatur "when a more closely tailored remedy is available").

[263] Dunn Decl. ¶¶ 14, 20.

[264] *Id.* ¶ 21. As explained in the Dunn Declaration, in the unlikely event the project does move forward after a second remand, the consequences would still be extremely disruptive. *See id.* ¶¶ 20.

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-59-

Case 3:23-cv-00061-SLG   Document 153   Filed 08/30/23   Page 69 of 71

STOEL RIVES LLP
600 University Street, Suite 3600, Seattle, WA 98101
Main 206.624.0900   Fax 206.386.7500

In short, vacating any of the agency decisions would have catastrophic consequences for people and businesses in Alaska and beyond. The Ninth Circuit has declined to vacate in similar circumstances.[265]

## IV. CONCLUSION

ConocoPhiffs respectfully requests that the Court deny Plaintiffs' motions for summary judgment and grant the cross-motions for summary judgment of the Federal Defendants and Intervenor-Defendants.[266]

DATED: August 30, 2023.

STOEL RIVES LLP

By: /s/ Ryan P. Steen
    Ryan P. Steen (Bar No. 0912084)
    Jason T. Morgan (Bar No. 1602010)
    Whitney A. Brown (Bar No. 1906063)
    Luke A. Sanders (*admitted pro hac vice*)
    Tiffany Wang (*admitted pro hac vice*)

    *Attorneys for Intervenor-Defendant*
    *ConocoPhillips Alaska, Inc.*

Certification: Counsel for ConocoPhillips certifies that this brief is 14,993 words. Counsel has sought leave to file a brief of no more than 15,000 words.

---

[265] *See Cal. Cmtys.*, 688 F.3d at 994.

[266] ConocoPhillips adopts the ANILCA arguments of Federal Defendants and the other Intervenors. Additionally, CBD does not address NEPA claims related to oil spill risks from paragraph 188 of its amended complaint (CBD Dkt. 104 at 47) and SILA does not address the litany of NEPA claims from paragraph 189 of its amended complaint (SILA Dkt. 88 at 62-63). These abandoned claims should also be dismissed. *See Ramirez v. City of Buena Park*, 560 F.3d 1012, 1026 (9th Cir. 2009).

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-60-

**STOEL RIVES LLP**
600 University Street, Suite 3600, Seattle, WA 98101
*Main 206.624.0900   Fax 206.386.7500*

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2023, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court of Alaska by using the CM/ECF system. Participants in Case No. 3:23-cv-00058-SLG and 3:23-cv-00061 SLG who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Ryan P. Steen
Ryan P. Steen

120570214.9 0028116-00168

*Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* - Case No. 3:23-cv-00058-SLG
*Center for Biological Diversity, et al. v. BLM, et al.* – Case No. 3:23-cv-00061-SLG
-61-
Case 3:23-cv-00061-SLG   Document 153   Filed 08/30/23   Page 71 of 71