**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; FRIENDS OF THE EARTH; GREENPEACE, INC.; NATURAL RESOURCES DEFENSE COUNCIL;DEFENDERS OF WILDLIFE, <br><br> *Plaintiffs - Appellants*, <br><br>  v. <br><br> UNITED STATES BUREAU OF LAND MANAGEMENT; UNITED STATES FISH & WILDLIFE SERVICE; NATIONAL MARINE FISHERIES SERVICE; UNITED STATES DEPARTMENT OF THE INTERIOR; UNITED STATES DEPARTMENT OF COMMERCE; DOUG BURGUM, in his official capacity as Secretary of the Interior; KATHARINE MACGREGOR, in her official capacity as Deputy Secretary of the Interior; HOWARD LUTNICK, in his official capacity as Secretary of Commerce; KEVIN PENDERGAST, in his official capacity as Alaska State Director of Bureau of Land Management; SARA | No. 23-3624 <br><br> D.C. No. 3:23-cv-00061-SLG <br><br><br> OPINION |

BOARIO, in her official capacity as
Regional Director of United States
Fish and Wildlife Service;
JONATHAN KURLAND, in his
official capacity as Regional
Administrator of National Marine
Fisheries Service,

       *Defendants - Appellees*,

CONOCOPHILLIPS ALASKA,
INC.; ARCTIC SLOPE REGIONAL
CORPORATION; NORTH SLOPE
BOROUGH; KUUKPIK
CORPORATION; STATE OF
ALASKA,

       *Intervenor-Defendants -
Appellees*.

SOVEREIGN INUPIAT FOR A
LIVING ARCTIC; ALASKA
WILDERNESS LEAGUE;
ENVIRONMENT AMERICA;
NORTHERN ALASKA
ENVIRONMENTAL CENTER;
SIERRA CLUB; THE
WILDERNESS SOCIETY,

       *Plaintiffs - Appellants*,

  v.

UNITED STATES BUREAU OF

No. 23-3627

D.C. No.
3:23-cv-00058-
SLG

LAND MANAGEMENT; UNITED
STATES FISH & WILDLIFE
SERVICE; UNITED STATES
DEPARTMENT OF THE
INTERIOR,

*Defendants - Appellees*,

CONOCOPHILLIPS ALASKA,
INC.; ARCTIC SLOPE REGIONAL
CORPORATION; NORTH SLOPE
BOROUGH; KUUKPIK
CORPORATION; STATE OF
ALASKA,

*Intervenor-Defendants -
Appellees*.

Appeal from the United States District Court
for the District of Alaska
Sharon L. Gleason, Chief District Court, Presiding

Argued and Submitted February 5, 2024
San Francisco, California

Filed June 13, 2025

Before: Ryan D. Nelson, Danielle J. Forrest, and Gabriel P.
Sanchez, Circuit Judges.

Opinion by Judge R. Nelson;
Concurrence by Judge R. Nelson;
Partial Concurrence and Partial Dissent by Judge Sanchez

## SUMMARY[*]

### Environmental Law

In a case in which environmental groups challenge the Bureau of Land Management's approval of the Willow Project, an oil and gas venture in America's northern Arctic, the panel (1) affirmed in part and reversed in part the district court's order granting summary judgment and dismissing plaintiffs' claims under the National Environmental Policy Act (NEPA), the Alaska National Interest Lands Conservation Act (ANILCA), the Naval Petroleum Reserves Production Act (Reserves Act), and the Endangered Species Act (ESA); and (2) remanded without vacatur.

The Bureau of Land Management (BLM) approved the Willow Project in 2023, allowing ConocoPhillips Alaska, Inc. to construct oil and gas infrastructure in Alaska's National Petroleum Reserve. Following a prior 2021 remand by the district court, BLM prepared a Supplemental Environmental Impact Statement (SEIS), where it insisted that in selecting project alternatives, it could only adopt a development proposal that would fully develop the oil field and not strand a large quantity of oil and gas that, standing alone, was economic to develop. BLM adopted the full field development standard, in part, because it did not want a project alternative that would lead to piecemeal development.

Addressing plaintiffs' claim that BLM's SEIS alternatives analysis violated NEPA, the panel held that,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

given the legitimate concerns associated with segmentation, BLM did not abuse its discretion in basing its environmental review on the full field development standard to avoid the risks of piecemeal development. BLM conceded in this litigation, however, that its final chosen alternative did not fully comply with the full field development standard. Because under the Administrative Procedure Act (APA), an agency must provide a reasoned analysis for changes to its existing position, and BLM did not provide a reasoned explanation at the Record of Decision stage for potentially deviating from the full field development standard, its 2023 approval of the Willow Project was arbitrary or capricious under the APA.

The BLM's assessment of the downstream emissions from the future oil development caused by the Willow Project, however, complied with NEPA. By estimating greenhouse gas emissions from potential future development in the cumulative effects section of the SEIS, BLM considered both indirect effects and cumulative impacts, which is all that NEPA and its implementing regulations require.

The panel next addressed plaintiffs' claim that, in approving the Willow Project and applying the full field development standard, BLM failed to consider its mandate under the Reserves Act to protect surface resources. The panel held that BLM can satisfy the Reserves Act's maximum-protection directive with mitigation measures that the Secretary of the Interior deems necessary or appropriate, even while using the full field development standard. Because nothing in the full field development standard precludes BLM from implementing protective conditions on exploration, it does not itself violate the Reserves Act. BLM also considered mitigation measures addressing downstream

greenhouse gas emissions before explaining why it chose to go in a different direction, and thus did not act arbitrarily in selecting mitigation measures under the Reserves Act.

The panel rejected plaintiffs' claim that BLM approved the Willow Project in contravention of its obligations to reduce impacts to subsistence users under § 810 of ANILCA. After determining at step one that the alternatives it analyzed would significantly restrict subsistence uses, BLM complied with step two by providing notice and hearing procedures and making the specified factual findings, including that reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources. Because BLM's application of the full field development standard was not contrary to § 810, BLM's approval of the Project satisfied ANILCA.

Finally, addressing the ESA claim, the panel held that the Center for Biological Diversity (CBD), had standing because its members' declarations identified redressable, concrete, and imminent injuries. On the merits, the decisions by BLM, the Fish and Wildlife Service, and the National Marine Fisheries Service to maintain the scope of the existing § 7 consultation were not arbitrary or capricious. Each agency satisfied its § 7 obligations by providing detailed scientific explanations for its conclusions that the effects of the Willow Project's greenhouse gas emissions on listed species were not sufficiently linked to merit further evaluation.

The panel remanded the NEPA claim without vacatur. BLM's lone error of failing to explain whether or why its adopted alternative complied with the full field development standard at the Record of Decision stage was, at heart, a procedural, not a substantive violation. Vacatur was

unwarranted because the procedural error was minor and the on-the-ground consequences of vacatur would be severe.

Concurring, Judge R. Nelson wrote separately to respond to Judge Sanchez on the validity of agency regulations under § 7 of the ESA pertaining to causation, pursuant to which if a consequence to ESA-protected species and habitat fails the "but for" causation test, it does not warrant further evaluation under § 7. Judge R. Nelson disagrees with Judge Sanchez's suggestion that but-for causation conflicts with § 7's text and purpose. But-for causation is the background against which Congress legislates, and it is the default rule that Congress is presumed to have incorporated, absent an indication to the contrary in the statute itself. There is nothing in § 7 that rebuts the presumption of but-for causation. Rather, the but-for causation standard tracks longstanding agency practice and is entrenched in the § 7 framework.

Concurring in part and dissenting in part, Judge Sanchez wrote that he cannot join the majority's adoption of an improper remedy—remand without vacatur—under the circumstances of this appeal. BLM's errors were more fundamental than simply failing to explain how it applied the full field development standard among the alternatives it reviewed. At bottom, the agency failed to provide any reasoned explanation for its adoption of full field development. The standard conflicts with various procedural and substantive requirements under NEPA, ANILCA, and the Reserves Act, and constitutes a manifest abuse of discretion requiring vacatur. Judge Sanchez concurred with the majority that CBD has standing to challenge BLM's failure to engage in formal consultation with other federal agencies on the climate impacts of the Willow Project, but CBD did not demonstrate how informal consultation was

arbitrary and capricious under the governing regulations. Nonetheless, he wrote separately to question whether the operative regulations that permitted BLM—in conjunction with the Fish and Wildlife Service and the National Marine Fisheries Service—to forego formal consultation are consistent with the text and purpose of the ESA.

## COUNSEL

Erik C. Grafe (argued), Carole A. Holley, and Jeremy C. Lieb, Earthjustice, Anchorage, Alaska; Eric P. Jorgensen, Earthjustice, Juneau, Alaska; Kristen Monsell, Center for Biological Diversity, Oakland, California; Cecilia Segal, Natural Resources Defense Council, San Francisco, California; Michelle Wu, Natural Resources Defense Council, New York, New York; Suzanne Bostrom (argued), Bridget Psarianos, and Brook Brisson, Trustees for Alaska, Anchorage, Alaska; for Plaintiffs-Appellants.

Amy E. Collier (argued), Rickey D. Turner Jr., Paul A. Turcke, Thekla Hansen-Young, and Robert J. Lundman, Attorneys; Todd Kim, Assistant Attorney General; Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.; Mike Routhier and Mike Gieryic, Attorneys, Office of the Solicitor, United States Department of the Interior, Washington, D.C.; for Defendants-Appellees.

Jason T. Morgan (argued), Tiffany Wang, Luke A. Sanders, and Ryan P. Steen, Stoel Rives LLP, Seattle, Washington; Whitney A. Brown, Stoel Rives LLP, Anchorage, Alaska; Stacey M. Bosshardt, Perkins Coie LLP, Washington, D.C.; Eric B. Fjelstad and James N. Leik, Perkins Coie LLP,

Anchorage, Alaska; Melinda L. Meade Meyers, Jonathan D. Simon, and Tyson C. Kade, Van Ness Feldman LLP, Washington, D.C.; Charlene Koski, Van Ness Feldman LLP, Seattle, Washington; Patrick Munson (argued), Charles A. Cacciola, and Kody George, Chandler Falconer Munson & Cacciola LLP, Anchorage, Alaska; Mary H. Gramling, Chief Assistant Attorney General; Treg Taylor, Attorney General; State of Alaska, Department of Law, Juneau, Alaska; for Intervenor-Defendants-Appellees.

Max Sarinsky and Donald L. R. Goodson, Institute for Policy Integrity, New York University School of Law, New York, New York; for Amicus Curiae Institute for Policy Integrity at New York University School of Law.

Andrew L. Welle, Our Children's Trust, Eugene, Oregon, for Amicus Curiae Our Children's Trust.

Jonathan W. Katchen and William R. Crowther, Holland & Hart LLP, Anchorage, Alaska; for Amici Curiae Alaska Congressional Delegation and Alaska State Legislature.

Alison Borochoff-Porte and George Krebs, Pollock Cohen LLP, New York, New York, for Amici Curiae Members of Congress.

Sarah K. McMillan and Melissa A. Hornbein, Western Environmental Law Center, Helena, Montana; Andrew M. Hawley, Western Environmental Law Center, Seattle, Washington; for Amicus Curiae Naqsragmiut Tribal Council.

Michael Burger and Jessica Wentz, Sabin Center for Climate Change Law, Columbia Law School, New York, New York, for Amicus Curiae Sabin Center for Climate Change Law.

**OPINION**

R. NELSON, Circuit Judge:

The Willow Project is an oil and gas venture in America's northern Arctic. The Bureau of Land Management approved the Project in 2023, allowing ConocoPhillips Alaska, Inc. to construct infrastructure to produce and transport oil and gas from its leases in Alaska's National Petroleum Reserve. Several environmental groups sued. The district court granted summary judgment and dismissed their claims under the National Environmental Policy Act, the Naval Petroleum Reserves Production Act, the Alaska National Interest Lands Conservation Act, and the Endangered Species Act. We affirm in part, reverse in part, and remand without vacatur.

I

A

In the 1920s, the federal government established a Naval Petroleum Reserve on Alaska's North Slope to ensure a continuing oil supply for national defense. *See N. Alaska Env't Ctr. v. Kempthorne*, 457 F.3d 969, 973–74 (9th Cir. 2006). Fifty years later, in the Naval Petroleum Reserves Production Act (Reserves Act), Congress transferred jurisdiction to the Secretary of the Interior and redesignated the Reserve as the National Petroleum Reserve-Alaska (NPR-A).[1] Pub. L. No. 94-258, §§ 102–03, 90 Stat. 303, 303 (1976) (codified at 42 U.S.C. §§ 6502–03).

---

[1] Please excuse our reliance on acronyms. Because "environmental litigation is awash in such alphabetical shorthand," we include a brief

CTR. FOR BIOLOGICAL DIVERSITY V. BUREAU OF LAND MGMT.   11

At first, private oil development was prohibited in the NPR-A.  That changed in 1980 when Congress, motivated by the oil crisis, amended the Reserves Act to instruct the Secretary to begin an "expeditious program of competitive leasing of oil and gas in the Reserve."  *See* Pub. L. No. 96-514, 94 Stat. 2957, 2964 (1980) (codified as amended at 42 U.S.C. § 6506a(a)).   While expanding development opportunities for private energy companies, Congress retained certain environmental protections.  First, activities authorized under the Reserves Act "shall include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the NPR-A.  42 U.S.C. § 6506a(b).  Second, "[a]ny exploration" of designated areas—those "containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value"—must be conducted in a way that "will assure the maximum protection of such surface values . . . ." *Id.* § 6504(a).  Under the Reserves Act, the federal government cannot greenlight private development without considering "the subsistence interests of Native American tribes in the area and the need to protect the environment."  *Kempthorne*, 457 F.3d at 973.

The task of balancing these directives falls to the Bureau of Land Management (BLM).  *See N. Alaska Env't Ctr. v. U.S. Dep't of the Interior*, 983 F.3d 1077, 1081 (9th Cir. 2020) ("The [Reserves Act] directs BLM to lease Reserve land to private entities for oil and gas development, while taking such measures as BLM deems necessary or appropriate to mitigate adverse environmental impacts."

---

glossary at the end.  *Ariz. ex rel. Darwin v. EPA*, 815 F.3d 519, 525 n.3 (9th Cir. 2016) (cleaned up).

(citing 42 U.S.C. § 6506a)).  In the late 1990s, BLM began issuing leases in the NPR-A to ConocoPhillips Alaska, Inc., an Anchorage-based oil and gas producer.  After lengthy exploration drilling, ConocoPhillips announced in 2017 that it had discovered oil and gas prospects in the Bear Tooth Unit of the NPR-A, sparking what is now known as the Willow Project.

B

BLM first approved the Willow Project in 2020.  *See Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* (*SILA I*), 555 F. Supp. 3d 739, 752–53 (D. Alaska 2021).  The district court vacated the approval, holding that BLM violated the National Environmental Policy Act (NEPA) by declining to consider reasonable project alternatives in its Environmental Impact Statement (EIS) based on the assumption that ConocoPhillips had the right to "extract all possible oil and gas from its leases."  *Id.* at 805. Because the Reserves Act requires BLM to mitigate adverse impacts on surface resources in the NPR-A, the district court disagreed with the agency that ConocoPhillips' leases gave the company the "unfettered right" to extract all oil and gas within the leased areas.  *Id.* at 768–69, 770.  The district court also concluded that the 2020 EIS violated NEPA because it did not analyze the effects of Willow's downstream foreign greenhouse gas emissions.  *Id.* at 762– 67, 805.  So the district court vacated the approval, remanded, and instructed BLM to "reassess its alternatives analysis" with the court's decision in mind.  *Id.* at 770, 805.

C

Following remand, BLM prepared a Supplemental Environmental Impact Statement (SEIS) to correct the deficiencies identified in the district court's order.  To

understand what happened next, a bit of background is useful. Under NEPA, federal agencies must "prepare a detailed EIS for all 'major Federal actions significantly affecting the quality of the human environment.'" *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (quoting 42 U.S.C. § 4332(2)(C)). The EIS "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir. 2010) (quoting *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004)). An EIS must "study, develop, and describe appropriate alternatives" to the proposed agency action, 42 U.S.C. § 4332(2)(H), thus informing policymakers and the public of options "that would avoid or minimize adverse effects" on the environment, 40 C.F.R. § 1502.1(b). This alternatives analysis is the "heart" of the EIS. 40 C.F.R. § 1502.14.

The Project's SEIS analyzed two kinds of alternatives: alternative components and action alternatives. The former are best understood as initial proposals—generated by BLM, cooperating agencies, and in some cases, the public—that describe different project design features, configurations, and timelines. BLM then applied screening criteria to whittle down the alternative components into a group of four action alternatives. The action alternatives—not the alternative components—received full analysis in the SEIS.

BLM's criteria for selecting the action alternatives is a key issue in this case. In selecting from the alternative components, BLM insisted that it could only adopt a development proposal that would "fully develop" the oil field. According to the SEIS, full field development is

development that would "not strand such a large quantity of oil and gas that, standing alone, is economic to develop." This full field development standard, BLM explained, is "routinely applied" across similar projects, and is the agency's "interpretation" of the regulations and the district court's order vacating BLM's initial approval of the Project. So, in BLM's eyes, if an alternative component did not meet the full field development standard, it was required to strike that component from further consideration.

With full field development in mind, BLM declined to advance several alternative components that would have minimized adverse environmental effects in the NPR-A, including in the special areas that the Reserves Act singles out for additional protection. *See* 42 U.S.C. § 6504(a) (requiring the Secretary to assure "maximum protection" of "significant" surface values in certain parts of the NPR-A). For example, alternative number 43 would have eliminated two surface-disturbing drill sites. And alternative number 44 would have kept all infrastructure out of the Teshekpuk Lake Special Area (TLSA)—a critical habitat for local caribou herds and migratory birds. But BLM explained that, because these components "would strand an economically viable quantity of recoverable oil," they did not "fully develop" the oil field, and were thus "eliminated from further analysis."

After excluding the alternative components that did not permit full field development, BLM was left with four action alternatives and a no-action alternative for baseline comparison. The SEIS summarized the environmental consequences of adopting each alternative. For example, BLM quantified the downstream greenhouse gas emissions resulting from projected changes in domestic and foreign oil consumption for each alternative. *Cf. SILA I*, 555

F. Supp. 3d at 762–67 (faulting BLM for not analyzing the effects of Willow's downstream emissions in its 2020 approval). And it predicted the climate effects and "social cost of greenhouse gases" for each option analyzed in the SEIS. In the end, the agency identified the fourth option—Alternative E—as its "preferred alternative." By eliminating certain drill sites and deferring approval of another, that option would cut the "amount of surface infrastructure," particularly in the TLSA.

As it was preparing the SEIS, BLM also initiated consultation with the U.S. Fish and Wildlife Service (FWS) and the National Marine Fisheries Service (NMFS) under § 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536. "Section 7 requires federal agencies to ensure that none of their activities . . . will jeopardize the continued existence of listed species or adversely modify a species' critical habitat." *Karuk Tribe v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc). BLM's § 7 consultation focused on the Project's potential effects on two listed species: the polar bear and ice seal. In early 2023, FWS issued a Biological Opinion (BiOp) concluding that Willow was unlikely to jeopardize the continued existence of the polar bear or adversely modify its critical habitat. And NMFS similarly issued a Letter of Concurrence noting that Willow was unlikely to adversely affect the ice seal.

Soon after, BLM issued its final Record of Decision (ROD) reapproving the Project. But rather than adopt its "preferred alternative," BLM approved a modified version of Alternative E that was not analyzed in the SEIS. Unlike Alternative E, which deferred approval of a fourth drill site and disapproved of a fifth, the alternative advanced in the ROD disapproved the fourth and fifth drill sites altogether. BLM explained that rejecting both the fourth and fifth drill

sites reduced construction time and associated environmental impacts.  In its words, "[t]his decision strikes a balance," and allows for "development to occur . . . consistent with the terms of existing leases" while also "requiring the implementation of robust protections for surface resources, as well as measures to limit greenhouse gas emissions and thereby reduce climate impacts."

By disapproving another drill pad, modified Alternative E barred development on several of ConocoPhillips' leases. BLM never explained whether this constituted full field development or not.

D

The Center for Biological Diversity (CBD) and Sovereign Iñupiat for a Living Arctic (SILA) sued.**[2]** *See Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.* (*SILA II*), 701 F. Supp. 3d 862 (D. Alaska 2023). They alleged that BLM, FWS, NMFS, and several other defendants violated federal law in approving the Project despite its purported danger to the environment, endangered species, and the subsistence needs of rural Alaskans. Although CBD and SILA (collectively, Plaintiffs) filed separate suits, the district court consolidated the cases, and we have done the same.**[3]**

---

[2] Plaintiffs include several other member-based environmental organizations.  We refer to the lead plaintiffs—CBD and SILA—as shorthand for all the plaintiff organizations and their respective members.

[3] The district court permitted ConocoPhillips, Arctic Slope Regional Corporation, North Slope Borough, Kuukpik Corporation, and the State of Alaska to intervene as defendants in both cases.

Plaintiffs moved for summary judgment, arguing that BLM again approved Willow without considering a reasonable range of alternatives under NEPA, its mandate to protect surface resources under the Reserves Act, and its obligation to reduce impacts to subsistence users under § 810 of the Alaska National Interest Lands Conservation Act (ANILCA). Plaintiffs also argued that BLM violated § 7 of the ESA by not consulting with FWS and NMFS on how Willow's carbon emissions might affect protected species and their critical habitat.

The district court denied Plaintiffs' motions for summary judgment and dismissed their claims. *Id.* at 924. It found that BLM had rectified the errors identified in its 2021 order, including any impermissible narrowing of NEPA alternatives based on a misunderstanding of the agency's authority. *Id.* at 875–86. For similar reasons, the district court concluded that BLM's alternatives analysis satisfied the Reserves Act and ANILCA. *Id.* at 891, 893–95. Turning to the ESA claims, the district court held that while Plaintiffs had Article III standing, *id.* at 901–05, they had not shown that Defendants violated § 7 by not addressing how Willow's greenhouse gas emissions could affect polar bears or ice seals, *id.* at 915–24.[4] This appeal followed.

_____

[4] Before the district court, CBD made two related ESA arguments—an "incidental take" claim and the greenhouse gas emissions claim that it pursues on appeal. The district court reasoned that CBD had standing to challenge FWS's BiOp under the "incidental take" claim and—on the merits—concluded that no "incidental take" would result to polar bears from the general construction and operation of the Willow Project. *SILA II*, 701 F. Supp. 3d at 901–05, 906–15. CBD has forfeited its ESA "incidental take" claim by failing to raise it on appeal.

II

We have jurisdiction under 28 U.S.C. § 1291. Plaintiffs' claims are reviewed under the Administrative Procedure Act (APA), which authorizes courts to "hold unlawful and set aside agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Fejes v. Fed. Aviation Admin.*, 98 F.4th 1156, 1159 (9th Cir. 2024) (quoting 5 U.S.C. § 706(2)(A)). We review de novo the district court's summary judgment ruling, *Karuk Tribe*, 681 F.3d at 1017, and review the agency's factual conclusions for substantial evidence, *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 869 (9th Cir. 2020).

III

We address the four claims on appeal that largely, not entirely, track Plaintiffs' case to the district court. First, Plaintiffs press similar NEPA claims, although CBD makes another argument about Willow's downstream carbon emissions. Second, Plaintiffs both assert, though on different grounds, that BLM violated the Reserves Act. Third, SILA argues that BLM violated ANILCA by disregarding more protective alternatives and failing to reduce impacts on subsistence uses by rural Alaskans. And finally, CBD brings a modified version of its ESA § 7 claim that focuses solely on the effects of Willow's greenhouse gas emissions on listed species and their critical habitat.

A

We begin with Plaintiffs' NEPA claims. NEPA has "twin aims." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)). It first requires that a federal agency "consider every significant

aspect of the environmental impact of a proposed action." *Id.* (quotation omitted). It then ensures that the agency will "inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Id.* (quotation omitted). "NEPA does not mandate particular results"—it is a purely procedural statute that requires the federal government to "take a hard look at the environmental consequences" before acting. *Kempthorne*, 457 F.3d at 975 (quoting *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999)). An "agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Seven County Infrastructure Coal. v. Eagle County*, No. 23-975, slip op. at 6 (U.S. May 29, 2025) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).

Again, NEPA mandates preparation of an EIS when a "major" federal action would "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA further requires agencies to use the EIS to analyze a reasonable range of alternatives to the proposed action. *Id.* § 4332(2)(C)(iii), (F), (H); *see also* 43 C.F.R. § 46.415(b). The alternatives analysis "requires disclosure of the environmental impacts of the proposed action and its alternatives, including their direct, indirect, and cumulative effects." *Audubon Soc'y of Portland v. Haaland*, 40 F.4th 967, 980 (9th Cir. 2022). "But 'for alternatives which were eliminated from detailed study,' an agency need only 'briefly discuss the reasons for their having been eliminated.'" *Id.* (quoting 40 C.F.R. § 1502.14(a)). In the end, the "touchstone" of our review "is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Id.* at 982 (quoting *Westlands Water Dist. v. U.S. Dep't of Interior*,

376 F.3d 853, 868 (9th Cir. 2004)). And as the Supreme Court put it: our review of an agency's alternatives analysis "must be at its 'most deferential.'" *Eagle County*, slip op. at 11 (quoting *Balt. Gas & Elec. Co.*, 462 U.S. at 103).

1

Both Plaintiffs argue that BLM's alternatives analysis for the Project violated NEPA because BLM used the full field development standard to select which alternative components would be advanced for further analysis in the SEIS. We disagree.

Plaintiffs also argue that BLM's alternatives analysis required full field development to select from the alternative components, but the agency then chose an alternative that did not comply with full field development. The problem for BLM is that it never explained in the ROD how its chosen alternative complied with full field development. Before this court (but not before the district court) BLM concedes that the final approval did not comply with full field development. In its words, "BLM 'evaluate[d] the impacts of full field development,' but then approved a scaled-back Project that does not allow ConocoPhillips to extract all economically viable oil from several of its leases." Stated another way, BLM took one position throughout the SEIS process—that it needed to screen out alternative components that stranded an economically viable quantity of oil. And then when it came time to issue the final approval, it never explained whether its adopted alternative satisfied the full field development standard.

Based on the agency's argument before this court, which is not contained in BLM's explanation in the ROD, BLM changed its position on the necessity of full field development. If BLM is correct in its litigating position

before us, then the agency changed its standard after the alternatives analysis. "[A]n agency changing its course must supply a reasoned analysis." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 57 (1983) (quoting *Greater Bos. Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)). The record lacks explanation whether or why BLM may have backed away from the full field development standard at the ROD stage. BLM likely offered an adequate rationale for applying the full field development standard to choose action alternatives. But it failed to discuss whether its adopted alternative either satisfied the full field development standard or to explain why it departed from that standard without providing a "reasoned explanation" for its change of heart. *See, e.g.*, *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966–67 (9th Cir. 2015) (en banc). Because BLM did not provide the explanation that NEPA requires, its 2023 approval of the Project was arbitrary or capricious under the APA.

a

First, the legal standard. An agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action. *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1100 (9th Cir. 2010) (alteration in original) (quoting 40 C.F.R. § 1502.14(a) (2019)). [5] Because the stated purpose and need of a proposed agency

---

[5] BLM initiated its NEPA process before the effective dates of the 2020 and 2022 amendments to the NEPA regulations, so BLM applied the regulations in effect before the amendments, codified at 40 C.F.R. § 1500.1 *et seq.* (2019). *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020); National Environmental Policy Act Implementing Regulations Revisions, 87 Fed. Reg. 23,453 (Apr. 20, 2022).

action dictates the range of alternatives that an agency must consider under NEPA, we "begin[] by determining whether or not the [EIS's] Purpose and Need Statement was reasonable." *Audubon*, 40 F.4th at 981 (first alteration in original) (quoting *Westlands*, 376 F.3d at 865). If it is, we then employ a "rule of reason" analysis to determine whether the agency considered an adequate range of alternatives to the proposed action. *Westlands*, 376 F.3d at 868 (citing *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997)).

But an agency "need not consider an infinite range of alternatives, only reasonable or feasible ones." *Id.* (quotation omitted). Nor does NEPA require a discussion of "[a]lternatives that are unlikely to be implemented" or that are "inconsistent with the [agency's] basic policy objectives." *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1993) (quotation omitted). This inquiry is "'essentially the same' as an abuse of discretion analysis." *Audubon*, 40 F.4th at 980 (quoting *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 734 (9th Cir. 2020)). "Thus, an 'agency will have acted arbitrarily and capriciously only when the record plainly demonstrates that [the agency] made a clear error in judgment in concluding that a project meets the requirements of NEPA.'" *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1052 (9th Cir. 2012)). Simply put, our "only role" is "to confirm" that the agency has addressed feasible alternatives to the proposed project. *Eagle County*, slip op. at 9 (quotation omitted).

b

Next, the record. BLM maintained throughout the evaluation process that it must limit its analysis to alternatives that would "fully develop" the oil field, meaning those that would not "strand" an economically viable quantity of oil. BLM acknowledged that its full field development standard "is not defined in regulation or case law." And Willow's SEIS does not explain how BLM came up with the economic viability constraint. But the agency did provide three explanations for the full field development standard at other places in the record.

First, and most often, BLM cited the Reserves Act's implementing regulations. Title 43 C.F.R. § 3137.71 is one of several regulations imposing development requirements on NPR-A lessees. Section 3137.71(b) instructs lessees to "submit to BLM a plan . . . [that] must describe the activities to fully develop the oil and gas field." According to BLM, the full field development standard "derives directly from" this language.

Second, BLM suggested that full field development was necessary to satisfy the Project's stated purpose and need. Appendix D.1 to the final SEIS discussed the alternative components that BLM considered but then eliminated from further analysis. Several components—including those that would eliminate surface-disturbing drill sites (alternative number 43) and keep infrastructure out of the TLSA (alternative number 44)—were eliminated because they "would not meet the Project's purpose and need and would strand an economically viable quantity of recoverable oil."

Third, BLM adopted the full field development standard because it "[did] not want an alternative that would [lead to] piecemeal development" in the NPR-A. BLM elaborated on

this rationale during the notice and comment process. "The purpose of a master development plan," the agency explained, "is to evaluate the impacts of full field development to ensure that the [NEPA] analyses are not segmented." "Segmentation is an attempt to circumvent NEPA by breaking up one project into smaller projects and not studying the overall impacts of the single overall project." *Coal. on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 311 (2d Cir. 2009) (quotation omitted). To avoid segmentation, BLM concluded that it must limit its analysis to alternatives that would fully develop the oil field. Otherwise, the agency "would expect to receive a future permit application to develop" stranded quantities of economically viable oil, likely requiring additional NEPA review. So in line with its anti-segmentation rationale, BLM "screen[ed] out" alternative components that did not meet the full field development standard.

c

Finally, our analysis. We first ask whether Willow's purpose and need statement was "reasonable." *Audubon*, 40 F.4th at 981 (quoting *Westlands*, 376 F.3d at 865). In vacating BLM's 2020 approval of the Project, the district court held that the agency's EIS statement of purpose conflicted with the Reserves Act's requirement that BLM "mitigate adverse effects on the surface resources" of the NPR-A. *SILA I*, 555 F. Supp. 3d at 768–69; *see* 42 U.S.C. § 6506a(b). The revised purpose and need statement in the SEIS is "to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources in the Willow reservoir located in the Bear Tooth Unit (BTU), while providing maximum protection to significant surface resources within the NPR-A, consistent with BLM's statutory directives." Willow's purpose and

need statement is now consistent with the Reserves Act, and Plaintiffs do not argue otherwise. *See* 42 U.S.C. §§ 6506a(a), 6506a(b), 6504(a).

The next question is whether BLM considered reasonable alternatives given the Project's purposes and needs. *Westlands*, 376 F.3d at 868. Plaintiffs maintain that BLM, by screening out proposals that did not meet the full field development standard, violated NEPA's requirement to "[r]igorously explore and objectively evaluate reasonable alternatives to the proposed action." 40 C.F.R. § 1502.14(a). In their view, the full field development standard is arbitrary for at least two reasons. First, to the extent that BLM offered explanations for using this standard, its reasoning falls short. Second, BLM ultimately approved a plan that did not allow ConocoPhillips to fully develop the oil field. Plaintiffs are right in some respects and wrong in others.

Let's start with the agency's reliance on the Reserves Act's implementing regulations. We agree with Plaintiffs that 43 C.F.R. § 3137.71(b)(1) does not require BLM to screen alternative components in line with the full field development standard. The regulation mandates that ConocoPhillips propose a plan that fully develops the oil field. *See* 43 C.F.R. § 3137.71(b)(1) ("If you have drilled a well that meets the productivity criteria, your plan must describe the activities to fully develop the oil and gas field."). But the regulation does not speak to ConocoPhillips's lease rights or otherwise compel BLM to only analyze and adopt alternatives that permit full field development. And the agency never elaborated on how the full field development standard "derives directly" from the regulation, despite the regulation's sole focus on development requirements for NPR-A lessees. Thus,

BLM's screening criterion is not supported by § 3137.71(b)(1).

BLM's reliance on Willow's purpose and need also falls flat. The purpose and need in the SEIS was "to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources in the Willow reservoir . . . while providing maximum surface protection to significant surface resources within the NPR-A, consistent with BLM's statutory directives." It is unclear how full field development is necessary to meet these goals. To illustrate, consider an alternative that reduces the number of drill pads or locates infrastructure outside of sensitive areas in the NPR-A. That alternative could presumably allow for oil and gas development (the first purpose) while providing maximum protection to resources in the NPR-A (the second purpose) consistent with BLM's statutory mandates. Such an alternative would still satisfy the Project's purpose and need, even if it does not fully develop the oil field. *See Earth Island Inst. v. U.S. Forest Serv.*, 87 F.4th 1054, 1065 (9th Cir. 2023) ("An alternative is reasonable if it . . . advances the project's purpose and need . . . .").

BLM did not grapple with this inconsistency—it simply concluded without explanation that it eliminated the challenged alternatives because they "would not meet the Project's purpose and need and would strand an economically viable quantity of oil." So that justification— and that justification alone—is what we review.

BLM's explanation is not otherwise obvious. Construction of infrastructure to allow production and transportation to market is required for any degree of oil and gas development, not just full field development. Nothing

in Willow's purpose and need statement barred BLM from adopting an alternative that would strand an economically viable quantity of oil.  Therefore, unlike the district court, *see SILA II*, 701 F. Supp. 3d at 883, we conclude that this statement cannot serve as the basis for the agency's full field development standard.

All that said, BLM's third explanation—the anti-segmentation rationale—supports its reliance on the full field development standard.  As the district court explained, adopting a partial development alternative "would invite challenges that BLM was improperly segmenting the project and failing to consider the impacts associated with drill sites that were likely to be constructed and were sufficiently connected to the Willow project to require consideration in a single EIS."  *SILA II*, 701 F. Supp. 3d at 881–82 (internal quotation marks omitted).  It is reasonable to think that a piecemeal development approach "fails to address the true scope and impact" of ConocoPhillips's activities in the NPR-A.  *See Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014); *see also Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 897 (9th Cir. 2002) ("NEPA . . . requires the assessment of the cumulative impact of 'individually minor but collectively significant actions taking place over a period of time.'" (quoting 40 C.F.R. § 1508.7)).  In public comments on the draft SEIS, Plaintiffs insisted that while BLM should consider an alternative that permits less than full field development, it must also "be clear about the true scope of Willow and should not allow Conoco to piecemeal its proposal."  So Plaintiffs appear to agree that drawbacks exist to not considering the environmental effects of the full scope of development that could arise under a given lease in a single EIS, instead leaving BLM to conduct supplementary (i.e.,

segmented) review for additional permit requests down the line.

What makes sense to Plaintiffs is lost on the dissent. In the dissent's view, by approving BLM's reliance on anti-segmentation as a basis for the full field development standard, we are "overstep[ping]" our authority by "supplying a rationale that the agency did not explain." Dissent at 81. Far from it. BLM explained that a master development plan measures "the impacts of full field development to ensure that the [NEPA] analyses are not segmented." Because if BLM adopted an "alternative concept [that] strands an economically viable quantity of oil," it "would expect to receive a future permit application to develop it." "Such an alternative concept," the agency explained, "does not disclose and analyze the impacts of full field development and is a false comparison to other action alternatives." These are BLM's words, not ours.

In the end, the "bedrock principle of judicial review in NEPA cases can be stated in a word: Deference." *Eagle County*, slip op. at 15. Accordingly, the rule of reason guides our review of BLM's choice of alternatives. *Am. Rivers v. FERC*, 201 F.3d 1186, 1200 (9th Cir. 1999) (citing *Carmel*, 123 F.3d at 1155). This deferential standard gives BLM significant discretion to choose parameters that narrow its alternatives analysis.[6] Indeed, we have held repeatedly that NEPA analysis under the rule of reason is functionally identical to abuse of discretion review. *E.g.*, *City of Los*

---

[6] The alternatives analysis must include a no-action alternative. 40 C.F.R. § 1502.14(c); *see* 42 U.S.C. § 4332(2)(C)(iii). That BLM analyzed a no-action alternative consistent with the regulations does not cast doubt on its reasons for using the full field development standard to avoid segmented NEPA review. *See* Dissent at 80–81.

*Angeles v. Fed. Aviation Admin.*, 63 F.4th 835, 842 (9th Cir. 2023); *see also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 n.23 (1989) (noting that the difference between the Ninth Circuit's "reasonableness" standard and an arbitrary-or-capricious or abuse of discretion standard is "not of great pragmatic consequence").

We do not fault an agency for excluding alternatives that "are infeasible, ineffective, or inconsistent with . . . basic policy objectives." *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180 (9th Cir. 1990). So while the dissent may disagree with BLM's policy choice, that is not enough to conclude that the agency's use of the full field development standard to select alternatives falls outside a "broad zone of reasonableness." *Eagle County*, slip op. at 12. Given the legitimate concerns associated with segmentation, we cannot say that BLM abused its discretion in using the full field development standard to avoid the risks of piecemeal development in the NPR-A.

But our review does not stop there. Because we assess BLM's NEPA compliance under the APA, we must ensure that BLM obeyed general principles of administrative law that apply to all final agency action. *See, e.g.*, *Ctr. for Biological Diversity*, 982 F.3d at 733. And on this point, BLM's approval of the Project falls short. BLM endorsed a revised alternative (modified Alternative E) that it suggests was "within the scope" of the four action alternatives. Oral Arg. at 27:05–23. And those alternatives, according to the agency, had to facilitate full field development. Yet BLM concedes in litigation that it "approved a scaled-back Project that does not allow ConocoPhillips to extract all economically viable oil from several of its leases." To put a finer point on it, although not explained in the ROD, BLM

now asserts that its chosen alternative did not fully comply with the full field development standard.

Taking BLM's statements at face value, its views may have shifted. Certainly, the APA allows for an agency's views to shift over time. *See Solar Energy Indus. Ass'n v. FERC*, 80 F.4th 956, 979 (9th Cir. 2023) ("The APA does not require regulatory agencies to establish rules of conduct to last forever, and agencies may adapt their rules and policies to the demands of changing circumstances." (cleaned up)). But when an agency changes course, it must provide a "reasoned analysis" for that decision. *State Farm*, 463 U.S. at 57; *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514–16 (2009).

BLM did not explain whether or how its final alternative complied with full field development or whether full field development was required at the ROD stage. To be sure, "[w]hen an agency changes its existing position, it 'need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *Fox*, 556 U.S. at 515). But it has to say *something*. *See id.* ("[T]he agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" (quoting *Fox*, 556 U.S. at 515)). And we are left to wonder why BLM may have approved an alternative that stranded economically viable quantities of oil, even though it screened out alternative components during the SEIS process—including some that better protected surface resources in the NPR-A—because they did not allow for full field development.

BLM framed its environmental review based on the full field development standard and had a rational explanation

for doing so.  But that does not permit BLM to potentially deviate from the standard without explanation.  Because our APA review requires more, we conclude that BLM's 2023 approval of the Project was arbitrary or capricious.

2

CBD separately argues that BLM violated NEPA by failing to present estimates of potential downstream emissions from reasonably foreseeable future oil development caused by the Project.  The SEIS discusses potential "development opportunities to the south and west of the Project area" and notes that infrastructure from the Project may make exploration and development of those areas easier and less expensive.  CBD argues that although BLM accounted for these potential downstream emissions as cumulative impacts, it did not separately present these emissions as indirect effects of potential future activity, particularly in the West Willow area of the NPR-A.

"NEPA requires agencies to evaluate the direct and indirect effects of the proposed action."  *Ctr. for Biological Diversity*, 982 F.3d at 737 (citing 40 C.F.R. § 1502.16).  The "direct effects occur 'at the same time and place' as the proposed project, while indirect effects occur 'later in time or [are] farther removed in distance.'"  *Id.* (alteration in original) (quoting 40 C.F.R. § 1508.8(a), (b)).  But the agency only needs to consider "reasonably foreseeable" indirect effects or ones that "a person of ordinary prudence would take . . . into account in reaching a decision."  *Id.* (quoting 40 C.F.R. § 1508.8(b); *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016)).  Growth-inducing effects may need to be considered, but only if they are "reasonably foreseeable."  *See id.* (quoting 40 C.F.R. § 1508.8(b)).

Willow's SEIS estimated cumulative greenhouse gas emissions from the Project, including the emissions from potential West Willow discovery.  It acknowledged that "there is no certainty as to whether, how, or when this discovery [in West Willow] could be developed."  But BLM still estimated that those discovery wells have a resource potential of around 75 million barrels, and it provided projections of the greenhouse gas emissions that would result if this oil were developed cumulatively along with the other emissions from the Willow Project.

The SEIS also tiered to (i.e., incorporated by reference) Integrated Activity Plans and EISs from 2012 and 2020 to develop its cumulative emissions estimates.  *Cf. Kern*, 284 F.3d at 1073 ("Tiering, or avoiding detailed discussion by referring to another document containing the required discussion, is expressly permitted by federal regulation . . . ." (citing 40 C.F.R. § 1502.20)).  Those documents include estimates of greenhouse gas emissions from theoretical development scenarios in the Willow area.  The SEIS used the higher end of the projected emissions from these documents to conservatively account for all projected emissions.

CBD counters that tiering to past documents is misleading because those statements "aggregate[d] impacts from many potential projects," thus "hid[ing] the effects induced by Willow itself."  It argues that BLM should have specifically highlighted Willow's potential downstream emissions because it is "essential for the public and the decisionmaker to understand" the Project's effects.  But CBD cites no authority requiring BLM to separately present estimates of the potential downstream emissions from reasonably foreseeable oil development in the West Willow area.  CBD argues that because NEPA's implementing

regulations split the requirement that an agency consider indirect effects and cumulative impacts into two subsections, BLM is therefore required to consider indirect and cumulative effects separately. *See* 40 C.F.R. §§ 1508.7, 1508.8(b) (2019).    But nothing in the text of those regulations prohibits BLM from considering indirect effects and cumulative impacts together.    The text only requires BLM to consider both, which it did.

Nor does CBD explain how separating out this analysis would further NEPA's "twin aims" to consider "every significant aspect of the environmental impact of a proposed action" and to ensure the public has the information needed for informed decisionmaking.[7] *Balt. Gas & Elec. Co.*, 462 U.S. at 97 (quotation omitted).    It is inconceivable that the public and policymakers would find it informative to separate out this single piece of information from a 441-page SEIS with over 20 supporting documents. *See* Bureau of Land Mgmt., BLM National NEPA Register (2023), https://perma.cc/WN8D-DNDF.

In sum, by estimating the greenhouse gas emissions from potential future development in the cumulative effects section of the SEIS, BLM considered the indirect effects and the cumulative impacts.    NEPA and its implementing regulations require no more.[8]    Thus, BLM's assessment of

---

[7] There is every reason to think that analyzing Willow's downstream greenhouse gas emissions in the cumulative effects section facilitated informed decisionmaking.    According to the U.S. Environmental Protection Agency, the SEIS contained "the most transparent analysis [it] has seen" regarding greenhouse gas emissions and their social cost.

[8] Nor was BLM required to evaluate possible environmental effects from potential future or geographically separate projects that may be built or expanded as a result of the Willow Project. *Eagle County*, slip op. at 16.

the downstream emissions from the future oil development caused by the Project complied with NEPA.

## B

We now turn to Plaintiffs' claims under the Reserves Act. Both CBD and SILA assert that BLM violated this Act by approving the Project, but on different grounds. SILA's argument is closely related to its NEPA challenge; it claims that by applying the full field development standard to screen alternative components, BLM unlawfully rejected alternatives that would have reduced effects on significant surface values in the NPR-A, including in designated special areas like the TLSA. *See* 42 U.S.C. §§ 6504(a), 6506a(b). CBD, for its part, argues that Willow will cause downstream greenhouse gas emissions detrimental to surface resources, and that BLM did not explain how the Project's mitigation measures comport with the Reserves Act given this potential harm. Both arguments fail.

Recall that the Reserves Act gives BLM several relevant directives. First, BLM must undertake "an expeditious program of competitive leasing of oil and gas" in the NPR-A. *Id.* § 6506a(a). Second, "[a]ny exploration" within certain special areas must "be conducted in a manner which will assure the maximum protection" of "significant subsistence, recreational, fish and wildlife, or historical or scenic value[s]" to "the extent consistent with the requirements of [the] Act." *Id.* § 6504(a). Third, the Secretary of the Interior must "provide for such conditions, restrictions, and prohibitions" as he "deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the Reserve. *Id.* § 6506a(b). This final authorization—the "mitigation mandate"—is discretionary. The Reserves Act

does not confer "discretion not to lease," but it does give the Secretary discretion "to develop restrictions necessary to mitigate adverse impact on the NPR–A." *Kunaknana v. Clark*, 742 F.2d 1145, 1149 (9th Cir. 1984) (citing 42 U.S.C. § 6508). So while we must confirm that BLM complied with the Reserves Act in approving the Project, when it comes to mitigation measures, we have less "power to specify what the action must be." *See Norton v. S. Utah Wilderness All*., 542 U.S. 55, 65 (2004). We therefore consider whether the mitigation measures imposed were arbitrary or capricious. *See* 5 U.S.C. § 706(2)(A).

1

SILA and the dissent maintain that BLM violated the Reserves Act by using the full field development standard to eliminate proposed alternatives that protect or minimize impacts to surface resources. *See* Dissent at 84–86. The argument goes like this: BLM declined to consider alternative components that would reduce surface impacts, including by eliminating all infrastructure in the TLSA, because those components would strand an economically viable quantity of oil. And the full field development standard violates the Reserves Act's clear requirement that "[a]ny exploration" "*shall* be conducted in a manner which will assure the *maximum protection*" of significant surface values in the TLSA. 42 U.S.C. § 6504(a) (emphasis added). That is, SILA contends that the Reserves Act's "oil and gas program does not override the statute's mandate that protections be implemented to avoid or reduce impacts to important resources and designated Special Areas, including after lease issuance."

While the Reserves Act requires BLM to evaluate surface impacts in the TLSA, it adds a caveat: activity in

designated special areas must maximally protect surface values, but only "to the extent consistent with the requirements of [the] Act for the exploration of the reserve." *Id.*   And one of those requirements is the Secretary's mitigation mandate.  *See Kunaknana*, 742 F.2d at 1149. Putting those provisions together, BLM had to ensure "maximum protection" of significant surface values in the TLSA, and one way it could do that "consistent with" the Reserves Act was by imposing "conditions, restrictions, and prohibitions" seen as "necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the NPR-A.   *See* 42 U.S.C. §§ 6504(a), 6506a(b).

Leaning on the term "maximum protection," the dissent argues that the Reserves Act signals "Congress's intent that agencies exercise the full extent of their authority, consistent with their other obligations, to safeguard sensitive areas" in the NPR-A.  Dissent at 85.  But the Reserves Act, like all statutes, does not "pursue[] a single policy at all costs." *Advoc. Christ Med. Ctr. v. Kennedy*, 145 S. Ct. 1262, 1274 (2025) (quotation omitted).  And the Reserves Act balances two objectives: oil and gas development and protection of surface resources.  *See* 42 U.S.C. §§ 6504(a), 6506a(a), (b). BLM can satisfy the Reserves Act's maximum-protection directive with mitigation measures that "the Secretary deems necessary or appropriate," *id.* § 6506a(b), even while using the full field development standard to eliminate some proposed alternatives that would better protect the TLSA.

That is what BLM did.  The SEIS and ROD contain specific elements designed to mitigate surface impacts, including in the TLSA.  For example, BLM will require ConocoPhillips to promote subsistence uses by designing boat ramps, pullouts, and bridges so they are safe for

community use.  ConocoPhillips will also be forced to minimize air traffic during calving season to reduce disturbances to local caribou herds.  And BLM will likewise develop plans to mitigate impacts on caribou by providing a buffer around Teshekpuk Lake and moving infrastructure from calving areas.

SILA does not challenge these mitigation measures, and they weaken SILA's argument that the full field development standard is out of step with the Reserves Act. BLM can analyze alternatives consistent with full development of the oil field, while also "condition[ing] permits for drilling on implementation of environmentally protective measures." *Kempthorne*, 457 F.3d at 976; *see also id.* (noting that the government "can deny a specific application altogether if a particularly sensitive area is sought to be developed and *mitigation measures are not available*" (emphasis added)).  Because nothing in the full field development standard precludes BLM from implementing protective conditions on exploration in the NPR-A, it does not itself violate the Reserves Act.

2

CBD's Reserves Act argument is distinct from SILA's. CBD does attack the adequacy of BLM's mitigation measures.  In its view, "BLM took modest steps to limit Willow's greenhouse gas emissions" but then "stopped short."  While the agency "elected to impose some mitigation measures to address Willow's direct emissions," it allegedly "rejected proposed measures to meaningfully limit the Project's *indirect*, or downstream, emissions—*i.e.*, emissions from the transport, processing, and combustion of oil it produces."  And CBD maintains that those emissions will cause "reasonably foreseeable and significantly

adverse" harm to the Reserve's surface values, such as its wetlands, water resources, and wildlife.  42 U.S.C. § 6506a(b).

CBD's argument stumbles from the get-go.  As explained, the Reserves Act grants broad discretion to the Secretary to determine the specifics of how to protect surface resources in the NPR-A.  *See Kunaknana*, 742 F.2d at 1149; *see also N. Alaska Env't Ctr.*, 983 F.3d at 1081 ("The [Reserves Act] directs BLM to lease Reserve land to private entities for oil and gas development, while taking such measures as BLM deems necessary or appropriate to mitigate adverse environmental impacts." (citing 42 U.S.C. § 6506a)).  Although the Act requires the agency to undertake some actions to mitigate the effect of greenhouse gas emissions on surface resources, we must accord deference to the agency's mitigation measures under § 6506a(b).  *Cf. Norton*, 542 U.S. at 65.  They may be set aside only to the extent that they are arbitrary.  *See* 5 U.S.C. § 706(2)(A).

In any event, BLM considered mitigation measures addressing downstream emissions before explaining why it chose to go in a different direction.  For example, BLM reviewed a mitigation measure identified in public comments that would require ConocoPhillips to offset 50% of Willow's projected net greenhouse gas emissions through reforestation.  The commenter explained that offsetting Willow's emissions in this way would help the United States comply with its commitments under the 2016 Paris Agreement.  In rejecting the measure, BLM explained that it "takes a narrow and prescriptive approach to what is a layered, extremely complex, and evolving policy and technical area guided by industry practice, government policy and regulation."  And "[r]equiring the offset of

downstream emissions (i.e., indirect emissions) from the Willow [P]roject," BLM continued, "would be redundant to the reduction / offset efforts of the end-users of Willow oil." As the district court noted, BLM's "well-reasoned explanation" for rejecting this measure was far from arbitrary. *SILA II*, 701 F. Supp. 3d at 893.

There are other examples too. The final SEIS lists several proposed mitigation measures dealing with the potential climate impacts of the Willow Project, such as limiting the Project's lifespan and requiring periodic NEPA reviews should ConocoPhillips recover larger amounts of oil than anticipated. BLM reasonably explained, consistent with its discretion under the Reserves Act, why it chose not to adopt these measures. *See id.* at 892–93. Thus, BLM did not act arbitrarily in selecting mitigation measures under the Reserves Act.

C

SILA and the dissent also argue that BLM violated ANILCA by overlooking alternatives that would reduce impacts to subsistence uses. *See* Dissent at 86–89. SILA asserts that BLM's ANILCA violation springs from its arbitrary conclusion that, under the Reserves Act, BLM must consider alternatives that provide for full field development. SILA argues that by limiting its consideration of alternatives based on this standard, BLM did not adequately consider alternatives that would "reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes" under § 810 of ANILCA. 16 U.S.C. § 3120(a). We affirm the district court's order that BLM complied with ANILCA in approving the Project.

First, some background. In ANILCA, Congress sought to balance two purposes, often thought conflicting: "to

'provide[] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska'" and "to provide[] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people." *Sturgeon v. Frost*, 587 U.S. 28, 36 (2019) (alterations in original) (quoting 16 U.S.C. § 3101(d)); *see City of Angoon v. Marsh*, 749 F.2d 1413, 1415–16 (9th Cir. 1984) (same).   In striking that balance, § 810 of ANILCA "does not prohibit all federal land use actions which would adversely affect subsistence resources." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987); *see Ninilchik Traditional Council v. United States*, 227 F.3d 1186, 1192 (9th Cir. 2000) ("Subsistence living, although at the heart of ANILCA, is not a per se preemptive statutory priority.").   Rather, the statute "sets forth a procedure through which such effects must be considered and provides that actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the adverse effects are minimized." *Amoco Prod. Co.*, 480 U.S. at 544.   It is this "procedural mechanism"—outlined in § 810—that "assure[s] the continuation of subsistence lifestyles" for North Slope residents. *Kunaknana*, 742 F.2d at 1150; *see* 16 U.S.C. § 3101(c) (stating that ANILCA allows "rural residents engaged in a subsistence way of life to continue to do so").

What does it mean to live a subsistence way of life?  We explained in *John v. United States* that the subsistence purpose in § 101 is informed by ANILCA's definition of "subsistence uses," which focuses on land-based resources. 720 F.3d 1214, 1218 (9th Cir. 2013).  "[S]ubsistence uses" include "the customary and traditional uses by rural Alaska residents of wild, renewable resources for *direct personal or*

*family consumption* as food, shelter, fuel, clothing, tools, or transportation."**[9]**  16 U.S.C. § 3113 (emphasis added).  Such uses are "accorded priority" over the taking of "fish and wildlife for other purposes," but not without exception.  *Id.* § 3114; *see Alaska v. Babbitt*, 72 F.3d 698, 708 n.5 (9th Cir. 1995) (Hall, J., dissenting).  ANILCA forbids "subsistence uses" that are wasteful.  16 U.S.C. § 3112(2).  It does not consider the commercial sale of fish a "subsistence use[]."  *Id.* § 3113(2)(B).  And it only supports a subsistence way of life "consistent with management of fish and wildlife in accordance with recognized scientific principles."  *Id.* § 3101(c).

ANILCA's protection of "subsistence uses" is achieved through § 810.  The § 810 analysis is two-fold.  *See Kunaknana*, 742 F.2d at 1150–51.  At step one, in deciding whether to use or take a proposed action on public lands, the agency must consider three factors: (1) "the effect of [the proposed action] on subsistence uses and needs"; (2) "the availability of other lands for the purposes sought to be achieved"; and (3) "other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."  16 U.S.C. § 3120(a).

If the agency determines that its proposed action "would significantly restrict subsistence uses," then it must proceed to step two, which imposes "notice and hearing procedures" meant to inform affected communities about the proposed agency action.  *Kunaknana*, 742 F.2d at 1151; *see* 16 U.S.C. § 3120(a)(1)–(2).  The agency also must make a set of specific findings at step two: (1) that the restriction is

---

[9] The definition of "subsistence uses" under Alaska law mirrors ANILCA's federal definition.  *See* Alaska Stat. § 16.05.940(34).

"necessary, consistent with sound [public lands] management," (2) that the "minimal amount of public lands necessary" will be used, and (3) that "reasonable steps will be taken to minimize the adverse impacts upon subsistence uses and resources."   16 U.S.C. § 3120(a)(3).   After complying with § 810's "procedural requirements" and "other applicable law," the agency "may manage or dispose of public lands . . . for any of those uses or purposes authorized by [ANILCA] or other law." *Id.* § 3120(d).

Echoing its NEPA and Reserves Act arguments, SILA asserts that BLM's use of the full field development standard undercuts the third factor of the step one evaluation— whether other alternatives "would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes." *Id.* § 3120(a).  In SILA's view, the full field development standard kept BLM from considering more protective alternatives, and thus the agency disregarded its obligations to consider alternatives that "reduce" the use of public lands necessary for subsistence use.  *Id.*  BLM's approach also allegedly renders arbitrary its related step two findings that Willow, as approved, included "the minimal amount of public lands necessary" and that "reasonable steps [were] taken to minimize adverse impacts upon subsistence uses and resources." *Id.* § 3120(a)(3)(B)– (C).

Consistent with our analysis of NEPA and the Reserves Act, we disagree that BLM's selection of alternatives for evaluation based on the full field development standard violated ANILCA.  For reasons already discussed, BLM's reliance on the full field development standard was not contrary to the Reserves Act or arbitrary or capricious.  Thus, the first building block of SILA's argument falls.

Moreover, BLM's obligation to consider "alternatives which would reduce or eliminate the use . . . of public lands needed for subsistence" is one of "three factors" informing its determinations at step one.    16 U.S.C. § 3120(a); *Kunaknana*, 742 F.2d at 1150.  This factor forces the agency to "compare the relative desirability" of its options. *Kunaknana*, 742 F.2d at 1151.  But while agencies are required to consider alternatives, nothing in the text of § 810 establishes that the existence of alternatives that could have a lesser impact on public lands needed for subsistence bars BLM from proceeding with a proposed action. **[10]**   The availability of alternatives is but one data point that the agency must consider in evaluating whether to proceed with a proposed action and in determining whether such action "would significantly restrict subsistence uses," thus triggering the step-two procedural requirements in § 810(a)(1) through (3). *See* 16 U.S.C. § 3120(a).  Provided BLM weighs the availability of alternatives, it can fill in "the particular details concerning when, where, and how leasing within the NPR-A shall occur." *Kunaknana*, 742 F.2d at 1151.

To the extent that SILA and the dissent suggest the mere existence of unconsidered alternatives that would reduce the use of public lands needed for subsistence purposes establishes a violation of ANILCA, we reject that premise. It glosses over the Supreme Court's recognition that ANILCA "does not prohibit all federal land use actions which would adversely affect subsistence resources"; it instead "sets forth a procedure through which such effects must be considered." *Amoco Prod. Co.*, 480 U.S. at 544; *see*

---

[10] The relevant alternatives are limited to "other tracts within the NPR-A which could be leased for oil and gas." *Kunaknana*, 742 F.2d at 1151.

*also John*, 720 F.3d at 1240 ("[A]NILCA simply recognizes subsistence uses as '*a* public interest' within a statutory 'framework for reconciliation, where possible, of competing public interests.'" (quoting *Amoco Prod. Co.*, 480 U.S. at 545–46)). At most, ANILCA "does little more than provide a broad outline of what uses must be preferred over others," leaving its "implementation to the Secretary of the Interior." *United States v. Alexander*, 938 F.2d 942, 945 (9th Cir. 1991); *see also id.* ("ANILCA . . . is a law without a bite."). So long as the agency considered alternatives and its selection of alternatives was not arbitrary or capricious, its step-one obligations are satisfied.

BLM has met that bar. Its SEIS and ROD contain a thorough § 810 analysis for each of the four action alternatives and the no-action alternative. For each alternative, BLM evaluated the effects on subsistence uses, the availability of other lands for accomplishing the same purposes, and other alternatives that would reduce or eliminate the use of public lands necessary for subsistence needs. BLM further recognized that each action alternative may alter caribou distribution and impact subsistence use, triggering step two. But it sought to minimize Willow's impacts by selecting an alternative that disapproved a drill site that was previously approved in the 2020 ROD. That disapproval removed one of the impediments to caribou movement and subsistence user access that underscored BLM's step one finding that each of the alternatives would significantly restrict subsistence uses. And just as it did in imposing limitations to reduce adverse impacts on surface resources, as required by the Reserves Act, BLM discussed other subsistence mitigation measures, such as altering flight paths to avoid interfering with subsistence resources relied

on by the local Nuiqsut community and protecting the surface area of the Teshekpuk Lake.

Thus, contrary to SILA's and the dissent's contentions, BLM did consider "alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes."   16 U.S.C. § 3120(a). BLM only had to select an alternative which would "reduce *or* eliminate" the lands needed for subsistence uses.  *Id.* (emphasis added).  The use of "or" presupposes that BLM was not required to "eliminate" impacts on subsistence uses. *See United States v. Woods*, 571 U.S. 31, 45–46 (2013) ("or" is "almost always disjunctive"); *see also Amoco Prod. Co.*, 480 U.S. at 545–46 ("Congress clearly did not state in ANILCA that subsistence uses are always more important than development of energy resources . . . .").  Reduction of impacts was enough.

To sum up, BLM complied with § 810 by evaluating the step one factors, determining that the alternatives it analyzed would "significantly restrict subsistence uses," and complying with step two by providing "notice and hearing procedures" and making the specified factual findings, including that "reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources."  16 U.S.C. § 3120(a).   Having satisfied § 810's procedural requirements, BLM was free to manage Alaska's public lands for "any of those uses or purposes" authorized under federal law, *id.* § 3120(d), including for "an expeditious program of competitive leasing of oil and gas" in the NPR-A, 42 U.S.C. § 6508.  Because BLM's application of the full field development standard was not contrary to § 810, BLM's approval of the Project satisfied ANILCA.

D

Only CBD presses an ESA claim on appeal. Defendants argue that CBD lacks Article III standing to assert this claim, and that, in any event, BLM complied with § 7 of the ESA in declining to consult with FWS and NMFS about the effect of Willow's greenhouse gas emissions on listed species. Defendants are partly right. Although CBD has standing to challenge BLM's § 7 consultation, its substantive argument fails on the merits.

1

We start with CBD's standing. CBD is an organization, so its standing turns on whether at least one of its members "would otherwise have standing to sue in their own right."[11] *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*, 33 F.4th 1107, 1120 (9th Cir. 2022) (quotation omitted). For one of CBD's members to independently satisfy Article III, that member must demonstrate "(i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Because it has shown that each element is met for at least two members, CBD has standing.

a

Begin with injury in fact. In environmental cases, Article III standing requires injury to the plaintiff, not the

---

[11] The organizational standing doctrine has other requirements not disputed here. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

environment.  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  CBD alleges a procedural injury—the failure to conduct a proper § 7 consultation under the ESA.  We have held that such an injury is cognizable for Article III purposes, but only if a concrete interest is threatened by the asserted procedural violation.  *See Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 970–71 (9th Cir. 2003).  The initial question, then, is whether any of CBD's members have a concrete interest threatened by BLM's alleged consultation error.

CBD argues that its members have spiritual, aesthetic, and recreational interests in listed species located in and around the Project area.  "Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing." *Lujan*, 504 U.S. at 562–63; *see also Friends of the Earth*, 528 U.S. at 183 ("We have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." (quotation omitted)).  But when these interests are tied to a particular area of land, generalized averments about using that land in the future are "simply not enough."  *Lujan*, 504 U.S. at 564.  To show imminent injury, a plaintiff must describe "concrete plans" for being in the area where the use or observation interest will be harmed. *Id.*

At least two CBD members have met that bar.  Rosemary Ahtuangaruak declares that she lives in Nuiqsut, which is next to the Project area; has an interest in hunting bearded seals around Oliktok Point; and has a subsistence and cultural interest in polar bears on the North Slope.

Ahtuangaruak details her activities near the gravel mine site west of Nuiqsut, which include hunting, boating, walking, and berry-picking, and how the increased mining activity from the Project will likely injure her enjoyment of those activities. CBD member Daniel Ritzman declares that he too has recreational interests that will be injured by Willow, including viewing polar bears around the Project area, particularly near Teshekpuk Lake and the Colville River. He has visited the area several times over many years for personal reasons and to guide wildlife-viewing trips and plans to return to the Colville River periodically to see polar bears and other wildlife.

Ahtuangaruak and Ritzman have alleged cognizable interests. But is an injury to those interests sufficiently imminent? Generally, when a plaintiff has shown a concrete interest in a procedural-injury case, the standard for proving imminence is lower. *Lujan*, 504 U.S. at 572 n.7. Under this relaxed standard, a plaintiff who asserts a procedural violation under § 7 need only show that compliance "*could* protect his concrete interests." *Nat. Res. Def. Council v. Jewell*, 749 F.3d 776, 783 (9th Cir. 2014) (en banc).

Willow's approval "could" threaten CBD's members' concrete interests in subsistence, spiritual, and recreational activities in areas directly affected by the Project. Although parts of Willow will take years to complete, the potential injury to Plaintiffs' concrete interests is imminent enough to satisfy Article III. *See Lujan*, 504 U.S. at 572 n.7 (noting that affected residents would have standing even though the challenged project "will not be completed for many years"). And even remote development made possible at the end of an agency's planning process is sufficiently imminent. *See, e.g.*, *Citizens for Better Forestry*, 341 F.3d at 973; *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1515–16

(9th Cir. 1992) (finding an imminent injury although the challenged action "does not propose any specific development" and instead was to be followed by further agency planning).    Thus, CBD—through its members' declarations—has satisfied the first prong of the standing analysis by identifying a concrete and imminent injury in fact.

b

Now consider causation.    A plaintiff's injury must be "fairly traceable" to the defendant's challenged conduct. *Lujan*, 504 U.S. at 560 (cleaned up).    Like the imminence requirement, the causation inquiry is relaxed in cases involving procedural injuries.    *WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1216 (9th Cir. 2023).    But "only in the sense that a plaintiff 'need not establish the likelihood that the agency would render a different decision after going through the proper procedural steps.'"    *Id.* (quoting *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*, 894 F.3d 1005, 1012 (9th Cir. 2018)).    "A plaintiff still must show 'a likelihood that the challenged action, if ultimately taken, would threaten their interests.'"    *Id.* at 1217 (quotation omitted).    Put another way, "environmental plaintiffs must make some showing of how the agency's failure to account for environmental consequences affects them, even if the environmental effects might not be realized 'for many years.'"    *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1013 (9th Cir. 2021) (quoting *Lujan*, 504 U.S. at 572 n.7).

One of CBD's theories is that Willow will increase greenhouse gas emissions and contribute to climate change; climate change will harm Alaskan polar bears and ice seals; and this, in turn, will harm CBD's members' recreational

and aesthetic interests in viewing the bears and seals. As much as CBD's causation theory rests on a link between Willow's greenhouse gas emissions and localized injuries to listed species, that argument is foreclosed by our precedent. In *Washington Environmental Council v. Bellon*, the plaintiffs alleged that various state agencies failed to regulate greenhouse gas emissions under the Clean Air Act. 732 F.3d 1131, 1138 (9th Cir. 2013). Their asserted injuries were climate-related; for example, decreased snowpack and an increased risk of forest fires owing to greenhouse gas emissions. *Id.* at 1140–41. We assumed that the plaintiffs had an Article III injury, and that man-made greenhouse gas emissions are "causally linked to . . . climate change." *Id.* at 1141, 1142.

But we held that the plaintiffs' alleged causal link between climate change and their injuries was too attenuated. *Id.* at 1142–43; *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("The causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing."). We explained that "there is a natural disjunction between Plaintiffs' localized injuries and the greenhouse effect. Greenhouse gases, once emitted from a specific source, quickly mix and disperse in the global atmosphere and have a long atmospheric lifetime." *Bellon*, 732 F.3d at 1143. And "there is limited scientific capability in assessing, detecting, or measuring the relationship between a certain [greenhouse gas] emission source and localized climate impacts in a given region." *Id.* Thus, the plaintiffs' conjectural link between the challenged actions, climate-related harms, and their localized injuries

was too speculative to meet the causation element of standing. *Id.* at 1142–44.

In reaching this conclusion, we distinguished *Massachusetts v. EPA*—which held that Massachusetts had standing to challenge the EPA's failure to regulate mobile source greenhouse gas emissions—because that case involved a procedural right, and the state received "special solicitude" for standing purposes. *Bellon*, 732 F.3d at 1144–45 (quoting *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007)). Because *Bellon* involved neither a procedural right nor a sovereign state, a relaxed causation requirement did not apply. *Id.* at 1145. Even then, *Bellon* reasoned that if a relaxed standard *did* apply, plaintiffs lacked standing because *Massachusetts* involved vehicle-based emissions that would make a "meaningful contribution" to global greenhouse gas concentrations. *Id.* at 1145–46. The emissions at issue in *Bellon*, by contrast, were comparatively negligible. *Id.* So, under *Bellon*, a causal link between greenhouse gas emissions and local effects cannot be established, even in a procedural-injury case, when the challenged government action involves negligible emissions on a global scale.

BLM acknowledged that the Project will lead to more greenhouse gas emissions, which will contribute to climate change and reduced sea ice. But the agency emphasized that it could not predict with reasonable certainty whether a reduction in sea ice would harm any listed species *in or around* the Project area.[12]   CBD does not offer persuasive

---

[12] This lack of causality between greenhouse gas emissions and localized injuries to species tracks longstanding agency views. In its original listing rule for the polar bear, FWS noted that ESA consultation was not

evidence to the contrary. Thus, under *Bellon*, CBD cannot show causation by citing climate-related injuries to localized, listed species.

If CBD asserted only climate-related injuries, then we would stop here. But CBD also argues that its members suffer aesthetic and recreational injuries caused by Willow's *non*-climate impacts. For instance, Ahtuangaruak alleges injuries tied to construction of a Willow-based gravel mine. And Ritzman declares that the immediate impacts of the Project will impede his ability to use the Colville River for recreational and professional pursuits.

These aesthetic and recreational injuries—caused by local, on-the-ground development of the Project—establish standing for CBD to raise its climate-related claim under the ESA. When it comes to causation, the Supreme Court has held that the claimed injury need not always be caused by the specific deficiency or violation identified by the plaintiff. In *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, the Court explained that "outside the context of taxpayers' suits" a litigant need not demonstrate "more than injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury." 438 U.S. 59, 79 (1978); *Bd. of Nat. Res. of Wash. v. Brown*,

---

required for downstream greenhouse gas emissions impacts because "there is no traceable nexus between the ultimate consumption of the petroleum product and any particular effect to a polar bear or its habitat." Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range, 73 Fed. Reg. 28,212, 28,300 (May 15, 2008). Although climate science has advanced since the original listing rule, BLM maintains that "the level of reliability and granularity provided by existing models is still insufficient to identify project-specific effects to listed species or designated critical habitat."

992 F.2d 937, 945 (9th Cir. 1993) (same).  To illustrate, take *Duke Power* itself.  The Court held that the plaintiffs had standing to challenge the constitutionality of the Price-Anderson Act, which generally deals with nuclear companies' liability for a meltdown, even though their asserted injuries related to the immediate environmental and aesthetic harms of specific nuclear development projects. 438 U.S. at 64–66, 69–70, 73–81.  There was no need for a "subject-matter nexus between the right asserted and the injury alleged."  *Id.* at 79.

Applying that reasoning here, CBD has standing for its § 7 claim even without a specific causal connection between its members' injuries and BLM's alleged failure to properly consult with FWS and NMFS about Willow's climate-related effects on listed species.  The members allege non-climate related aesthetic and recreational injuries caused by the challenged substantive agency action—approval of the Project.  And under *Duke Power*, CBD need not "allege a climate-change related injury in order to have standing to challenge BLM's analysis of climate change impacts." *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1231 (10th Cir. 2017) (citing *Duke Power*, 438 U.S. at 72–79).   The D.C. Circuit reached the same conclusion.  In *WildEarth Guardians v. Jewell*, the D.C. Circuit noted that the plaintiffs "cannot establish standing based on the effects of global climate change."  738 F.3d 298, 307 (D.C. Cir. 2013) (citing *Bellon*, 732 F.3d at 1141–46).  But the D.C. Circuit explained that the plaintiffs still "established a separate injury in fact not caused by climate change—the harm to their members' recreational and aesthetic interests from *local* pollution."  *Id.*  Thus, CBD has satisfied the causation element of standing, even without a

causal link between the Project's greenhouse gas emissions
and ESA-listed species.

c

That leaves redressability. Typically, a plaintiff must
establish that its asserted injuries will "likely" be redressed
by a favorable judicial decision. *Lujan*, 504 U.S. at 561. But
under the relaxed redressability standard for procedural-
injury cases, *id.* at 572 n.7, CBD only must show that further
§ 7 consultation "may influence the agency's ultimate
decision of whether to take or refrain from taking a certain
action," *Salmon Spawning & Recovery All. v. Gutierrez*, 545
F.3d 1220, 1226–27 (9th Cir. 2008). "This is not a high bar
to meet." *Id.* at 1227. Here, vacatur would redress CBD's
members' injuries because BLM's re-approval of the Project
"*could be influenced* by" additional consultation with FWS
and NMFS about the effect of Willow's greenhouse gas
emissions on polar bears and ice seals. *Citizens for Better
Forestry*, 341 F.3d at 976 (quoting *Pub. Citizen v. Dep't of
Transp.*, 316 F.3d 1002, 1019 (9th Cir. 2003)); *see* 5 U.S.C.
§ 706(2). No more is required. We therefore conclude that
CBD has standing to challenge BLM's § 7 consultation.

2

We turn next to the merits of CBD's ESA § 7 claim.

a

The ESA "is a comprehensive scheme with the 'broad
purpose' of protecting endangered and threatened species."
*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
698 F.3d 1101, 1106 (9th Cir. 2012) (quoting *Babbitt v.
Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S.
687, 698 (1995)). The ESA advances that goal through two
"interlocking provisions." *Id.* Section 9 makes it unlawful

for any person to "take" an endangered or threatened species.[13]  16 U.S.C. § 1538(a)(1)(B).  Section 7, in turn, imposes on federal agencies "an affirmative duty to prevent violations of Section 9." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1238 (9th Cir. 2001) (citing 16 U.S.C. § 1536(a)(2)).

Under § 7(a)(2), agencies must ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species."  16 U.S.C. § 1536(a)(2).  To that end, § 7 sets out a consultation process with FWS or NMFS, depending on the species potentially affected.[14]

If listed species "may be present" in an agency's project area, the agency must conduct a "biological assessment" to identify listed species "likely to be affected" by the project. *Id.* § 1536(c)(1).  If the agency determines that its proposed action "may affect" any listed species or its critical habitat, then consultation—either formal or informal—is required. *Karuk Tribe*, 681 F.3d at 1027.  An agency can only avoid consultation if its action will have "no effect" on a listed species or critical habitat. *Id.*

If an agency determines (and FWS or NMFS concurs) that an action "may affect" but "is not likely to adversely affect" a listed species or designated critical habitat, then consultation may conclude informally.  *Id.*; *see* 50 C.F.R.

---

[13] "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Sweet Home*, 515 U.S. at 691 (quoting 16 U.S.C. § 1532(19)).

[14] FWS administers the ESA with respect to terrestrial species, while marine species are under the jurisdiction of NMFS. *Westlands*, 376 F.3d at 873; *see* 50 C.F.R. § 402.01(b).

§§ 402.13(c), 402.14(a)–(b).  Otherwise, the agency must formally consult with FWS or NMFS.    50 C.F.R. § 402.14(a).  This process results in a BiOp, which reflects the agency's opinion on whether the proposed action "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  *Ctr. for Biological Diversity*, 698 F.3d at 1107 (quoting 50 C.F.R. § 402.14(g)(4)).

An agency must consider the "effects of the action" at each stage of the § 7 process.  For example, the regulations provide that a "biological assessment shall evaluate *the potential effects of the action*" on listed species and critical habitat.  50 C.F.R. § 402.12(a) (emphasis added).  The same goes for formal consultation—FWS and NMFS are required to "[e]valuate *the effects of the action* and cumulative effects" on ESA-protected species and habitat.  *Id.* § 402.14(g)(3) (emphasis added); *see also id.* § 402.14(h)(1) ("The biological opinion shall include . . . (iii) A detailed discussion of the effects of the action . . . .").

"Effects of the action" are defined, in part, as "all consequences to listed species or critical habitat that are caused by the proposed action."  *Id.* § 402.02.  "A consequence is caused by the proposed action if it would not occur but for the proposed action *and* it is *reasonably certain to occur*."  *Id.* (emphasis added).  So the plain text of the ESA's implementing regulations requires that the reasonable-certainty requirement be applied to the consequences of a proposed action on listed species and critical habitat.  *See Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 988 n.4 (9th Cir. 2023); *see also* Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976, 44,977 (Aug. 27, 2019) ("Consequences to the species or critical habitat

caused by the proposed action must also be reasonably certain to occur.").

Additionally, the regulations in effect during Willow's approval directed that a "conclusion of reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available." 50 C.F.R. § 402.17(b) (2022) (repealed by Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 89 Fed. Reg. 24,268, 24,298 (Apr. 5, 2024)). Other considerations for deciding whether a proposed agency action causes consequences to a protected species or critical habitat include temporal and geographic proximity, and whether the "consequence is only reached through a lengthy causal chain that involves so many steps as to make the consequence not reasonably certain to occur." *Id.* § 402.17(b)(1)–(3). The reasonable-certainty requirement is "not a particularly stringent standard to meet," provided that the government does more than "rely on speculation sprinkled with dabs of evidence." *Ctr. for Biological Diversity*, 87 F.4th at 989. CBD did not preserve any argument that these regulations conflict with the ESA itself.

b

All this context leads to CBD's argument. BLM conducted a biological assessment of several listed species. It determined that Willow "may affect and is not likely to adversely affect" eleven listed marine mammal species, including ice seals. And BLM initiated only informal consultation with NMFS. BLM then secured a Letter of Concurrence from NMFS agreeing that the Project was not likely to adversely affect any listed species or critical habitat, thus ending informal consultation. But when it came to terrestrial species, BLM began formal consultation with

58   CTR. FOR BIOLOGICAL DIVERSITY V. BUREAU OF LAND MGMT.

FWS because it concluded that Willow is "likely to adversely affect" two listed species, including polar bears.

The biological assessment provided to each Service did not analyze Willow's greenhouse gas emissions as an "effect of the action." *See* 50 C.F.R. § 402.12(a). After BLM solicited public input on its draft SEIS, and while § 7 consultation with the Services was ongoing, CBD submitted a comment asserting that § 7 required BLM to "consider the impacts from the direct, indirect, and cumulative greenhouse gas emissions caused by the project." In response to CBD's comment, BLM issued a detailed memorandum explaining why "additional climate changed-related information does not alter" the existing scope of the § 7 consultations. BLM reasoned that because it could not predict where sea ice loss would occur because of emissions from the Project, or how such sea ice loss would affect listed species, further analysis of greenhouse gas emissions was unnecessary.

FWS agreed, responding that "the current state of climate science does not allow us to draw causal links between contributions from project-specific [greenhouse gas] emissions to global climate change, and subsequent project-specific effects on listed species." The next day, FWS issued a BiOp with a "no jeopardy" determination that did not specifically analyze Willow's climatic impacts as an "effect of the action." NFMS also concurred in BLM's finding "that the scope of the ESA Section 7 consultation with respect to [greenhouse gas] emissions is appropriate."

CBD challenges the reasoning behind BLM's (and FWS's and NMFS's) conclusions that the effects of the Project's greenhouse gas emissions on listed species were not sufficiently linked to merit further analysis as an "effect of the action." These are policy determinations subject to

arbitrary-or-capricious review under the APA.  *See Ctr. for Biological Diversity*, 87 F.4th at 987, 989; 5 U.S.C. § 706(2)(A).  To survive APA review, "[an] agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choices made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  If an agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence before the agency," its action is arbitrary or capricious.  *Id.*

First, regarding BLM's analysis, CBD argues that the "best scientific and commercial data available" shows a direct causal link between increased greenhouse gas emissions and decreased sea ice.  *See* 50 C.F.R. § 402.17(b) (2022).  Thus, the argument goes, the effect of Willow's project-specific emissions on polar bears and ice seals is "reasonably certain to occur," demanding further § 7 consultation as an "effect of the action." *See id.* § 402.02.

BLM reached a different conclusion, which was not arbitrary or capricious.  BLM's supplemental memorandum shows that the agency considered potential emissions effects on listed species, and it explained why it declined to expand the scope of its § 7 consultations.  For example, BLM acknowledged that Willow is "anticipated to result in a marginal increase in global [greenhouse gas] emissions that would contribute to climate change and, potentially, a marginal seasonal decrease in sea ice extent somewhere in the Arctic."  But it could not predict with any precision where and when the sea ice reduction would occur, and thus could not anticipate whether any reduction stemming from the Project would cause a "reasonably certain" consequence

to listed species in the Willow area. BLM supported that conclusion with studies suggesting that the relationship between sea ice loss and the impact to polar bears is non-linear. As the agency explained, much more information than what is available is needed "to understand the species-specific consequences of a marginal sea ice loss caused by a specific project" like Willow. Considering BLM's detailed explanation for why it did not view project-specific greenhouse gas emissions as "effects of the action," we see no reason to conclude that its decision to retain the biological assessment's effects analysis was arbitrary or capricious. *See State Farm*, 463 U.S. at 43.

Next, CBD argues that NMFS's concurrence with BLM's decision to maintain the scope of the existing § 7 consultation was arbitrary. BLM concluded that consultation on greenhouse gas emissions was unnecessary. NMFS concurred: "Without commenting on the conclusions that BLM has drawn, we agree that the scope of the ESA Section 7 consultation with respect to [greenhouse gas] emissions is appropriate." And in its Letter of Concurrence, NMFS did not include climate change as one of the "effects of the action." But NMFS's response to BLM shows that it considered the issue, and the fact that it omitted climate change from its "effects of the action" analysis shows that it agreed with BLM's reasoning. That provides a "satisfactory explanation" for its Letter of Concurrence. *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005). NMFS was not required to repeat the entire effects analysis to survive judicial scrutiny.[15]

---

[15] Even if NMFS's explanation were deficient, any error would be harmless because BLM's underlying conclusion was not arbitrary or

Finally, CBD argues that FWS's concurrence with BLM's analysis was arbitrary or capricious because it did not engage with the best available science. But FWS "agree[d] that the current state of climate science does not allow [it] to draw causal links between contributions from project-specific [greenhouse gas] emissions to global climate change, and subsequent project-specific effects on listed species and designated critical habitat." The Service further "agree[d] that an estimate of a project-caused decrease in sea ice occurring somewhere in the Arctic, without more specific information . . . does not enable [it] to predict any 'effects of the action' to listed species or designated critical habitat per section 7 and its implementing regulations." Put simply, FWS fully concurred in BLM's scientific analysis. And because BLM's analysis was not arbitrary or capricious, FWS's concurrence was not either.

At bottom, each agency "rationally explain[ed] why it did what it did." *In re Big Thorne Project*, 857 F.3d 968, 976 (9th Cir. 2017); *see also id.* ("[W]e have an Administrative Procedure Act, not an Administrative Policy Act."). We thus hold that the agencies satisfied their § 7 obligations.

## IV

Having found a NEPA deficiency in BLM's approval of the Project, we now assess the remedy. We remand without vacatur only "in limited circumstances." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012). In deciding whether to vacate agency action, "[w]e weigh the seriousness of the agency's errors against 'the disruptive

---

capricious. *See Paulsen v. Daniels*, 413 F.3d 999, 1006 (9th Cir. 2005) (citing 5 U.S.C. § 706); *SILA II*, 701 F. Supp. 3d at 921–22.

consequences of an interim change that may itself be changed.'" *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022) (quoting *Cal. Cmtys.*, 688 F.3d at 992). We also look to "whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand." *Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015).

BLM's lone error is at heart a procedural, not a substantive violation. NEPA is a procedural statute that, unlike the ESA, does not require any substantive agency response. BLM only failed to explain whether or why its adopted alternative complied with the full field development standard at the ROD stage. And while some procedural errors could be "serious," this one is not. *See Cal. Cmtys.*, 688 F.3d at 992. As we have noted, while the full field development standard is not compelled by statute or regulation, neither does it conflict with BLM's statutory obligations. Thus, BLM should be permitted to explain its application of this principle better either at the screening stage or the ROD stage. There are different considerations the agency is tasked with balancing at each stage.

Although BLM does not explain in the ROD whether modified Alternative E complies with full field development, its adopted alternative would still produce about 94% of the oil expected under Alternative E. This is not a situation where "fundamental flaws" will require the agency to adopt an alternative that is meaningfully different from what it has already approved. *Pollinator*, 806 F.3d at 532. Even so, BLM needs to explain whether and how its approved alternative strands economically viable oil despite

maintaining throughout the SEIS process that it would only consider alternatives that would fully develop the oil field. *See State Farm*, 463 U.S. at 57. But "given the technical nature of [BLM's] error," the agency "will 'likely be able to offer better reasoning' and 'adopt the same rule on remand.'" *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 929 (9th Cir. 2020) (quoting *Pollinator*, 806 F.3d at 532).

Plus, the disruptive consequences of vacating Willow's approval would be severe. The Project is a billion-dollar venture potentially employing upwards of 1,000 people. If we vacated the ROD, it would be "economically disastrous." *See Cal. Cmtys.*, 688 F.3d at 994 (remanding without vacatur for a "venture employing 350 workers"). The ROD also provides a host of local benefits that would evaporate with vacatur.[16] For example, the ROD guarantees a network of gravel roads and boat ramps that facilitate safer and more efficient access to subsistence resources. And the ROD requires BLM to institute long-term mitigation measures for the caribou herd, a critical subsistence source for rural Alaskans. Willow's benefits for the communities most affected by the Project weigh strongly against vacatur here.

Having weighed the equities, *see Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995), vacatur is unwarranted because the procedural error is minor and the on-the-ground consequences of vacatur would be severe. Still, we "expect and urge [BLM] to move promptly" in rectifying the ROD's deficiencies on remand. *Nat'l Fam. Farm Coal.*, 966 F.3d at 930 (quoting *EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015)). But because "we have been given no reason to

---

[16] Because of these benefits and others, Willow has received overwhelming support from Alaska's state and federal elected leaders.

believe that the agency would be unable to cure those deficiencies," *Solar Energy Indus.*, 80 F.4th at 997, we remand without vacating BLM's 2023 approval of the Project.

V

For these reasons, we largely affirm the district court's order granting summary judgment for Defendants and dismissing Plaintiffs' claims. We reverse the part of the district court's order approving BLM's NEPA alternatives analysis and remand without vacatur. Appellants' motions for injunctive relief pending appeal are denied as moot.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED WITHOUT VACATUR.**

---

R. NELSON, Circuit Judge, concurring:

I write separately to respond to Judge Sanchez, who opines on the validity of agency regulations under § 7 of the Endangered Species Act (ESA).

Section 7 requires federal agencies to consult with the Fish and Wildlife Service or the National Marine Fisheries Service to "insure" that a proposed agency action is "not likely" to jeopardize ESA-protected species or habitat. 16 U.S.C. § 1536(a)(2). The Services have long been required to evaluate the "effects of the proposed action" during the § 7 process. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 924 (9th Cir. 2008); *see also* Interagency Cooperation—Endangered Species Act of 1973, 51 Fed. Reg. 19,926, 19,932 (June 3, 1986) (codified at 50 C.F.R. § 402.02). "Effects of the action" are "all consequences to listed species or critical habitat that are *caused by* the

proposed action."   50 C.F.R. § 402.02 (emphasis added).
The proposed action "cause[s]" a consequence to listed
species or critical habitat if the consequence "would not
occur but for the proposed action" and "is reasonably certain
to occur." *Id.* If a consequence to ESA-protected species
and habitat fails this causation test, it does not warrant
further evaluation under § 7.

The Bureau of Land Management (BLM), alongside the
Services, concluded that current science does not support a
sufficient causal link between the Willow Project's
greenhouse gas emissions and sea ice loss in the Project area
that would adversely affect listed species like the polar bear.
So BLM declined to analyze the Project's greenhouse gas
emissions as an effect of the action.   Today, we hold that
BLM's § 7 ESA decision was not arbitrary or capricious.
Maj. Op. at 58–61; *see Ctr. for Biological Diversity v.
Haaland*, 87 F.4th 980, 987 (9th Cir. 2023).   On that point,
we all agree.  *See* Dissent at 92.

But Judge Sanchez goes further, suggesting that but-for
causation conflicts with the text and purpose of the ESA.  *Id.*
at 92–95.   In my view, the ESA is not just consistent with
but-for causation—it compels it.   Future courts should think
twice before casting doubt on this longstanding practice.

I

Judge Sanchez suggests that but-for causation conflicts
with § 7's text and purpose. *See id.*  I disagree.  But-for
causation is "the background against which Congress
legislate[s]," and it is "the default rule[]" that Congress "is
presumed to have incorporated, absent an indication to the
contrary in the statute itself." *Univ. of Tex. Sw. Med. Ctr. v.
Nassar*, 570 U.S. 338, 347 (2013); *see Richards v. County of
San Bernardino*, 39 F.4th 562, 572 (9th Cir. 2022) ("The

traditional means of proving factual causation is the 'but for' causation test."). In directing agencies to "insure" that their actions are "not likely" to jeopardize a protected species or habitat, § 7 implies that federal agencies must consider the causal connection between a proposed action and any adverse environmental consequences. 16 U.S.C. § 1536(a)(2). But it does not specify what causal link is required before the consulting agency must consider a consequence to a protected species or habitat as an effect of the proposed action. *Cf. Burrage v. United States*, 571 U.S. 204, 213 (2014) (but-for causation where statutes use the phrases "because of," "based on," and "by reason of" (citations omitted)).

So there is nothing in § 7 that rebuts the presumption of but-for causation. In fact, § 7 barely says anything about causation at all. And while we no longer defer to an agency's interpretation of a statute's ambiguity, *see Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024), there is no ambiguity in a provision that says virtually nothing about causation. *See* Dissent at 92. With no clear reference to causation, I presume that Congress incorporated the but-for standard in drafting § 7. *See Nassar*, 570 U.S. at 347.

But-for causation also finds support in the broader statutory scheme. The point of § 7 consultation is to identify measures that federal agencies can take to "inure to the benefit of a protected species." *Karuk Tribe v. U.S. Forest Serv.*, 681 F.3d 1006, 1024 (9th Cir. 2012) (en banc). That is why the ESA's implementing regulations limit § 7's application to "actions in which there is discretionary Federal involvement or control." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (quoting § 402.03). Think about how that implicates the effects of the action. If a consequence to a protected species

or habitat will happen despite the proposed action—in other words, if the but-for causation test is not met—then an agency's discretionary efforts to protect listed species hit a dead-end.

In that scenario, where the agency is powerless to stop a consequence to a protected species or habitat that will occur despite the proposed action, "there is no duty to consult because 'consultation would be a meaningless exercise.'" *See Karuk Tribe*, 681 F.3d at 1024–25 (quoting *Sierra Club v. Babbitt*, 65 F.3d 1502, 1508–09 (9th Cir. 1995)). Today, agencies are required to consult on consequences that would not occur *but for* the proposed action. *See* 50 C.F.R. §§ 402.02, 402.14. Those circumstances are where the action agency can implement discretionary measures to mitigate harm to listed species or critical habitat. Identifying such measures is a core reason for interagency consultation under the ESA. The but-for causation standard therefore reflects the justifications for the § 7 process.

II

The but-for causation standard also tracks longstanding agency practice. For decades, "[e]ffects of the action" referred to "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action." 51 Fed. Reg. at 19,958. "Indirect effects" were "those that are caused by the proposed action and are later in time, but still are reasonably certain to occur." *Id.* The regulation did not use the words "but-for." Still, we interpreted aspects of the regulation to require but-for causation in assessing effects of the action. *See Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1225 (9th Cir. 2015) ("The test for interrelatedness or interdependentness

is 'but for' causation . . . ." (quoting *Sierra Club v. Marsh*, 816 F.2d 1376, 1387 (9th Cir. 1987))).

In 2019, the Trump Administration made the first comprehensive revisions to § 7's regulations in over 30 years. *See* Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976 (Aug. 27, 2019). Relevant here, the Services simplified the definition for "effects of the action" by collapsing the terms "direct," "indirect," "interrelated," and "interdependent" into a two-part test. *Id.* A consequence is caused by the proposed action if, first, the consequence would not occur "but for" the proposed action, and second, if the consequence is "reasonably certain to occur." *Id.*

In making these changes, the Services emphasized that but-for causation is nothing new. "[T]he Services have applied the 'but for' test to determine causation for decades." *Id.* at 44,977. Even before 2019, the Services "looked at the consequences of an action and used the causation standard of 'but for' plus an element of foreseeability (*i.e.*, reasonably certain to occur) to determine whether the consequence was caused by the action under consultation." *Id.* That was especially true for "indirect effects" on listed species and critical habitat—effects that are caused by a proposed action but occur later in time. The original definition of "indirect effects" referred to effects that are "caused by" the proposed action. *Id.* at 44,991. But-for causation, the Services explained, "is similar to 'caused by'" in that "both tests speak to a connection between the proposed action and the consequent results of that action." *Id.* The 2019 revisions setting out the current two-part causation test were therefore a continuation of past agency practice.

In streamlining "effects of the action," the Services emphasized that the two-part test is "consistent with the prior regulatory definition," meaning "the scope of [the] effects analyses will stay the same." *Id*. at 44,990; *see Ctr. for Biological Diversity*, 87 F.4th at 988 n.4 (the new language in the definition was "not meant to change how the regulation operates but clarifies and simplifies the regulation"). At no point did the Services alter the existing framework in making the but-for causation requirement more explicit.

Two years later, President Biden issued an order directing the Executive Branch to review agency actions taken by the prior administration and, as appropriate, consider revising or rescinding those actions if they impeded the new administration's environmental goals. *See* Exec. Order No. 13,990, Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis, 86 Fed. Reg. 7037 (Jan. 20, 2021). In response, the 2019 revisions to § 7's implementing regulations were singled out for review. *See* Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 89 Fed. Reg. 24,268, 24,268 (Apr. 5, 2024). In the end, the Biden Administration largely endorsed the 2019 revisions. And while it proposed small changes to "effects of the action," it reaffirmed the "longstanding" but-for causation standard, which "has been part of [agency] practice" since 1986. *Id.* at 24,272.

As this history shows, but-for causation is entrenched in the § 7 framework. The standard persists across presidential

administrations, garnering the support of both political parties. And until recently, it has gone unchallenged.[1]

### III

The slippery nature of climate modeling and projection cannot justify our deviation from these longstanding principles. *See* Dissent at 94–95. As Judge Sanchez recognizes, climate science does not allow for a but-for causal link between a particular project's greenhouse gas emissions and localized climatic effects. *Id.* In fact, it might never allow that degree of causal or predictive certainty. *See id.*

Federal agencies have said so for years. For example, in its 2008 rule listing the polar bear as an ESA-protected species, the Fish and Wildlife Service noted that § 7 consultation on downstream greenhouse gas emissions was not required because the best scientific data "does not provide the degree of precision needed to draw a causal connection between the oil produced at a particular drilling site, the [greenhouse gas] emissions that may eventually result from the consumption of the refined petroleum product, and a particular impact to a polar bear or its habitat."

---

[1] The 2019 revisions, along with other revisions to the ESA regulations, were challenged. *See, e.g.*, *Ctr. for Biological Diversity v. Bernhardt*, No. 3:19-cv-05206 (N.D. Cal.). The district court at first vacated the 2019 revisions and remanded to the Services without reaching the merits. After we temporarily stayed that decision, *In re Wash. Cattlemen's Ass'n*, No. 22-70194, 2022 WL 4393033, at *1 (9th Cir. Sept. 21, 2022), the district court remanded the regulations without vacatur, allowing the Services to proceed with a rulemaking process to amend some aspects of the 2019 rule, *see* Amended Order Granting Motion to Remand, *Ctr. for Biological Diversity v. Bernhardt*, No. 3:19-cv-05206 (N.D. Cal. Nov. 11, 2022), ECF No. 198. The 2024 regulations, which reaffirmed the longstanding use of but-for causation, resulted from that process.

Endangered and Threatened Wildlife and Plants; Determination of Threatened Status for the Polar Bear (Ursus maritimus) Throughout Its Range, 73 Fed. Reg. 28,212, 28,300 (May 15, 2008). BLM and the Services decided much the same here, too. As our opinion explains, the corresponding decision not to consult on the Project's emissions as an effect of the action was not arbitrary or capricious. Maj. Op. at 58–61.

Though the current science makes it difficult to establish but-for causal links in the climate context, *see* Dissent at 94, that is no reason to jettison the but-for causation standard, which is consistent with the text of the ESA. Because but-for causation is baked into the statutory text, we have no discretion to apply a looser standard when it compels results we do not like. Whether to modify the ESA or its implementing regulations is a decision best left to the political branches, not the courts. *See Loper Bright*, 603 U.S. at 403–04. Until then, we should continue to enforce but-for causation in identifying the effects of the action subject to § 7 consultation.

---

SANCHEZ, Circuit Judge, concurring in part and dissenting in part.

In reviewing and approving the largest domestic oil drilling project on federal public lands, the Bureau of Land Management (BLM) excluded from its review any alternatives that did not "fully develop" the Willow Project's oil and gas fields. The agency determined that it would not consider alternatives that would strand an "economically viable" quantity of oil, even if they provided more robust recreational, environmental, or subsistence protections to

72    CTR. FOR BIOLOGICAL DIVERSITY V. BUREAU OF LAND MGMT.

Alaska's North Slope.  Yet no statute, regulation, or even the Willow Project's purpose and need statement required BLM to adopt this constrained view of its discretion.    My colleagues observe as much, *see* Maj. at 25–27, and conclude that remand is necessary. *See* Maj. at 62–64.  On these basic points, we agree.  But I cannot join the majority's adoption of an improper remedy—remand without vacatur—under the circumstances of this appeal.

BLM's errors were more fundamental than simply failing to explain how it applied the full field development standard among the alternatives it reviewed.  At bottom, the agency failed to provide any reasoned explanation for its adoption of full field development.  Other than a few cursory responses to public comments and notes from consultation meetings, BLM sheds no light on where this standard came from, how it operates in light of BLM's statutory mitigation requirements, or why it would allow the agency to foreclose review of other reasonable alternatives.    The standard appears to be based on the agency's misreading of 43 C.F.R. § 3137.71(b)(1), a regulation that addresses a lessee's continuing development obligations and plainly does not constrain BLM's ability to consider alternative scenarios that provide greater protection to surface resources.

Even if full field development did not rest on a misreading of BLM's regulatory authority, this standard conflicts with various procedural and substantive requirements under the National Environmental Policy Act (NEPA), the Alaska National Interest Lands Conservation Act (ANILCA), and the Naval Petroleum Reserves Production Act (Reserves Act).    Because the agency's unexplained decision constitutes a manifest abuse of discretion and requires vacatur, I respectfully dissent from this portion of the majority opinion.

As to the Endangered Species Act (ESA) claim, I concur with the majority that the Center for Biological Diversity (CBD) has standing to challenge BLM's failure to engage in formal consultation with other federal agencies on the climate impacts of the Willow Project, but that CBD did not demonstrate how informal consultation was arbitrary and capricious under the governing regulations.  Maj. at 46–61.  Nonetheless, I write separately to question whether the operative regulations that permitted BLM—in conjunction with the Fish and Wildlife Service and the National Marine Fisheries Service—to forgo formal consultation are consistent with the text and purpose of the ESA.

## I.

### A.

It is undisputed that BLM only analyzed alternatives that would allow ConocoPhillips to "fully develop" the Willow Project's oil and gas field.  For its part, BLM acknowledged that full field development "is not defined in regulation or case law."  But the agency did not explain in its draft or final Supplemental Environmental Impact Statement (SEIS) or Record of Decision (ROD) what full field development is or what justified its adoption, and the confusion arising from the agency's failure to do so lies at the heart of this appeal.

BLM seems to have adopted the full field development standard after the district court vacated its approval of the Willow Project in 2021.  *Sovereign Inupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F. Supp. 3d 739, 805 (D. Alaska 2021).  There, the district court held that the agency's alternatives analysis violated NEPA because it rested on an incorrect assumption that ConocoPhillips had the right "to extract all the oil and gas possible within the leased areas."  *Id.* at 768–70.  The court observed that "[t]he

leases do not grant [ConocoPhillips] the unfettered right to drill wherever it chooses or categorically preclude BLM from considering alternative development scenarios," and added that "BLM's asserted restriction on its authority is [also] inconsistent with its own statutory responsibility to mitigate adverse effects on the surface resources." *Id.* at 768–69.

After the district court order, BLM prepared an SEIS to address the deficiencies identified by the court. During this drafting process, BLM implemented new screening criteria, including the requirement that alternatives "fully develop the targeted oil and gas field." The draft SEIS stated that this criterion was derived "directly from language contained in 43 C.F.R. 3137.71(b)(1), which addresses the lessee's obligation to BLM in their development proposal" and meant that "BLM may not permit a development proposal that would strand an economically viable quantity of oil." The agency echoed this criterion in consultations with stakeholders, maintaining that "an applicant cannot strand an economically viable amount of recoverable resource" and characterizing the full field development principle as "BLM's interpretation of the Alaska District Court's ruling and BLM's regulation."

In the agency's final SEIS, however, the terms "full field development" or "fully develop" were notably absent from its stated screening criteria. Nonetheless, the agency's final SEIS rejected various alternative concepts on the grounds that they would "strand an economically viable amount of [recoverable] oil," and referenced its definition of full field development in its attached responses to at least three public comments.

Despite the agency's repeated reliance on full field development, there is no statutory or regulatory basis for this standard.  The regulation cited by BLM concerns a lessee's "continuing development obligations."  *See* 43 C.F.R. § 3137.71.  It provides that once a lessee has met its "initial development obligations" and has drilled a well that meets productivity criteria, the lessee must submit a plan to BLM that "describe[s] the activities to fully develop the oil and gas field."  *Id.* at § 3137.71(b)(1).  Notably, that is the only time the phrase "fully develop" appears in *any* federal regulation by the Department of Interior.  No Interior regulation mentions, much less describes, a "full field development" requirement for oil and gas leases on public lands, including regulations concerning the competitive leasing program for oil and gas within the National Petroleum Reserve in Alaska.  *See* 43 C.F.R. §§ 3100, *et seq*. (Oil and Gas Leasing), §§ 3120, *et seq*. (Competitive Leases), §§ 3130, *et seq.* (Oil and Gas Leasing, National Petroleum Reserve, Alaska).

If full field development was a driving consideration of the oil and gas leasing program under the Reserves Act, one might expect this requirement to appear in regulations governing the submission of bids or the award of leases, *see id.* at §§ 3132.2, 3132.5; the extension or renewal of a lease, *see id.* at §§ 3135.1-5, 3135.1-6; the requirements of an NPR-A unit agreement or reasons BLM may reject a unit agreement application, *see id.* at §§ 3137.21, 3137.24; or a lessee's initial development obligations and actions the agency may take if a lessee does not meet a continuing development obligation, *see id.* at §§ 3137.70, 3137.76.  But

no such regulation defines, explains, or implements a full field development requirement.[1]

Even if full field development accurately reflects a *lessee's* obligations under the regulations, BLM does not explain how this standard would constrain *its own* discretion to review and approve oil and gas development alternatives. The regulations do not restrict BLM's ability to consider alternative scenarios that provide greater protection to surface resources, but rather direct BLM to develop "special stipulations" when the agency "deems [it] necessary and appropriate for mitigating reasonably foreseeable and significant adverse impacts on the surface resources." *Id.* at § 3131.3; *see also id.* at § 3135.2(a) (directing BLM to require a lessee to suspend operations and production when it determines, *inter alia*, that doing so "mitigates reasonably foreseeable and significantly adverse effects on surface resources" or "conserv[es] natural resources"). Moreover, it is difficult to perceive any difference between the agency standard the district court previously rejected—that proposed alternatives must "extract all the oil and gas possible within the leased areas"—and BLM's current full field development standard—that proposed alternatives may not "strand an economically viable quantity of recoverable oil."

Nor does the Willow Project's purpose and need statement support the full field development standard. The Project's purpose statement highlights the need "to construct the infrastructure necessary to allow the production and

---

[1] Although BLM asserted that full field development of resources is "something routinely applied across oil and gas projects" in one of its consultation sessions, the agency failed to mention a single time that has been so.

transportation to market of federal oil and gas resources in the Willow reservoir . . . *while providing maximum protection to significant surface resources within the NPR-A, consistent with BLM's statutory directives*." As the majority observes, "[n]othing in Willow's purpose and need statement bar[s] BLM from adopting an alternative that would strand an economically viable quantity of oil." Maj. at 26–27. In short, BLM appears to have invented the full field development standard out of whole cloth with no explanation for its course of action.

B.

When an agency fails to offer a reasoned explanation for its decision, it violates a basic procedural requirement of administrative decision-making. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *League of United Latin Am. Citizens v. Regan*, 996 F.3d 673, 696 (9th Cir. 2021) ("An agency has a baseline obligation to articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." (internal quotations and citations omitted)). The agency's reasoning must provide an analytical "path [that] may reasonably be discerned," *Encino Motorcars*, 579 U.S. at 221 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)), and must be "sufficient to permit effective judicial review," *Dioxin/Organochlorine Ctr. v. Clarke*, 57 F.3d 1517, 1525 (9th Cir. 1995) (citing *S.E.C. v. Chenery Corp.,* 332 U.S. 194, 196–97 (1947)).

An agency action is "arbitrary and capricious if the agency has … offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle*

*Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "Unexplained inconsistency" in agency action is "a reason for holding an interpretation to be an arbitrary and capricious change." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

By adopting a full field development standard in the draft and final SEIS and subsequent 2023 ROD, BLM expressly declined to consider any development alternatives that would strand an "economically viable" quantity of oil. BLM does not explain what an "economically viable" quantity of oil means, or how this standard accords with the Willow Project's stated goal of providing "maximum protection to significant surface resources within the NPR-A, consistent with BLM's statutory directives." BLM's response to public comments asserted that full field development differs from the previous standard of allowing ConocoPhillips to "extract all possible oil and gas from its leases," but failed to explain what those differences are. BLM cited 43 C.F.R. § 3137.71(b)(1) as a basis for full field development but did not explain how a regulation concerning a lessee's continuing development obligations could constrain the agency's own review of reasonable alternatives. Finally, BLM failed to explain how full field development is consistent with its procedural or substantive obligations under NEPA, the Reserves Act, or ANILCA. As I discuss below, full field development—as best we can glean from the record—directly conflicts with several statutory requirements. *See infra* I.C.

The majority agrees that full field development is not explained or supported by 43 C.F.R. § 3137.71(b)(1) or the Willow Project's purpose and need statement, *see* Maj. at 25–27, but nonetheless concludes that an "anti-

segmentation" rationale justifies the agency's adoption of the full field development standard, Maj. at 27–29. Under this rationale, partial development options were permissibly excluded from consideration because they would "segment" the agency's NEPA analysis by inviting future permit applications to develop the remaining quantities of oil, as purportedly required under 43 C.F.R. § 3137.71(b)(1). In other words, evaluating partial development options would prevent BLM from analyzing the true extent of the Willow Project's current and future environmental impacts because it would not "disclose and analyze the impacts of full field development."

The anti-segmentation rationale is legally and logically untenable. Nothing in NEPA or its implementing regulations requires an agency to ignore partial development alternatives in favor of those that constitute full development. On the contrary, NEPA demands that agencies examine all "reasonable" alternatives to a proposed action, 40 C.F.R. § 1502.14(a) (2019), which necessarily includes alternatives that would mitigate significant adverse impacts to surface resources, even if doing so strands oil. Moreover, nothing in § 3137.71(b)(1) provides ConocoPhillips the right or obligation to develop all economically viable quantities of oil on leased lands or prevents BLM from denying future permit applications based on the adverse environmental impacts BLM itself has identified. As discussed above, § 3137.71(b)(1) merely describes the contents of a lessee's continuing development plan, and no regulation, including § 3137.71(b)(1), describes, explains, or implements BLM's full field development standard.

The agency's anti-segmentation logic does not withstand even passing scrutiny. For one, the notion that the agency cannot examine partial development options because such

alternatives would "not disclose and analyze the impacts of full field development" and would provide "false comparison[s]" to other alternatives presupposes that full field development of the Willow reserves must occur. Such circular reasoning demonstrates that the agency already made up its mind about the scope of development it would approve. We have repeatedly cautioned that NEPA review cannot be used "as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000).

Moreover, just because a partial development alternative might invite future permit applications, that does not constrain BLM's ability to evaluate the current and future environmental impacts of the Willow Project. A future application to develop other quantities of oil would require the agency to consider the immediate, indirect, and cumulative impacts of that proposed action in relation to the environmental impacts of the current agency action, as well as related projects. *See* 40 C.F.R. §§ 1508.7, 1508.8(a)–(b) (2019); *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 897 (9th Cir. 2002) ("NEPA . . . requires the assessment of the cumulative impact of 'individually minor but collectively significant actions taking place over a period of time.'" (quoting 40 C.F.R. § 1508.7)). It is BLM's responsibility to evaluate such impacts now and in the future when such contingencies arise. Anti-segmentation seems to boil down to a plea of convenience—the agency would prefer to avoid another environmental impact analysis down the road. But agency convenience cannot override BLM's statutory obligation to evaluate a reasonable range of alternatives.

The record itself also undermines the anti-segmentation rationale. For instance, the agency considered a No-Action

alternative, as required under 40 C.F.R. § 1502.14(d) (2019), and repeatedly affirmed that it could select that option in response to several public comments.  But the No-Action alternative would also invite future permit applications to develop the remaining oil in the Reserve.  And by approving modified Alternative E in the 2023 ROD, which the government concedes "does not allow ConocoPhillips to extract all economically viable oil from several of its leases," the agency did, in the end, open itself to another application to develop the remaining quantities of oil.[2]  These actions undercut any supposed need by the agency to avoid segmenting its environmental analysis.

The district court and majority's attempt to make sense of the agency's cursory responses to public comments by supplying a rationale that the agency did not explain oversteps the role of a reviewing court.  *See Encino Motorcars*, 579 U.S. at 224 ("It is not the role of the courts to speculate on reasons that might have supported an agency's decision" and courts "may not supply a reasoned basis for the agency's action that the agency itself has not given." (internal quotations and citations omitted)); *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021) ("[R]eviewing courts remain bound by traditional administrative law principles, including the rule that judges generally must assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise.").  Rather, our review is "limited to the

---

[2] BLM described the approved project as a "minor variation" of Alternative E.  Modified Alternative E's total oil production is 52.9 million fewer barrels (8.4%) than Conoco's proposal (Alternative B). Thus, although modified Alternative E does not fully develop the field, it corresponds to approximately 94% of the total possible extraction under Alternative E's full field development projections.

explanations offered by the agency in the administrative record," *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008), however flawed they may be.

BLM's failure to offer a reasonable explanation for the full field development standard is reason enough to vacate the agency's decision and remand for further proceedings. *See* 5 U.S.C. § 706(2)(A) ("The reviewing court shall . . . hold unlawful *and set aside* agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (emphasis added)).  We have consistently done so in NEPA challenges, which are reviewed under the Administrative Procedure Act. *See*, *e.g., Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50–52 (9th Cir. 2025) (affirming vacatur of BLM decision that failed to provide a reasoned explanation for a change in policy); *Organized Vill. of Kake v. United States Dep't of Agric.*, 795 F.3d 956, 969–70 (9th Cir. 2015) (en banc) (vacating an agency policy because "[t]he absence of a reasoned explanation for disregarding previous factual findings violate[d] the APA").[3]

Even if the agency's few comments and responses in the administrative record constitute adequate explanation of the full field development standard, the agency's decision must nevertheless be vacated because this standard cannot be reconciled with the procedural and substantive requirements of several governing statutory schemes.

---

[3] BLM's apparent reliance on an erroneous interpretation of 43 C.F.R. § 3137.71(b)(1) to adopt full field development is also a basis to vacate the agency's decision.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (explaining an action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider").

C.

Under NEPA and its implementing regulations, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action.  40 C.F.R. § 1502.14(a) (2019).  While, under the "rule of reason," the agency "need not consider an infinite range of alternatives, only reasonable or feasible ones," *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quotations and citation omitted), it must consider alternatives "varied enough to allow for a real, informed choice," *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008).[4]

Because the full field development standard lacks any basis in law, the Willow Project's purpose and need, or legitimate feasibility concerns, BLM's use of this standard to artificially constrain its examination of reasonable alternatives was patently unreasonable.  *See Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 876–78 (9th Cir. 2022) (holding that agency failed to consider a reasonable range of alternatives in its environmental assessment); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1051–54 (9th Cir. 2013) (holding that BLM's environmental assessment was deficient where the agency only meaningfully analyzed alternatives that reflected the same level of grazing); *State of Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (holding that an agency erred in failing to

---

[4] As the majority highlights, the Supreme Court recently reiterated that the "rule of reason" guides our review of the adequacy of an EIS's range of alternatives under NEPA.  *See Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, No. 23-975, slip op. at 12 (U.S. May 29, 2025).  In so doing, the Court affirmed the long-standing role of courts to "confirm that the agency has addressed environmental consequences and feasible alternatives as to the relevant project."  *Id.* at 9 (citation omitted).

consider an alternative because it "uncritically assume[d] that a substantial portion of the [project] areas should be developed and consider[ed] only those alternatives with that end result").

The record discloses that other viable development alternatives were excluded from the outset of the agency's supplemental review because they did not meet the full field development standard. For example, BLM excluded from consideration one alternative that would have eliminated two surface-disturbing drill sites and another alternative that would have prevented infrastructure in the Teshekpuk Lake Special Area (TLSA). These proposed alternatives would have kept infrastructure out of the TLSA, precluded infrastructure in important subsistence-use areas, reduced greenhouse gas emissions, or otherwise would have further reduced impacts to surface resources. The "existence of a viable but unexamined alternative renders the environmental review conducted under NEPA inadequate." *City of Los Angeles, Cal. v. Fed. Aviation Admin.*, 63 F.4th 835, 844 (9th Cir. 2023) (quotations and citation omitted). And BLM's exclusion of viable partial development alternatives without any reasonable justification is no exception.

Full field development also runs counter to the agency's mitigation obligations under the Reserves Act. While "[t]he government cannot . . . consistent with current statutory imperatives, forbid all oil and gas development," *N. Alaska Env't. Ctr. v. Kempthorne*, 457 F.3d 969, 976 (9th Cir. 2006), BLM retains the discretion, and indeed, is required to conduct its oil and gas leasing program with mitigation measures in mind. *See Kunaknana v. Clark*, 742 F.2d 1145, 1149 (9th Cir. 1984) ("[T]he Secretary was given the discretion to provide rules and regulations under which leasing *would* be conducted and was to develop restrictions

necessary to mitigate adverse impact on the NPR-A." (citation omitted)).

The Reserves Act requires the agency to "include or provide for such conditions, restrictions, and prohibitions as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the Reserve.  42 U.S.C. § 6506a(b); *see also* 43 C.F.R. §§ 3131.3; 3135.2(a).  Beyond surface resource protection, the Act also designates certain "special areas," including the TLSA, for which "[a]ny exploration . . . shall be conducted in a manner which will assure the *maximum protection* of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve."  42 U.S.C. § 6504(a) (emphasis added).  No reasonable interpretation of these mandates would permit an agency to categorically exclude any alternative that leaves behind "economically viable" quantities of oil.  This limitation flouts Congress' explicit directive to "maximize protection" of special areas and wholly disregards the Act's mitigation goals.

The majority missteps in concluding that BLM complied with the Reserves Act because the "SEIS and ROD contain specific elements designed to mitigate surface impacts, including in the TLSA."  Maj. at 36.  This reasoning glosses over the fact that BLM adopted these mitigation measures *after* artificially limiting its analysis to a set of narrow full development alternatives.   The "maximum protection" directive of § 6504(a) clearly signaled Congress's intent that agencies exercise the full extent of their authority, consistent with their other obligations, to safeguard sensitive areas such as the TLSA.  Because the record is undisputed that excluded alternatives would have provided greater protection for the TLSA and other surface resources, it cannot be the case that

BLM "assure[d] the *maximum protection* of such surface values" in special areas, 42 U.S.C. § 6504(a), or reasonably calculated what measures would be "necessary or appropriate" to  "mitigate reasonably foreseeable and significantly adverse effects on the surface resources," *id.* at § 6506a(b).  The majority fails to give effect or meaning to the Reserve Act's "maximum protection" and mitigation directives.  Nothing in the statutory text permits an agency to impose an arbitrary constraint on its authority to fulfill either of these objectives.

The full field development standard is also contrary to BLM's obligations under ANILCA.  It bears repeating that the Willow Project is the largest domestic oil drilling project on federal public lands.  These same lands, however, have supported subsistence activities in Alaska's North Slope for thousands of years, which in turn have ensured the survival of rural residents and their cultures.   Despite the unprecedented scale of Willow, this inherent tension between the development of Alaska's vast natural resources and local reliance on those resources for survival is not unique to this case.  Rather, Congress passed ANILCA against the backdrop of these competing interests, declaring as a matter of policy that Alaska's public lands must be utilized in a way that would "cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands."  16 U.S.C. § 3112(1).

To effectuate this intent, Congress expressly gave "priority" to non-wasteful subsistence uses of resources over the "taking on such lands of fish and wildlife for other purposes."  *Id.* at § 3114.  Accordingly, subsistence practices "may not be restricted unless necessary to protect the continued viability of fish and wildlife populations." *United States v. Alexander*, 938 F.2d 942, 945 (9th Cir. 1991)

(citation omitted).  In addition, § 810 of ANILCA provides that in land use and subsistence decisions, BLM "shall evaluate . . . other alternatives which would *reduce or eliminate*" the action's use of public lands needed for subsistence purposes.    16 U.S.C. § 3120(a) (emphasis added).  No development proposal may be approved until the agency has determined that significant restrictions on subsistence uses are "*necessary*," that "the proposed activity will involve the *minimal amount* of public lands necessary" to accomplish the proposal's objectives, and that "reasonable steps will be taken to *minimize* adverse impacts upon subsistence uses."  *Id.* at § 3120(a)(3) (emphases added).  This process is "intended to minimize the impact of a proposed project on resources which rural village residents of Alaska use for subsistence."  *City of Tenakee Springs v. Clough*, 915 F.2d 1308, 1310 (9th Cir. 1990).

BLM's full field development standard clearly contravenes these procedural and substantive obligations. As a practical matter, the limitation effectively prevents the agency from examining any alternative that would "reduce or eliminate the use . . . of public lands needed for subsistence purposes," 16 U.S.C. § 3120(a), because such alternatives would inevitably strand an economically viable quantity of oil on public lands.  The agency's practice of blindly eliminating any alternative that does not effectuate full field development is also plainly antithetical to Congress' stated intent to ensure that land-use decisions cause the "least adverse impact possible" on subsistence activities.  *Id.* at § 3112(1).

My colleagues conclude that the agency satisfied ANILCA's requirements, reasoning that while the agency must consider alternatives at "step one" of the § 810 analysis, "[t]he availability of alternatives is but one data

point that the agency must consider." Maj. at 43. "[N]othing in the text of § 810 establishes that the existence of alternatives that could have a lesser impact on public lands needed for subsistence bars BLM from proceeding with a proposed action," the majority explains. Therefore, because BLM's final SEIS and ROD provided a § 810 analysis of subsistence impacts among the full development action alternatives it considered, the agency's process satisfied ANILCA. Maj. at 45.

The majority's reasoning is untethered to the plain text and stated purposes of ANILCA. Consideration of a project's impacts on subsistence uses of public lands is not simply a "data point" or factor for the agency to consider and then cast aside. Rather, ANILCA expressly prohibits federal approval of any proposal that would "significantly restrict subsistence uses" unless and until the agency determines that such a restriction is "necessary" and the proposed activity "involve[s] the minimal amount of public lands necessary to accomplish the purposes [of that proposal]." 16 U.S.C. § 3120(a)(3). And while ANILCA may not require that the agency adopt the most protective alternative when faced with a range of options, *see Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544 (1987), the statutory text clearly requires that the agency at least *evaluate* more protective alternatives when doing so may "reduce or eliminate" the use or disposition of public lands needed for subsistence purposes. 16 U.S.C. § 3120(a).

The majority notably fails to grapple with the above portions of ANILCA's plain text and statements of congressional intent. It is difficult to see, for example, how BLM's chosen alternative—modified Alternative E—was "necessary" and involved a "minimal amount of public lands" used for subsistence purposes when the agency

refused to consider other alternatives that afforded greater
protection for subsistence uses from the outset. A finding of
necessity requires the agency to engage in a good faith
comparative analysis of real alternatives. In short, ANILCA
does not permit the agency to disregard every viable
alternative that would realistically reduce or eliminate
impacts to subsistence lands simply because these
alternatives do not fully develop the Willow Project.[5] Nor
was BLM's error at step one of the § 810 analysis saved by
its consideration of mitigation measures for only the most
extractive development alternatives the agency did review.
In the same way that the majority fails to give effect or
meaning to the Reserve Act's "maximum protection" to
sensitive areas, the majority similarly fails to give effect to
Congress's stated goal that land use decisions cause the
"least adverse impact possible" on subsistence, *id.* at
§ 3112(1), and the "necessity" requirements underlying its
procedural review of alternatives, *id.* at § 3120.

D.

The majority acknowledges that errors were committed
by the agency but concludes that vacatur is not warranted
because BLM's errors were "procedural," not "substantive"
in nature and therefore not "serious." Maj. at 62.
Respectfully, I disagree. As the majority points out, this
court will remand without vacatur *only* "in limited

---

[5] For this reason, Appellants' ANILCA claim does not rise and fall with
their NEPA challenge. Unlike NEPA, ANILCA adds a substantive
condition to the type of alternatives the agency must consider when
approving projects that significantly restrict subsistence uses. *See* 16
U.S.C. § 3120(a). In contrast, NEPA affords comparatively greater
discretion to the agency to consider alternatives that the agency
determines are "reasonable." *See* 40 C.F.R. § 1502.14(a) (2019); 42
U.S.C. § 4332(2)(C)(iii).

circumstances." *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012) (per curiam). Here, BLM's full field development standard is unexplained, grounded in an erroneous interpretation of a regulation, and contrary to the agency's obligations under NEPA, the Reserves Act, and ANILCA. The agency's improper reliance on this standard at the outset of its supplemental analysis infected each determination that the agency subsequently made.

Given the extent of agency error, I see no reason to deviate from the typical remedy our cases and the APA have required under such circumstances. *See* 5 U.S.C. § 706 ("The reviewing court shall . . . hold unlawful *and set aside* agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (emphasis added)); *Cal. Wilderness Coal. v. U.S. Dept. of Energy*, 631 F.3d 1072, 1095 (9th Cir. 2011) ("When a court determines that an agency's action failed to follow Congress's clear mandate the appropriate remedy is to vacate that action."); *see also 350 Mont. v. Haaland*, 50 F.4th 1254, 1259 (9th Cir. 2022) ("The presumptive remedy for violations of NEPA and the Administrative Procedure Act is vacatur." (citing 5 U.S.C. § 706)).

## II.

CBD argues that BLM, the Fish and Wildlife Service (FWS), and the National Marine Fisheries Service (NMFS) (collectively, the Services) violated Section 7 of the ESA by failing to conduct formal consultation on the effects of the Willow Project's greenhouse gas emissions on the designated habitats of polar bears and ice seals. Section 7 "requires federal agencies to ensure that none of their activities, including the granting of licenses and permits, will

jeopardize the continued existence of listed species or adversely modify a species' critical habitat." *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1020 (9th Cir. 2012) (en banc) (citation omitted).

As the largest domestic drilling project on federal lands, it is estimated that the Willow Project will produce 576 million barrels of oil over its thirty-year lifespan and cause 239 million metric tons of indirect greenhouse gas emissions to be released into the atmosphere. FWS acknowledged that "[b]ecause the polar bear depends on sea ice for its survival, loss of sea ice due to climate change is its largest threat worldwide," and concluded that the project was "likely to adversely affect" polar bears.

Despite the well-established scientific linkages between carbon emissions and climate change, melting sea ice, and threatened habitats for protected species, BLM and the Services concluded that they did not need to engage in formal consultation on the effects of greenhouse gas emissions resulting from the Willow Project on polar bears or ice seals. In making that determination, the agencies relied on the ESA's implementing regulations, which require formal consultation only for those consequences that "would not occur but for the proposed action and [are] reasonably certain to occur." 50 C.F.R. § 402.02. The agencies also apparently relied on guidance from 2008 determining that "a proposed action that will involve the emission of [greenhouse gases] cannot pass the 'may affect' test, and is not subject to consultation under the ESA and its implementing regulations" because "the causal link simply cannot currently be made between emissions from a proposed action and specific effects on a listed species or its critical habitat." U.S. Dep't of Interior, M-37017, "Guidance on the Applicability of the Endangered Species

Act's Consultation Requirements to Proposed Actions Involving the Emission of Greenhouse Gases" (October 3, 2008).

CBD does not challenge this regulatory scheme or guidance, and therefore any inquiry into the validity of the but-for causation standard is not before this court.[6] Under the but-for causation standard, I agree with the majority that CBD has not established that BLM and the Services' decision not to engage in formal consultation was arbitrary and capricious. Maj. at 54–61. Nonetheless, I question whether the but-for causation requirement aligns with the text and purpose of the ESA.

Following the Supreme Court's decision in *Loper Bright Enters. v. Raimundo,* we need not defer to an agency's interpretation of a statute's ambiguity. 603 U.S. 369, 412–13 (2024). Although we may "seek aid from the interpretations of those responsible for implementing particular statutes," our role under the APA "is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 394–95.

The Supreme Court has explained that "examination of the language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174 (1978). Consistent with Congress's intent, Section 7 requires that federal agencies, "in consultation with and with the assistance of" FWS or NMFS, "insure that any action authorized, funded, or carried out by

---

[6] As noted above, I agree with the majority's conclusion that CBD has standing to assert this claim because its asserted injuries are fairly traceable to the defendants' challenged conduct. *See* Maj. at 46–54.

such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat based on "the best scientific and commercial data available."    16 U.S.C. § 1536(a)(2).    Accordingly, "[t]he only question is whether the agency's proposed action is likely to have an adverse effect on listed species or critical habitats." *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1054 (9th Cir. 2024).    And we have held that the "minimum threshold for an agency action to trigger consultation . . . is low," *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011), and that agencies must analyze even imprecise consequences of a large development project, *see Conner v. Burford*, 848 F.2d 1441, 1453–54 (9th Cir. 1988).

Notably, nowhere in the text of Section 7 did Congress exempt consultation for actions that fail to meet a strict but-for causation standard but will nonetheless contribute to adverse impacts on listed species or their designated critical habitats.    On the contrary, the ESA requires reliance on the "best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), which does not demand a perfect causal connection.    A broader understanding of the purpose and requirements of Section 7 would reflect the "conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth.,* 437 U.S. at 185; *Karuk Tribe of Cal.,* 681 F.3d at 1020.    Strict adherence to a but-for causation requirement runs counter to the high priority Congress has placed on the protection of endangered species and its intent to prevent species' "slow slide into oblivion." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,* 524 F.3d 917, 930 (9th Cir. 2008).

Though climate science has certainly progressed since 2008,[7] there is no telling whether scientific development in our time, or in generations to come, will allow for direct attribution between a project's particular greenhouse gas emissions and its climate consequences. *See*, *e.g.*, Michael Burger, et al., *The Law and Science of Climate Change Attribution*, 45 Colum. J. Env't L. 57, 201 (2020) ("[T]he problem for proving climate harms here is clear: emissions of any one actor, or even any small set of actors, will be difficult to pin down as a 'but-for' cause of impacts arising from anthropogenic climate change."); Douglas A. Kysar, *What Can Climate Change Do About Tort Law*, 41 Env't. L. 1, 30–34 (2011) (noting "conceptual and empirical difficulties" with but-for causation requirements in the context of tort litigation arising from climate change harms); Richard J. Lazarus, *Super Wicked Problems and Climate Change: Restraining the Present to Liberate the Future*, 94 Cornell L. Rev. 1153, 1159–79 (2009) (highlighting the barriers to legislative reform posed by the temporal and spatial distance between the causes and effects of climate change). Nonetheless, this dilemma should not allow an agency to cast aside their formal consultation obligations when presented with evidence that their actions will, albeit indirectly, adversely impact listed species.[8] Such a result defies both logic and law.

---

[7] The agencies' continued reliance on dated 2008 guidance is also questionable, given the ESA's directive that agencies use the "best scientific and commercial data available" in making consultation determinations under the statute. 16 U.S.C. § 1536(a)(2).

[8] In his concurrence, Judge Nelson suggests that agencies have no duty to engage in formal consultation for climate impacts because they are

Indeed, this case does not sound in vague claims of harm arising from distant climate-forcing actions. The cause and relevant effects of the Willow Project are discreetly located in the North Slope, a region that remains uniquely vulnerable to the impacts of the climate crisis. FWS acknowledged that the loss of sea ice from climate change is the greatest threat to polar bears and certain ice seals. BLM determined that the Willow Project will release significant greenhouse gas emissions, that those emissions will cause ice loss, and that sea ice loss impacts protected animals. Yet, by demanding scientific precision to meet a strict legal requirement that finds no basis in the text or purpose of the ESA, the current regulatory framework governing formal consultation has fully exempted the climate impacts of the largest domestic oil drilling project on federal public lands from Section 7's procedural mandate. This case is perhaps the best evidence that a change in the regulatory scheme is past due. But that task belongs to the Services, Congress, or another court.

---

"powerless to stop a consequence to a protected species or habitat that will occur despite the proposed action." Concurrence at 67. That is simply not true. Even if one cannot establish a but-for causal link between a proposed action and its climate consequences on specific species and their designated habitats, agencies are not "powerless" to mitigate the harms from climate-forcing actions. Formal consultation can inform an agency's mitigation strategies, which in turn helps prevent the very problem of species extinction that the ESA was designed to address. As the Supreme Court explained in *Massachusetts v. EPA*, "[a]gencies, like legislatures, do not generally resolve massive problems in one fell regulatory swoop. . . . They instead whittle away at them over time, refining their preferred approach as circumstances change and as they develop a more nuanced understanding of how best to proceed." 549 U.S. 497, 524 (2007).

## GLOSSARY OF ACRONYMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| ANILCA | Alaska National Interest Lands Conservation Act |
| BiOp | Biological Opinion |
| BLM | Bureau of Land Management |
| BTU | Bear Tooth Unit |
| CBD | Center for Biological Diversity |
| EIS | Environmental Impact Statement |
| FWS | U.S. Fish and Wildlife Service |
| NMFS | National Marine Fisheries Service |
| NPR-A | National Petroleum Reserve-Alaska |
| NEPA | National Environmental Policy Act |
| ROD | Record of Decision |
| SEIS | Supplemental Environmental Impact Statement |
| SILA | Sovereign Iñupiat for a Living Arctic |
| TLSA | Teshekpuk Lake Special Area |